# EXHIBIT 1

2021 WL 1205625
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

HALMAN ALDUBI PROVIDENT AND
PENSION FUNDS LTD., Plaintiff,
v.
TEVA PHARMACEUTICAL INDUSTRIES
LIMITED, et al., Defendants.

CIVIL ACTION NO. 20-4660-KSM
|
Filed 03/26/2021

**MEMORANDUM**

MARSTON, J.

 **\*1**  This is a putative class action in which Plaintiff Halman Aldubi Provident and Pension Funds ("Halman Aldubi"), in its individual capacity and on behalf of others similarly situated, alleges that Defendants Teva Pharmaceutical Industries Limited and its former officers Erez Vigodman, Eyal Desheh, Robert Koremans, and Michael Derkacz (the "Individual Defendants")[1] (collectively, "Teva")[2] violated securities laws by making false and misleading statements. (Doc. No. 1.) Specifically, Halman Aldubi accuses Teva, a pharmaceutical company, of misleading investors about the profitability of one of Teva's drugs, Copaxone, as Teva allegedly did not disclose that it made illegal kickback payments as part of a scheme to inflate Copaxone sales. (*Id.*) Halman Aldubi claims that when Teva's misconduct was publicly disclosed on August 18, 2020, the price of Teva's shares dropped precipitously, causing significant losses to investors who held Teva stock at the time. (*Id.*)

Securities class actions are governed by the Securities Exchange Act of 1934, as modified by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Pursuant to those Acts, courts before which a securities class action is pending have an obligation to appoint a lead plaintiff to represent the interests of the purported class in the litigation. 15 U.S.C. § 78u-4(a)(3)(B)(i). Presently pending before the Court are motions from two movants—Menorah and Clal[3] and The Investor Group[4]—who wish to be appointed as lead plaintiff

in this matter and to have their choice of counsel approved as lead counsel for the putative class. (Doc. Nos. 8 & 9.) For the reasons that are discussed below, the Court will appoint The Investor Group, consisting only of Gerald Forsythe, as lead plaintiff and will approve Faruqi & Faruqi, LLP as lead counsel.

## I. BACKGROUND

### A. The Alleged Misconduct[5]

 **\*2**  Teva is a pharmaceutical company that produces Copaxone,[6] "a prescription drug that is used to treat relapsing forms of multiple sclerosis." (Doc. No. 1 at ¶ 3.) Throughout the class period, which is October 29, 2015 to August 18, 2020, Teva described Copaxone as its "leading specialty medicine" and reported consistently high sales and revenues for the drug. (*Id.* at ¶ 22, 23, 27–28, 31, 33, 36, 40, 42, 44, 46–48.) For instance, in the third quarter of 2015, Copaxone accounted for 22% of Teva's revenue. (*Id.* ¶ 23.) Teva explained that Copaxone performed so well because there was a high demand for it, patients were able to get it, and it was safe and effective. (*Id.* ¶ 22.) Furthermore, Teva and the Individual Defendants also consistently represented in public statements and filings with the Securities and Exchange Commission ("SEC") that Copaxone would be a sustainable source of revenue for the company. (*See id.* at ¶¶ 25–26, 30, 32, 34–35.)

Unfortunately for Teva's shareholders, Copaxone's success was not the unmitigated boon it seemed. On August 18, 2020, the Department of Justice announced that it had filed a civil action against Teva under the False Claims Act, alleging that Teva had paid illegal kickbacks to two non-profit foundations with the understanding that the foundations would use the money to cover patients' Medicare copays for their Copaxone prescriptions. (*Id.* at ¶ 52.) When traders learned of this news, Teva's stock price fell $1.11, a 9.6% decrease from its price at close of trading the previous day. (*Id.* at ¶ 53.) Not only did the stock price fall sharply, but trading in Teva securities was "unusually heavy" on August 18. (*Id.*)

### B. This Lawsuit is Filed
Halman Aldubi filed this lawsuit as a putative class action on September 23, 2020. (Doc. No. 1.) Halman Aldubi claims that as a result of Teva's allegedly fraudulent statements, it and others who owned shares of Teva stock during the class period suffered damages. (*Id.* at ¶ 55.) According to Halman Aldubi, this is so because Teva's investors were deceived by Teva's

fraudulent statements, and purchased shares of Teva stock at artificially inflated prices. (*Id.* at ¶ 66.) When the truth came out, Teva's investors lost money as the market value of their shares rapidly declined. (*Id.* at ¶ 71.) As such, Halman Aldubi claims that it and others are entitled to recoup their damages from Teva and the Individual Defendants. (*See id.* at ¶¶ 73, 79; *see also id.* at p. 28 (prayer for relief).)

Pursuant to the PSLRA's notice requirement, *see* 15 U.S.C. § 78u-4(a)(3)(A)(i), Halman Aldubi published a notice of this lawsuit in *PRNewswire*, a nationally circulated business-oriented publication, on September 23, 2020. (Doc. No. 8-4.)[7] Under the PSLRA, class members had 60 days from September 23 to file a motion to be appointed as lead plaintiff of the purported class. 15 U.S.C. § 78u-4(a)(3)(A)(i)(II). In response to the *PRNewswire* notice, two movants—Menorah and Clal and The Investor Group—filed applications to be named the lead plaintiff in this matter.[8] The movants also filed replies, sur-replies, and sur-sur-replies to each other's filings.[9]

**\*3** On March 1, 2021, this matter was reassigned to the Honorable Karen Spencer Marston. (Doc. No. 37.) On March 3, 2021, the Court held a telephonic status conference with the parties to discuss the next steps to be taken in this case. (*See* Doc. No. 44.) Then, on March 15, 2021, the Court conducted oral argument on Menorah and Clal and The Investor Group's motions to be appointed lead counsel. (*See* Doc. No. 51.)

### C. Potential Lead Plaintiffs

#### 1. Menorah and Clal

Menorah and Clal is comprised of five entities: Menorah Mivtachim Insurance, Ltd.; Menorah Mivtachim Pension & Gemel, Ltd.; Menorah Mivtachim and the Federation of Engineers Provident Fund Management Ltd.; Clal Insurance Company Ltd.; and Clal Pension & Provident Ltd. (*See* Doc. No. 9 at p. 1.) Although the Menorah entities and the Clal entities are members of two separate corporate families, they have worked together as members of lead plaintiff groups in another securities class action, *Jansen v. International Flavors & Fragrances Inc.*, No. 1:19-cv-07536 (S.D.N.Y.). (Doc. No. 9-6 at ¶ 5.) Both the Menorah and the Clal entities have extensive experience acting as lead plaintiffs in securities class actions. In the last three years alone, they have participated as lead plaintiffs in a combined four securities class actions, including the *Jansen* matter in which they were co-lead plaintiffs. (Doc. No. 9-5 at pp. 1–2, 3, 5–6, 13, 15.)

During the class period, Menorah and Clal owned multiple types of Teva securities, "including both ... common stock and bonds." (Doc. No. 9-1 at p. 18.) Menorah and Clal suffered significant damages as a result of Teva's allegedly fraudulent statements. Calculated on a first-in, first-out ("FIFO") basis, they lost $436,573,220. (Doc. No. 9-1 at p. 6.) Calculated on a last-in, first-out ("LIFO") basis, their damages were $372,626,348.[10] (*Id.*)

Menorah and Clal informed the Court that they are represented by two law firms in this matter: Pomerantz LLP and Kaskela Law LLC.[11] (*See id.* at pp. 19–20.) Pomerantz is to serve as lead counsel, and Kaskela is to be liaison counsel. (*Id.*) Both firms have extensive and impressive experience representing plaintiff classes in securities actions. Combined, they have represented plaintiffs in dozens of securities class actions, and have recovered billions of dollars on behalf of their clients. (*See* Doc. No. 9-7 at pp. 2–6; Doc. No. 9-8 at p. 1.) Moreover, their attorneys have extensive experience in securities fraud class actions, including in matters that were litigated in the Eastern District of Pennsylvania. (*See, e.g.*, Doc. No. 9-7 at p. 39; Doc. No. 9-8 at p. 1.)

**\*4** The Menorah and the Clal entities have both submitted their retainer agreements with Pomerantz to the Court in support of their motion for appointment as lead plaintiff in this matter.[12] With the exception of the names of the relevant parties, the two agreements are identical. Both agreements provide the same fee structure Pomerantz will use in its motion for attorneys' fees, should it be appointed as lead counsel in this matter and succeed in recovering damages on behalf of the class:

   a) Amounts recovered up to $100 million—19%

   b) Amounts recovered between $100 million - $200 million – 18%

   c) Amounts recovered from $200 million to $300 million – 17%

   d) Amounts recovered from $300 million to $500 million – 15%

   e) Amounts recovered above $500 million – 12.5%

In other words, Pomerantz's proposed recovery of attorneys' fees is on a sliding scale; the greater the class's ultimate damages, the lower Pomerantz's percentage fee.

### 2. The Investor Group

As of March 11, 2021, there are now two members of The Investor Group: Gerald Forsythe, an individual investor, and the Dekalb County Pension Fund (the "Pension Fund").[13] (Doc. No. 8-5 at pp. 6, 8.) During the class period, The Investor Group suffered approximately $2,067,327.65 in losses that it says are attributable to Teva's alleged fraud—$1,067,327.65 in losses suffered by the Pension Fund, and "approximately $1 million in losses" suffered by Mr. Forsythe.[14] (Doc. No. 8-1 at p. 11; Doc. No. 35 at pp. 3, 5.) Although they have expressed their willingness to work together to prosecute this action and have put procedures in place to help facilitate that process, Mr. Forsythe and the Pension Fund do not have a pre-existing relationship. (Doc. No. 8-3 at ¶¶ 8, 10, 13–14.) Mr. Forsythe has not served as a lead plaintiff in a securities class action. (See Doc. No. 8-5 at p. 6.) However, the Pension Fund has extensive experience actively participating in securities class actions, and in the last three years it has twice been selected to serve as a lead plaintiff in one of these actions. (See Doc. No. 8-5 at p. 8.)

The Investor Group has selected Faruqi & Faruqi, LLP as its counsel in this matter. (Doc. No. 8-1 at pp. 13–16.) Faruqi & Faruqi is "a minority-owned and woman-owned law firm" with extensive experience litigating securities class actions, including securities fraud actions. (Doc. No. 8-1 at p. 13; see also Doc. No. 8-7 at p. 2.) The firm has represented plaintiffs in dozens of such matters and has recovered hundreds of millions of dollars on behalf of its clients in those cases. (Doc. No. 8-6 at pp. 2–7.) Faruqi & Faruqi's attorneys also have extensive experience litigating in the Eastern District of Pennsylvania. (See, e.g., id. at pp. 15–16, 21, 23.)

**\*5** In support of their motion for appointment as lead plaintiff, Mr. Forsythe and the Pension Fund have submitted their retainer agreements with Faruqi & Faruqi to the Court. The agreements are largely identical, but differ in one important respect. While Faruqi & Faruqi's agreement with the Pension Fund limits their attorneys' fees to "no more than to [sic] 28% of the gross recovery" by the class in this matter, their agreement with Mr. Forsythe provides only that "the Firm will seek that the Court make an award of attorney's fees and expenses to the Firm at the successful conclusion of the case to be paid from the recovery for the Class." In other words, Faruqi & Faruqi's agreement with the Pension Fund provides a maximum recovery of attorneys' fees—28 percent of whatever damages the class is able to recover in this matter

—while their agreement with Mr. Forsythe places no limit on their maximum recovery of attorneys' fees.[15]

## II. STANDARD OF REVIEW

The PSLRA "establishe[s] a two-step process for appointing a lead plaintiff: the court first identifies the presumptive lead plaintiff, and then determines whether any member of the putative class has rebutted that presumption." *In re Cendant Corp. Litig.*, 264 F.3d 201, 262 (3d Cir. 2001). The Act provides a "rebuttable presumption" that the "most adequate plaintiff" is the class member or group of class members that (1) "has either filed the complaint or made a motion in response to a notice," (2) "has the largest financial interest in the relief sought by the class," and (3) "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii). A fourth factor, though not explicitly identified as such in the PSLRA, is Congress's preference that institutional investors serve as lead plaintiffs in securities class actions. *In re Vicuron Pharms., Inc. Sec. Litig.*, 225 F.R.D. 508, 511 (E.D. Pa. 2004); *see also In re Cendant Corp. Litig.*, 264 F.3d at 244.

The first and fourth elements of the PSLRA test for the appointment of a presumptive lead plaintiff are self-explanatory. As for the second element, the Court "should consider, among other things: (1) the number of shares that the movant purchased during the putative class period; (2) the total net funds expended by the plaintiffs during the class period; and (3) the approximate losses suffered by the plaintiffs." *In re Cendant Corp. Litig.*, 264 F.3d at 262; *see also In re Party City Sec. Litig.*, 189 F.R.D. 91, 105 (D.N.J. 1999) (identifying "the number of net shares purchased by the movant during the Class Period" as an additional factor for courts to consider (quoting *Lax v. First Merchs. Acceptance Corp.*, Nos. 97 C 2715, et al., 1997 WL 461036, at \*5 (N.D. Ill. Aug. 11, 1997)). Of these factors, courts focus most strongly on the losses suffered. *In re Vicuron Pharms., Inc. Sec. Litig.*, 225 F.R.D. at 511.

Last, under the third element, the Court looks to Rule 23. Rule 23(a) lists four requirements governing whether a lawsuit should be designated as a class action:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interest of the class.

Fed. R. Civ. P. 23(a). At this stage, typicality and adequacy of representation are the only requirements relevant to the lead plaintiff determination, and movants seeking to be appointed as the lead plaintiff have to make only a *prima facie* showing that these requirements are satisfied. *See In re Cendant Corp. Litig.*, 264 F.3d at 263 ("The initial inquiry ... should be confined to determining whether the movant has made a *prima facie* showing of typicality and adequacy.").

**\*6** Under Rule 23, there is a " 'low threshold' for typicality": provided "the interests of the class and the class representative are aligned," courts will find typicality even when class members' claims are only legally similar, and not factually similar. *In re Nat'l Football League Players*, 821 F.3d at 427–28 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182–83 (3d Cir. 2001)). In securities class actions, courts "consider whether the circumstances of the movant with the largest losses 'are markedly different or the legal theory upon which the claims of that movant are based differ from that upon which the claims of other class members will perforce be based.' " *In re Cendant Corp. Litig.*, 264 F.3d at 265 (quoting *Hassine v. Jeffes*, 846 F.2d 169, 177 (3d Cir. 1988)) (alterations adopted).

Courts considering adequacy of representation under Rule 23 examine both "the qualifications of class counsel and the class representatives." *In re Nat'l Football League Players*, 821 F.3d at 428. Under this prong of the analysis, courts seek "to root out conflicts of interest within the class" and to "uncover conflicts of interest between the named parties and the class they seek to represent." *Id.* at 428, 430 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). "A class representative must represent a class capably and diligently," but this is a low bar: " 'a minimal degree of knowledge' about the litigation is adequate." *Id.* at 430 (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007)). "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *In re Cmty. Bank of N. Va.*, 795 F.3d at 393 (quoting *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012)). In securities class actions, in addition to potential conflicts of interest, courts consider a movant's willingness and ability to prosecute the action, obtain competent class counsel (with a reasonable retainer), and (when the movant is a group) work together effectively with other members of the group in representing the class's interests. *In re Cendant Corp. Litig.*, 264 F.3d at 265–66.

Once the presumption has been triggered, the Court's duty is to determine whether the presumptive lead plaintiff will be able to fairly and adequately represent the interests of the class, or "is subject to unique defenses that render [them] incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). The Court does not ask "whether another movant might do a better job of protecting the interests of the class than the presumptive lead plaintiff; instead, the question is whether anyone can prove that the presumptive lead plaintiff will not do a fair and adequate job." *In re Cendant Corp. Litig.*, 264 F.3d at 268 (cleaned up). "If no class member succeeds in rebutting the presumption, then the district court should appoint the presumptive lead plaintiff as the lead plaintiff." *Id.* If the presumption has been rebutted, then the Court restarts the process with the remaining movant who "has the highest financial interest in the class's recovery." *Id.*

## III. DISCUSSION

### A. Appointing a Lead Plaintiff

#### 1. Menorah and Clal

The Court first considers whether Menorah and Clal is the presumptive lead plaintiff. Having determined that it is, the Court next considers whether The Investor Group has provided sufficient evidence to rebut the presumption. The Court concludes that it has, and that Menorah and Clal will not be named lead plaintiff in this matter.

#### a. Presumptive Lead Plaintiff

**\*7** There is no question that, with FIFO losses of $436,573,220 and LIFO losses of $372,626,348, Menorah and Clal have made a *prima facie* showing that they are the presumptive lead plaintiff movant. Indeed, Menorah and Clal's losses so dwarf The Investor Group's that the Court need not consider the other factors sometimes used to determine which lead plaintiff movant has the strongest financial interest in this litigation. *See Grodko v. Cent. Eur. Distrib. Corp.*, Civil Action Nos. 12-5530 (JBS-KMW), 12-5531 (JBS-KMW), 2012 WL 6595931, at \*10 (D.N.J. Dec. 17, 2012); *see also In re Vicuron Pharms., Inc. Sec. Litig.*, 225 F.R.D. at 511 (identifying losses suffered as the most important factor for a court to consider when determining which lead plaintiff movant has the largest

financial interest in the outcome of the case). This conclusion is buttressed by The Investor Group's concession that Menorah and Clal qualifies as the presumptive lead plaintiff having shown that they have suffered the largest loss. (Hr'g Tr. at 20:15–17.)

As for the Rule 23 typicality and adequacy requirements, Menorah and Clal have made a *prima facie* showing that these are satisfied. As to typicality, Menorah and Clal assert that they have suffered damages because they purchased shares at prices artificially inflated by Teva's false and misleading statements, which shares lost value when Teva's alleged misconduct was disclosed. (Doc. No. 9-1 at pp. 13–14.) These "claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Beck v. Maximus, Inc.*, 457 F.3d 291, 295–96 (3d Cir. 2006) (quoting *Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994)).

Adequacy, too, is met. As a starting point, a party seeking to represent others in a class action must have standing to do so. *Wood v. Saroj & Manju Invs. Phila. LLC*, Civil Action No. 19-2820-KSM, 2020 WL 7711409, at *5 (E.D. Pa. Dec. 28, 2020). Here, Menorah and Clal claim that they were harmed by Teva's alleged misconduct and seek damages to redress their harm. (*See* Doc. No. 9-1 at pp. 13–14.) This is sufficient to make a *prima facie* showing of standing. Further, Menorah and Clal's motion to be appointed lead plaintiff does not evidence a conflict with other members of the class, as Menorah and Clal have an incentive to maximize their recovery of damages. Further, they have selected competent and experienced class counsel, and, as shown by their past experience working together as lead plaintiffs in securities class actions, have the ability to work together effectively as a lead plaintiff group. (*See id.* at pp. 14–18.) Thus, on their papers, Menorah and Clal made a *prima facie* showing that they satisfy Rule 23's typicality and adequacy requirements.

Last, as large institutional investors, Menorah and Clal fulfill Congress's preference, implicit in the PSLRA, to have institutional investors serve as lead plaintiffs in securities class actions. *In re Vicuron Pharms., Inc. Sec. Litig.*, 225 F.R.D. at 511; *see also In re Cendant Corp. Litig.*, 264 F.3d at 244.

The Court therefore finds that Menorah and Clal qualify as the presumptive lead plaintiff in this matter. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii); *In re Cendant Corp. Litig.*, 264 F.3d at 244.

#### b. Rebutting the Presumption

The Court now turns to whether The Investor Group has rebutted the presumption that Menorah and Clal should be appointed lead plaintiff in this action. The Investor Group raises three arguments to rebut the presumption. First, they argue that Menorah & Clal, and their attorneys, are pursuing a separate action against Teva in the District of Connecticut, which will necessitate arguments which are in direct conflict with the position the lead plaintiff must take in this case. Second, The Investor Group asserts that Menorah and Clal should be disqualified because they failed to disclose that Pomerantz agreed to jointly prosecute this action with two Israeli law firms. Third, the Investor Group contends that in the event Teva goes bankrupt, Menorah and Clal, based on its District of Connecticut lawsuit, could be competing as unsecured creditors with class members in this matter. The Court addresses each of these arguments in turn.

#### i. The Connecticut Action

**\*8** Courts consider potential conflicts of interest between plaintiffs when deciding who to appoint as the lead plaintiff in a securities class action. *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d at 265 (citing *Hassine*, 846 F.2d at 179 ); *A1 Credit Co. v. RAIT Fin. Tr.*, Civil Action No. 2:07-cv-03148-LDD, 2007 WL 9677273, at *3 (E.D. Pa. Oct. 25, 2007); *Janovici v. DVI, Inc.*, Nos. Civ.A.2:03CV04795-LD, et al., 2003 WL 22849604, at *12 (E.D. Pa. Nov. 25, 2003); *A.F.I.K. Holding SPRL v. Fass*, 216 F.R.D. 567, 574 (D.N.J. 2003); *Roth v. Knight Trading Grp., Inc.*, 228 F. Supp. 2d 524, 531 (D.N.J. 2002).[16] Similarly, courts handling these types of actions keep an eye on potential conflicts of interest between class counsel and the class. *See, e.g., In re AT&T Corp.*, 455 F.3d 160, 168 (3d Cir. 2006); *Wayne Cty. Emps.' Ret. Sys. v. Mavenir, Inc.*, Civil Action No. 18-1229-CFC-SRF, 2019 WL 3494734, at *3–4 (D. Del. Aug. 1, 2019).[17]

However, the mere existence of a conflict of interest is not enough to disqualify a presumptive lead plaintiff; rather, the conflict must be sufficiently strong that it overcomes the presumption. *A1 Credit Co.*, 2007 WL 9677273, at *3; *Grodko v. Cent. Eur. Distrib. Corp.*, Civil Action Nos. 12-5530 (JBS-KMW), 12-5531 (JBS-KMW), 2012 WL 6595931, at *9 (D.N.J. Dec. 17, 2012). And, where the

conflict is between the presumptive lead plaintiff's chosen counsel and the members of the class, the solution is to "advise the plaintiff about [the issue] and ask him whether he would be willing to serve as lead, even if the court were to disapprove his choice of counsel and he were forced to seek the services of another attorney." *Grodko*, 2012 WL 6595931, at *9 (quoting *In re Cavanaugh*, 306 F.3d 726, 733 n.12 (9th Cir. 2002)).

The Third Circuit has held that *de minimus* conflicts between a lead plaintiff and the remainder of the class do not defeat Rule 23's adequacy requirement. *Dewey*, 681 F.3d at 184. Rather, the conflicts must be "fundamental." *Id.* (collecting cases).

Here, The Investor Group argues that Menorah and Clal face such a fundamental conflict of interest. (*E.g.*, Doc. No. 12 at pp. 10–11.) Menorah and Clal, as part of a group of twenty-two institutional investors, have filed a securities action against Teva in the District of Connecticut in which they allege that Teva made fraudulent statements to disguise its violations of antitrust laws, artificially inflating its share prices. (*See* D. Conn. Dkt. No. 3:17-cv-00558-SRU, Doc. No. 391 at ¶ 1.) Among the many allegations in the complaint is that Teva made statements partially disclosing its misconduct, which statements caused its share prices to fall. (*Id.* at ¶¶ 518–24.) This direct action against Teva has been consolidated for pre-trial purposes with a securities class action against Teva, also in the District of Connecticut. (*See* D. Conn. Dkt. No. 3:17-cv-00558-SRU, Doc. No. 341.)

**\*9** The Investor Group argues that Menorah and Clal's conflict arises because certain statements were alleged as partial disclosures with a deflationary impact in the Connecticut action, and yet, these same statements arguably have artificially *inflated* Teva's share prices in this matter. (Doc. No. 12 at pp. 13–14.) The Investor Group argues it would be untenable for Menorah and Clal and their counsel to argue that these certain statements were both inflationary and deflationary. (*See id.*)

Unsurprisingly, Menorah and Clal see things differently. They argue that a company's share price can both lose value due to the disclosure of some misconduct, yet remain artificially inflated as other misconduct remains undisclosed. (Doc. No. 29 at pp. 9–11.) A sophisticated damages expert, they say, could convincingly disaggregate the deflationary aspect of one portion of a statement from the inflationary aspect of another portion of the same statement. (*Id.* at pp. 11–12.) As

such, Menorah and Clal claim there is no conflict between their position in the Connecticut action and the position they would need to take on behalf of the class here. (*Id.*)

The Court disagrees. The reality is that the parties to the Connecticut actions have an incentive to argue that Teva's statements partially disclosing its alleged violation of antitrust laws deflated its share prices. And, to maximize their damages, they have an incentive to argue that the deflationary impact of those statements was as high as possible. In this matter, however, the putative class has an incentive to argue that some of the same statements at issue in the Connecticut actions inflated Teva's share prices by not disclosing Teva's alleged involvement in a kickback scheme. Then, to maximize their damages in the instant action, they have an incentive to argue that the inflationary impact of those statements was as high as possible. If Menorah and Clal were appointed lead plaintiff in this matter, they would be forced to make an argument that directly contradicts their argument in the Connecticut action.[18]

It is true, as Menorah and Clal argue, that a disinterested and sophisticated expert economist could arguably disentangle the allegedly deflationary and inflationary aspects of the same statement. But our adversarial judicial system is premised on the idea that justice is best achieved when parties to a dispute raise the strongest arguments and evidence in their own favor, which evidence and arguments are then evaluated by a neutral arbiter.

Here, the Court finds that Menorah and Clal's (and Pomerantz's) incentives to maximize their damages in both the Connecticut action and this matter mean that they must make contradictory arguments—arguments that, if made in the other action, would necessarily lead to a smaller recovery.[19] As such, the Court finds that there is a fundamental conflict between Menorah and Clal's interests in the Connecticut action and the class's interests in this matter, and that it has strong reason to question whether Menorah and Clal can fairly and adequately represent the interests of the class in this matter. *See In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, Master Docket No. 09-md-02063-JLK-KMT, 2009 WL 4016635, at *8 (D. Colo. Nov. 18, 2009) (refusing to appoint a single lead plaintiff to represent two different classes in related securities class actions due to the risk of conflicts of interest or "accusations of conflicts of interest"); *Baker v. Arnold*, Case Number C 03-05641 JF, 2004 WL 7340186, at *3 (N.D. Cal. May 17, 2004) (finding a conflict of interest between the class and class counsel where counsel

represented two classes with competing theories of the case in two related securities actions); *Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581, 590–91 (W.D. Tex. 2002) (finding a disqualifying conflict of interest where counsel represented shareholders in multiple class actions against the same defendant because "[w]ith multiple lawsuits, more than a fair chance exist[ed] that the shareholders represented in the various suits, and their interests [might] not always coincide"); *see also In re Turquoise Hill Res. Ltd. Sec. Litig.*, 20-cv-8585 (LJL), 2021 WL 148752, at *8 (S.D.N.Y. Jan. 15, 2021) (recognizing that a lead plaintiff's maintenance of a separate suit against a defendant for the same conduct as alleged in a securities class action could pose a conflict of interest, and setting procedures to guide against such a possibility); *cf. In re Nw. Corp. Sec. Litig.*, 299 F. Supp. 997, 1007 (D.S.D. 2003) (finding that class counsel did not have a conflict of interest where counsel's involvement in a potentially competing securities class action was "limited" and ended quickly).

**\*10** Although there are some cases in which courts have found that there is no conflict of interest between parties or counsel pursuing parallel securities litigations provided that "the maintenance of parallel actions ... does not pit one class against the other in terms of satisfying a potential judgment," *see, e.g., Dietrich v. Bauer*, 192 F.R.D. 119, 126 (S.D.N.Y. 2000),[20] this Court does not find those cases persuasive here. Many of the cases in which courts declined to find a conflict did not involve situations where counsel or parties would be required to make conflicting arguments in the two matters. *See, e.g., id.* Here, Menorah and Clal—and their counsel, Pomerantz—would be in the position of making competing arguments in this matter and the Connecticut action, creating a conflict of interest regardless of Teva's ability to satisfy potential judgments in both cases. This Court finds that these competing arguments constitute a fundamental conflict of interest that rebuts the presumption of Menorah and Clal's status as lead plaintiff in this case.

### ii. Undisclosed Counsel

Pomerantz's retainer agreements with Menorah and Clal provide that Pomerantz will "jointly prosecute" this matter with two Israeli law firms, Guy, Bachar & Co. and Eitan Lavie & Co. (Ltr. from Jeremey A. Lieberman, Managing Partner, Pomerantz LLP, to Shay Kompel and Nir Moroz, Menorah Mivtachim Ins. Ltd., Menorah Mivtachim Pensions & Gemel Ltd., and Menorah Mivtachim & the Fed'n of Eng'rs Provident Fund Mgmt. Ltd. (Oct. 13, 2020) [hereinafter Menorah

Retainer Agreement]; Ltr. from Jeremey A. Lieberman, Managing Partner, Pomerantz LLP, to Yossie Dori and Barak Benski, Clal Insurance Co. Ltd. and Clal Pension & Provident Ltd. (Nov. 4, 2020) [hereinafter Clal Retainer Agreement].) As a result of these agreements, the Israeli law firms would receive "22.5% of the net fees awarded to Pomerantz in this action." (Menorah Retainer Agreement; Clal Retainer Agreement.) The Court only learned of the involvement of the two Israeli law firms *after* specifically requiring that the competing lead plaintiffs provide their respective retainer agreements to the Court.[21]

The Investor Group argues that Menorah and Clal's failure to disclose the involvement of the two Israeli firms should disqualify Menorah and Clal from serving as lead plaintiff. (Doc. No. 50-1 at pp. 11–14.) The Court agrees.

As an initial matter, even if Menorah and Clal had originally disclosed the involvement of the Israeli firms, the Court would have been skeptical of this arrangement. At oral argument, Menorah and Clal asserted that the involvement of Israeli counsel is necessary in this matter for two reasons: (1) to coordinate the distribution of damages to the owners of Israeli shareholders and (2) to coordinate with the attorneys managing a securities lawsuit against Teva in Israel's courts. (Hr'g Tr. at 37:6–38:11.) In fact, counsel for Menorah and Clal even goes as far as to argue that the fact The Investor Group has failed to engage Israeli counsel illustrates their inadequacy to be lead plaintiff in this case. (*Id.* at 40:16–20.) The Court is not persuaded.

**\*11** First, Israeli counsel would only be necessary to help distribute damages from this action to owners of Israeli shares in Teva if the plaintiffs in this matter are successful in winning damages for the class. Since such a result could be years in the future—if, indeed, it happens at all—the involvement of Israeli firms now is premature. Second, coordination with the lawyers pursuing the lawsuit against Teva in Israel's courts is necessary only to the extent those two suits come into conflict with one another. Since that has not happened yet, the need for coordination with an Israeli law firm is also premature. Moreover, even if there does come a point during the course of this litigation that coordination with an Israeli law firm is necessary, there is an important difference between hiring a law firm to serve in that role and agreeing to "jointly prosecute" a matter—from the outset—with that firm (or, in this case, two firms). In the latter situation, there is a strong risk that the multiple law firms involved in a matter will duplicate one another's efforts, driving up costs without a

corresponding benefit accruing to the class. See *In re Allergn PLC Sec. Litig.*, No. 18 Civ. 12089 (CM)(GWG), 2020 WL 5796763, at \*8 (S.D.N.Y. Sept. 29, 2020).

Indeed, the Court need not resort to mere speculation in concluding that the involvement of the two Israeli firms would not benefit the class at this stage of the proceedings in this case. At the hearing on Menorah and Clal's and The Investor Group's motions to be appointed lead plaintiff, Teva's counsel informed the Court that the lawsuit against it in Israel's courts has "been stayed since late December or January." (Hr'g Tr. at 75:21–24.) Teva's counsel made this disclosure *after* Attorney Jeremy Lieberman, counsel for Menorah and Clal, had made an extended argument about the necessity of jointly prosecuting this matter with the Israeli firms to ensure that this litigation is coordinated with the lawsuit in Israel's courts. (*See id.*) When the Court questioned Attorney Lieberman why he apparently did not know about the stay, he responded:

> Your Honor, it very well could be that — it could be that I was told that. It could be that, you know — I honestly — until we're appointed lead, we haven't been — we haven't been dealing with that issue. We haven't been, you know, tracking as much. It could be that I was informed of that, I just wasn't dealing with it.

(*Id.* at 76:25–77:5.)

The Court finds this explanation disingenuous. It is hard to believe Attorney Lieberman, who engaged these two Israeli law firms to help coordinate the parallel Israeli litigation, would not have known that the parallel litigation has been stayed since approximately December 2020. And although the Court would like to believe Attorney Lieberman merely "forgot" about the stay,[22] that also is extremely difficult to comprehend given Attorney Lieberman's argument which included his assertion that:

> Often in cases where there's a parallel US and Israeli case, the case in Israel is often stayed. Sometimes you can get the plaintiffs to stay, to agree to let the US case go, because a lot of times, actually often in dual-listed securities, the Israeli court will recognize US law. The Supreme Court has recognized that US law applies, so they'll stay the Israeli action. You need someone to coordinate that issue with the Israeli case.

(*Id.* at 40:22–41:4). Further, Attorney Lieberman suggested that The Investor Group's failure to engage an Israeli law firm is "a significant issue" (*id.* at 37:12–13), because "by definition, there is a case in Israel, in Tel Aviv District Court,

that's either going to be stayed or that's going to be in conflict with the case that occurs here" (*id.* at 44:13–15).

The Court is hesitant to impugn the character of the attorneys and litigants that appear before it, but the Court finds Menorah and Clal and Pomerantz's tactics and arguments related to this aspect of the retainer agreement troubling. At oral argument, Menorah and Clal claimed that there was "no mechanism" to disclose the involvement of the Israeli firms in this matter. (*Id.* at 39:18–19.) This argument is preposterous. Menorah and Clal has thus far filed multiple pleadings in support of their bid to be appointed lead plaintiff, and this is not to mention the myriad letters and emails they have sent to the Court. (*See* Doc. Nos. 9, 11, 29, 34, & 49.) Any one of these writings could have been used to disclose the involvement of the Israeli firms—and should have been.

**\*12** Similarly unconvincing is Menorah and Clal's and Pomerantz's argument that the involvement of the two Israeli firms should not come as a surprise because these same firms have worked with Pomerantz representing Menorah and Clal in other securities class actions. (*See* Hr'g Tr. at 39:10–13.) The PSLRA is clear that the appointment of lead counsel is "subject to the approval of the court." 15 U.S.C. § 78u-4(a)(3)(B)(v). It is incumbent upon the parties seeking approval of their chosen counsel to provide the Court with the information necessary to evaluate whether counsel will properly serve the interests of the class. The Court should not have to scour the dockets of every matter a party has been involved in to determine which attorneys may also be representing the party in the instant matter.

Nor does the Court take any consolation from Menorah and Clal's suggestion that it has used these two Israeli law firms in conjunction with Pomerantz in pursuing two other securities class action matters in which they served as lead plaintiff. (*See* Hr'g Tr. at 38:15–17.) Menorah and Clal acknowledged that in both those matters, they did not disclose the use of the Israeli firms until the class certification stage. (*Id.*) That Menorah and Clal withheld important information from the courts in two other matters does not dispose this Court to excuse similar misconduct in this matter.

Menorah and Clal's failure to disclose the involvement of two Israeli firms who have been engaged to "jointly prosecute" and will receive "22.5% of the net fees awarded to Pomerantz in this action" causes the Court great concern. This concern is only heightened by the fact Pomerantz has been admonished

2021 WL 1205625

for this kind of less-than-forthcoming behavior in the recent past.

In *Cook v. Allergn PLC*, Pomerantz's client was appointed lead plaintiff, and Pomerantz was appointed class counsel. [Nos. 18 Civ. 12089 (CM) et al., 2019 WL 1510894, at *4 (S.D.N.Y. Mar. 21, 2019)](). Pomerantz sought to serve as co-lead counsel, but the court, anxious to avoid inflated legal fees, elected to appoint Pomerantz as sole lead counsel. *Id.* That should have been the end of matters. It was not. When it came time to certify the class, the court learned that Pomerantz had been prosecuting the matter with its co-counsel, despite the court's explicit instructions otherwise. *In re Allergn PLC Sec. Litig.*, 2020 WL 5796763, at *6. The only concession Pomerantz had made to the court's explicit command was to modify its agreement with co-counsel such that it was splitting its fees 55-45 rather than 50-50. *Id.*

The court excoriated Pomerantz and its client for their conduct, writing:

> Full transparency required advising the Court that, despite its ruling, two law firms intended to continue working on this matter, and had entered into a fee-sharing arrangement. It required advising the court that lawyers from both firms were attending conferences and reviewing pleadings (matters about which I could not possibly know anything) — even though I specifically said there could not be co-lead counsel and explained that duplication of effort was the reason why. It required notifying the court that [co-counsel]'s role in the conduct of this lawsuit had not changed one iota as a result of my order directing that there not be two lead counsel, as [the client's] corporate representative candidly testified. It is undisputed that the court was not notified of any of this by [the client], or by Pomerantz, or by co-counsel. That is unacceptable.

*Id.* at *8. Moreover, just as in this matter, the court in *In re Allergn* found Pomerantz's explanation for its conduct utterly unsatisfying, observing that the explanation was "a lie" and "utterly disingenuous." *Id.* at *8. As a result of Pomerantz and its client's misconduct, the court refused to certify the class with the client as the lead plaintiff. *Id.* at *9.

**\*13** After such a rebuke, this Court would expect Pomerantz to understand the importance of complete transparency and full disclosure of any and all arrangements with law firms "jointly prosecuting" a matter. Yet, until the Court requested a copy of the retainer agreements, the Court had no knowledge of the involvement of the two Israeli firms. There was no convincing explanation for this failure to disclose. Even if

Menorah and Clal did not have a conflict of interest with the class, these facts, standing alone, would cause the Court to seriously question if Menorah and Clal and Pomerantz could fairly and adequately represent the class's interests in this matter.

### iii. Teva's Potential Bankruptcy

Finally, the Court addresses The Investor Group's argument that Menorah and Clal is conflicted because Teva may go bankrupt during the course of this litigation, at which point Menorah and Clal and Pomerantz, by virtue of their participation in the Connecticut action, could be competing with class members in this case for a share of Teva's dwindling resources. (*E.g.*, Doc. No. 12 at p. 22.) As discussed above, courts do consider potential conflicts of interest between lead plaintiff candidates or their counsel and the remainder of the putative class when deciding who to appoint as lead plaintiff in securities class actions.

The concern with lawyers representing multiple clients (or, in this case, multiple classes of client) with competing interests in a potential bankruptcy action must be in proportion to the chances that those clients' interests would *actually* be competing. Thus, a lawyer representing two slip-and-fall clients with relatively small claims against a large and financially healthy corporation has no ethical concerns, because the chances are very low that his clients will ever become competing creditors of the corporation. However, in a case in which an attorney represents two clients (or classes of client) with very large claims against a faltering company, there are ethical concerns because there is a much higher probability that the clients will become competing creditors if the defendant company goes bankrupt. Similar concerns necessarily apply when a lead plaintiff has claims that could compete with the class's against a company that is or could soon be bankrupt. *See, e.g., Kuper*, 145 F.R.D. at 83; *Jackshaw Pontiac*, 102 F.R.D. at 192.

Nonetheless, courts in the Third Circuit, relying on the Circuit's opinion in *In re Cendant Corp. Litigation*, have been hesitant to disqualify a lead plaintiff whose interests may differ from the class's if the defendant is forced into bankruptcy. *See Fass*, 216 F.R.D. at 575. For instance, in *Fass*, the District of New Jersey was confronted with a situation in which the presumptive lead plaintiff's grandparent company had loaned the defendant $20 million. *Id.* at 574. The $20 million loan dwarfed the presumptive lead plaintiff's damages

of $650,000. *Id.* Moreover, there was at least some evidence that the defendant company was facing liquidity issues. *See id.* The court noted that on these facts, "a nascent conflict of interest exist[ed]." *Id.* at 575. Nonetheless, the Court concluded that based on the Third Circuit's reasoning in *In re Cendant Corp.*, the fact that a presumptive plaintiff's parent or grandparent company did "not necessarily own stock in the defendant company, but nevertheless ha[d] a strong financial stake in that company's future" was not enough to create "an unacceptable and disqualifying conflict of interest." *Id.*

In order to overcome the statutory presumption that the movant with the largest financial interest in the litigation should be appointed lead plaintiff, a class member must provide evidence. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *In re Cendant Corp. Litig.*, 264 F.3d at 268. In support of its contention that there is a strong possibility Teva will go bankrupt during the pendency of this case, The Investor Group asks the Court to take judicial notice of Teva's own statements about its debt load and financial analysts' statements about the likelihood that Teva could go bankrupt in the near future. (Hr'g Tr. at 19:2–14.) Even if the Court were inclined to take judicial notice of these unauthenticated hearsay statements, which it is not, they would be unconvincing. The Court is unable to say with any confidence that these statements are reliable indicators that a company may go bankrupt.[23] The Court finds there is no conflict of interest based on speculation Teva might go bankrupt at some point in the unforeseeable future.

\*\*\*

 **\*14**  The Court concludes that there is a conflict of interest between Menorah and Clal and the members of the putative class based on Menorah and Clal's Connecticut suit. The Court is deeply concerned by Menorah and Clal's failure to disclose that the two Israeli firms would be jointly prosecuting this matter with Pomerantz and entitled to 22.5 percent of any fees awarded to Pomerantz. For these reasons, the Court finds that The Investor Group has rebutted the presumption and proven that Menorah and Clal "will not fairly and adequately protect the interests of the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

### 2. The Investor Group

The Court now turns to whether The Investor Group, with the next-largest LIFO loss, should be appointed lead plaintiff. The Investor Group is typical of the class in that it alleges to have suffered losses after it purchased shares at artificially inflated prices caused by Teva's false and misleading statements, and lost money when Teva's misconduct was disclosed. (Doc. No. 8-1 at pp. 12–13.) As for adequacy, The Investor Group alleges to have suffered damages owing to Teva's misconduct. (*See id.*) There are no apparent conflicts of interest between The Investor Group and the class, it has hired competent counsel to represent it and the class, and it has detailed how it will work together as a group to pursue the class's interests. (*Id.* at pp. 12–16; *see also* Doc. No. 8-3 at ¶¶ 7–15.)

The Investor Group timely moved to be appointed lead plaintiff, has the largest financial interest in the outcome of this litigation of the remaining movants, has made a *prima facie* showing that it satisfies Rule 23's typicality and adequacy requirements, and includes a large institutional investor. As such, it is the next presumptive lead plaintiff in this matter.

The primary argument against The Investor Group is the contention that The Investor Group's institutional investor, the Pension Fund, lacks standing, and thus will be subject to a unique defense. (*E.g.*, Doc. No. 11 at pp. 13–14.) Menorah and Clal claims that the Pension Fund has no standing because it sold all of its Teva shares prior to the August 18, 2020 corrective disclosure. (*Id.* at p. 13.) Menorah and Clal relies on *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). There the United States Supreme Court noted that if someone purchases shares in a company for a fraudulently inflated price and then "sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Id.* at 342. Likewise, here, if the Pension Fund sold its shares prior to the August 18 disclosure, any losses suffered would not be fairly traceable to Teva's misconduct. (Doc. No. 11 at p. 13.)

The Investor Group counters that the Pension Fund has standing to sue because it suffered significant losses on its investment in Teva securities, and that its losses were due to Teva's allegedly fraudulent statements about Copaxone. (Doc. No. 30 at pp. 8–10.) The Investor Group contends that the Pension Fund will likely have standing after an amended complaint is filed in this matter, because discovery will potentially identify partial disclosures of Teva's alleged Copaxone-related fraud—disclosures which led to losses to the class well before August 18, 2020, and, critically, before

the Pension Fund sold its Teva shares. (Hr'g Tr. at 27:5–28:7; *see also* Doc. No. 50-1 at pp. 15–16.)

As an initial matter, the Court declines at this stage in the litigation to rule on whether the Pension Fund has standing. When considering a motion to be appointed as a lead plaintiff, the Court considers whether a person or entity seeking to be lead plaintiff "is subject to unique defenses," but does not rule definitively on whether those defenses apply. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb); *see also Beck v. Maximus, Inc.*, 457 F.3d 291, 300–01 (3d Cir. 2006); *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 201 (E.D. Pa. 2008). Rather, the focus is on whether a unique defense "is likely to become a major focus of the litigation." *Beck*, 457 F.3d at 301.

 *15  With that limitation in mind, the Court finds that the Pension Fund's potential lack of standing is likely to become a major focus of the litigation in this matter. The complaint in this matter alleges only a single corrective disclosure, which occurred on August 18, 2020. (Doc. No. 1 at ¶¶ 5, 52.) It is undisputed that at the time of this disclosure, the Pension Fund did not own any Teva securities. (Doc. No. 30 at p. 8.) On the face of the complaint, then, the Pension Fund cannot tie their losses to the August 18, 2020 disclosure of Teva's alleged misconduct. *See Dura Pharms., Inc.*, 544 U.S. at 342; *Topping v. Deloitte Touche Tohmatsu CPA*, 95 F. Supp. 3d 607, 618 (S.D.N.Y. 2015) ("Because Jayhawk did not own any shares of ChinaCast stock during or after the initial March 26, 2012 disclosure alleged in the original Complaint ... Jayhawk suffered no losses attributable to the ChinaCast fraud."). And, it is hornbook law that a party only has standing if (among other requirements) its injury is "fairly traceable to the defendant's allegedly unlawful conduct."[24] *Hein v. Freedom From Religion Found.*, 551 U.S. 587, 598 (2007) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Thus, based on the operative complaint in this matter, the Pension Fund appears to lack standing.

The Investor Group argues that regardless of whether the Pension Fund has standing to sue under the operative complaint, they will most likely have standing under the amended complaint that will be filed in this matter. (*See* Hr'g Tr. at 27:5–28:7.) Like other courts, this Court is unconvinced by this argument. For instance, in *Topping v. Deloitte Touche Tohmatsu CPA*, the court refused to consider allegations raised in a "corrected" complaint filed after the deadline for lead plaintiff motions in determining who should be appointed the lead plaintiff. 95 F. Supp. 3d at 619–20. Relying on cases in which the same issue had arisen, the *Topping* court

concluded that allowing a lead plaintiff candidate to rely on allegations made in a new complaint filed after the PSLRA lead plaintiff motion deadline had passed would prejudice other class members. *Id.* at 620; *see also id.* at 619 (collecting cases); *Plaut v. Goldman Sachs Group, Inc.*, 18-CV-12084 (VSB), 2019 WL 4512774, at *5 (S.D.N.Y. Sept. 19, 2019) (refusing to consider an amended complaint filed by the plaintiff 20 days after the deadline for lead plaintiff motions).

In this matter, there is no amended or corrected complaint. The Investor Group's claim that the Pension Fund *could* have standing based on an amended complaint is entirely speculative. Therefore, based on the operative complaint, which does not allege any partial disclosures, the Pension Fund is subject to the unique defense that it does not have standing. If the Pension Fund were included in a lead plaintiff group, that group would be required to expend significant time and resources litigating the issue of the Pension Fund's standing. It may be that in an amended complaint, The Investor Group will be able to allege that Teva made partial disclosures of its misconduct before August 18, 2020. In that case, the Pension Fund may move to rejoin The Investor Group. But at this early stage, the Pension Fund's interests are not aligned with those of the putative class, and the Pension Fund must be severed from the Investor Group, leaving Mr. Forsythe remaining as the presumptive lead plaintiff.

Menorah and Clal's two additional arguments against The Investor Group as lead plaintiff are unconvincing.[25] First, Menorah and Clal claim that The Investor Group should be found to also have a conflict of interest due to The Investor Group's participation in the Connecticut action. Ironically, Menorah and Clal argue that to the extent its Connecticut action creates a conflict of interest between Menorah and Clal and the members of the putative class in this case, The Investor Group—including Mr. Forsythe—shares the same conflict because The Investor Group is a member of the class in that action. (Hr'g Tr. at 50:3–6.) This argument fails. The Investor Group's membership in the Connecticut class is not relevant. Unlike Menorah and Clal, The Investor Group is not actively litigating a case against Teva based on Teva's alleged cover-up of its antitrust violations. Any benefit that The Investor Group gains from being members of the Connecticut class will accrue to them passively. Since they are not actively pursuing that matter, there is no conflict of interest between them and the members of the putative class in this matter. *See Dietrich*, 192 F.R.D. at 126 (finding no conflict of interest where "the Court [wa]s not presented with a situation in

which counsel simultaneously represents classes in parallel litigations seeking to tap the same pool of finite assets").

**\*16** Second, Menorah and Clal argue that Mr. Forsythe has not sufficiently demonstrated his ability to manage the class litigation or his relationship with counsel. Specifically, Menorah and Clal argue that Mr. Forsythe has demonstrated his inability to manage his relationship with Faruqi & Faruqi because he did not negotiate a set limit on the fees that Faruqi & Faruqi will be able to recover in this matter, and because he was not aware of the potential deficiencies of the other members of The Investor Group as lead plaintiffs.

This Court agrees that Mr. Forsythe's failure to negotiate a cap must be taken into consideration. However, our inquiry focuses not on whether Mr. Forsythe "may have ... negotiated a better fee agreement" but rather on whether Menorah and Clal have provided evidence that his choices "are so deficient as to demonstrate that [he] will not fairly and adequately represent the interests of the class." *See In re Cendant Corp. Litig.*, 264 F.3d at 266. They have not. Mr. Forsythe selected experienced counsel with a long track record of successfully representing plaintiffs in securities class actions. And, while he could have negotiated better terms in his retainer agreement, nothing in that agreement is unreasonable.

Moreover, the Court does not consider Mr. Forsythe's retainer agreement in a vacuum. Rather, it must be considered in the context of the Pension Fund's agreement, which limits Faruqi & Faruqi's attorney's fees to no more than "28% of the gross recovery" won by the class in this matter.[26] (Pension Fund Retainer Agreement.)

Additionally, Mr. Forsythe did not lock himself into a retainer agreement with unscrupulous counsel seeking only to maximize their profits; at oral argument Faruqi & Faruqi committed to seeking no more than 28 percent of the class's potential recovery in attorney's fees—regardless of whether it is the Pension Fund's or Mr. Forsythe's retainer agreement that ultimately controls. (Hr'g Tr. at 34:19–24.) Last, Mr. Forsythe's retainer agreement includes an acknowledgement that the Court will have to approve any attorneys' fees Faruqi & Faruqi seeks in this matter. (Forsythe Retainer Agreement.) Given the Court's "independent obligation to ensure the reasonableness of any fee request" under the PSLRA, *see In re Cendant Corp. Litig.*, 264 F.3d at 281–82, this clause explicitly recognizes limitations on Faruqi & Faruqi's power to collect fees in this matter, even if it does not precisely cap those fees.

For these reasons, nothing about Mr. Forsythe's conduct in setting the terms of his retainer agreement with Faruqi & Faruqi causes the Court to question his ability to fairly and adequately represent the interests of the class.

Finally, Menorah and Clal argue that Mr. Forsythe should have known that the Pension Fund lacks standing to pursue this matter and that Mr. Al Kooheji, a former member of the Investor Group, was atypical of the members of the putative class. (*Id.*) However, these are legal determinations, and, as the reams of briefing filed on Menorah and Clal's and The Investor Group's motions to be appointed lead plaintiff in this matter demonstrate, they are legal issues which are hotly contested. Menorah and Clal apparently seek to disqualify Mr. Forsythe for not coming to the precise legal conclusions about this matter that their counsel did. This is not the standard that the Court must apply. Rather, the Court considers whether Mr. Forsythe "has the ability and incentive to represent the claims of the class vigorously," whether he "has obtained adequate counsel," and whether there is a conflict between his claims and those asserted on behalf of the class. *In re Cendant Corp. Litig.*, 264 F.3d at 265 (quoting *Hassine*, 846 F.2d at 177). Menorah and Clal have provided no evidence to suggest that Mr. Forsythe does not meet this standard.

\*\*\*

**\*17** In sum, the Court finds that Menorah and Clal have failed to provide sufficient evidence to rebut the presumption that The Investor Group should serve as lead plaintiff in this matter. However, the Court also concludes that at this juncture, the Pension Fund is subject to the unique defense that it lacks standing. As such, The Investor Group, consisting only of Mr. Forsythe, shall be appointed lead plaintiff.

### B. Selection of Lead Counsel

The PSLRA mandates that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). Although the PSLRA contemplates court intervention in the lead plaintiff's selection of counsel, *see id.*, the Third Circuit has made clear that courts should defer to the lead plaintiff's choice of attorneys and should only interfere with that choice if it is unreasonable. *In re Cendant Corp. Litig.*, 264 F.3d at 276 ("[W]e think that the court's inquiry is appropriately limited to whether the lead plaintiff's selection and agreement

2021 WL 1205625

with counsel are reasonable on their own terms."). The Third Circuit has also provided a non-exhaustive list of factors for courts to consider when making this determination:

> (1) the quantum of legal experience and sophistication possessed by the lead plaintiff; (2) the manner in which the lead plaintiff chose what law firms to consider; (3) the process by which the lead plaintiff selected its final choice; (4) the qualifications and experience of counsel selected by the lead plaintiff; and (5) the evidence that the retainer agreement negotiated by the lead plaintiff was (or was not) the product of serious negotiations between the lead plaintiff and the prospective lead counsel.

*Id.* The "ultimate inquiry," however, "is always whether the lead plaintiff's choices were the result of a good faith selection and negotiation process and were arrived at via meaningful arms-length bargaining." *Id.*

Here, the Court finds no reason to disapprove of Faruqi & Faruqi as The Investor Group's choice of lead counsel. First, although Mr. Forsythe has not served as a lead plaintiff in a securities class action before, he is a sophisticated investor who is "highly motivated" to pursue this matter on behalf of the class. (*See* Doc. No. 8-3 at ¶¶ 4, 8, 10.) As for the second and third factors, Mr. Forsythe came to Faruqi & Faruqi based on an advertisement that they had published regarding this matter. (*See* Hr'g Tr. at 35:1–4.) While perhaps not the most ideal means of selecting a law firm to represent

oneself in a securities class action, given Faruqi & Faruqi's experience in these matters the Court cannot fault Mr. Forsythe's choice. Fourth, there is no question that Faruqi & Faruqi are qualified and experienced in securities class actions. While Mr. Forsythe's retainer agreement was not subject to negotiation (*see id.* at 34:4–5 ("He got our standard new client retainer ....")), the terms of his agreement with Faruqi & Faruqi were reasonable. And, because Faruqi & Faruqi has agreed not to seek more than 28 percent of the class's recovery in attorneys' fees, the Court finds that this factor does not weigh against The Investor Group's selection of Faruqi & Faruqi as class counsel. Because the Court finds no reason to disapprove of The Investor Group's choice, Faruqi & Faruqi will be appointed lead counsel in this matter.

## IV. CONCLUSION

For these reasons, The Investor Group, consisting only of Gerald Forsythe, shall be the lead plaintiff in this matter, and Faruqi & Faruqi, LLP shall be lead counsel for the putative class.

**\*18** An appropriate order follows.

## All Citations

Slip Copy, 2021 WL 1205625

## Footnotes

1    The Individual Defendants served as Teva officers during the time period relevant to this case. Specifically, Vigodman was Teva's Chief Executive Officer, Deshesh was Teva's Chief Financial Officer, Koremans was Teva's President and Chief Executive Officer of Teva's Global Specialty Medicines division, and Derkacz was Teva's Senior Vice President and General Manager of Teva's Global CNS division. (Doc. No. 1 at ¶¶ 14–17.)

2    At times in this opinion, the Court refers to claims or arguments made about the Individual Defendants and refers to them as such. Unless otherwise indicated, references to "Teva" refer to all Defendants collectively.

3    Menorah and Clal is comprised of five entities: Menorah Mivtachim Insurance, Ltd.; Menorah Mivtachim Pension & Gemel, Ltd.; Menorah Mivtachim and the Federation of Engineers Provident Fund Management Ltd.; Clal Insurance Company Ltd.; and Clal Pension & Provident Ltd. (*See* Doc. No. 9 at p. 1.)

4    As of March 11, 2021, there are now two members of The Investor Group: Gerald Forsythe, an individual investor, and the Dekalb County Pension Fund. (Doc. No. 8-5 at pp. 6, 8.)

5    At this stage, the Court takes as true the facts asserted in the complaint.

6    Copaxone is the drug's trade name; its scientific name is glatiramer acetate. (*See* Doc. No. 1 at ¶ 3.)

7    The Court finds that Halman Aldubi's notice complied with PSLRA requirements because it provided enough information for a putative class member to "(1) determine whether she is eligible for lead plaintiff status based on the class period; (2) learn enough about the asserted claims to make an initial judgment as to whether to obtain a copy of the Complaint ... and (3) contact the clerk's office to obtain a copy of the Complaint and discover the procedures for filing a motion" to be appointed lead plaintiff. *Marsden v. Select Med. Corp.*, No. Civ. A. 04-4020, 2005 WL 113128, at \*4 (E.D. Pa. Jan. 18, 2005); *see also* 15 U.S.C. § 78u-4(a)(3)(B)(i) (stating that the notice should advise members of the putative class about "the pendency of the action, the claims asserted therein, and the purported class period; and ... that, not later than 60

2021 WL 1205625

days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff"); *In re Party City Sec. Litig.*, 189 F.R.D. 91, 105 n.10 (D.N.J. 1999) (finding that publication in *PRNewswire* satisfied the PSLRA's requirements).

8    Initially, a third movant, ERJ – 145 NUA, Inc., applied to be the lead plaintiff. (Doc. No. 7.) However, ERJ subsequently withdrew its motion. (Doc. No. 43.)

9    The relevant filings are: The Investor Group's Motion for Appointment as Lead Plaintiff and Approval of Lead Counsel (Doc. No. 8); Menorah and Clal's Notice of Motion for Appointment as Lead Plaintiff and Approval of Selection of Counsel (Doc. No. 9); Menorah and Clal's Memorandum of Points and Authorities In Further Support of Its Motion for Appointment as Lead Plaintiff and Approval of Selection of Counsel and in Opposition to Competing Motions (Doc. No. 11); The Investor Group's Memorandum of Law in Opposition to Competing Motions for Appointment as Lead Plaintiff and Approval of Lead Counsel (Doc. No. 12); Menorah and Clal's Reply Memorandum of Points and Authorities in Further Support of Its Motion for Appointment as Lead Plaintiff and Approval of Selection of Counsel and in Opposition to Competing Motions (Doc. No. 29); The Investor Group's Reply Memorandum of Law In Further Support of Its Motion for Appointment as Lead Plaintiff and Approval of Lead Counsel (Doc. No. 30); Menorah and Clal's Sur-Reply Memorandum of Points and Authorities In Further Support of Its Motion for Appointment as Lead Plaintiff and Approval of Selection of Counsel and in Opposition to Competing Motions (Doc. No. 34); and The Investor Group's Sur-Reply Memorandum of Law in Response to the Sur-Reply Filed by the Menorah & Clal Group and in Further Support of Its Motion for Appointment as Lead Plaintiff and Approval of Lead Counsel (Doc. No. 35). Following Mr. Al Kooheji's last-minute withdrawal from participation in the Investor Group on March 11, 2021 (Doc. No. 48), Menorah and Clal also filed a Response to Notice of Withdrawal (Doc. No. 49). The Investor Group then filed a motion to strike Menorah and Clal's response, and, in the alternative, a response to the response. (Doc. No. 50.)

The Court hopes that the cost of preparing these voluminous filings will not be passed on to the plaintiff class, should plaintiffs succeed in their claims against Teva. *Cf. Tsirekidze v. Syntax-Brillian Corp.*, Nos. CV-07-2204-PHX-FJM et al., 2008 WL 942273, at *3 (D. Ariz. Apr. 7, 2008) ("We have before us six inches of briefing that has precious little to do with the merits of the claim and less to do with the fitness of any class member to steer this litigation. What we have in abundance is unwelcome sniping among counsel.").

10   First-in, first-out and last-in, first-out (also known as "FIFO" and "LIFO," respectively) are accounting methods which are often used to tabulate damages in securities cases. *Pelletier v. Endo Int'l PLC*, 316 F. Supp. 3d 846, 849 n.7 (E.D. Pa. June 19, 2018). As explained in *Pelletier v. Endo International PLC*:

LIFO assumes that the first stocks to be sold are the stocks purchased most recently. On the other hand, FIFO assumes that the first stocks to be sold are the stocks that were acquired first. Using LIFO or FIFO, each purchase of securities is matched or assigned to a specific sale of securities to calculate the trading loss or gain on each transaction during the class period. Because FIFO and LIFO use different sorting principles, these methods can produce significantly different results.

*Id.* (citations omitted).

11   As discussed in Part III.A.1.b.ii, *infra*, this representation proved to be false.

12   The Court notes the retainer agreement does not indicate how Kaskela Law LLC is being paid.

13   Originally, The Investor Group also included a third member, Faris Al Kooheji, an individual investor. (*See* Doc. No. 8-5 at p. 2.) However, Mr. Kooheji subsequently filed a notice indicating that he was withdrawing from participating in The Investor Group. (Doc. No. 48.)

14   When Mr. Kooheji was a part of The Investor Group, the Group represented that their losses were $5,160,224.38. (Doc. No. 8-1 at p. 11.) The Investor Group has not provided the Court with an updated damages figure now that Mr. Kooheji has left the Group. The Court bases its $2,067,327.65 figure on The Investor Group's assertion that Mr. Forsythe "suffered approximately $1 million in losses" and that the Pension Fund "has net losses of $1,067,327.65 pursuant to standard LIFO calculation methodology." (Doc. No. 35 at pp. 3, 5.)

15   Although Mr. Forsythe's retainer agreement did not contain the 28 percent cap on attorneys' fees, counsel for The Investor Group agreed at oral argument that in the event Mr. Forsythe's retainer agreement controlled (i.e., if the Pension Fund was severed from The Investor Group), Faruqi & Faruqi would not seek more than 28 percent of the class's potential recovery in attorneys' fees. (Hr'g Tr. at 34:19–24.)

16   As the Third Circuit has made clear, however, the fact that a lead plaintiff still owns a significant amount of stock of the defendant company is not enough to create a conflict of interest between the lead plaintiff and class members who do not own stock (or at least do not own much stock) in the defendant company. *In re Cendant Corp. Litig.*, 264 F.3d at 243–44.

17   For obvious reasons, this focus is particularly strong when it comes to class counsel's request for attorneys' fees.

At oral argument, counsel for Menorah and Clal raised—for the first time—the argument that Menorah and Clal may ultimately decide to forego their individual action in favor of joining the Connecticut class action. (Hr'g Tr. at 50:7–51:13.) However, this argument is unavailing. The fact is that, as of now, Menorah and Clal are actively pursuing their individual Connecticut action against Teva, and that the arguments they make in that action necessarily contradict the position the putative class must take in this matter. That Menorah and Clal may, at some hypothetical future point, *not* be actively pursuing a claim that contradicts the claim asserted by the putative class in this matter does not alter the fact that as of now, they *are* pursuing such a claim. The Court must deal in reality, not in hypotheticals that serve the parties' interests.

The parties did not fully brief—and the Court does not address—whether collateral estoppel would prevent Menorah and Clal from making inconsistent arguments in the Connecticut action and this matter.

*Dietrich* sought to distinguish a line of cases in which courts had found that there was a conflict of interest when one group of attorneys represented two classes of plaintiffs against the same defendant in securities class actions, because there was a possibility that the plaintiff classes would be in competition with one another to recover the same pool of resources. *See Dietrich*, 192 F.R.D. at 126; *see also Kuper v. Quantum Chem. Corp.*, 145 F.R.D. 80, 83 (S.D. Ohio 1992) (conflict of interest where "both Plaintiff classes clearly seek recovery from a common pool of assets"); *Jackshaw Pontiac v. Cleveland Press Publ'g Co.*, 102 F.R.D. 183, 192 (N.D. Ohio 1984) (same); *Sullivan v. Chase Inv. Servs. of Bos.*, 79 F.R.D. 246, 258 (N.D. Cal. 1978) (same).

Again, the Court notes it is unclear from the retainer agreement what the terms of the arrangement are with Pomerantz's liaison counsel, Kaskela Law LLC. This is also troubling given counsel's argument that there was "no mechanism" to disclose the involvement of the two Israeli law firms. Even when Menorah and Clal believed a mechanism existed for disclosing their relationship with firms other than Pomerantz—as they clearly did with respect to Kaskela (*see* Doc. No. 9-1 at pp. 19–20)—they did not disclose the terms of that relationship.

Even assuming Attorney Lieberman "forgot" the Israeli action had been stayed, this would demonstrate a lack of diligence in this litigation.

The Investor Group's argument that the Individual Defendants may go bankrupt during the course of this action is similarly unavailing. (*See id.* at 17:13–23.) This argument is even easier to dispose of, as The Investor Group has provided *no* proof that the Individual Defendants are at risk of bankruptcy.

The full test for standing asks whether the plaintiff (1) has an injury (2) that was caused by the defendant's allegedly unlawful conduct and (3) can be redressed by the requested relief. *E.g., Hein*, 551 U.S. at 598 (citing *Allen*, 468 U.S. at 751).

Menorah and Clal also raise a third additional argument against The Investor Group serving as lead plaintiff in this matter: The Investor Group is inadequate to the task of representing the interests of the class "because it is nothing more than a group of ... unrelated investors ... with no evident relationship, cobbled together by counsel in hopes of assembling the largest aggregate loss in this litigation." (Doc. No. 11 at p. 25; *see also* Hr'g Tr. at 55:13 (referring to The Investor Group as "a motley assortment").)

There are seemingly conflicting lines of caselaw regarding how related a group must be to pass muster under the PSLRA. On the one hand, some courts have found that it is not relevant to the appointment of a lead plaintiff if a group of class members is coherent or "cobbled together" for the purposes of the litigation. *See Nasin v. Hongli Clean Energy Techs. Corp.*, Civ. No. 2:17-3244 (WJM), 2017 WL 5598214, at *3 (D.N.J. Nov. 21, 2017); *see also Allegheny Cty. Emps.' Sys. v. Energy Transfer LP*, Civil Action No. 20-200, 2020 WL 815136, at *8 (E.D. Pa. Feb. 19, 2020). On the other hand, some courts have observed that lead plaintiff groups brought together by their attorneys for the sole purpose of maximizing the group's financial interest in the litigation are unacceptable. *See McDermid v. Inovio Pharms., Inc.*, 467 F. Supp. 3d 270, 278–79 (E.D. Pa. 2020); *Takata v. Riot Blockchain, Inc.*, Civil Action Nos. 18-2293 (FLW) (TJB) et al., 2018 WL 5801379, at *5 (D.N.J. Nov. 6, 2018). The Court concludes that these lines of caselaw can be reconciled with reference to the Third Circuit's command in *In re Cendant Corp. Litigation* that the only limitation on the formation of a group is that it must not have been formed in such a manner that would "preclude it from fulfilling the tasks assigned to a lead plaintiff." 264 F.3d at 266. Thus, it does not matter whether a group is "cobbled together," *provided* that it is able to work cohesively to manage counsel and fairly and adequately represent the interests of the class. *See id.*

However, this third argument is rendered moot by the Court's decision to sever the Pension Fund from The Investor Group. As such, we need not now consider whether the Fund and Mr. Forsythe have evidenced a sufficient ability to work together to manage counsel and fairly and adequately represent the class in this matter.

Menorah and Clal assert that the inconsistencies between the Pension Fund's and Mr. Forsythe's retainer agreements demonstrate that The Investor Group is not capable of coordinating this action amongst themselves. (*E.g.*, Doc. No. 49 at p. 7.) The Court is not convinced. There is nothing in the PLSRA that requires members of a lead plaintiff group to

2021 WL 1205625

negotiate lockstep retainer agreements with their chosen class counsel. Moreover, the fact that the Pension Fund and Mr. Forsythe signed materially different retainer agreements—i.e., that they were not given identical, boilerplate retainer agreements—lends credence to the notion that they were not brought together by their attorneys for the sole purpose of maximizing their claimed losses. Regardless, as discussed above, *supra* n.25, this issue is now moot.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.