UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: EVOLUS INC. SECURITIES
LITIGATION

**ORDER**

20 Civ. 8647 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

This is a putative class action brought under federal securities laws on behalf of those who purchased or otherwise acquired Evolus, Inc. securities between February 1, 2019 and July 6, 2020. Pending before the Court are four motions for the appointment of lead plaintiff and approval of lead counsel.[1] (Ahmad Mot. (Dkt. No. 24); Lefebvre Mot. (Dkt. No. 27); Diaferia and Sisun Mot. (Dkt. No. 38); Investor Group Mot. (Dkt. No. 45)) For the reasons stated below, Raja Ahmad will be appointed as lead plaintiff, and the Rosen Law Firm, P.A. will be appointed lead counsel.

## BACKGROUND

Evolus is a public company headquartered in California whose shares are listed on the New York Stock Exchange under the symbol "EOLS." (Malakouti Cmplt. (Dkt. No. 1) ¶¶ 2, 13)[2] Evolus is a "medical aesthetics company" that "develops, produces, and markets clinical neurotoxins for the treatment of aesthetic concerns." (Id. ¶ 2) Evolus sought to "develop and introduce a cheaper alternative to Botox® to the U.S. market." (Id. ¶ 19) Botox is a "purified botulinum toxin . . . that is widely used for temporarily reducing or eliminating facial fine lines

---

[1] Nine such motions were filed, but three movants have since withdrawn their motions, and two movants have filed notices of non-opposition to the four competing motions that are the subject of this Order. (Dkt. Nos. 23, 50, 51, 52, 56)

[2] Because the factual allegations in the first-filed Malakouti complaint are essentially repeated in the subsequently filed Cox action, this Court refers to the first-filed Malakouti complaint throughout.

and wrinkles." Botox is manufactured by Allergan plc and Allergan Inc. ("Allergan") and is distributed by Allergan's partner, Medytox Inc. (Id. ¶ 18)

Evolus's Botox alternative is Jeuveau. In September 2013, as part of its effort to develop Jeuveau, Evolus entered into a licensing agreement with Daewoong Pharmaceuticals Co., Ltd., which had served as Allergan's exclusive distributor of Botox for more than a decade. And between January 2014 and February 2019, Evolus hired five "former high-level Allergan employees with significant Botox® experience. . . ." (Id. ¶¶ 20-21)

On January 30, 2019, Allergan and Medytox filed a complaint with the U.S. International Trade Commission ("ITC") alleging that, in developing Jeuveau, Evolus and Daewoong had used and misappropriated Medytox's trade secrets. (Id. ¶ 23) Evolus dismissed these allegations as "speculative" and "intended to create confusion." (Id. ¶ 24)

On February 1, 2019, Evolus issued a press release announcing that the U.S. Food and Drug Administration ("FDA") had approved the marketing of Jeuveau for cosmetic use, and initiated its campaign to promote the commercial launch of Jeuveau in the United States. (Id. ¶¶ 3, 25) Evolus also told investors – in dozens of public statements promoting Jeuveau – that Jeuveau is a proprietary product that is backed by "years of clinical research and millions of dollars' worth of investment in research and development." (Id. ¶¶ 3, 27) Evolus also predicted that Jeuveau "would attain the number two U.S. market position within 24 months of launch." (Id. ¶¶ 3, 26)

On July 6, 2020, an ITC administrative law judge ("ALJ") issued an Initial Final Determination in the case brought by Allergan and Medytox. The ALJ concluded that Evolus and Daewoong had "misappropriated [from Medytox] the botulinum toxin bacterial strain as well as the manufacturing process that led to [Jeuveau's] development and manufacture." (Id. ¶¶ 5,

63) The ALJ recommended that Evolus be barred – for ten years – from importing and selling Jeuveau in the United States. (Id.) In the two days after this decision was issued, Evolus's stock price dropped 37 percent. (Id. ¶ 6)

Plaintiffs in the instant actions claim that – during the alleged class period of February 1, 2019 to July 6, 2020 –

> Defendants made materially false and misleading statements, and failed to disclose material adverse facts about the Company's business, operational, and compliance policies. Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) the real source of botulinum toxin bacterial strain as well as the manufacturing processes used to develop Jeuveau™ originated with and were misappropriated from Medytox; (ii) sufficient evidentiary support existed for the allegations that Evolus misappropriated certain trade secrets relating to the botulin toxin strain and the manufacturing processes for the development of Jeuveau™; (iii) as a result, Evolus faced a real threat of regulatory and/or court action, prohibiting the import, marketing, and sale of Jeuveau™; which in turn (iv) seriously threatened Evolus' ability to commercialize Jeuveau™ in the United States and generate revenue; and (v) any revenues generated from the sale of Jeuveau™ were based on Evolus' unlawful activities, including the misappropriation of trade secrets and secret manufacturing processes belonging to Allergan and Medytox.

(Id. ¶ 4)

On October 16, 2020, Plaintiff Armin Malakouti filed an action against Defendants Evolus Inc., David Moatazedi, Rui Avelar, and Lauren Silvernail ("Defendants"), on behalf of a class of all those who acquired Evolus common stock between February 1, 2019 and July 6, 2020. (Id. ¶ 31) On October 28, 2020, Plaintiff Clinton Cox filed a largely identical putative class action. (Cox Cmplt. (Case No. 20 Civ. 9053, Dkt. No. 1)) On November 13, 2020, this Court consolidated the Malakouti and Cox actions pursuant to a joint stipulation under the caption In re Evolus Inc. Securities Litigation. (See Malakouti Order (Case No. 20 Civ. 8647, Dkt. No. 12); Cox Order (Case No. 20 Civ. 9053, Dkt. No. 8))

3

I.    APPOINTMENT OF LEAD PLAINTIFF

    A.    **Presumptive Lead Plaintiff:  Largest Financial Interest**

        1.    **Legal Standard**

The Private Securities Litigation Reform Act (the "PSLRA") directs courts to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members."  15 U.S.C. § 78u-4(a)(3)(B)(i).  The PSLRA creates a "[r]ebuttable presumption" that "the most adequate plaintiff . . . is the person or group of persons" that "has the largest financial interest in the relief sought by the class," provided that such person or group "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.'"  Id. § 78u-4(a)(3)(B)(iii)(I).  This presumption may be rebutted upon a showing that the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class," or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

    "The PSLRA does not specify a method for calculating which plaintiff has the 'largest financial interest'. . . ."  In re Fuwei Films Sec. Litig., 247 F.R.D. 432, 436 (S.D.N.Y. 2008) (quoting Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co., Inc., 229 F.R.D. 395, 404 n.15 (S.D.N.Y. 2004)).  Many courts in this District, however, determine a prospective lead plaintiff's financial interest by looking to "(1) the number of shares purchased; (2) the number of net shares purchased; (3) total net funds expended by the plaintiff[] during the class period; and (4) the approximate losses suffered by the plaintiff[]."  In re CMED Sec. Litig., No. 11 Civ. 9297 (KBF), 2012 WL 1118302, at *3 (S.D.N.Y. Apr. 2, 2012) (citing Richman v. Goldman Sachs Grp., Inc., 274 F.R.D. 473, 475 (S.D.N.Y. 2011); Foley v. Transocean Ltd., 272

F.R.D. 126, 127–28 (S.D.N.Y. 2011); Pirelli, 229 F.R.D. at 404; Lax v. First Merchs. Acceptance Corp., No. 97 C 2715 et al., 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997)).

Courts in this District "'place the most emphasis on the last of the four factors: the approximate loss suffered by the movant.'" In re Orion Sec. Litig., No. 08 Civ. 1328 (RJS), 2008 WL 2811358, at *5 (S.D.N.Y. July 8, 2008) (quoting Kaplan v. Gelfond, 240 F.R.D. 88, 93 (S.D.N.Y. 2007)). And in calculating loss, "[c]ourts in this [D]istrict have a 'very strong

preference' for the 'last-in, first-out' ['LIFO'] method of calculating losses."[3] Rosian v. Magnum Hunter Res. Corp., Nos. 13 Civ. 2668 (KBF) et al., 2013 WL 5526323, at *1 (S.D.N.Y. Oct. 7, 2013) (quoting Richman, 274 F.R.D. at 473)).

### 2. Lead Plaintiff Applicants

The following parties seek appointment as lead plaintiff: (1) Raja Ahmad; (2) James LeFebvre; (3) Peter Diaferia and Mitchell Sisun, who seek appointment as co-lead plaintiffs; and (4) Armin Malakouti, Mahmood Gholami, and Daniel Mierlak, who seek appointment as the "Investor Group." (See Dkt. Nos. 24, 27, 38, 45)

Based on the motion papers submitted to this Court, the relevant financial interest components are as follows:

| Movant | Shares Purchased During Class Period | Net Shares Retained | Net Funds Expended | Approximate Loss |
|---|---|---|---|---|
| Raja Ahmad | 340,000 | 0 | $6,607,762.51 | $748,294.84 |
| James LeFebvre | 46,496 | 15,000 | $262,314.39 | $233,821.91 (LIFO)[4] |
| Diaferia & Sisun | 45,050 | 36,050 | $1,089,024 | $652,565 (FIFO); $626,306 (LIFO) |
| Investor Group | 47,922 | 35,208 | $651,706.96 | $526,444.45 |

---

[3] "LIFO calculates losses by assuming that the first stocks to be sold are the stocks purchased most recently prior to that sale." Foley, 272 F.R.D. at 129. "'The main advantage of LIFO is that, unlike FIFO, it takes into account gains that might have accrued to plaintiffs during the class period due [to] the inflation of the stock price.'" City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc., 269 F.R.D. 291, 295 (S.D.N.Y. 2010) (quoting In re eSpeed, Inc. Sec. Litig., 232 F.R.D. 95, 101 (S.D.N.Y. 2005)).

[4] In his initial motion papers, LeFebvre states that he suffered a loss of $213,057.81. (See Linkh Decl., Ex. C (Dkt. No. 29-3) at 3) In his later opposition papers – in which LeFebvre uses the LIFO method of calculating loss – LeFebvre states that he suffered a loss of $233,821.91. (See Lefebvre Opp. (Dkt. No. 55) at 9)

(See Ahmad Br., Ex. 3 (Dkt. No. 26-3); Linkh Decl., Ex. C (Dkt. No. 29-3); Lieberman Decl., Ex. A (Dkt. No. 43-1); Investor Group Br. (Dkt. No. 47) at 11; Wilson Decl., Ex. C (Dkt. No. 48-3))[5]

While LeFebvre, Diaferia and Sisun, and the Investor Group acknowledge that Ahmad claims the largest loss, they argue that Ahmad does not have the largest financial interest, because he sold all of his Evolus securities before Defendants' alleged fraud was disclosed to the market, and his losses are therefore not recoverable. (See Diaferia and Sisun Opp. Br. (Dkt. No. 54) at 11-13; Investor Group Opp. Br. (Dkt. No. 57) at 8-10; Lefebvre Reply (Dkt. No. 59) at 6; Diaferia and Sisun Reply (Dkt. No. 60) at 13-14)

Ahmad sold all of his Evolus securities between March 13, 2019 and January 14, 2020. (Ahmad Br., Ex. 3 (Dkt. No. 26-3))  He argues that his losses are recoverable because Plaintiffs' claims do not "rest[] on one lone corrective disclosure at the end of the Class Period." Plaintiffs instead allege that "[d]uring the Class Period, . . . the relevant truth slowly leaked out through partial corrective disclosures. . . ." (Ahmad Reply (Dkt. No. 58) at 3)

The Second Circuit has identified "two requirements necessary to establish loss causation: 1) the loss must be foreseeable, and 2) the loss must have been caused by the materialization of the concealed risk." In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 40 (2d Cir. 2009) (citing Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005)). Moreover, "under Dura [Pharmaceuticals v. Broudo, 544 U.S. 336 (2005)] and its progeny, any losses that [a plaintiff] may have incurred before [a defendant's] misconduct was ever disclosed to the public are not recoverable, because those losses cannot be proximately linked to the

---

[5]  All four movants utilize a class period of February 1, 2019 to July 6, 2020. (Ahmad Br., Ex. 3 (Dkt. No. 26-3); Lefebvre Opp. (Dkt. No. 55) at 9; Diaferia and Sisun Opp. (Dkt. No. 54) at 7; Investor Group Br. (Dkt. No. 47) at 11)

7

misconduct at issue in th[e] litigation." In re Comverse Tech., Inc. Sec. Litig., No. 06-CV-1825 (NGG)(RER), 2007 WL 680779, at *4 (E.D.N.Y. Mar. 2, 2007), adhered to on reconsideration, No. 06-CV-1825 (NGG)(RER), 2008 WL 820015 (E.D.N.Y. Mar. 25, 2008).

"[W]hen evaluating a plaintiff's financial interest for purposes of selecting a lead plaintiff, courts in this Circuit consider that plaintiff's recoverable loss, and do not take into account losses from shares sold prior to corrective disclosures." Sallustro v. CannaVest Corp., 93 F. Supp. 3d 265, 273 (S.D.N.Y. 2015) (collecting cases). "However, a plaintiff's theory of 'loss causation may be premised on partial revelations that do not uncover the complete extent of the falsity of specific prior statements' where the partial disclosure 'somehow reveals to the market that a defendant's prior statements were not entirely true.'" Kux-Kardos v. VimpelCom, Ltd., 151 F. Supp. 3d 471, 476 (S.D.N.Y. 2016) (quoting In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008)); see also In re Flag Telecom Holdings, 574 F.3d at 41-42 ("The standards laid out in Dura and Lentell are relevant to the in-and-out traders because in order to prove loss causation, any plaintiff who sold their stock prior to the February 13, 2002 disclosure must prove that . . . the information that 'leaked' into the market prior to February 13, 2002, revealed the truth with respect to the specific misrepresentations alleged." (citing Lentell, 396 F.3d at 175)).

In arguing that "the relevant truth slowly leaked out," Ahmad contends that – before the July 6, 2020 ITC determination – Defendants' misappropriation of trade secrets and alleged fraud was partially disclosed through:

    (1) the ITC's March 1, 2019 press release announcing that it would commence a formal investigation into allegations that Evolus had misappropriated trade

> secrets from Allergan and Medytox, after which "Evolus shares fell $1.39, or 5%";[6]
>
> (2) an August 12, 2019 earnings call during which Defendant Maotazedi was questioned about "the legal proceedings pending against . . . Evolus alleging misappropriation of proprietary technology," after which "Evolus shares fell $1.71 per share, or 10%";
>
> (3) a February 25, 2020 earnings call during which Defendant Moatazedi "continued to provide allegedly false reassurances regarding" the ITC proceedings, which caused Evolus shares to fall "$0.67, or 7%"; and
>
> (4) a March 4, 2020 statement issued by Medytox "'disclos[ing] that a staff attorney at the ITC . . . submitted an opinion backing Medytox's claim'" against Evolus and Daewoong, after which "'Evolus' and Daewoong's shares fell 5.7%.'"

(Ahmad Reply (Dkt. No. 58) at 3-5 (citing Malakouti Cmplt. (Dkt. No. 1) ¶¶ 28, 43-44, 56, 60))

---

[6] Although the March 1, 2019 press release referenced by Ahmad is not mentioned in any of the complaints, all of the Plaintiffs allege that the ITC commenced a formal investigation into the misappropriation allegations on March 1, 2019. (See Malakouti Cmplt. (Dkt. No. 1) ¶ 28; Cox Cmplt. (Case No. 20 Civ. 9053, Dkt. No. 1) ¶ 28) Ahmad provides a cite to the March 1, 2019 press release – which is publicly accessible on the ITC's website – in support of his motion, and no Plaintiff has disputed that the ITC issued a press release at that time announcing that it would begin a formal investigation, or that Evolus shares fell 5% after the press release was issued. (See Ahmad Reply (Dkt. No. 58) at 4 n.3 (citing Press Release, ITC, USITC Institutes Section 337 Investigation of Certain Botulinum Toxin Prods., Process for Mfg. or Relating to Same and Certain Prods. Containing Same (Mar. 1, 2019), https://www.usitc.gov/press_room/news_release/2019/er0301ll1057.htm (hereinafter "ITC Press Release")))

This Court "may take judicial notice of well-publicized stock prices," In re VimpelCom, Ltd., No. 1-15-cv-8672 (ALC), 2016 WL 5390902, at *3 (S.D.N.Y. Sept. 26, 2016) (citing Ganino v. Citizens Utils. Co., 228 F.3d 154, 166 n.8 (2d Cir. 2000)), and of the March 1, 2019 ITC press release, "'for the purpose of establishing that the information in the . . . document[] was publicly available.'" Landow v. Wachovia Sec., LLC, 966 F. Supp. 2d 106, 119 (E.D.N.Y. 2013) (quoting Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 426 (2d Cir. 2008)); see also Lipow v. Net1 UEPS Techs., Inc., 131 F. Supp. 3d 144, 158 (S.D.N.Y. 2015) ("Matters of which judicial notice can be taken include press coverage establishing what information existed in the public domain during periods relevant to the plaintiffs' claims.") (internal quotation marks and citation omitted); In re Zyprexa Prods. Liab. Litig., 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008) ("Judicial notice can be taken of prior complaints and legal proceedings, press releases and news articles and published analyst reports in determining what the market knew.") (citations omitted).

As to the August 12, 2019 and February 25, 2020 earnings calls, the Malakouti complaint does not allege that any disclosure of Defendants' fraud took place during these calls. See Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc., 879 F.3d 474, 480 n.3 (2d Cir. 2018) ("A 'corrective disclosure' is an announcement or series of announcements that reveals to the market the falsity of a prior statement." (citing Lentell, 396 F.3d at 175 n.4)).  According to the Malakouti complaint, during the August 12, 2019 call, Defendant Moatazedi "assured investors that '. . . we remain very confident in our IP an[d] we'll let the court system continue to work through the case.'" (Malakouti Cmplt. (Dkt. No. 1) ¶¶ 43-44) (emphasis omitted)  And that complaint goes on to allege that during the February 25, 2020 call, Moatazedi told investors "'not to draw any definite conclusions from individual documents'" filed in the ITC action. Moatazedi allegedly "dodged [a] question" about "the 'potential realistic scenarios that could emerge from the ITC case. . . .'"  (Id. ¶¶ 56-57)  Given that the ITC proceedings against Evolus were already known to the public, these allegations suggest that Moatazedi was attempting to conceal – rather than expose – the truth regarding Evolus's misappropriation of trade secrets. See In re Flag Telecom Holdings, 574 F.3d at 41 ("Plaintiffs cannot have it both ways.  They cannot allege that Defendants made certain misstatements . . . and simultaneously argue that the misstatement itself constituted a corrective disclosure. . . .").  Accordingly, the Court concludes that the earnings calls do not constitute partial disclosures of the Defendants' alleged fraud.

As to the ITC's announcement of its investigation, "courts have found [that] 'the announcement of . . . investigations may qualify as partial disclosures for purposes of loss

causation.'" Kux-Kardos, 151 F. Supp. 3d at 477 (quoting In re Gentiva Sec. Litig., 932 F. Supp. 2d 352, 388 (E.D.N.Y. 2013); citing Take-Two, 551 F. Supp. 2d at 288 (collecting cases)).[7]

The ITC's March 1, 2019 press release states that the ITC

> voted to institute an investigation of certain botulinum toxin products, processes for manufacturing or relating to same and certain products containing same. . . . The investigation is based on a complaint filed by Medytox Inc. of Seoul, South Korea[]; Allergan plc of Dublin, Ireland; and Allergan, Inc., of Irvine, CA, on January 30, 2019.  The complaint alleges violations of section 337 of the Tariff Act of 1930 in the importation into the United States and sale of certain botulinum toxin products, processes for manufacturing or relating to same and certain products containing same that misappropriate trade secrets asserted by the complainants.  The complainants request that the USITC issue a limited exclusion order and cease and desist orders.
>
> The USITC has identified the following as respondents in this investigation: Daewoong Pharmaceuticals Co., Ltd., of Seoul, South Korea; and Evolus, Inc., of Irvine, CA.

(ITC Press Release, supra note 6; see also Ahmad Reply (Dkt. No. 58) at 3-4)

In sum, the ITC's press release discloses the nature of the ITC's investigation – misappropriation of trade secrets relating to botulinum toxin products – and the subjects of the investigation – Evolus and Daewoong.  Moreover, Ahmad asserts that on March 4, 2019 – the next trading day after the press release was issued – Evolus shares fell "$1.39 per share, or 5%." (Ahmad Reply (Dkt. No. 58) at 4)[8]  The Court concludes that the March 1, 2019 announcement of the ITC investigation constitutes a partial disclosure of Defendants' alleged misappropriation of trade secrets and fraud.  See In re VimpelCom, 2016 WL 5390902, at *3 ("[Plaintiff] has

---

[7] The movants opposing Ahmad's application do not address whether the March 1, 2019 announcement of the ITC investigation constitutes a partial disclosure of Defendants' alleged fraud.

[8] See also Historical Data, Evolus, Inc. (EOLS), YAHOO! FINANCE, https://finance.yahoo.com/quote/EOLS/history?p=EOLS (last visited Sept. 16, 2021).

11

sufficiently alleged that partial disclosures revealed some aspect of [defendant's] misconduct and that the partial disclosures caused an immediate material stock decline.").

As to Medytox's March 4, 2020 statement, the Malakouti complaint alleges that Medytox "disclosed that a staff attorney at the ITC, who plays a vital role in the decision of the ITC, submitted an opinion backing Medytox's claim that Daewoong and Evolus used Medytox's botulinum toxin strain[,]" and that "on this news, Evolus' and Daewoong's shares fell 5.7%." (Malakouti Cmplt. (Dkt. No. 1) ¶ 60)  In other words, when Medytox reported that an ITC attorney had found the misappropriation of trade secrets allegations against Evolus to be substantiated, it "reveal[ed] to the market the falsity of [Evolus's] prior statement[s]," which caused Evolus's stock price to fall.  Ark. Teachers, 879 F.3d at 480 n.3.

Movants Diaferia and Sisun concede that Medytox's March 4, 2020 statement is a partial corrective disclosure.  (See Diaferia and Sisun Reply (Dkt. No. 60) at 13 ("[T]he market first began to learn of Defendants' alleged malfeasance on March 4, 2020, with the announcement that an ITC attorney had found merit in the misappropriation claims. . . ."))

Movant Lefebvre argues, however, that Medytox's March 4, 2020 statement is only "[s]peculation by an Evolus competitor regarding the outcome of a legal proceeding based on an opinion[, which] is not the type of new information normally considered a 'corrective disclosure.'"  (Lefebvre Reply (Dkt. No. 59) at 7 n.5)  Lefebvre further asserts that the Malakouti complaint "does not allege a corrective disclosure on March 4, 2020" because (1) the complaint "only alleges that the defendants made false statements on that day"; and (2) the section in the Malakouti complaint discussing the subsequent July 6, 2020 ITC determination is entitled, "The Truth Begins to Emerge."  (Id. at 6-7 (citing Malakouti Cmplt. (Dkt. No. 1) ¶¶ 60, 62, 63)) These arguments are not persuasive.

As discussed above, the Malakouti complaint alleges that Medytox reported on March 4, 2020, that an ITC attorney had found the misappropriation claims against Evolus to be substantiated. Medytox did not speculate about the outcome of the ITC proceedings. As to Lefebvre's argument that Medytox's statement is "not the type of new information normally considered a 'corrective disclosure,'" Lefebvre provides no explanation for his argument, nor does he offer any case law support. (Id. at 7 n.5) The Court concludes that Medytox's report that an ITC attorney had found the claims of trade secret misappropriation to be substantiated undermined Defendants' prior assertions that the allegations against it were "speculative" and that there was reason to "remain very confident in [Evolus's] IP." (Malakouti Cmplt. (Dkt. No. 1) ¶¶ 24, 44) Finally, while the section of the Malakouti complaint discussing the July 6, 2020 ITC determination is entitled "The Truth Begins to Emerge," Lefebrve's "reliance on this single allegation . . . is insufficient to establish the date of [the] first corrective disclosure." Di Scala v. ProShares Ultra Bloomberg Crude Oil, No. 20 Civ. 5865 (NRB), 2020 WL 7698321, at *3 (S.D.N.Y. Dec. 28, 2020) (declining to exclude movant's losses where partial disclosures took place before an incident described in a section of the complaint "[en]titled 'The Truth Emerges'").[9]

The Court concludes that Medytox's March 4, 2020 statement constitutes a partial disclosure of Defendants' alleged misappropriation of trade secrets and fraud.

---

[9] Lefebvre also cites Ahmad's "acknowledge[ment] in his opening memorandum . . . that 'on July 6, 2020, the investing public learned the truth about Jeuveau.'" (Lefebrve Reply (Dkt. No. 59) at 6 (quoting Ahmad Br. (Dkt. No. 26) at 3)) But there is no inconsistency in arguing that Defendants' fraud was fully disclosed on July 6, 2020, and that partial corrective disclosures occurred before that date. As discussed above, "a plaintiff's theory of 'loss causation may be premised on partial revelations that do not uncover the complete extent of the falsity of specific prior statements. . . .'" Kux-Kardos, 151 F. Supp. 3d at 476 (quoting Take-Two, 551 F. Supp. 2d at 283).

\*   \*   \*   \*

The Malakouti complaint adequately alleges two partial corrective disclosures prior to the end of the Class Period:  (1) the ITC's March 1, 2019 announcement that it would commence an investigation into the misappropriation allegations against Evolus and Daewoong; and (2) Medytox's March 4, 2020 statement reporting that an ITC attorney issued an opinion supporting the trade secret misappropriation claims brought against Evolus and Daewoong.  Because Ahmad sold his shares after the first partial disclosure on March 1, 2019, his losses could be found to have been proximately caused by Defendants' fraudulent conduct.

The Court accepts Ahmad's calculation of his losses, and concludes that – at $748,294.84 – he has alleged the greatest loss and the largest financial interest among the movants.  (Ahmad Br., Ex. 3 (Dkt. No. 26-3))  Accordingly, and subject to Rule 23 requirements, there is a rebuttable presumption that Ahmad is the most adequate plaintiff.  See 15 U.S.C. § 78u-4(a)(3)(B)(iii).

### B.     Rule 23 Requirements

Fed. R. Civ. P. 23 states that a party may serve as a class representative only if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  In order for the rebuttable presumption to apply, courts have required only a prima facie showing that the requirements of Rule 23 are met.  See In re KIT Digital, Inc. Sec. Litig., 293 F.R.D. 441, 445 (S.D.N.Y. 2013).  Furthermore, "[t]ypicality and adequacy of representation are the only provisions relevant to a determination of lead plaintiff under the PSLRA."  In re Oxford Health Plans, Inc. Sec.

Litig., 182 F.R.D. 42, 49 (S.D.N.Y. 1998); see also Simmons v. Spencer, Nos. 13 Civ. 8216 (RWS), et al., 2014 WL 1678987, at *4 (S.D.N.Y. Apr. 25, 2014); In re KIT Digital, 293 F.R.D. at 445; Varghese v. China Shenghuo Pharms. Holdings, Inc., 589 F. Supp. 2d 388, 397 (S.D.N.Y. 2008); Kaplan, 240 F.R.D. at 94 ("[A]t this stage of litigation, only a preliminary showing of typicality and adequacy is required.").

"Typicality is established where each class member's claim 'arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" Freudenberg v. E*Trade Fin. Corp., Nos. 07 Civ. 8538, et al., 2008 WL 2876373, at *5 (S.D.N.Y. July 16, 2008) (quoting In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992)). However, "[t]he lead plaintiff's claims 'need not be identical to the claims of the class to satisfy the [preliminary showing of] typicality.'" In re Fuwei Films, 247 F.R.D. at 436 (quoting Pirelli, 229 F.R.D. at 412).

Lefebvre, Diaferia and Sisun, and the Investor Group argue that Ahmad does not satisfy Rule 23's adequacy and typicality requirements because he "held no Evolus securities on the date that the Defendants' alleged fraud was disclosed to the market. As such, Ahmad has incurred no injury traceable to Defendants' alleged securities fraud and lacks standing to pursue fraud claims in this litigation, which will subject him to a unique defense." (Investor Group Opp. (Dkt. No. 57) at 8; see also Diaferia and Sisun Opp. (Dkt. No. 54) at 16-17; Lefebvre Reply (Dkt. No. 59) at 6 n.4)  These movants assert that, "[i]f appointed as a Lead Plaintiff, Ahmad will clearly be forced to spend considerable time and energy litigating the question of his standing, at the expense of his ability to pursue fraud claims on behalf of the Class." (Diaferia and Sisun Opp. (Dkt. No. 54) at 16; see also Investor Group Opp. (Dkt. No. 57) at 8)

15

As explained above, however, Ahmad sold his shares after the March 1, 2019 partial disclosure alleged in the Malakouti complaint, and has thus adequately pled both loss causation and standing. See Montoya v. Mamma.com Inc., Nos. 05 Civ. 2313(HB) et al., 2005 WL 1278097, at *2 (S.D.N.Y. May 31, 2005) ("[L]oss causation does not require full disclosure and can be established by partial disclosure during the class period which causes the price of shares to decline[.]") (emphasis in original). Moreover, "'[c]ourts in this District have found that where a putative lead plaintiff sold all its shares after a partial disclosure of misconduct by the defendant but before the final disclosure that led to the lawsuit, that putative lead plaintiff does not face the unique defense of having to show loss causation to the extent that it cannot serve as lead plaintiff.'" In re Gentiva Sec. Litig., 281 F.R.D. 108, 116-17 (E.D.N.Y. 2012) (quoting Juliar v. SunOpta Inc., Nos. 08 Civ. 933 (PAC) et al., 2009 WL 1955237, at *2 (S.D.N.Y. Jan. 30, 2009); citing Ellenburg v. JA Solar Holdings Co. Ltd., 262 F.R.D. 262, 268 (S.D.N.Y. 2009) ("[S]elling shares during the class period does not disqualify a class member from being appointed lead plaintiff."); Freudenberg, 2008 WL 2876373, at *7 ("Nor does the sale by KSG of their E*Trade securities by August 20, 2007, prior to the end of the alleged class periods in the current complaints, render them inadequate or atypical under the PSLRA, absent a showing that such divestiture creates divergent interests."); Weiss v. Friedman, Billings, Ramsey Grp., Inc., Nos. 05 Civ. 4617 et al., 2006 WL 197036, at *5 (S.D.N.Y. Jan. 25, 2006) ("[D]espite the fact that all the Operating Engineers Trust's shares were sold before the class period ended, one would not necessarily have to conclude that the Trust's losses are unattributable to the alleged fraudulent inflation.")). Accordingly, that Ahmad sold all of his Evolus securities before the end of the Class Period does not render him an inadequate lead plaintiff or render his claims atypical.

Ahmad has otherwise made the requisite showings of typicality and adequacy within the meaning of the PSLRA and Rule 23(a)(3). As to typicality, Ahmad alleges that – like other class members – he purchased shares of Evolus stock during the Class Period and suffered harm because of Defendants' misrepresentations and/or material omissions. (Ahmad Br. (Dkt. No. 26) at 6) This Court concludes that Ahmad's claims and legal arguments are similar to those of other investors and therefore representative of the putative class. Accordingly, Ahmad has made the preliminary showing required for typicality at this stage of the proceedings.

Ahmad has also demonstrated that he will fairly and adequately protect the interests of the putative class. The adequacy requirement of Rule 23(a)(4) is satisfied where "(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) there is no conflict between the proposed lead plaintiff and the members of the class; and (3) the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy." Foley, 272 F.R.D. at 131.

Here, Ahmad has retained competent and experienced counsel and pled a significant loss that gives him a sufficient stake in this litigation to ensure vigorous prosecution on behalf of all class members. See Sallustro, 93 F. Supp. 3d at 278; Ahmad Br. (Dkt. 26) at 5-8. Moreover, there is no apparent conflict between Ahmad's interests and those of the rest of the class. (Id.) And, as discussed above, no movant has shown that Ahmad's claims are subject to unique defenses or are otherwise rebuttable. Having met the adequacy requirements, Ahmad – as the investor with the largest financial interest in this action – will be appointed lead plaintiff.

## II.     APPOINTMENT OF LEAD COUNSEL

Under the PSLRA, "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). There

is a "strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection."  See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig., No. 03 MDL 1529 (LMM), 2008 WL 4128702, at *2 (S.D.N.Y. Sept. 3, 2008) (quoting In re Cendant Corp. Litig., 264 F.3d 201, 276 (3d Cir. 2001)).

Here, Ahmad has selected the Rosen Law Firm as his counsel.  In support of the request to appoint lead counsel, Ahmad and his counsel have submitted a firm resume, which provides a detailed description of the educational backgrounds and legal experience of the attorneys at the firm – including the attorneys who have appeared in this action – along with a list of the numerous cases in which the firm has served or is now serving as lead or co-lead counsel.  (See Ahmad Br., Ex. 4 (Dkt. No. 26-4))  Having reviewed Ahmad's brief and the firm resume, this Court concludes that the Rosen Law Firm is qualified to serve as lead counsel in this matter.

## CONCLUSION

For the reasons stated above, Plaintiff Ahmad's motion for appointment as lead plaintiff and of lead counsel (Dkt. No. 24) is granted.  All competing motions (Dkt. Nos. 27, 38, 45) are denied.  The Clerk of Court is directed to terminate the motions.  (Case No. 20 Civ. 08647, Dkt. Nos. 13, 17, 24, 27, 30, 31, 38, 39, 45)

Dated:  New York, New York
            September 17, 2021

SO ORDERED.

_____
Paul G. Gardephe
United States District Court