**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE: EVOLUS INC. SECURITIES LITIGATION** | **CASE No.: 20-cv-8647-PGG**<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Raja Ahmad together with named Plaintiff Kim Keller, named Plaintiff Mitchell Sisun, and named Plaintiff Peter Diaferia ("Plaintiffs" or "Investors"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Investors' own acts and upon information and belief as to all other matters based on the investigations conducted by and through Investors' own attorneys. This investigation included, among other things: review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by Evolus, Inc. ("Evolus" or the "Company"); Evolus's press releases and earnings call transcripts; public information regarding Evolus, including information on Evolus's website; analyst reports and media reports about Evolus; interviews with former employees of Evolus and documents filed in International Trade Commission ("ITC") Investigation No. 337-TA-1145 *In the Matter of Certain Botulinum Toxin Products* (the "ITC Litigation").

## NATURE OF THE ACTION

1.      Investors bring this securities class action on behalf of all persons or entities who purchased Evolus common stock on the NASDAQ between February 1, 2019 and July 6, 2020, both dates inclusive (the "Class Period") and who held such shares on March 4, 2019, and/or March

4, 2020 and/or July 6, 2020 and suffered compensable damages thereby (the "Class").[1]

2.     Evolus is a medical aesthetics company with one product only, an injectible botulinum neurotoxin ("BTX") product called Jeuveau used to treat wrinkles.  Jeuveau is just like Allergan's popular BTX product BOTOX Cosmetic, only cheaper. Both Jeuveau and BOTOX Cosmetic are manufactured from a highly potent neurotoxin called *C. botulinum.*  Nearly all of Evolus's management team during the Class Period worked at Allergan in high-level positions prior to working at Evolus.

3.     Because Jeuveau is a biologic it requires FDA approval.  In 2013 Evolus purchased an exclusive license to develop Jeuveau from South Korean pharmaceutical company Daewoong Pharmaceuticals ("Daewoong"). Analogously, Allergan has a partnership with a South Korean company called Medytox ("Medytox") which produces a BTX product. Allergan singlehandedly developed the U.S. market for BTX products over the course of 30 years.

4.     Evolus conducted clinical trials of Jeuveau beginning in 2014.  In 2017 the FDA accepted Evolus's Biologics License Application ("BLA") for Jeuveau. On February 1, 2019 Evolus received FDA approval to market Jeuveau.

5.     Evolus's receipt of FDA approval for Jeuveau enabled Evolus to compete in the $2.5 billion (annual) aesthetic neurotoxin market.

6.     Prior to the Class Period, in 2017, Medytox sued Evolus and Daewoong in California Superior Court alleging that Jeuveau had been misappropriated from Medytox when a former Medytox employee named BK Lee ("BK Lee") stole both Medytox's proprietary BTX

---

[1]  Excluded from the Class are: Defendants and their immediate families; the officers and directors of Evolus and Alphaeon Corporation at all relevant times; any Defendants' subsidiaries, affiliates, legal representatives, heirs, successors, or assigns; and any entity in which Defendants or any excluded persons have or had a controlling interest.

strain and Medytox's proprietary manufacturing process for its BTX strain and gave them to Daewoong in exchange for employment at Daewoong, compensation and other favors. Because of a parallel action Medytox filed in Korea, the California court stayed the case as to Evolus. Evolus and Daewoong maintained in documents filed in the ITC Litigation (discussed below) that the BTX strain used to manufacture Jeuveau was discovered in the soil in South Korea.

7.    According to Evolus's former Director of Medical Affairs, despite Evolus's awareness of the allegations that Jeuveau was the product of misappropriation, Evolus and its senior management refused to investigate the allegations. As the former Director of Medical Affairs explained, Evolus had no interest in investigating the claims because it would not benefit Evolus to discover that Jeuveau was the product of misappropriation.

8.    On January 25, 2019 Allergan and Medytox filed a complaint before the International Trade Commission[2] again alleging that Evolus and Daewoong misappropriated their BTX product and manufacturing process, and requesting that the ITC institute an investigation. The ITC Complaint sought, among other things, a cease-and-desist order preventing Evolus from importing and selling Jeuveau.

9.    Despite Evolus's willful refusal to investigate the allegations, Defendants represented to investors that the allegations had no merit and touted Jeuveau's proprietary manufacturing process. For example, when asked about the ITC Complaint Evolus stated *"we remain confident in our intellectual property and proprietary manufacturing process* and will work with the ITC through its review. *We continue to believe that Allergan and Medytox's claims are completely without merit* and that their complaint and associated timing reflect their level of

---

[2] *See Verified Complaint of Medytox and Allergan under Section 337 of the Tariff Act of 1930, as Amended* ("ITC Complaint"). A copy of the ITC Complaint is attached hereto as Exhibit A.

concern surrounding Evolus' entry as a new competitor that will enhance consumer and physician choice."

10.     The ITC agreed to commence an investigation on March 1, 2019 (the "ITC Litigation").  When the ITC issued a press release announcing it would open an investigation, correcting Defendants' prior misrepresentations that Allergan's and Medytox's claims were "completely without merit," Evolus's stock fell 5%.

11.     Unlike in Federal district and U.S. state courts, where the public enjoys a presumptive right of access, discovery in ITC cases and proceedings in ITC Court are for the most part confidential. Accordingly, Defendants, but not the investing public had received all the fact and expert evidence in the case as it was produced. Similarly, Defendants, but not the investing public were able to attend the three day-long evidentiary hearing that took place at the conclusion of the investigation.

12.     In possession of material non-public information concerning the evidence demonstrating that Jeuveau was the product of misappropriation, on May 20, 2019 Evolus's controlling shareholder, Alphaeon sold 4 million shares of Evolus stock in a secondary offering for proceeds of $77 million at the artificially inflated price of $19.25 per share.

13.     Fact discovery in the ITC Litigation closed on July 19, 2019. Expert discovery in the ITC Litigation closed on October 30, 2019. During fact discovery the ITC judge ordered Medytox to produce to Evolus and Daewoong the trade secrets allegedly misappropriated. This permitted Evolus to see for itself whether the BTX strain and manufacturing process for Jeuveau and Medytox's BTX product were in fact the same and that Jeuveau was therefore the product of misappropriation.

14.     Indeed, unbeknownst to investors, the scientific evidence in the ITC Litigation

4

demonstrated that Jeuveau and Medytox's BTX strains shared six identical DNA mutations. The possibility of this occurring by chance was less than one in a few million.  The scientific evidence likewise showed that the genomes for Jeuveau's BTX strain and Medytox's, whose DNA consisted of 3.7 million nucleotides, were virtually identical. In other words, the scientific and genetic evidence established to a "virtual certainty" that it was impossible that the BTX strain for Jeuveau was isolated from the wild in a soil sample in South Korea.  Defendants knew beyond any doubt Daewoong had stolen the strain for Jeuveau from Medytox.

15.     As to the manufacturing process for Jeuveau, Daewoong and Evolus were unable to produce research and development records showing how they developed the manufacturing process for Jeuveau. Indeed, the manufacturing processes for Jeuveau and Medytox's BTX product shared ten commonalities which could not have been coincidental. Further, Evolus and Daewoong claimed Jeuveau was developed in an incredibly short amount of time and that a Daewoong intern performed all the development work.

16.     Despite Defendants knowing the above facts and evidence proving that Jeuveau was manufactured using the BTX strain and manufacturing process Daewoong stole from Medytox, Defendants assured investors that "nothing changed through the case," and that they "remained confident in the strength of Evolus's IP."   For example, on August 12, 2019 when an analyst asked Evolus's CEO David Moatazedi about the ITC Judge's order requiring Allergan/Medtyox to produce its trade secrets (which would allow Evolus to determine if Jeuveau was made using those same trade secrets and was therefore the product of misappropriation) Moatazedi refused to specifically answer the question but assured investors that "*As we've said from the beginning, we remain very confident in our IP*."  Further, Defendants continued to tout Evolus's supposedly "proprietary" product and Jeuveau's competitive advantages, which in truth

were attributable to misappropriation.

17.     Shortly after the close of expert discovery in the ITC Litigation, on November 6, 2019 Evolus conducted a public offering of 5,217,000 shares of common stock at a price of $13.00 per share, providing Evolus net proceeds from the November Offering of approximately $63.5 million.

18.     The Evidentiary hearing in the ITC Litigation took place from February 4-7, 2020.

19.     On March 4, 2020 Medytox released a statement revealing that during the ITC Hearing the ITC Staff Attorney sided with Allergan and Medytox.  On this news shares of Evolus common stock fell 7%, damaging investors.

20.     That same day, Defendants swiftly issued a statement characterizing Medytox's disclosure as "speculative and intended to create confusion."  Similarly, Defendants continued to issue the same false and misleading statements assuring investors of the strength of Evolus's IP and reassuring investors that, as to the ITC Litigation, there was nothing to worry about.

21.     On July 6, 2020 the ITC Court issued its Final Initial Determination ("FID")[3]. The ITC Judge held Jeuveau was the product of misappropriation and recommended an order preventing Evolus from importing Jeuveau into the U.S for ten years and a cease-and-desist order prohibiting Evolus from marketing and selling Jeuveau in the U.S., also for a period of ten years.

22.     On this news, shares of Evolus common stock fell to $3.35 per share over the next two days, representing a decline of 37%, damaging investors.

23.     As a result of Defendants' knowing and/or reckless false and misleading statements and omissions of material fact, the price of Evolus common stock was artificially inflated during the Class Period.  When news of the ITC Investigation, the ITC Staff Attorneys' position and the

---

[3] A copy of the FID is attached hereto as Exhibit B.

FID revealed the truth in a series of partial corrective disclosures and Evolus's share price declined, Investors and other Class Members suffered significant losses and damages.

## JURISDICTION AND VENUE

24.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

26.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

27.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

28.     Lead Plaintiff Raja Ahmad, as set forth in the certification submitted in connection with his lead plaintiff motion filed in this action (ECF No. 26-3), purchased Evolus common stock during the Class Period at artificially inflated prices and suffered damages as a result of the federal securities law violations alleged herein.

29.     Named Plaintiff Kim Keller purchased Evolus common stock during the Class

Period at artificially inflated prices and suffered damages as a result of Defendants' federal securities law violations. Ms. Keller's PSLRA certification is attached hereto as Exhibit C and incorporated by reference herein.

30.     Named Plaintiff Mitchell Sisun, as set forth in the certification submitted in connection with his lead plaintiff motion filed in this action (ECF No. 43-3), purchased Evolus common stock during the Class Period at artificially inflated prices and suffered damages as a result of the federal securities law violations alleged herein.

31.     Named Plaintiff Peter Diaferia, as set forth in in the certification submitted in the certification submitted in connection with his lead plaintiff motion filed in this action (ECF No. 43-3), purchased Evolus common stock during the Class Period at artificially inflated prices and suffered damages as a result of the federal securities law violations alleged herein.

32.     Evolus is incorporated in Delaware with its principal executive offices in Newport Beach, California. Evolus's common stock trades on the NASDAQ Exchange ("NASDAQ") under the ticker symbol "EOLS."  Evolus was incorporated in 2013 and began trading on the NASDAQ after its initial public offering in February 2018.

33.     Defendant David Moatazedi ("Moatazedi") has been Evolus's President and CEO since May 2018. Prior to joining Evolus, Moatazedi worked for Allergan for thirteen years in various capacities, including as the Head of Allergan's Medical Aesthetics division. Defendant Moatazedi was the most senior person at Allergan with direct responsibility for Botox and was privy to all strategic thinking and planning regarding the commercial side of Botox. One of the last things Moatazedi did before leaving Allergan was assess the competitive threat to Botox Evolus posed.

34.     Defendant Rui Avelar ("Avelar") has been Evolus's Chief Medical Officer

("CMO") and Head of Research and Development since January 2014.  Prior to joining Evolus, Avelar worked for almost ten years at Allergan as its Chief Medical Officer. Defendant Avelar served as the CMO of Defendant Alphaeon Corp. (defined below) from March 2011 to December 2013.

35.     Defendant Lauren Silvernail ("Silvernail") has been Evolus's CFO and Executive Vice President since May 2018. Prior to joining Evolus, Defendant Silvernail worked for eight years at Allergan as a Vice President of Business Development.

36.     Defendant Alphaeon Corporation ("Alphaeon") is a Delaware Corporation with its principal place of business located in Irvine, California. A company called SCH-AEON, in turn wholly owns Alphaeon. According to Evolus's SEC filings, Alphaeon is a technology company focused on providing healthcare products and services, including patient financing services. Alphaeon was the majority shareholder of Evolus at the beginning of the Class Period, owning 56% of the Company's outstanding shares of common stock. According to Evolus's 2018 10-K, Alphaeon controls the direction of Evolus's business and is able to determine the outcome of all corporate actions requiring stockholder approval. Additionally, certain of Evolus's directors "may have actual or potential conflicts of interest because of their ownership of debt or equity securities in Alphaeon and their positions within Alphaeon."  At the beginning of the Class Period Alphaeon had the ability to elect a majority of the directors on the board of Evolus. In its SEC filings, Evolus has referred to Alphaeon as its parent company.

37.     On May 20, 2019 Alphaeon sold 4 million shares of Evolus stock in a secondary public offering at price of $19.25 per share, netting proceeds of $77 million and a net profit of $77 million based on a per share purchase price of $0.00.[4]

---

[4]   Based on a purchase price of $0.00 per share as described at Page 65 of Evolus's initial public offering prospectus dated February 1, 2018.

38.     Non-party Vikram Malik ("Malik") has been a member and Chairman of Evolus' Board of Directors Evolus since January 2018. Malik has also been a member of the board of directors of Alphaeon since January 2018.

39.     Non-party Simone Blank ("Blank") has been a member of Evolus's Board of Directors since January 2018. Blank has also been the Chairwoman of Alphaeon's board of directors since July 2016.

40.     Non-party Bosun Hau ("Hau") has been a member of Evolus's Board of Directors since January 2018.  Hau has also been a member of the board of directors of Alphaeon since May 2016.

41.     Non-Party Kristine Romine M.D. ("Romine") has been a member of Evolus's board of directors since January 2018. Form April 2017 to February 2018 Romine served as a member of Alphaeon's Board of Directors.

42.     Non-party Robert Hayman ("Hayman") has been a member of Evolus's board of directors since January 2018.  From April 2014 to February 2018 Hayman served as a member of Alphaeon's board of directors.

43.     Defendants Moatazedi, Silvernail and Avelar (collectively the "Individual Defendants"), because of their positions of control over the Company, and Defendant Alphaeon, because of its ability to control the Company through share ownership and control over the Board of Directors, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market.

44.     The Individual Defendants and Alphaeon were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be

corrected. Because of their positions and access to material nonpublic information available to them, the Individual Defendants and Alphaeon knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants and Alphaeon are liable for the false statements pleaded herein.

45.    Additionally, Defendants Moatazedi and Silvernail certified, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), as to the Company's compliance with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and to the Company's quarterly and annual reports filed with the Securities and Exchange Commission during the Class Period:  (i) "Based on [Defendants'] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; (ii) having fairly presented, in all material respects, the financial condition and operating results of the Company; and (iii) having disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting".

## ALLEGATIONS OF MISCONDUCT

### A.  Background

### *Botulinum Neurotoxin* ("BTX")

46.    Botulinum Neurotoxin or "BTX" is a product made from *C. botulinum,* the bacteria that causes botulism. *C. botulinum* is a highly potent neurotoxin that can cause muscle paralysis and death. Therefore, it must be handled carefully. BTX products are biologics that have both therapeutic and aesthetic applications. These include treating chronic migraine headaches,

spasticity and urinary incontinence. Aesthetically, BTX products are used to temporarily improve the appearance of glabellar lines (i.e. frown lines), crow's feet and forehead lines.

47.     Allergan was the first company to launch a BTX product in the United States. Allergan received FDA approval for its trademark product BOTOX for therapeutic uses in 1989 and for aesthetic uses in 2002.  Allergan's BOTOX Cosmetic is the "gold standard" BTX product for cosmetic purposes.

48.     Medytox is a South Korean company founded in 2000 for the purpose of researching, developing and manufacturing BTX products.  In 2006 Medytox received approval form the Korean Ministry of Food and Drug Safety to sell the first BTX product developed in Korea called Meditoxin.

49.     In September 2013 Allergan and Medytox entered into a licensing and supply agreement whereby Medytox licensed a formulation of its BTX product to Allergan for commercialization in the U.S.  Allergan is the exclusive licensee of Medytox's BTX product.

### *Evolus' Business*

50.     Evolus is a medical aesthetics company established in 2012. Evolus's only product is Jeuveau, which is a purified BTX product for the temporary improvement in the appearance of moderate to severe frown lines in adults.  Since its inception, Evolus's sole focus has been bringing Jeuveau to the U.S. market.

51.     Evolus's Class Period SEC filings state that the Company's ability to develop and successfully commercialize Jeuveau was, and continues to be, critically important to its continued operations. Indeed, the Company's entire existence hinges on its ability to successfully market and sell Jeuveau in the U.S.

52.     Evolus began trading on the NASDAQ under ticker symbol "EOLS" upon the

closing of its IPO in February 2018. As of February 28, 2019 Evolus had only 70 employees, all of whom worked for the Company full-time.

53.     In January 2013, Medytox and Evolus began negotiating a supply and license agreement whereby Medytox would sell and supply its BTX product, Meditoxin, to Evolus so that Evolus could sell it in the United States. Medytox and Evolus exchanged a term sheet and proceeded to negotiate the terms and conditions of the anticipated agreement. The CEO's of Evolus and Medytox had an initial in person meeting in Korea on March 19, 2013. On May 7, 2013 the CEO of Medytox visited Evolus at its headquarters in California for a follow up meeting.

54.     However, four months later, Evolus entered into an agreement with a different South Korean pharmaceutical company for the exclusive rights to license its BTX product. On September 20, 2013 Evolus entered into an agreement with South Korean pharmaceutical company Daewoong Pharmaceuticals Co, Ltd ("Daewoong"). Pursuant to the agreement Daewoong would manufacture and supply Jeuveau to Evolus and grant Evolus an exclusive license to import, distribute, promote, market, develop, offer for sale or otherwise commercialize and exploit Jeuveau in the U.S., EU, Canada, Australia, Russia and South Africa (and a non-exclusive license to do so in Japan).

55.     DWP-450 is Daewoong's internal designation for its BTX product.  DWP-450 products are sold under the brand name Nabota in South Korea, and Nuceiva in Canada and Europe, in addition to Jeuveau in the U.S.

56.     Analysts estimated that the value of the agreement between Evolus and Daewoong was approximately $250 million.

57.     Beginning in early 2014 Evolus began the process of seeking FDA approval to market Jeuveau in the U.S.

58.     While Evolus licensed Jeuveau from Daewoong, Evolus sponsored, conducted and oversaw the clinical trials of Jeuveau, which took place in the United States.

59.     In September 2014, the FDA accepted Evolus's Investigational New Drug ("IND") application to conduct clinical trials of Jeuveau. Shortly thereafter, Evolus began conducting clinical trials of Jeuveau in the U.S.

60.     Evolus conducted four separate clinical trials of Jeuveau involving over 1,500 individuals beginning in 2014. Concurrent with the commencement of these clinical trials, Defendant Avelar left his position as Chief Medical Officer at Allergan to become the Chief Medical Officer of Evolus.  Defendant Avelar conducted each of Evolus's four clinical trials and is one of the authors of the publication in the *Journal of Dermatologic Surgery* of the results of Evolus's pivotal Phase III studies on Jeuveau.

61.     On July 19, 2017 Evolus announced that the FDA had accepted its Biologics License Application ("BLA") for Jeuveau. Evolus's BLA, which it did not publicly file, contains representations concerning the source and identity of the BTX strain used to manufacture Jeuveau. Indeed, in describing a drug substance in a BLA the FDA expects the applicant to provide the "biological name (including strain…)…[and] the source of the cells, including microbes, from which the drug substances were derived…."[5] Evolus is responsible for the integrity of the data and information in its BLA submission to the FDA. Daewoong claimed that it discovered the BTX strain used to manufacture Jeuveau from the soil in Korea. Presumably, Evolus repeated this false statement to the FDA in its BLA for Jeuveau.

---

[5] *See* Guidance for Industry: Content and Format of Chemistry, Manufacturing and Controls Information and Establishment Description Information for a Vaccine or Related Product (January 1999), at 3, available at https://www.fda.gov/downloads/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/Vaccines/ucm092272.pdf.

62.     On May 7, 2018 Defendant Moatazedi left his position as the Senior Vice President of U.S. Medical Aesthetics at Allergen to take the helm at Evolus as its CEO and President and develop a rival to BOTOX.  Commenting on his tenure at Evolus, Moatazedi stated "The team at Evolus has done a fantastic job in bringing forward what I believe will be the most exciting new product in aesthetics. I look forward to working with this talented group of professionals and completing the build out of a best in class leadership team."  Moatazedi spent 14 years at Allergen, in his words, "all in medical aesthetics in the same category [and] worked on brands like BOTOX, launched the Juvederm franchise back in 2006 and held different roles and responsibilities over that time, including running the U.S. Aesthetics business."

63.     In confidential testimony in the ITC Litigation Moatazedi admitted that as recently as early as 2018 he was "the most senior person in [Allergan] with direct responsibility for BOTOX Cosmetic" and was thus "privy to all strategic thinking and planning…with regard to the commercial side of BOTOX Cosmetic." *See* FID (Exh. B), p. 194.

64.     One of the last things Moatazedi did at Allergan was assess the competitive threat Evolus posed to BOTOX.  *Id.*

65.     Aside from Defendant Moatazedi, almost all of Evolus's senior management team (six out of its nine members) during the Class Period consisted of former high-level Allergan employees with significant BOTOX experience. These individuals include Evolus's CFO and Vice President of Business Development, Defendant Silvernail, Evolus's Chief Medical Officer and Head of Research and Development, Defendant Avelar; Evolus's Vice President of Corporate Communications and PR, Crystal Muilenburg; Evolus's Vice President of Sales Kurt Knab; and Evolus's Chief Marketing Officer, Michael Jafar.

66.     Analysts have recognized the competitive advantage Evolus gained from the former

Allergan employees. For example, Goldman Sachs reported that "Evolus'[s] management team consists almost exclusively of former Allergan employees, suggesting expertise in the field and a track record of success." FID, p. 194

67.    Unsurprisingly, the clinical trials testing the safety and efficacy of Jeuveau were successful. On February 1, 2019 Evolus announced that it received FDA approval to market Jeuveau.  Experts in dermatology who viewed the trial results concluded that Jeuveau and BOTOX were interchangeable given their similar efficacy and safety profiles.[6] Indeed, Defendant Moatazedi boasted that Evolus "developed the first Phase III clinical study that's head-to-head versus the market leader in BOTOX."

68.    Shares in Evolus rose over 11% after it announced the FDA had approved Jeuveau.

### *The Market for BTX Products*

69.    Defendants launched Jeuveau in the United States in May 2019 with the specific intent of competing with and taking market share from BOTOX Cosmetic. As Defendant Moatazedi stated on the CNBC show "Mad Money," Jeuveau "was designed from the outset to compete with the market leader" (*i.e*. BOTOX).

70.    The market for injectable neurotoxin products for aesthetic purposes is enormous. According to Evolus's 10-K filed on March 20, 2019 ("2018 10-K"), the global aesthetic neurotoxin market generated approximately $2.5 billion in revenue in 2018 and would likely grow to approximately $3.5 billion in 2021. The U.S. aesthetic neurotoxin market generated approximately $1.2 billion in sales in 2018.

71.    Aside from Allergan's BOTOX only two other injectable neurotoxin products have received FDA approval: Dypsort (marketed by Galderma, S.A.,) and Xeomin, (marketed by Merz

---

[6] *See, e.g.,* https://www.pharmaceutical-technology.com/comment/botox-competitor-jeuveau/.

Pharma GmbH) & Co. Dysport and Xeomin are not nearly as effective as BOTOX.  For this reason, BOTOX is by far the neurotoxin market leader.

72.     In 2018, Allergan's BOTOX generated approximately $907 million in revenue (for cosmetic indications only), and its share of the neurotoxin market was 75%. In 2019 BOTOX generated $1.66 billion in revenue (also for cosmetic indications only).

73.     Jeuveau is the first neurotoxin sold for cosmetic purposes only. Thus unlike BOTOX, which Allergan markets for both cosmetic and therapeutic indications, Evolus would market Jeuveau for cosmetic indications only. This meant that Evolus would not receive reimbursement from the Center for Medicaid and Medicare Services ("CMS") and would therefore not be subject to the physician payment Sunshine Act (the "Sunshine Act") which requires a company who receives reimbursement from Medicare of Medicaid to report payments to doctors and other information. Accordingly, Evolus would be able to utilize aggressive marketing strategies targeting physicians to market Jeuveau.

74.     Evolus summarized its marketing strategy, stating:

> Our primary market is self-pay aesthetic healthcare, which includes medical products purchased by physicians that are then sold to consumers or used in procedures for aesthetic indications that are not reimbursed by any third-party payor, such as Medicaid, Medicare or commercial insurance. ***By focusing on the self-pay medical aesthetics market, we believe we will not be exposed to reimbursement risk associated with a reliance on payments from such third-party payors, and we will be subject to fewer regulations that place limits on the types of marketing and other interactions we can have with physicians…We intend to create a strongly desirable experience for physicians and consumers by leveraging our management team's extensive industry experience, our compelling head-to-head clinical data compared with BOTOX, and our unique technology platform*** designed to transform the aesthetic market by eliminating the friction points existing for customers today.

75.     Analysts agreed that Evolus's marketing strategy for Jeuveau would likely prove effective. According to analysts from JPM Securities "EOLS will compete with BOTOX as a

branded player instead of competing as a generic. EOLS is building an aesthetics-only focused company with no therapeutic indications, thus EOLS can aggressively leverage marketing strategies not available to other toxin players. The Sunshine Act will not apply to EOLS as it will not receive reimbursement from CMS. Building customer relationships without such limitations should support a strong launch for JEUVEAU and expand an under-penetrated U.S. toxin market, in our view.[7]"

### *BTX: Technical Background*

    **a.**   *C. Botulinum*

    76.    In a typical cosmetic procedure, a 50-unit or 100-unit vial of a BTX product is injected via syringe into the muscle of a target area. The BTX product operates as a neuromuscular blocking agent, which functions by temporarily interfering with nerve signals and temporarily relaxing muscles through localized injections. *See* FID, p. 9.

    77.    *C. botulinum* is a bacterial organism, or bacteria.  All BTX products require use of a commercially viable *C. botulinum* strain. A serotype is a distinct variation within a species of bacteria. Different strains of *C. botulinum* produce different serotypes of neurotoxin. These serotypes are labeled alphabetically from serotype A to serotype G.  There are also subtypes within each serotype, e.g, A1, A2, etc.).  Type A1 BTX products are the most commercially viable. FID, p. 10.

    78.    Even though Type A1 strains of BTX are the most commercially viable not every Type A1-producing strain can be used to make a commercial BTX product. The properties of a

---

[7] Jan. 30, 2019 – JMP Securities, Donald Ellis, Nazibur Rahman – market outperform.  Target $35, current $15.09.

given strain are critical when determining whether the strain can be used for a commercial product. In addition to requiring a strain, producing a BTX product requires a carefully calibrated manufacturing process. The manufacturing process for BTX products includes manufacturing of the drug substance itself (also called the API or "bulk") and the drug product- i.e. the finished product sold to consumers. Manufacturing the BTX drug substance involves culturing (*i.e.* growing) the *C. botulinum* bacteria and then separating, isolating and purifying what is referred to as the "neurotoxin complex" (explained below). *Id.*

79.     When *C. botulinum* bacteria are cultured, they secrete the neurotoxin protein molecule as well as several other neurotoxin associated proteins. Together, these form the whole protein complex, which is called the neurotoxin complex. The whole neurotoxin complex can be used for a BTX product or it can be further purified until all of the proteins (with the exception of the neurotoxin protein molecule) are removed. *Id.*

80.     The molecular weight of the whole neurotoxin complex can vary, but the largest size is 900 kilodaltons ("kDa"). FID p. 11.

81.     Evolus's BTX product Jeuveau is the only other BTX product aside from Allergan's BOTOX with a molecular weight of 900kDa. *Id.* As Defendant Moatazedi stated at Evolus's May 14, 2019 Bank of America Healthcare Conference "we're the first product [that] entered the U.S. market that's a 900-kilodalton molecule. That scientifically is a similar molecule to BOTOX. No other molecule has entered in a comparable stage to BOTOX."

82.     After the drug substance is obtained it must be formulated and packaged into the final drug product that is sold to clinicians. Production of the drug involves combining the drug substance with additional ingredients called excipients to stabilize the neurotoxin molecules and provide sterile preparation of the product for injection. FID, p. 11.

83.     The "Hall A-hyper strain" is a strain of *C. botulinum* that U.S. army researchers developed in the 1940's and has been prized ever since for its characteristics that are not present in other *C. botulinum* strains. *Id.*

84.     The Hall A-hyper strain is an exceptionally productive strain, which makes the separation and purification process easier and the manufacturing process safer. The Hall A-hyper strain is also stable, which means it does not degenerate over time to a strain that produces less neurotoxin. *Id.*  Both Jeuveau and Medytox's BTX strain are derived from the Hall A-hyper strain. The Hall A-hyper strain cannot be isolated from nature because it does not contain spores (without spores, the Hall strain cannot be isolated from soil), undermining Evolus's and Daewoong's claim that Daewoong "discovered" the BTX strain for Jeuveau in the soil in South Korea.

**b.  *DNA Sequencing***

85.     The genome of any organism is the total of the DNA that encodes all the cells necessary for the organism to exist.  DNA is composed of four nucleotides: adenine (A), cytosine (C), guanine (G) and thymine (T). The arrangement of these four DNA nucleotides provides the information that dictates the biological activity of the organism.

86.     DNA sequencing is the process of determining the sequence or arrangement of DNA in a particular organism. The advent of rapid DNA sequencing methods has greatly accelerated biological and medical research and discovery.[8]  With rapid DNA sequencing a scientist can map an organism's genome. The genome of *C. Botulinum* type A1 bacteria is roughly 3.5 million to 4 million nucleotides in length, depending on the strain. The genome of the Hall A-hyper strain is 3,760,560 nucleotides in length. FID, p. 13.

---

8  https://en.wikipedia.org/wiki/DNA_sequencing

### c. *Growing Bacteria*

87.     Scientists refer to "growing" or "expanding" bacteria as synonyms for bacterial culturing to increase the number of bacteria. The most common way to grow large numbers of bacteria is called liquid culturing, where a small amount of the bacteria is put in a liquid medium with nutrients that make the bacteria grow.  FID, p. 15

88.     When bacteria reproduce, the cell must replicate its genomic DNA so that each cell has a copy of the genome.  The enzyme that copies the DNA in bacteria has an estimated error rate of between 1 error per 100 million and 1 error per 1 billion nucleotides that it copies.  In other words, if an organism has 100 million nucleotides when it reproduces it will have between .10 and 1 errors.  FID, p. 16.  An error or alteration to a DNA sequence is referred to as a mutation.

89.     When bacterial cells are cultured in laboratories scientists take advantage of the natural error or mutation rate to select and isolate single cells and start new cultures that allow these "mutant" cells to multiply.  Given that bacteria grow rapidly, scientists in a laboratory can create and isolate a bacterial culture that has several mutations from the original bacterium in a matter of weeks.  FID, p. 17

90.     However, this does not happen in nature. In nature, mutations do not arise that quickly.  New mutations of *C. botulinum* in nature can take years- even thousands of years to occur. FID, p. 18

91.     Medytox's proprietary *C. botulinum* strain contained six distinct mutations that Medytox cultivated in the laboratory through years of research and development and which are not present in any of the many other *C. botulinum* strains that exist.

### The ITC and Relevant Trade Secret Law

#### a.  ITC Court

92.    The International Trade Commission ("ITC") is an independent, quasi-judicial administrative agency. The ITC is responsible for, among other things, adjudicating allegations of unfair competition and unfair acts in the importation of articles into the United States[9]. Under the Tariff Act of 1930, as amended, the ITC has authority to investigate infringement of U.S. patent and trade secret rights by products imported in the United States.  ITC investigations for patent infringement or trade secret misappropriation are called "Section 337 cases". The ITC's mission is to protect domestic industries from unfair competition[10].

93.    Section 337 cases have several distinctions from district court cases.  The ITC uses its own rules, and discovery proceeds at a much faster pace than in district courts. Administrative Law Judges (ALJs) preside over ITC cases. In addition, a government ITC staff attorney is assigned to every ITC investigation at the outset of the investigation.  The staff attorney, from the Office of Unfair Import Investigations ("OUII") represents the "public interest" in a fair and reasoned adjudication of the investigation.  The ITC staff attorneys often have patent experience and advanced technical degrees. Further, the ITC staff attorneys actively participate in Section 337 cases:  they can take discovery, file briefs and participate in the hearing.

94.    According to empirical data, the ALJs heavily weigh the opinion of ITC staff attorneys in deciding cases.[11] Additionally, unlike district courts which favor public disclosure over confidentiality, one of the first things an ITC ALJ does is issue a protective order.  The ITC

---

[9] *See,* David L. Schwartz, *Courting Specialization: An Empirical Study of Claim Construction Comparing Patent Litigation Before Federal District Courts and the International Trade Commission*, 50 Wm. & Mary L. Rev. 1699, 1709 (2009).
[10] *Courting Specialization: An Empirical Study of Claim Construction Comparing Patent Litigation Before Federal District Courts and the International Trade Commission*, 50 Wm. & Mary L. Rev. 1699, 1709, 1723 (2009)
[11] *Id.* Note 112.

also routinely seals the courtroom for a hearing or trial when discussing confidential matters.[12] The ITC has always viewed its ability to gather and protect confidential information as crucial to its ability to perform its mission.[13]   Accordingly, much of what takes place in and ITC court investigation and hearing is not known to the public.

95.     Remedies in ITC Court are also different than remedies available in district court cases.  The ITC court cannot award monetary damages.  However, the ITC Court can issue cease and desist orders which will bar any further sales of the accused products. A victory for a complainant in ITC court can result in blocking the sale of goods made with misappropriated secrets in as little as 16 months from institution of an investigation.[14]

96.     For Evolus, a cease and desist order would mean that it could no longer market Jeuveau, its only product, in the U.S.

### b.  Relevant Law

97.     119 U.S.C. §1337 ("Section 337")– Unfair Practices in Import Trade- makes unlawful "unfair methods of competition and unfair acts in the importation of articles into the United States, on in the sale of such articles by the owner, importer, or consignee, the threat of effect of which is to destroy or substantially injure an industry in the United States." 19 U.S.C. §1337(a)(1)(A)(i). Section 337 applies to trade secret misappropriation. FID, p. 45.

---

[12] ITC Litigation: How Discovery in the ITC is Different from Federal Court, Joseph Dorris, Thomas Fusco, Jacqueline Tio, Fish & Richardson, Aug. 4, 2020, citing Jerold B. Murphy, A Statistical Comparison of the Staff Attorneys' Position on Disputed Issues and the Administrative Law Judges' Decisions on Such Issues, 21 337 REPORTER 53, 54 (2005) (finding 65.6 percent agreement between ALJ and ITC staff attorney on claim construction, and 89.2 percent agreement on other disputed issues).

[13] What Happens in the ITC Stays in the ITC – Except Related District Court Cases, Fish & Richardson Litigation Blog, Sept. 12, 2017, available at:
https://www.jdsupra.com/legalnews/what-happens-in-the-itc-stays-in-the-36379/

[14] https://www.fr.com/itc-litigation-trade-secret-protection/

98.     The Uniform Trade Secrets Act ("UTSA") defines a Trade Secret as "information, including a formula, pattern, compilation, program, device, method, technique or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain, economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  FID, p. 39 citing UTSA §1(4) (as amended, 1985).

99.     The ITC considers six factors in determining whether or not a trade secret exists: 1) the extent to which the information is known outside the complainant's business; 2) the extent to which it is known by employees and others in the complainant's business; 3) the extent of measures taken by complainant to guard the secrecy of the information; 4) the value of the information to complainant and competitors; 5) the amount of effort or money expended by complainant in developing the information and 6) the ease or difficulty with which the information could be properly acquired or duplicated.  The above factors are not a six-part test; instead they are "instructive guidelines for ascertaining whether a trade secret exists." FID, p. 39.

100.    A trade secret can exist in a combination of characteristics or components each of which, by itself, is in the public domain if the unique combination of these elements is not publicly know and provides the owner a competitive advantage.  FID, p. 41. The value of a trade secret process lies not only in the discrete components for the process but in the fact that those components (even if each is publicly available) have been combined as part of a commercially viable process.  FID, p. 42.

101.    The elements of trade secret misappropriation are: (1) the existence of a process that is protectable as a trade secret; (2) that the complainant is the owner of the trade secret; (3) that the complainant disclosed the trade secret to the respondent while in a confidential relationship

or that the respondent wrongfully took the trade secret by unfair means; and (4) that the respondent has used or disclosed the trade secret causing injury to the respondent. FID, p. 45. Unauthorized use of a trade secret does not require use of every aspect of the trade secret. In other words, liability for misappropriation exists even if the trade secret contains independently created modifications or improvements. The only requirement is that the product be "substantially derived" from the trade secret. FID, p. 46.

### B.  The ITC Litigation

102.  On January 25, 2019 Medytox and Allergan filed the ITC Complaint before the International Trade Commission alleging that Evolus and Daewoong misappropriated their BTX products and manufacturing process and requesting that the ITC institute an investigation. Allergan and Medytox filed both public and confidential versions of the ITC Complaint. The public version contains redactions omitting all confidential/trade secret information.

103.  The ITC Complaint sought, among other things, a cease-and-desist order preventing Evolus from importing and selling Jeuveau. The ITC Complaint alleged that Allergan, as the exclusive licensee for Medytox, had spent 30 years investing in the BTX products market and that Evolus's Jeuveau was created using trade secrets stolen from Medytox.

104.  Specifically, the ITC Complaint alleged that an individual named BK Lee, who was a former employee at Medytox, stole Medytox's trade secrets and BTX strain and transferred them to Daewoong. Daewoong then used this stolen information to develop and manufacture Jeuveau. In exchange, Daewoong provided BK Lee with monetary compensation and facilitated his placement at a post-doctoral fellowship program at Purdue University in Indiana. ITC Complaint (Exh. A), ¶36.

105.  Medytox developed the process for manufacturing its BTX products through

extensive research. This information is contained in a document called the "Batch Record," which is the most sensitive and closely guarded document any BTX manufacturer would have. In addition to the Batch Record, Medytox also prepared a "Characterization Report" which details the specific testing procedures it used to assess the drug's characteristics. The Batch Record and Characterization Report contain all the information necessary to develop a BTX product.  ITC Complaint, ¶¶63-65.

106.    The ITC Complaint alleged that BK Lee, a researcher at Medytox, printed 17 copies of Medytox's entire Batch Record and 2 copies of Medytox's Characterization Report as well as other documents, for no legitimate business purpose and in contravention of his confidentiality agreement. He then left Medytox to work for Daewoong at a time when Daewoong was frantically searching for a replacement for BOTOX, given that its licensing agreement with Allergan had expired.  *Id.* ¶¶ 100-103.

107.    In responding to news of the ITC Complaint, on February 4, 2019 an "Evolus spokesman" wrote a statement to the popular pharmaceutical news publication *StatNews* denying the allegations out of hand. Evolus stated that the claims are "*completely without merit*" and that the timing of the suit reflects the "competitive threat (Jeuveau) presents to the BOTOX franchise. This represents another legal maneuver in a long litany of attempts by Allergan and Medytox to stifle competition and limit physician and consumer choice. … Given this history, we have been prepared and will vigorously defend our intellectual property."[15]

108.    Indeed, this was not the first time Allergan and Medytox sued Evolus and Daewoong for misappropriating its BTX strain and related manufacturing methods.

109.    On October 30, 2017 Medytox filed an action in South Korea ("Korean Action")

---

[15] https://www.statnews.com/pharmalot/2019/02/04/allergan-itc-botox-trade-secrets/

alleging that Daewoong misappropriated trade secrets BK Lee stole from it.

110.    On June 6, 2017 Medytox filed a lawsuit against Evolus, Daewoong and BK Lee in the Superior Court of California alleging that Daewoong usurped Medytox's economic opportunity with Evolus to distribute a BTX product in the U.S. and sought to enjoin Evolus from distributing Jeuveau in the U.S.  ("California Case"). On October 12, 2017 the court dismissed BK Lee from the suit for lack of personal jurisdiction and dismissed Daewoong based on *forum non conveniens*. The court stayed the case as to Evolus pending the outcome of the Korea Action.

111.    In December 2017, Medytox filed a Citizen Petition with the FDA seeking to delay approval of the BLA for Jeuveau until the FDA determines the identity and source of the botulinum strain for Jeuveau. The Citizen Petition alleged among other things, that Evolus made false statements in its BLA for Jeuveau about the source and identity of the BTX strain for Jeuveau. The Citizen Petition requested that the FDA require Evolus's BLA to include what is a called a SNP (single nucleotide polymorphism) analysis of the genome sequence for Jeuveau's BTX strain. Such an analysis would determine the true source of the BTX strain used to manufacture Jeuveau.  The FDA declined to delay approval of Jeuveau despite the Citizen Petition.

112.    On March 1, 2019 the ITC announced it had agreed to initiate an investigation and instituted the ITC Litigation under ITC Inv. No. 337-TA-1145, *In the Matter of Certain Botulinum Toxin Products.* In response to news that the ITC had agreed to commence an investigation, a spokesperson from Evolus wrote to *StatNews* stating "we remain confident in our intellectual property and proprietary manufacturing and will work with the ITC through its review. *We continue to believe that Allergan and Medytox's claims are completely without merit* and that their complaint and associated timing reflect their level of concern surrounding Evolus' entry as a new

27

competitor that will enhance consumer and physician choice.[16]"

113.   On March 6, 2019 the ITC issued a broad protective order governing confidential business information produced or exchanged in the Investigation. Because of the trade secret nature of the Investigation the evidence the parties produced in fact and expert discovery remained confidential throughout the course of the Investigation. Accordingly, Defendants, but not the investing public, were privy to all the hard evidence in the case as it was produced throughout the course of the ITC Litigation.

114.   Fact discovery in the ITC Litigation closed on July 19, 2019. Expert discovery in the ITC Litigation closed on October 30, 2019.

115.   After the close of discovery Defendants continued to reassure the public that they were "very confident" in their intellectual property. For example, on the August 12, 2019 Earnings Calls for Evolus's second quarter 2019 results Defendant Moatazedi informed investors that the ITC extended the deadline for the final resolution to October 2020, stating "We continue to remain confident in our IP, but of course, we'll let the case continue to play out."  In response to an analyst's question about next steps in the case, Defendant Moatazedi reassured investors that nothing had changed since the ITC investigation began stating *"[a]s we've said from the beginning, we remain confident in our IP* and will let the court system continue to work through the case."

116.   The ITC Court held a three-day long evidentiary hearing ("ITC Hearing") from February 4-7, 2020. Evolus's General Counsel, Jeff Plumer along with outside counsel for Evolus, Daewoong, Medytox and Allergan attended the hearing. The ITC Hearing was closed to the public.

---

[16] https://www.statnews.com/pharmalot/2019/03/04/allergan-botox-evolus-itc-trade-secrets/

As Defendant Moatazedi stated, the ITC Hearing was "top of mind for investors…with the ITC, the majority of those hearings are confidential.  It's not like a public trial where most of the information is available to you."

117.    Among the experts who testified at the ITC Hearing was Allergan's and Medytox's expert Dr. Paul Keim. Dr. Keim is the director of the renowned Institute of Genomics and Microbiology. The Institute sequences over 10,000 genomes a year and has been under contract with the U.S. government, FBI, Department of Homeland Security and Department of Energy for the past 20 years.

118.    After the evidentiary hearing concluded Defendants again reiterated that "nothing changed through the case" and that the Company "remain[ed] confident in the strength of our IP." On Evolus's February 25, 2020 earning call for the fourth quarter of 2019, Defendant Moatazedi provided an "update" on the ITC case, stating "as you many know, the ITC hearing took place from February 4 through February 7th in Washington, D.C.…In the interim, it's customary for various redacted versions of motions, brief and transcripts to become public. However, I would caution you not to draw any conclusions from individual documents, as the initial determination will be decided based on the totality of the merits assessed by the judge in June and the ITC in October. We look forward to resolving this case before year-end ***and remain confident in the strength of our IP***.

119.    On March 4, 2020, Medytox issued a press release stating that during the ITC Hearing the ITC Staff Attorney agreed that Evolus and Daewoong misappropriated Medytox's trade secrets. Medytox stated that "ITC attorneys' opinions are known to have a profound effect on the final decision of the court." Defendants quickly responded with a press release calling Medytox's statements "speculative and intended to create confusion."  Evolus further reassured

investors stating "[t]he Judge assigned to the ITC case is not obligated to accepts a staff attorney's position on the facts, and *it's fairly common for the Judge and the staff attorney to disagree on substantive matters*." Evolus again reiterated that "*Evolus and Daewoong remain confident in the strength of our intellectual property.*"

120.  Defendant Silvernail likewise assured investors that given the evidence and testimony presented at the ITC Hearing Evolus was "in a very solid position." In a March 11, 2020 question and answer session at the Barclay's Global Healthcare Conference Defendant Silvernail responded to an analyst's question about possible scenarios stating "***we are in a very solid position****. **We like our odds in this****. **We believe in the merits of our case and are very confident in the IP****. **<u>So we are really not worried about the outcome here.</u>**"

### *<u>Defendants Purposely Refuse to Investigate the Longstanding Allegations that Jeuveau is the Product of Misappropriation</u>*

121.  According to Evolus's former Executive Director of Medical Affairs, Defendants did not want to investigate the allegations that Jeuveau was the product of misappropriation because doing so could have put them out of business.

122.  Confidential Witness 1 ("CW1") is the former Director of Medical Affairs at Evolus. CW1 held this position from October 2018 through November 2019. This is an Executive top-level position. CW1 reported directly to Defendant Avelar, who hired CW1 personally after an interview over dinner. CW1 explained that the role of Medical Affairs is to provide the Company with unbiased education about the pharmaceutical products it markets. As Executive Director, Medical Affairs at Evolus CW1 attended tradeshows, conducted training on Jeuveau for clinicians using Jeuveau, responded to inquiries from doctors about the product, reviewed marketing materials the Company authored and hosted clinical discussions with doctors in which

he presented scientific data concerning Jeuveau.

123.    CW1 explained that he felt his role within Medical Affairs at Evolus was to act as a "figurehead."  He explained that the FDA requires pharmaceutical companies to have a Medical Affairs director whose role is to provide, to both the Company and clinicians, unbiased education about the Company's products. CW1 explained that half-way through his tenure at Evolus he realized that the position was not a good fit primarily because of the difficulties he encountered with Defendant Avelar. CW1 explained that that Defendant Avelar was not transparent. For example, Avelar failed to inform CW1 about a clinical study the Company performed in Korea until the results of the study were published, despite that fact that a company's Director of Medical Affairs should always be apprised of all clinical trials.

124.    CW1 explained Evolus's commercial strategy: Evolus was focused on marketing to the millennial demographic by having a social media presence and campaigns that were "fresh and new." CW1 stated that the Company differentiated itself from Botox primarily by undercutting Botox's price in order to gain market share. Additionally (given Evolus's ability to skirt the requirements of the Sunshine Laws and physician payment reporting requirements) the Company hosted what it titled an "Advisory Board" in Mexico.  The "Advisory Board" was a lavish party in Mexico that physician attended and that cost Evolus about $1 million.[17]

125.    CW1 explained that his original understanding was that Evolus represented that Jeuveau's BTX strain was similar to Botox's BTX strain: that it had an identical molecular structure but that it was found in the soil in Korea. CW1 recalled thinking that Evolus's explanation

---

[17] The New York Times reported critically on the party given that even though Jeuveua is not subject to CMS reporting requirements, it is still a drug and therefore ethical norms in terms of marketing to physicians should still apply.  *See A Rival to Botox Invites Doctors to Party in Cancun, With Fireworks, Confetti and Social Media Posts*, New York Times, May 15, 2019.

that the BTX strain used to manufacture Jeuveau originated in the soil in Korea seemed unbelievable.

126.   CW1 stated that when he went to work for Evolus he was aware of the California Action alleging that Jeuveau was the product of misappropriation and understood that the case was stayed. The ITC Complaint was filed in late January 2019, about three months after CW1 began working at Evolus. ***CW1 stated with certainty that the Company did not investigate the allegations that Jeuveau was the product of misappropriation. CW1 stated that the Company had no interest in investigating the incredible claim that Jeuveau was discovered in the soil in Korea because it would not be beneficial for Evolus to know that Jeuveau was misappropriated.***

127.   Given CW1's high-level position in the Company and his daily interactions with the Individuals Defendants CW1 was in a position to know whether or not Defendants had conducted an investigation into the allegations that Jeuveau was the product of misappropriation. CW1 is certain that they did not.

### ***Defendants Become Fully Aware that Jeuveau is the Product of Misappropriation Through Discovery in the ITC Litigation***

128.   Unbeknownst to investors, Defendants were fully aware, by the time fact and expert discovery in the ITC Investigation concluded (July 2019 and October 2019, respectively), at the very latest, that DNA sequencing proved that Jeuveau and Medytox's ***proprietary BTX strain were nearly identical and that the possibility of this genetic similarity occurring by chance and not as a result of misappropriation was "infinitesimally small- less than one in the number of stars in the universe."*** FID, 94-99.

129.   Additionally, Defendants were also aware, by the time discovery in the ITC Investigation concluded at the very latest, that the evidence demonstrated that not only had Evolus and Daewoong misappropriated Medytox's BTX strain but that it also misappropriated the

manufacturing process for Jeuveau.  This process consisted of ten distinct steps, each one of which was independently a trade secret.

130.    As the ITC Court stated, "the evidence presented by complainants, and the other parties, reasonably points **_only_** to a finding of misappropriation."  FID, p. 94.  Accordingly, the evidentiary record directly contradicted Defendants' representations concerning the proprietary nature of Jeuveau, and the strength of Evolus' IP and demonstrated that Defendants had no reasonable basis to express confidence to investors concerning the "strength of Evolus's IP," its proprietary nature, or the outcome of the ITC Litigation.

131.    The facts and evidence below are contained in the FID which became publicly available on August 6, 2020, **_after_** the close of the Class Period. Defendants were aware of the foregoing facts and evidence during the heart of the Class Period and withheld them from investors while issuing positive statements concerning the strength of Evolus's IP and the proprietary nature of Jeuveau.

### C. Evolus and Daewoong Misappropriated Medytox's BTX Strain

1. *Medytox's Proprietary C. Botulinum Strain*

132.    Medytox's BTX strain has a unique genomic sequence which differs from that of other publicly known Hall-A hyper strain sequences of BTX. This unique genetic sequence occurred through mutations that occurred over decades.  FID, p. 64.

133.    Experts in the ITC Investigation performed genetic sequencing of Medytox's BTX strain.  Nobody outside of Medytox knew the full sequence of Medytox's BTX strain, a fact which Evolus did not dispute.  *Id.*

134.    Medytox took extensive measures to guard the secrecy of its BTX strain. Medytox facilities contained security systems including security guards and CCTV monitoring.  Medytox

also heavily restricted the number of employees authorized to access and remove samples of its BTX strain and made its employees sign mandatory confidentiality agreements. FID, p. 69.

135.    Medytox's BTX strain is commercially valuable. Medytox's BTX strain has at least three qualities that make it especially valuable: (1) it is a high toxin producer (2) it is stable over long periods of time and (3) it does not produce spores during the drug substance manufacturing process. FID, p. 74.

136.    Medytox expended years of time, money and effort commercially developing the BTX product that Daewoong and Evolus misappropriated. It took Medytox six years to develop its manufacturing process for Meditoxin and obtain approval to market it.  Further, Medytox never made its BTX strain available to anyone outside of Medytox for sale or for any other purpose.

**D.  Evolus and Daewoong Misappropriated Medytox's C. Botulinium Strain**

137.    Evolus and Daewoong claimed that Daewoong found the BTX strain used to manufacture Jeuveau from the soil in Korea and that the strain was a Hall A-hyper strain. Defendants knew or recklessly disregarded indisputable evidence that this claim was false.

138.    During the heart of the Class Period Defendants were aware that DNA evidence conclusively established that Evolus and Daewoong misappropriated Medytox's BTX strain. *See, e.g.* FID, p. 94

139.    The Medytox and Evolus BTX strains share six distinctive mutations- DNA "fingerprints" that are not found in any other publicly known strains of *C. botulinum*.  FID, p. 94-95.

140.    Medytox's expert used DNA fingerprinting to analyze whether Evolus obtained its BTX strain from the Medytox strain.  This method entails examining the complete composition of DNA (i.e. the genome) of an organism.

141.    Medytox's expert demonstrated that out of more than 200 strains of *C. botulinum*, the Hall A-hyper strain, the Medytox strain, and Evolus' strain inherited a shared pattern of mutations, confirming that the Medytox strain came from the Hall A-hyper strain and that the Evolus strain came from the Medytox strain.  FID, p. 94-95

142.    The Medytox and Evolus strains are linked by a series of six SNP's (single nucleotide polymorphism) which are not present in any other publicly available *C. botulinum* genome.  In addition to sharing these six SNP's, Medytox's expert demonstrated that the Evolus and Medytox strains are practically identical to one another.  FID, p. 95

143.    The possibility of two unrelated strains sharing the same six identical SNPs at the exact same nucleotide positions along a DNA sequence of nearly 3.7 million nucleotides is effectively impossible. Indeed, as expert testimony demonstrated, ***"the possibility of a single mutation arising by chance in two genomes in exactly the same position in a strand of 3.7 million positions is extraordinarily low- less than one in a few million.***  And for two genomes to share *six* instances of such a shared unique mutation at precisely the same positions is even more unlikely to happen by chance."  FID, p. 99.

144.    As the ITC Staff Attorney concluded, and as was apparent to Defendants: "the DNA sequencing analysis is virtually indisputable; the Daewoong strain is derived from the Medytox strain and all circumstantial evidence points to Daewoong having misappropriated Medytox's BTX strain and other Medytox trade secrets. ***The scientific and genetic evidence establishes to a virtual certainty that Daewoong's strain could not have been isolated from the wild in a soil sample.*** FID, p. 103.

145.    In addition to the six shared SNPs, Evolus's and Medytox's strain are largely identical to one another. There are approximately 3.7 million DNA bases (SNPs) in Medytox's

and Evolus's BTX strains.  Unrelated strains of *C. Botulinum* are separated by tens of thousands of SNPs.  As part of the discovery process, experts took samples from the Medytox cell bank and the Daewoong cell bank. These samples demonstrated that the SNPs were identical but for a range of six to thirteen SNPs out of approximately 3.7 million SNPs. FID, p. 103.  Further, the Hall A-hyper strain (and Medytox's strain) were both developed in the laboratory, undercutting the claim that Evolus' BTX strain was found in the soil in Korea.

### E. Evolus and Daewoong Misappropriated Medytox's Manufacturing Process and Research and Development Related Information

146.    Additionally, during the heart of the Class Period Defendants were aware that the manufacturing process for Jeuveau was the product of misappropriation.

1. *Medytox's Manufacturing and R&D Related Information Are Protectable Trade Secrets*

147.    Medytox's manufacturing process is protectable as a trade secret because: (a) of its economic value, (b) it is not generally known or readily ascertainable, and (c) Medytox took reasonable precautions to maintain its secrecy.  FID, p. 127

148.    Medytox's description of its manufacturing process is heavily redacted from the FID given its proprietary nature.  While Medytox's manufacturing process is a compilation of steps is it not only the compilation but also the selection of the elements in its manufacturing process that is itself a trade secret.  FID, p. 116.

149.    No producer of commercial BTX products has made its manufacturing process publicly available. As the evidence Medytox produced proves, the manufacturing process is "amongst the most closely guarded secrets of any commercial BTX company."  FID, p. 127.

150.    In the ITC Litigation Medytox identified information and processes that have significant commercial value which reflect years of Medytox research and development that are not publicly available and have never been publicly disclosed.  FID, p. 117.

151.   Neither Evolus nor Daewoong offered any evidence that each of the constituent elements of Medytox's manufacturing process in the specific combinations Medytox and Evolus/Daewoong used to manufacture BTX were publicly disclosed or existed in the public domain. Instead, Evolus and Daewoong pointed to disparate literature as supposedly disclosing the specific elements of the Medytox manufacturing process. However no single reference Evolus/Daewoong cited disclosed each of the specific elements of Medytox's manufacturing process- the identical process used to manufacture Jeuveau.  As Defendants were aware, it is black letter law that the manufacturing process in its totality is a trade secret, even if the elements of the process are separately publicly available.  FID, p. 119.

152.   Accordingly, Defendants were aware that they had no defense to Medytox's/Allergan's claim that Evolus and Daewoong misappropriated Medytox's manufacturing process given that they were aware that they were using the same process Medytox used to manufacture Jeuveau which consisted of separate steps that were not publicly available in their totality.

153.   The evidence Medytox produced in the ITC Investigation also demonstrated the extent of the measures Medytox took to guard the manufacturing process. For example, Medytox employees were required to sign confidentiality agreements prohibiting them from giving Medytox's "technical secrets including manufacturing method of a product" to "competing companies." Medytox also employed robust physical security measures at its facilities and even maintained physical separation and security with respect to its BTX strain and manufacturing process. Since 2007 Medytox has had in place robust IT security consisting of a system that tracks employee email, logs employee printing and prevents employees from saving to physical storage devices like USB thumb drives or web-based storage like Dropbox.  FID, p. 120-21.

37

154.    Medytox likewise produced evidence demonstrating the value of its manufacturing information to itself and Allergan and to its competitors. Medytox undertook a research and development program from August 2000 to October 2004 to develop a manufacturing process for BTX type A complex.  As a result of this effort, Medytox was able to independently develop a BTX product for commercial use and sale.  In total, it took Medytox six years to develop the manufacturing process for Meditoxin and then receive regulatory approval to sell it in Korea. FID, p. 121-22.

155.    Indeed, by using Medytox's proprietary manufacturing process information and innovations, Evolus gained a head start of at least 21 months in the commercial manufacture of Jeuveau. FID, p. 122.

156.    The evidence Medytox produced also demonstrated the extensive effort and money Medytox expended in developing the manufacturing process.  While the specific amount of money Medytox expended on the process is redacted from the public record the record does detail Medytox's painstaking efforts to independently develop a BTX product fit for commercial use.

157.    For example, Medytox first designed two potential methods to separate and purify the neurotoxin complex from its BTX strain. Then, between August 2000 and August 2004 Medytox ran these processes and iterations thereof numerous times to identify areas for improvement, including testing whether a different order of steps or a different purification method altogether would produce a higher quality drug substance.  FID, p. 123-24.  The iterative process was extremely complicated.  Medytox also recorded the various versions of its processes in batch records.  The batch record reflects not only information concerning each step but how the steps fit together. Given the value of this information, Medytox has never publicly disclosed these documents or the information they contain.  FID, p. 126.

2. *Evolus and Daewoong Misappropriated Medytox's Manufacturing and Research and Development Trade Secrets*

158.   The manufacturing process for Jeuveau mirrored the manufacturing process for Medytox's BTX product.  Three factors conclusively demonstrated that Evolus and Daewoong misappropriated the manufacturing process for Jeuveau from Medytox:  1) the similarity of the two processes; 2) the lack of evidence of that Evolus or Daewoong had independently developed a manufacturing process for Jeuveau and 3) the implausibly fast timeline by which Jeuveau achieved production at a commercial scale. FID, p. 132.

159.   First, the manufacturing processes for Jeuveau and Medytox's BTX product substantially overlap.  The two processes share ten commonalities.  The similarities between these processes cannot be coincidental.  FID, p. 134-136.

160.   Second, Neither Evolus nor Daewoong produced contemporaneous documentation showing that Jeuveau was developed independently. In fact, Evolus and Daewoong only produced a handful of lab notebooks that pertained to the development of Jeuveau. Evolus implausibly asserted that it was "prejudiced" by the passage of time because "documents have become unavailable."  But as the ALJ held, "it is unlikely that a major pharmaceutical company with international sales of drug products that require regulatory approval, in most, if not all, of the jurisdictions in which its products are sold would not maintain its development records, including laboratory notebooks, that provide a contemporaneous record of its work…***The lack of contemporaneous research and development records…is highly unusual for a pharmaceutical company, especially when the drug is successfully brought to market.***"  FID, p. 141.

161.   In addition, while claiming to have pieced together the steps of the manufacturing process for Jeuveau, Evolus and Daewoong did not produce any contemporaneous documentation or citations in their lab notebooks or other drug development records to the disparate published

literature purportedly relied on to piece together the steps of the manufacturing process. FID, p. 143.

162.    The core documentation that would support the research and development process Evolus and Daewoong claimed Daewoong completed would be laboratory notebooks recording the research and development. However, the few laboratory notebooks Daewoong produced only reflect experiments relating to the development of Jeuveau's manufacturing process **before** the first batch was manufactured at a commercial scale. As the ALJ found, and as Defendants were aware, this evidence did not explain the development process for Jeuveau.  FID, p. 145. Further, Daewoong provided different, inconsistent accounts about which academic articles it supposedly relied on as the basis for its research and development efforts.  FID, p. 146. As the ALJ found "*Daewoong has not provided sufficient evidence demonstrating its own independent development of its manufacturing process in order to support its arguments and respond to discovery requests.  This should have been an easy task for Daewoong.*" FID, p. 142.

163.    In contrast, Medytox produced voluminous documents demonstrating its research and development.  Evolus did not challenge the sufficiency of Medytox's R&D records or dispute the fact that Medytox produced far more voluminous records even though the work Medytox performed in developing its BTX product occurred a *decade* earlier than the development of Jeuveau. FID, p. 146.

164.    Evolus and Daewoong presented evidence concerning the supposed amount of time it took to develop Jeuveau.  While this evidence is redacted from the public record the ALJ found that *"it is not credible to reach a commercial scale batch in such a short amount of time."*  FID, p. 148.

165.    Further contributing to the implausibility of developing Jeuveau in such a short time

frame from scratch, the team supposedly developing Jeuveau lacked BTX experience, and an *intern* purportedly performed the bulk of the development work.  As the ALJ found and as Defendants were aware, "[f]rom a practical standpoint, such a schedule could not be achieved through independent development from scratch. ***This is particularly the case in view of the team's lack of BTX experience, the purported development work was done by an intern, and the minimal amount of actual development activity recorded in that time span.***" FID, p. 151-152.

166.    Accordingly, as the ALJ found, **"*Daewoong wrongfully took the trade secrets by unfair means.*"** FID, p. 152.

### F.  Defendants' Illegal Conduct Substantially Injured Allergan's Domestic Industry

167.    Section 337 also requires the complainant to show that the "threat or effect" of the alleged unfair acts is "to destroy or substantially injure an industry in the United States."  190. Factors for assessing substantial injury include (1) the defendant's volume of imports and penetration into the market; (2) the plaintiff's lost sales; (3) underselling by the defendant; (4) plaintiff's declining production, profitability and sales; and (5) harm to plaintiff's goodwill and reputation.  FID, p. 190.

168.    Defendants were well aware that Allergan amply met its burden of showing substantial injury.  In fact, Evolus (and Daewoong) chose not to cross-examine Allergan fact witnesses or economic experts concerning Allergan's claims of injury.  FID, p. 191.

169.    First, Jeuveau's 2.61% market share came entirely at the expense of BOTOX Cosmetic, and, as Defendant Moatazedi testified at the ITC Hearing, Evolus projected its revenue and sales for Jeuveau to rapidly increase from 2019 to 2022.  FID, p. 199-200.

170.    Second, Evolus has pricing flexibility because Jeuveau is only approved for cosmetic indications. Allergan does not have pricing flexibility because it sells BOTOX for

therapeutic purposes in addition to cosmetic purposes. Regulations require that a price reduction for BOTOX Cosmetic will also reduce reimbursement for BOTOX therapeutic. FID, p. 206. Further, Evolus admitted that it offered discounts on Jeuveau. Accordingly, Allergan will need to reduce its pricing to compete. FID, p. 207-208.

171.    Third, the evidence demonstrated that Evolus will continue to be able to undersell BOTOX in the future, in part due to its pricing flexibility. Indeed, Defendant Moatazedi testified in the ITC Litigation that Evolus continues to expect to achieve the number two U.S. market position for cosmetic BTX sales. FID, p. 218-219. Allegan further produced evidence demonstrating it faces potential long-term price erosion due to Jeuveau because Allergan will be pressured to lower its pricing to compete, leading to a significant amount of lost revenue for Allergan. FID, p. 221.

**Defendants' Class Period False and Misleading Statements and Omissions of Facts that the Company Was Required to Disclose**

172.    The Class Period begins on February 1, 2019, approximately one week after Allergan and Medytox filed the ITC Complaint. On that day, Evolus issued a press release announcing the FDA approved Jeuveau. In the press release, Defendant Moatazedi highlighted Evolus's achievement regarding the commercial launch of Jeuveau, stating "Evolus is the first company in nearly a decade to enter the fast-growing U.S. aesthetic neurotoxin market…We are pleased to introduce Jeuveau, the first FDA approved neurotoxin dedicated to aesthetics and manufactured in a state of the art facility using Hi-Pure technology…We are focusing our efforts on ensuring a successful launch of Jeuveau."

173.    The February 1, 2019 press release contained a description of Jeuveau, which states in part: "Jeuveau (prabotulinumA-xvfs) is a ***proprietary*** purified botulinum toxin type A formulation indicated for the temporary improvement in the appearance of moderate to severe

glabellar lines in adults."

174.    The foregoing statement describing Jeuveau as "proprietary" was materially false and misleading when made and omitted material facts necessary to make the statement not misleading. The definition of "proprietary" is "something that is used, produced, or marketed under exclusive legal right of the inventor or owner."[18] In truth, the "purified botulinum type A formulation" and the manufacturing process used to manufacture Jeuveau was illegally misappropriated from Medytox and was not in fact Evolus's (or Daewoong's) "proprietary" formulation but instead belonged to Medytox.

175.    Evolus' stock price increased 11% after Evolus announced FDA approval of Jeuveau and Defendants expressed their confidence in Jeuveau's commercial success.

176.    Analysts responded enthusiastically to the news that Evolus had successfully obtained FDA approval for Jeuveau and commented on Evolus's ability to undercut Allergan's pricing for BOTOX. In a February 1, 2019 analyst report SunTrust Robinson analyst Ashwani Verma stated: "While the approval does not come as a surprise to us, we believe it removes the regulatory uncertainty in the stock… ***In our model, we assume EOLS launching Jeuveau at a 20-25% discount to Allergan's (AGN, not rated) market-leading Botox***…As the market leader, AGN's Botox is deeply entrenched in aesthetics clinics across US. Hence, taking market share from the 800-pound gorilla is likely going to be a challenging endeavor for EOLS. ***Nevertheless, we think EOLS is approaching the market in the right stride, and Jeuveau has the wherewithal of becoming a cornerstone asset in the botulinum toxin market. We think EOLS' early and intense focus on building a robust Commercial capability could help it realize its goal of becoming the #2 player in the aesthetics toxin market two-years post-launch.***"  The analyst also

---

[18]  https://www.merriam-webster.com/dictionary/proprietary

referenced the ITC Litigation, stating ***"we view the probability of the [ITC] complaint hindering the launch as low."***

177.   On February 4, 2019 Evolus held a "Special Call" for institutional investors and analysts discussing the Company's plans to rapidly commercialize Jeuveau. During the Special Call, Defendant Avelar highlighted the proprietary nature of Jeuveau, giving details regarding the primary and repeat treatment studies which Jeuveau underwent on the path to commercial formulation, including data demonstrating Jeuveau's performance compared to Botox. Avelar confirmed that Jeuveau was Evolus's "***proprietary Jeuveau formulation*** [ ] manufactured in a brand-new state-of-the-art facility using a Hi-Pure technology."

178.   Defendant Avelar's statement describing Jeuveau as Evolus's "proprietary formulation" was false materially false and misleading when made and omitted material facts necessary to make the statement not misleading because, the BTX strain and the manufacturing process used to manufacture Jeuveau was illegally misappropriated from Medytox.

179.   Also on February 4, 2019 popular pharmaceutical news website *StatNews* published an article detailing the ITC Complaint:

> As new competition arrives for its best-selling Botox treatment, Allergan (AGN) is asking the International Trade Commission to investigate a pair of rival companies for allegedly stealing trade secrets for a new version of its medicine.
>
> In its complaint, Allergan contended a former employee at Medytox, which has a deal to supply the drug maker with a newer wrinkle-smoothing treatment that is still being tested, stole detailed information and provided the material to Daewoong Pharmaceuticals. Late last week, meanwhile, Daewoong and Evolus (EOLS) won Food and Drug Administration approval for Jeuveau, a Botox competitor due to become available this spring.
>
> Specifically, Allergan alleged B.K. Lee, a former Medytox researcher, had access to proprietary information about botulinum neurotoxin strains being developed, as well as step-by-step manufacturing plans. But he surreptitiously took the information and after leaving in 2008, became a consultant to Daewoong, which three years later began domestic marketing of what is now called Jeuveau.

44

Allergan also maintained Daewoong and Evolus could not have successfully developed Jeuveau as quickly as it did without access to information that Lee allegedly provided. ***In fact, the big drug maker insisted the story offered by Daewoong about its drug development — that the strain used to make this treatment was discovered in the soil — is "scientifically impossible," according to the complaint.[19]***

180.   The same article also published the unequivocal denial that Evolus offered the publication in response to the allegations: ***"An Evolus spokesman wrote us that the claims are 'completely without merit' and the timing reflects the 'competitive threat (Jeuveau) presents to the Botox franchise.  This represents another legal maneuver in a long litany of attempts by Allergan and Medytox to stifle competition and limit physician and consumer choice…Given this history, we have been prepared and will vigorously defend our intellectual property.'"***

181.   Evolus's foregoing denial was materially false and misleading when and omitted material information necessary to make the statement misleading because, as CW1 stated, Defendants purposely refused to investigate the allegations so that they could remain willfully ignorant of evidence that Jeuveau was the product of misappropriation.  Accordingly, Defendants had no reasonable basis to believe, and represent to investors, that the claims in the ITC Complaint were "completely without merit."

182.   On March 1, 2019 the ITC issued a press release announcing that it would grant Allergan's and Medytox's request to institute an investigation, stating that the ITC "voted to institute an investigation of certain botulinum toxin products, processes for manufacturing the same and certain products containing same…The complaint alleges violations of section 337 of

---

[19] https://www.statnews.com/pharmalot/2019/02/04/allergan-itc-botox-trade-secrets/

the Tariff Act of 1930 in the importation in the United States and sale of certain botulinum toxin products, processes for manufacturing or related to same and certain products containing same that misappropriate trade secrets asserted by complainants."

183.   The next trading day after the ITC issued its press release, March 4, 2019, Evolus shares fell $1.39 per share, or 5%, damaging investors.

184.   Upon news that the ITC had agreed to commence an investigation Evolus issued another false denial.  On March 4, 2019 *StatNews* published an article announcing the ITC's decision to investigate.  The article further reported that: "an Evolus spokeswoman wrote to say *'we remain confident in our intellectual property and proprietary manufacturing process* and will work with the ITC through its review.  *We continue to believe that Allergan and Medytox's claims are completely without merit* and that their complaint and associated timing reflect their level of concerning surrounding Evolus' entry as a new competitor that will enhance consumer and physician choice."

185.   The foregoing statements were materially false and misleading when made and omitted material information necessary to make the statements not misleading, because, as CW1 stated, Defendants purposely refused to investigate the allegations so that they could remain willfully ignorant of evidence that Jeuveau was the product of misappropriation.  Accordingly, Defendants had no reasonable basis to believe, and represent to investors, that the claims were "completely without merit." For the same reasons, Defendants had no reasonable basis to express confidence to investors concerning Evolus's "intellectual property and proprietary manufacturing processes."

186.   On March 20, 2019, the Company filed its Annual Report on SEC Form 10-K for the quarter and year ended December 31, 2018 ("2018 10-K").  The Individual Defendants signed

46

the 2018 10-K, and the 2018 10-K also contained certifications required pursuant to SOX that Defendants Moatazedi and Silvernail signed.  In the 2018 10-K, the Company detailed its research and clinical testing program, which purportedly led to the development of Jeuveau. As to the "competitive strength" of Jeuveau, the Company's 2018 10-K stated: Jeuveau will offer the U.S. market the first known 900 kDa neurotoxin alternative to BOTOX. The manufacture of both Jeuveau and BOTOX starts with a 900 kDa complex, includes adding the excipients human serum albumin, or HSA, and sodium chloride, and finishes by vacuum drying. We believe Jeuveau is the only known neurotoxin product in the United States with a 900 kDa neurotoxin complex other than BOTOX. We also believe an important component of competitiveness in the neurotoxin market relates to the characteristics associated with the 900 kDa complex and the potential of the accessory proteins to increase the effectiveness of the active toxin portion of the complex.  In the 2018 10-K Defendants described Jeuveau as Evolus's "proprietary 900 kDa purified botulinum toxin type A formulation."

187.   The foregoing statements in the 2018 10-K were false and misleading when made and omitted material facts necessary to make the statements not misleading. First, Evolus' "competitive strengths" were due to its misappropriation rather than the reasons suggested above. Second, the "purified 900 kDa botulinum type A formulation" was illegally misappropriated from Medytox and was not in fact Evolus's (or Daewoong's) "proprietary" formulation but instead belonged to Medytox.

188.   On May 8, 2019 Evolus held a Corporate Analyst Meeting call. On the call Defendant Avelar touted Jeuveau's ability to compete with BOTOX- the "gold standard-" and Jeuveau's purportedly "proprietary" manufacturing process:

> So what I'd like to do is take a So what I'd like to do is take a few minutes and introduce you to our first product, which is Jeuveau. ***When this project started, the***

47

***objective was to develop a product that was actually competitive with the gold
standard.***
\***
For those of you that don't know Evolus, the company was formed 6 years ago. The
root of the name Evolus was around this concept of evolving with the market. The
original founder was a former Head of R&D at Allergan, ***developed this neurotoxin***
and focused it solely on this category of medical aesthetics

189.   Defendant Avelar's above statement was materially false and misleading when
made and omitted material facts necessary to make the statement not misleading because
Defendant Avelar knew or recklessly disregarded that, the original founder of Evolus did not
"develop[]" this neurotoxin.  Instead, Medytox developed the neurotoxin, its proprietary BTX
strain, after years of research and development.

190.   On May 15, 2019 Evolus issued a press release announcing the U.S. launch of
Jeuveau.  The press release stated, in part, "…there's a #NEWTOX on the market.  Jeuveau was
approved by the [FDA] in February 2019…Evolus is planning to launch Jeuveau Experience
Treatment (J.E.T.) through approximately 3,000 accounts nationwide."   In describing Jeuveau
Evolus' press release stated: "***Jeuveau is a ___proprietary___ 900 kDa purified botulinum toxin type A
formulation*** indicated for the temporary improvement in the appearance of moderate to severe
glabellar lines in adults."

191.   The foregoing statement was materially false and misleading when made and
omitted material information necessary to make the statement not misleading because Jeuveau was
not Evolus' "proprietary" formulation but instead belonged to Medytox and was the product of
misappropriation.

192.   In response to Evolus's commercial launch of Jeuveau analysts commented on the
commercial threat to Allergan's Botox, noting that Evolus's launch of Jeuveau performed better
than expected.  In a June 27, 2019 Cantor Fitzgerald analyst report analysts Louise Chen, Brandon

Folkes and Jennifer Kim wrote: "We think one of the biggest concerns for Allergan has been the potential impact from the mid-May launch of Evolus' Jeuveau, a new competitor to Botox. Early indications seem to support that the launch has performed better than Evolus' initial expectations, with over 3,000 accounts having enrolled in the Jeuveau Experience Treatment (J.E.T.) program in just three weeks. The next phase of Evolus' launch strategy, the '#NEWTOX NOW' consumer conversion program, is expected to begin on July 1."

193. Capitalizing on the momentum from Evolus's commercial launch and Defendants' false assurances that the claims in the ITC Litigation had no merit, which caused Evolus stock to trade at artificially inflated prices, Defendant Alphaeon seized the opportunity to sell 4 million shares of Evolus common stock. On May 15, 2019 Evolus filed a prospectus supplement with Alphaeon as the selling stockholder ("May 2019 Offering"). Pursuant to the May 2019 Offering on May 20, 2019 Alphaeon sold 4 million shares of Evolus stock at a price of $19.25 per share for net proceeds of $77 million. After the May 2019 Offering Alphaeon continued to hold 11,268,987 shares of Evolus stock, representing 41.2% of Evolus's outstanding shares.

194. In the May 15, 2019 prospectus supplement Evolus repeated the same false and misleading statement concerning Evolus' "competitive strengths" and its "proprietary" product Jeuveau included in the 2019 10-K which were false and misleading for the reasons set forth in ¶187 above.

195. On July 19, 2019 fact discovery in the ITC Litigation closed. In connection with fact discovery the ITC Court ordered Medytox and Allergan to produce the allegedly misappropriated trade secrets, i.e., the BTX strain used to manufacture the BTX product they alleged Daewoong and Evolus had misappropriated as well as the manufacturing process for the product which consisted of ten steps which, when combined, constituted a protectable trade secret.

Accordingly, Defendants were now aware, had they had any doubt previously, that the manufacturing process for Jeuveau and for Medytox's BTX strain were virtually identical, as were the two BTX strains. The odds of this occurring by chance were nil.  Jeuveau was the product of misappropriation.

196.    On August 12, 2019, approximately one month after the close of fact discovery in the ITC Litigation, Evolus filed its Quarterly Report for the quarter ended June 30, 2019 ("2Q19 10-Q").  In it, the Company reiterated the proprietary nature of Jeuveau and its plan to rapidly commercialize Jeuveau in the U.S.:

> ***Jeuveau® is <u>a proprietary</u> 900 kDa purified botulinum toxin type A formulation indicated for the temporary improvement in the appearance of moderate to severe glabellar lines, also known as "frown lines," in adults.*** Our primary market is the self-pay aesthetic market, which includes medical products purchased by physicians that are then sold to consumers or used in procedures for aesthetic indications that are not reimbursed by any third-party payor, such as Medicaid, Medicare or commercial insurance. We believe we offer physicians and consumers a compelling value proposition with Jeuveau®. Currently, onabotulinumtoxinA (BOTOX) is the neurotoxin market leader, and prior to the approval of Jeuveau®, was the only known 900 kDa botulinum toxin type A complex approved in the United States. We believe aesthetic physicians generally prefer the performance characteristics of the complete 900 kDa neurotoxin complex and are accustomed to injecting this formulation.

197.    Additionally, Evolus reported generating "net revenues of $2.3 million consisting of sales of Jeuveau, which was commercially launched and began shipping to customers in the United States in May 2019."

198.    The foregoing statement was materially false and misleading when made and omitted material facts necessary to make the statements not misleading because Defendants knew but concealed from investors that the evidence in the ITC Litigation demonstrated that Jeuveau was not Evolus's "proprietary" formulation but was instead the product of misappropriation.

199.    The same day, Defendants held an earnings call, touting the Company's success in

commercially launching Jeuveau.  On the earnings call Wells Fargo analyst David Maris asked Defendant Moatazedi to provide an update on the "Korean situation" -meaning the legal proceedings pending against Evolus and Daewoong alleging misappropriation of proprietary trade secrets.   In response, Defendant Moatazedi assured investors that he and the Company "***continue[s] to remain confident in [Evolus'] IP.***"

200.   Another analyst, Balaji V. Prasad from Barclays Bank PLC referred to the ITC Court's ruling ordering Medytox and Allergan to produce their trade secrets in the ITC Litigation and asked Moatazedi to "help me understand this please."   In response, Moatazedi refused to provide a substantive answer and reiterated Defendants' confidence in their IP, stating "I know there's a lot of interest around the legal case.  Look, we're not going to be in a position to comment about the specifics as the case continues to unfold.  ***As we've said from the beginning, we remain very confident in our IP*** and will let the court system continue to work through the case."

201.   The foregoing statements were materially false and misleading when made and omitted material facts necessary to make the statements not misleading because Defendants had no reasonable basis to express continued "confidence" to investors in Evolus's IP because Defendants knew, but concealed from investors that the evidence in the ITC Litigation established that: 1) the Medytox and Evolus BTX strains were linked by six SNP's and otherwise had nearly identical genomes establishing to a "virtual certainty" that the strain for Jeuveau could not have been isolated from the wild in a soil sample, and was instead the product of misappropriation; and 2) the manufacturing process for Jeuveau mirrored the manufacturing process for Medytox's BTX strain and Daewoong was unable to produce evidence showing it independently developed Jeuveau, demonstrating that Jeuveau was the product of misappropriation.

202.   On November 4, 2019 the Company issued a press release announcing its financial

and operational results for the third quarter of 2019. In the press release, Defendant Moatazedi touted the Company's $13.2 million net revenue as "exceptional." In the quarterly report Defendants filed the same day, for the quarter ended September 30, 2019 ("3Q19 10-Q") Defendants repeated the statement that "Jeuveau is *a proprietary* 900 kDa purified botulinum toxin type A formulation indicated for the temporary improvement in the appearance of moderate to severe glabellar lines, also known as "frown lines," in adults.

203.   The foregoing statement was false and misleading when made and omitted material facts necessary to make the statements not misleading because Defendants knew but concealed from investors that the evidence in the ITC Litigation demonstrated that Jeuveau was not Evolus's "proprietary" formulation but was instead the product of misappropriation.

***Evolus Sells $63.5 Million in Stock to Investors at Prices Artificially Inflated By Defendants' Fraud***

204.   On November 6, 2019 Evolus issued a press release announcing that it commenced a proposed underwritten public offering ("November Offering") to issue and sell shares of its common stock. The next day, Evolus issued a press release announcing the pricing of the November Offering. Evolus issued 5,217,000 shares of common stock at a price of $13.00 per share, making Evolus's net proceeds from the November Offering approximately $63.5 million.

205.   Evolus issued the November Offering pursuant to a prospectus supplement dated November 6, 2019. The prospectus supplement stated: "The Company received the approval of its first product Jeuveau (prabotulinumtoxinA-xvfs) from the U.S. Food and Drug Administration (the "FDA") in February 2019. The product was approved by Health Canada in August 2018 and the European Commission ("EC") in 31 countries in September 2019. Jeuveau® is a *proprietary* 900 kDa purified botulinum toxin type A formulation indicated for the temporary improvement in the appearance of moderate to severe glabellar lines, also known as "frown lines," in adults.

206.    The foregoing statement was materially false and misleading when made and omitted material facts necessary to make the statements not misleading because Defendants knew but concealed from investors that the evidence in the ITC Litigation demonstrated that Jeuveau was not Evolus's "proprietary" formulation but was instead the product of misappropriation.

***Defendants Continue to Lie to Investors Even After the Confidential ITC Hearing***

207.    Between February 4 and 7, 2020 the ITC Hearing took place in Washington D.C. During the confidential hearing the ITC Court reviewed the evidence and heard the expert testimony establishing that Evolus's purportedly "proprietary" the BTX strain and Medytox's BTX strain are nearly identical genetically. As Medytox's expert testified, the possibility of this occurring by chance was ***"infinitesimally small- less than one in the number of stars in the universe***." Additionally, the ITC Court also reviewed the evidence and expert testimony establishing that the manufacturing process for Jeuveau was nearly identical to Medytox's manufacturing process. Again, this could not have occurred by coincidence. In other words, the genetic and circumstantial evidence established that Jeuveau was misappropriated from Medytox and not a result of Daewoong's independent development.

208.    Notwithstanding the overwhelming evidence, Defendants continued to issue positive statements concerning Jeuveau's commercial success and the proprietary nature of Jeuveau.

209.    On February 25, 2020 the Company filed its Annual Report on SEC Form 10-K for the quarter and year ended December 31, 2019 ("2019 10-K"). The Individual Defendants signed the 2019 10-K, and the 2019 10-K also contained certifications required pursuant to SOX that Defendants Moatazedi and Silvernail signed. In the 2019 10-K, the Company reiterated the proprietary nature of Jeuveau by, among other things, detailing the clinical process leading to the development and FDA approval of Jeuveau.

210.   As to the "competitive strengths" of Jeuveau Evolus stated "*Jeuveau® offers the U.S. market the first known 900 kDa neurotoxin alternative to BOTOX*. The manufacture of both Jeuveau® and BOTOX starts with a 900 kDa complex, includes adding the excipients human serum albumin, or HSA, and sodium chloride, and finishes by vacuum drying. We believe Jeuveau® is the only known neurotoxin product in the United States with a 900 kDa neurotoxin complex other than BOTOX. We also believe an important component of competitiveness in the neurotoxin market relates to the characteristics associated with the 900 kDa complex and the potential of the accessory proteins to increase the effectiveness of the active toxin portion of the complex." As to the "proprietary" nature of Jeuveau, Evolus stated "**our first product, Jeuveau, is a proprietary 900kDa purified botulinum toxin type A formulation** indicated for the temporary improvement in the appearance of moderate to severe glabellar lines, also known as 'frown lines' in adults."

211.   The above statements in the 2019 10-K were materially false and misleading when made and omitted material facts necessary to make the statement not misleading.  First, Evolus' "competitive strengths" were due to misappropriation rather than the reasons suggested above. Second, the "purified 900 kDa botulinum type A formulation" was illegally misappropriated from Medytox and was not in fact Evolus's (or Daewoong's) "proprietary" formulation but instead belonged to Medytox.

212.   The same day, Defendants held an earnings call to discuss the Company's financial and operational results for the fourth quarter of 2019.  On the call Defendant Moatazedi purported to update investors on the ITC Litigation and the impending decision stating:

> Lastly, I'd like to provide an update on the International Trade Commission, or ITC case. As you may know, the ITC hearings took place February 4 through 7 in Washington D.C.  In June, the judge will reach an initial determination, followed by a final decision by the ITC targeted for October 2020. In the interim, it's customary for various redacted versions of motions, briefs and transcripts to become public. However, I would caution you not to draw any definite conclusions

from individual documents, as the initial determination will be decided based on the totality of the merits as assessed by the judge in June and the ITC in October. We look forward to resolving the case before year end ***and remain confident in the strength of our IP.*** We can't speak further to this matter on today's call, but recognize it is something important to all of our employees and to our shareholders.

213.   In response to a question from Stifel analyst, Annabel Samimy, regarding the "potential realistic scenarios that could emerge from the ITC case, from the worst case to the best case," Defendant Moatazedi dodged the question, citing confidentiality, yet assured investors of the propriety of its IP: Clearly, top of mind for investors. As we mentioned earlier, the hearings took place earlier in February. And with the ITC, the majority of those hearings are confidential, it's not like a public trial where most of the information is available to you. So unfortunately, Annabel, I am not able to provide any more color than what I provided earlier. ***That being said, nothing changed through the case, we feel confident in the strength of our IP and we expect that this case will be resolved before the end of the year and this will be behind us.***

214.   Defendant Moatazedi's above statements were materially false and misleading when made and omitted material facts necessary to make the statements not misleading. First, Moatazedi Defendants had no reasonable basis to express continued "confidence" to investors in Evolus's IP because Defendants knew, but concealed from investors that the evidence in the ITC litigation established that: 1) the Medytox and Evolus BTX strains were linked by six SNP's and otherwise had nearly identical genomes establishing to a "virtual certainty" that the strain for Jeuveau could not have been isolated from the wild in a soil sample, and was instead the product of misappropriation; and 2) the manufacturing process for Jeuveau mirrored the manufacturing process for Medytox's BTX strain and Daewoong was unable to produce evidence showing it independently developed Jeuveau, demonstrating that Jeuveau was the product of misappropriation. Second, Moatazedi's statement that "nothing changed through the case" was

false given the abundance of fact and expert evidence, including genetic testing and DNA fingerprinting evidence establishing that, as the ITC Court found "Daewoong wrongfully took the trade secrets by unfair means."

215.    Given Defendants' above reassurances, analysts continued to issue positive reports and ratings, upgrading Evolus stock. For example, in a February 25, 2020 report SVB Leerink analysts Marc Goodman, Joanna Ruiz and Rudy Li rated Evolus "outperform," issuing a price target of $25/share, nearly three times Evolus' then current trading price of $8.68/share.  The report stated: "Bottom Line: Evolus pre-announced 4Q19 sales and key data metrics previously so the call today was focused on new marketing started for 2020 […] *and brief commentary on the ITC litigation.  Everything we heard supports out positive view of the stock, and we maintain our Outperform rating.*

216.    On March 4, 2020, Medytox issued a press release disclosing that during the ITC Hearing the ITC Staff Attorney sided with the allegations that Evolus and Daewoong misappropriated Medytox's trade secret BTX stain. Medytox commented that "ITC attorneys' opinions are known to have a profound effect on the final decision of the court."  On this news, Evolus' shares fell over 7% damaging investors.

217.    Defendants quickly responded in a press release Evolus issued the same day. The press release stated:

> *In several media reports this week, Medytox has made comments on the International Trade Commission (ITC) case, which Evolus believes are speculative and intended to create confusion in the U.S. market* ahead of the ITC Judge's initial determination in June 2020 and the ITC's final determination, which is targeted for October 2020.
>
> *Importantly, nothing has changed as a result of the media reports from Korea.* The ITC Judge will make his own independent decision based upon all the evidence presented at the hearing and through all the parties' filings.  The Judge assigned to the ITC is not obligated to accept a staff attorney's position on the facts, and *it's*

*fairly common for the Judge and the staff attorney to disagree on substantive matters.*

*Evolus and Daewoong remain confident in the strength of our intellectual property* and will continue to vigorously defend it through the entirety of the ITC process.

218.   The foregoing false exculpatory statement was false and misleading when made and omitted material facts necessary to make the statement not misleading. First, Defendants had no reasonable basis to express continued "confidence" to investors in Evolus's IP because Defendants knew, but concealed from investors that the evidence in the ITC litigation established that: 1) the Medytox and Evolus BTX strains were linked by six SNP's and otherwise had nearly identical genomes establishing to a "virtual certainty" that the strain for Jeuveau could not have been isolated from the wild in a soil sample, and was instead the product of misappropriation; and 2) the manufacturing process for Jeuveau mirrored the manufacturing process for Medytox's BTX strain and Daewoong was unable to produce evidence showing it independently developed Jeuveau, demonstrating that Jeuveau was the product of misappropriation. Second, Defendants' statement that "nothing changed through the case" was false given the abundance of fact and expert evidence, including genetic testing evidence establishing that "Daewoong wrongfully took the trade secrets by unfair means." Third, Defendants' statement characterizing Medytox's disclosure of the ITC Staff Attorney's position as "speculative and intended to create confusion" and representation that "it's fairly common for the judge and the staff attorney to disagree on substantive matters" misled investors into believing Medytox was mischaracterizing the facts when in truth the evidentiary record clearly demonstrated that Evolus misappropriated Medytox's trade secrets.

219.   Defendants' false denials had their intended effect on analysts and the market to

mitigate the adverse news from the Medytox press release and prop up Evolus's stock price. For example, analysts from Cantor Fitzgerald reiterated their overweight rating of Evolus stock. Analysts Louise Chen, Brandon Folkes and Jennifer Kim of Cantor Fitzgerald issued a report the same day (March 4, 2020) giving Evolus stock a price target of $35 (compared to its then current trading price of $7.70):

> *Don't believe everything you read; headlines on ITC case unduly weighing on EOLS shares today*
>
> Takeaways ∎
>
> Today (3/4), EOLS's stock is trading -9% intraday (vs S&P 500 +2%) following recent headlines from Korean press related to EOLS and Daewoong's (NC) ongoing ITC case with Allergan (NC) and Medytox (NC). Following EOLS's update in response to these headlines, ***and our conversations with management this morning***, *we strongly believe the negative reaction is overdone*, and believe this is a good buying opportunity ahead of expected strong sales momentum for Jeuveau in 2020. We reiterate our OW rating.
>
> ∎ ***Our key takeaway is that nothing has changed as a result of Korean media reports.*** The judge will make the Initial Determination based on the totality of evidence (expected on 6/5/20). Importantly, this totality of evidence is not expected to be available to the public prior to the Initial Determination. ***We caution investors against speculating on outcomes using cherry-picked/assertions of information, and expect if/when briefs become public that they will be heavily redacted, as is expected of these types of cases given privacy concerns around trade secrets.*** There is no exact timeline for when the briefs may become public
>
> \*\*\*
>
> ∎ We are reiterating our OW rating and 12-month price target of $35. EOLS has delivered on a strong launch for Jeuveau, increasing its purchasing account base from ~350 in 2Q19 to 2,000 in 3Q19 to 3,500 in 4Q19, and we think Jeuveau is well on its way to reach the #2 position in the aesthetic neurotoxins market within 24 months of launch. We believe momentum will continue in 2020, with the recent introduction of the customer loyalty program, Evolux, and the consumer loyalty program expected to be unveiled in 2Q20.

220.    The foregoing statement was false and misleading for the same reasons stated in ¶217 above. Defendants are liable for the above statement given that it was based on

"conversations with management this morning".

221.   On March 11, 2020 at the Barclay's Global Healthcare Conference Defendant Silvernail participated in a question/answer session where she discussed the ITC Litigation, evading substantive questions but reiterating the Company's "solid position" with respect to the ITC Litigation.

> Balaji V. Prasad: - Maybe just on the point to clarify, too, on this. Going by your press release last week, you stated that it's perfectly normal for the attorney and ruling judge to have divergent stands. We read some independent checks and kind of corroborated that. But your press release, ***should we interpret this as a fact that the ITC attorney did indeed side with Medytox, or is that fact under dispute?***

> Defendant Silvernail: I think if you look through it all and you look through all the information that is out there, ***it's very contradictory. And so I'd be careful about drawing any conclusions about who sided with whom on what.*** There just is a tremendous amount of information coming out and will come out over the next 90 days or so***. And we believe in the merits of our case, we're confident in our IP***. But it's hard to comment on each individual fact that's going to come out. Some of them are going to look like the case is swinging to Daewoong and some are going to make it look like it's swinging to Medytox

222.   Defendants Silvernail's statement that "it's very contradictory" and "I'd be careful about drawing any conclusions with whom on what" was materially false and misleading because Silvernail was aware, given Evolus's presence at the ITC Hearing, that the OUII Staff Attorney did in fact side with Medytox and Allergan.  Further, Defendant Silvernail's statement "we believe in the merits of our case, we're confident in our IP" was materially false and misleading because Silvernail had no reasonable basis to express confidence in the merits of the case or Evolus' IP given that the evidence demonstrated that Jeuveau was the product of misappropriation.

223.   Defendant Silvernail went on to reassure investors that there was nothing to worry about in terms of the ITC Litigation and the Evolus was in a "solid position:"

**Balaji V. Prasad** - …So the way we see it, eventually, there's one of 3 scenarios: you win the dispute, and everything settles down and it's back to business as usual; or two, there is some kind of midway path where you have a settlement with Medytox; or three, you lose the case. Is the last scenario, which investors are worried especially, if such a scenario pans out, what could the back-up be for you to continue business as usual?

**Defendant Silvernail** - Sure, sure. As I mentioned earlier, when you look at the case, there will be a preliminary decision in June and a final decision in October. If there is a settlement, it will be between Medytox and Daewoong. And only they can really comment on that, and so we won't be commenting on settlement today at all. ***For us, we have -- we are in a very solid position. We like our odds in this. We believe in the merits of our case and are very confident in the IP. So we are not really worried about the outcome here.***

224.   Defendant Silvernail's above statements were materially false and misleading when made and omitted material information necessary to make the statements not misleading.  First, Defendant Silvernail had no reasonable basis to state the Evolus was in "a very solid position" given the abundant fact and expert evidence, including genetic evidence that Jeuveau was the product of misappropriation.  Second, Defendant Silvernail had no reasonable basis to represent to investors that "we like our odds in this" and "we are not really worried about the outcome here" given the evidentiary record set forth herein.

225.   On May 11, 2020, two months before the ITC Court issued its Final Initial Determination, Evolus filed its quarterly report for the quarter ended March 31, 2020 ("1Q 2020 10-Q").  In the 1Q 2020 10-Q Defendants continued to represent Jeuveau as Evolus' "proprietary 900kDa purified botulinum toxin type A formulation." During the Earnings Call held on the same day, Defendant Moatazedi provided an update on the ITC case, forecasting resolution of the case and assuring investors that Evolus "***remain[s] confident in the strength of our IP***."

226.   The foregoing statements in the 1Q 2020 10-Q and earnings conference call were materially false and misleading when made and omitted material facts necessary to make the

statements not misleading because Defendants knew but concealed from investors that the evidence in the ITC Litigation demonstrated that Jeuveau was not Evolus' "proprietary" formulation but was instead the product of misappropriation. In addition, Defendants had no reasonable basis to express continued "confidence" to investors in Evolus' IP because Defendants knew, but concealed from investors that the evidence in the ITC litigation established that: 1) the Medytox and Evolus BTX strains were linked by six SNP's and otherwise had nearly identical genomes establishing to a "virtual certainty" that the strain for Jeuveau could not have been isolated from the wild in a soil sample, and was instead the product of misappropriation; and 2) the manufacturing process for Jeuveau mirrored the manufacturing process for Medytox's BTX strain and Daewoong was unable to produce evidence showing it independently developed Jeuveau, demonstrating that Jeuveau was the product of misappropriation.

## **DEFENDANTS' CLASS PERIOD INSIDER SALES**

227.    Beginning on May 17, 2019, just several days after Evolus commercially launched Jeuveau and following Defendants' false statements assuring investors that the allegations in the ITC Complaint had no merit Defendants unloaded shares of Evolus stock at artificially inflated prices.

228.    The chart below details Defendants' insider sales during the Class Period.

| Party | Date | Number of Shares | Price | Proceeds |
|---|---|---|---|---|
| Alphaeon | 5/17/2019-5/20/2019 | 4,000,000 | $19.25 | $77,000,000.00 |
| Alphaeon | 5/20/2019 | 1,017,000 | $19.25 | $19,577,250 |
| Alphaeon | 5/22/2019 | 290,518 | $19.25 | $5,592,471,59 |
| Lauren Silvernail | 5/31/2019 | 2,612 | $13.53 | $35,340.36 |
| Alphaeon | 6/3/2019 | 1,299,000 | $19.25 | $25,005,750.00 |
| Rui Avelar | 1/7/2020 | 39,442 | $10.71 | $422,423.82 |
| **TOTAL** | | **6,648,572** | | **$127,633,235.68** |

229.    Alphaeon sold an additional 2.6 million shares of its stock during the Class Period. In total, Defendant Alphaeon sold over 6.6 million shares of Evolus stock, representing 43% of its total shares of Evolus stock[20] during the Class Period.

230.    Defendant Avelar sold 36% of his total holdings in Evolus stock during the Class Period. These sales were suspicious in both timing and amount.

231.    By engaging in these insider sales Defendants illegally profited in these trades.

**_The ITC Court Issues Its Final Initial Determination Causing Shares of Evolus to Crater_**

232.    On July 6, 2020, the ITC Court issued its Final Initial Determination. The ITC Court found that Evolus misappropriated Medytox's trade secrets causing substantial injury to the domestic industry. Additionally, the ITC Court found that Daewoong misappropriated certain trade secrets relating to the manufacturing processes of the relevant botulinum toxin strain. As a remedy, the ITC Court recommended a limited exclusion order preventing Evolus from importing Jeuveau into the U.S. for ten years and a cease-and-desist order that would prevent Evolus from marketing

---

[20] Neither Avelar nor Silvernail sold any Evolus stock prior to the Class Period. In addition to the 4 million shares Alphaeon sold in the Secondary Offering, Alphaeon sold approximately 2.6 million additional shares during the Class Period pursuant to private transactions, selling a total of 6.6 million shares of Evolus stock during the Class Period compared to the 3.3 million shares of stock Alphaeon sold prior to the Class Period.

and selling Jeuveau. in the U.S., also for a period of ten years.

233.   On this news, the Company's shares dropped to $3.35 per share over the next two trading days, representing a decline of 37%, damaging investors.

**POST CLASS PERIOD EVENTS**

234.   On August 6, 2020 the ITC Court issued a 282-page public version of its Final Initial Determination. The document revealed the voluminous fact and expert evidence demonstrating Evolus's liability for misappropriation, including the clear genetic evidence that Jeuveau and Medytox's BTX strain shared the same DNA "fingerprints." The FID demonstrated to investors that during the heart of the Class Period Defendants knew but withheld from them that the "scientific and genetic evidence establishe[d] to a virtual certainty" that Jeuveau was the product of misappropriation and not isolated from the wild in a soil sample as Daewoong preposterously claimed.   FID. p. 102.

235.   On December 16, 2020 the ITC affirmed with modification the FID in a Final Determination. The ITC affirmed the FID's findings that Evolus violated Section 337.  The ITC further affirmed that FID's finding that the manufacturing process for Jeuveau was the product of misappropriation of trade secrets but held that the bacterial strain itself was not a trade secret. Nevertheless, the result was the same:  a cease-and-desist order and limited exclusion order against Evolus prohibiting it from importing and commercializing Jeuveau.

236.   While the ITC reduced the ban to 21 months, as Wells Fargo analysts put it, "the aesthetics market may look different by 2023 when Revance will have launched their long duration toxin Daxi, and is further challenged by financing and talent retention issues…while this is better than the 10-year ban that Judge Shaw proposed, this is clearly a very significant roadblock for the company to overcome.  Even at the current valuation, we think the risk reward for this stock

remains unfavorable.[21]"

## LOSS CAUSATION/ECONOMIC LOSS

237.   On March 1, 2019 the ITC issued a press release announcing that it would grant Allergan's and Medytox's request to institute an investigation, stating that the ITC "voted to institute an investigation of certain botulinum toxin products, processes for manufacturing to same and certain products containing same…The complaint alleges violations of section 337 of the Tariff Act of 1930 in the importation in the United States and sale of certain botulinum toxin products, processes for manufacturing or related to same and certain products containing same that misappropriate trade secrets asserted by complainants."

238.   On the above news, partially correcting Defendants' prior misrepresentations that the ITC Complaint had no merit, the next trading day March 4, 2019, Evolus common stock fell $1.39 per share, or 5%, damaging investors.

239.   On March 4, 2020, Medytox issued a press release stating that during the ITC Hearing the ITC Staff Attorney agreed that Evolus and Daewoong misappropriated Medytox's trade secrets. Medytox stated that "ITC attorneys' opinions are known to have a profound effect on the final decision of the court."

240.   On the above news partially correcting Defendants' prior misrepresentation Evolus common stock fell $0.57 per share, or over 7%, damaging investors.  That same day, Evolus issued a press release imploring investors that the Medytox's statement was misleading.  Evolus also repeated its false claim that its IP position was strong. Evolus's false exculpatory statement had the effect of propping up Evolus's share price and preventing a steeper decline.

241.   On July 6, 2020, the ITC Court issued its Final Initial Determination. The ITC Court

---

[21] ***ITC Ruling Critical Setback; What's Next From Here***, Wells Fargo, Dec. 21, 2020.

found that Evolus misappropriated Medytox's trade secrets causing substantial injury to the domestic industry. Additionally, the ITC Court found that Daewoong misappropriated certain trade secrets relating to the manufacturing processes of the relevant botulinum toxin strain. As a remedy, the ITC Court recommended a limited exclusion order preventing Evolus from importing Jeuveau into the U.S. for ten years and a cease-and-desist order that would prevent Evolus from marketing and selling Jeuveau. in the U.S., also for a period of ten years.

242.   On this news, the Company's shares dropped to $3.35 per share over the next two trading days, representing a decline of 37%, damaging investors.

243.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Investors and other Class Members have suffered significant losses and damages.

## INVESTORS' CLASS ACTION ALLEGATIONS

244.   Investors bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Evolus common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants, the officers and directors of Evolus, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Individual Defendants have or had a controlling interest.

245.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Evolus common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Investors at this time and can be ascertained only through appropriate discovery, Investors believe that there are hundreds or

thousands of members in the proposed Class.

246.   Investors' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

247.   Investors will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Investors have no interests antagonistic to or in conflict with those of the Class.

248.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

-whether the federal securities laws were violated by Defendants' acts as alleged herein;

-whether statements Defendants made to the investing public during the Class Period misrepresented material facts about the business, operations and management of Evolus;

-whether the Individual Defendants caused Evolus to issue false and misleading statements during the Class Period;

-whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

-whether the prices of Evolus common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and whether the members of the Class have sustained damages and, if so, what the proper measure of damages is.

249.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

250.   Investors will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;
  -the Company's securities are traded in efficient markets;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

- Investors and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented -material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

- unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

251.   Based upon the foregoing, Investors and the members of the Class are entitled to a

presumption of reliance upon the integrity of the market.

252.   Alternatively, Investors and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## NO SAFE HARBOR

253.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

254.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Evolus who knew that the statement was false when made.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

255.   Investors repeat and reallege each and every allegation contained above as if fully set forth herein.

256.   This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

257.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

258.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

259.   Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose

the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Investors and the Class.

260.   As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Investors and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

261.   Had Investors and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which the Company and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

262.   As a result of the wrongful conduct alleged herein, Investors and other members of the Class have suffered damages in an amount to be established at trial.

263.   By reason of the foregoing, the Company Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

264.   Investors repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

265.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

266.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

267.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

268.   Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Investors and the other members of the Class complain.

269.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**COUNT III**
**Violations of Section 20(a) of the Exchange Act**
**Against Alphaeon**

*Alphaeon Controlled Evolus*

270.    As a majority owner of the Company, Alphaeon exercised significant control over Evolus.  According to Evolus' 2018 10-K Evolus was a "controlled company" for purposes of the Nasdaq marketplace rules.

271.    As the Company acknowledged in its 2018 10-K "certain of our directors may have actual or potential conflicts of interest because of their ownership of debt and equity securities in Alphaeon and their positions with Alphaeon."

272.    Indeed, non-parties Blank, Malik, Hau, Romine and Hayman served on Evolus' board of directors during to the Class Period and also on Alphaeon's board of directors. Additionally, Blank and Malik served on Evolus's three-member Compensation Committee during the Class Period; Hau and Hayman served on Evolus's three-member Audit Committee during the Class Period; and Hau served as the chair of Evolus's four person Nominating and Corporate Governance Committee, with Blank, Malik and Romine serving as the remaining three members.

273.    Up until May 20, 2019 Evolus was deemed a "controlled company" for purposes of the Nasdaq marketplace rules.  Moreover, a majority of Evolus' Board of Directors was not "independent" as defined by Nasdaq listing rules.

*Alphaeon's Benefit from the Fraud Through Stock Sales*

274.    Alphaeon used its control of Evolus to cash out its investment in the Company at enormous profits bolstered by the fraud.

275.   At the beginning of the Class Period, there were 27,274,991 shares of Evolus common stock outstanding of which Alphaeon beneficially owned 15,268,987 or 56.0%.

276.   Evidencing Alphaeon's ability to profit from its control of Evolus, Alphaeon caused Evolus to file a shelf registration statement on March 22, 2019 enabling Alphaeon to sell its shares to the market.   The shelf registration statement was declared effective on April 15, 2019. Approximately one month later Alphaeon offered and sold 4,000,000 shares of stock at $19.25 per share for total proceeds of $77,000,000.

277.   Alphaeon sold an additional 2.6 million shares during the Class Period at the artificially inflated price of $19.25 per share, making its total proceeds from sales of Evolus stock during the Class Period $127,633,235.68.

### *Violations of 20(a)*

278.   During the Class Period Alphaeon participated in the operation and management of Evolus, and conducted and participated, directly and indirectly, in the conduct of Evolus' business affairs.

279.   Because of Alphaeon's position as the Company's largest shareholder, its control over the Board by virtue of its appointees on the Board of Directors and participation through its appointees on the Audit Committee, Compensation Committee and Nominating and Corporate Governance Committees, and control over Board members, it was a control person of the Company.

280.   Because of its position of control and authority, Alphaeon was able to, and did, control the contents of the various reports, press release and public filings which Evolus. disseminated in the marketplace during the Class Period concerning Evolus' results of operations.

281.   Alphaeon had the power to direct the actions of, and exercised the same to cause,

Evolus to engage in the unlawful acts and conduct complained of herein. Alphaeon exercised control over the general operations of Evolus and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain. By reason of the above conduct, Alphaeon is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Evolus.

282.    This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

**COUNT IV**

**Violations of Section 20A of the Exchange Act**
**Against Alphaeon**
**(Insider Trading)**

283.    This claim is brought against Alphaeon under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1 against Alphaeon, on behalf of Plaintiffs who purchased shares contemporaneously with Alphaeon's sales and were damaged by Alphaeon's insider trading.

284.    Alphaeon required that Evolus file a registration statement allowing it to sell its restricted shares publicly on the NASDAQ.

285.    On May 17, 2019, Evolus filed a final prospectus allowing for the sale of 4.0 million shares of Evolus stock on the NASDAQ.

286.    The offering began no earlier than 2 pm on Friday May 17, 2019, and was completed by close of business on Monday May 20, 2019. From 2:00 pm on May 17, 2019, through 5:00 pm on May 20, 2019, Alphaeon's shares were sold on the NASDAQ to Class Members in a series of transactions.

287.    When the offering was completed on May 20, 2019, Alphaeon had sold 4,000,000 shares of Evolus stock for total proceeds of $77,000,000.

288.    Lead Plaintiff Raja Ahmad purchased 40,000 shares of Evolus stock on May 20, 2019 contemporaneous with Alphaeon' sale of shares in the public offering.

289.    Named Plaintiff Mitchell Sisun purchased 2,000 shares of Evolus stock on May 20, 2019, contemporaneous with Alphaeon' sale of shares in the public offering.By virtue of its members on Evolus's Board of Directors, who were also members of Evolus's Audit Committee, Corporate Governance Committee and Compensation Committee and were also members of Alphaeon's Board of Directors, Alphaeon had access to the Company's material non-public information and was aware of and/or recklessly disregarded the evidence demonstrating that Jeuveau was the product of misappropriation.

290.    As detailed herein, Alphaeon was in possession of material, non-public information concerning Evolus.  Alphaeon took advantage of its possession of material, non-public information regarding Evolus to earn $77 million in insider trading profits on May 20, 2019.

291.    Plaintiffs Raja Ahmad, who purchased 40,000 shares, and Mitchell Sisun, who purchased 2,000 Evolus shares, both on May 20, 2019, and the sub-class of investors who likewise purchased Evolus's shares contemporaneously with Alphaeon's sales in the May 17 through May 20, 2019 public offering are entitled to disgorgement of the amounts by which Alphaeon profited from such trades.

292.    By virtue of the foregoing, Defendant Alphaeon is liable for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.

293.    This action was filed within two years of discovery of the fraud and within five years of each plaintiffs' purchases of securities giving rise to the cause of action.


**PRAYER FOR RELIEF**

WHEREFORE, Investors demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Investors as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Investors and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Investors and the other members of the Class prejudgment and post-judgment interest, as well as expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Investors hereby demand a trial by jury.

Dated: November 16, 2021                    **THE ROSEN LAW FIRM, P.A.**

<u>/s/ Sara Fuks</u>
Sara Fuks
Laurence Rosen
Phillip Kim
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: sfuks@rosenlegal.com
        lrosen@rosenlegal.com
        pkim@rosenlegal.com

*Lead Counsel for Investors and the Putative Class*