**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **In re EVOLUS, INC. SECURITIES LITIGATION** | **Civil Action No. 20-cv-8647-PGG** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**THE EVOLUS DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

Dated:  January 18, 2022
           New York, New York

**O'MELVENY & MYERS LLP**

Jonathan Rosenberg
B. Andrew Bednark
7 Times Square
New York, NY 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061
jrosenberg@omm.com
abednark@omm.com

*Attorneys for Defendants Evolus, Inc.,*
*David Moatazedi, Rui Avelar, and Lauren*
*Silvernail*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 3

    Evolus Licenses Jeuveau from Daewoong ........................................................... 3

    Medytox Sues Daewoong and Evolus for Trade-Secret Misappropriation ......................... 4

    Evolus Discloses Medytox's Claims in Its IPO Registration Statement ........................... 5

    Medytox Files—and Evolus Discloses—Similar Claims with the ITC............................ 5

    The ITC Litigation Proceeds Through a February 2020 Hearing....................................... 6

    The ALJ Finds for Medytox and Allergan, But the Full Commission Reverses in Part ..................................................................................................................... 8

    Evolus Shareholders File Securities-Fraud Complaints ..................................................... 9

ARGUMENT ........................................................................................................................... 10

    I.    THE AC FAILS TO PLEAD ANY MATERIALLY FALSE OR MISLEADING STATEMENT. ................................................................... 11

        A.    All the AC's Alleged Misstatements Are Nonactionable Puffery. ........... 11

            1.    The Litigation Optimism is aspirational puffery. ........................ 12

            2.    The Jeuveau Descriptions are nonspecific puffery. ...................... 14

        B.    The Evolus Defendants' Litigation Optimism Is Protected by the PSLRA's Safe Harbor for Forward-Looking Statements and the Bespeaks Caution Doctrine. ....................................................................... 17

    II.    THE AC FAILS TO PLEAD PARTICULARIZED FACTS SUPPORTING A STRONG SCIENTER INFERENCE. ................................... 19

        A.    The AC Does Not Adequately Plead Motive and Opportunity. .............. 19

        B.    The AC Fails to Allege the Individual Defendants' Conscious Misbehavior or Recklessness. ................................................................... 23

            1.    The Evolus Defendants' prior positions at Allergan do not support a scienter inference. ....................................................... 23

            2.    The AC's allegations based on a confidential witness are inadequate. ................................................................................. 23

**TABLE OF CONTENTS**
**(continued)**

**Page**

3.      The ITC Litigation discovery record cannot support an inference of recklessness...................................................................... 25

C.      The AC's Allegations, Viewed Holistically, Fail to Plead Scienter. ........ 27

III.    THE AC DOES NOT ADEQUATELY ALLEGE THAT THE EVOLUS DEFENDANTS' OPINION STATEMENTS WERE FALSE OR MISLEADING................................................................................................ 28

IV.     PLAINTIFFS' SECTION 20(a) CLAIM AGAINST THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED. ....................................................... 29

CONCLUSION......................................................................................................................... 29

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Acito v. IMCERA Group*,
47 F.3d 47 (2d Cir. 1995) ......................................................................................... 11, 19

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ...................................................................................... 18, 29

*Axar Master Fund, Ltd. v. Bedford*,
308 F. Supp. 3d 743 (S.D.N.Y. 2018) ............................................................. 18, 25, 28

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ...................................................................................................... 11

*Campo v. Sears Holdings Corp.*,
635 F. Supp. 2d 323 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010) ....................... 24

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
2014 WL 4832321 (S.D.N.Y. 2014) ............................................................................ 12

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ......................................................................................... 11

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020) ..................................................................... 11, 15

*Crutchfield v. Match Group, Inc.*,
529 F. Supp. 3d 570 (N.D. Tex. 2021) ...................................................... 13, 25, 28

*Druskin v. Answerthink, Inc.*,
299 F. Supp. 2d 1307 (S.D. Fla. 2004) ........................................................................ 20

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ......................................................................................... 23

*Eshelman v. Orthoclear Holdings Inc.*,
2009 WL 506864 (N.D. Cal. 2009) .............................................................................. 18

*Fishbaum v. Liz Claiborne, Inc.*,
1999 WL 568023 (2d Cir. 1999) .................................................................................. 21

*Frankfurt-Trust Inv. Luxemburg AG v. United Tech. Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018) .......................................................................... 22

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011) .......................................................................... 24

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Gregory v. ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018) ..................................................................... 16

*Grobler v. Neovasc Inc.*,
2016 WL 6897760 (D. Mass. 2016) ......................................................................... 17

*Hadley v. Kellogg Sales Co.*,
273 F. Supp. 3d 1052 (N.D. Cal. 2017) ................................................................... 13

*Hall v. Johnson & Johnson*,
2019 WL 7207491 (D.N.J. 2019) ............................................................... 25, 26, 28

*Hampton v. Root9B Tech., Inc.*,
2016 WL 9735744 (D. Colo. 2016), *aff'd*, 897 F.3d 1291 (10th Cir. 2018) ........... 15

*Hawaii Structural Ironworks Pension Trust Fund v. AMC Entertainment Holdings, Inc.*,
422 F. Supp. 3d 821 (S.D.N.Y. 2019) ..................................................................... 19

*IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*,
660 Fed. App'x 850 (11th Cir. 2016) ....................................................................... 12

*In re Aratana Therapeutics Inc. Sec. Litig.*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018) ..................................................................... 12

*In re Bausch & Lomb, Inc. Sec. Litig.*,
592 F. Supp. 2d 323 (W.D.N.Y. 2008) .................................................................... 21

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005) ..................................................................... 18

*In re Cannavest Corp. Sec. Litig.*,
307 F. Supp. 3d 222 (S.D.N.Y. 2018) ..................................................................... 29

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004) ..................................................................... 14

*In re Columbia Pipeline, Inc.*,
405 F. Supp. 3d 494 (S.D.N.Y. 2019) ..................................................................... 12

*In re eSpeed, Inc. Sec. Litig.*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006) ..................................................................... 19

*In re Express Scripts Holding Co. Sec. Litig.*,
2017 WL 3278930 (S.D.N.Y. 2017) ......................................................................... 4

*In re Fusion-io, Inc. Sec. Litig.*,
2015 WL 661869 (N.D. Cal. 2015) .......................................................................... 18

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re Gaming Lottery Sec. Litig.*,
1998 WL 276177 (S.D.N.Y. 1998).................................................................................. 14

*In re GeoPharma, Inc. Sec. Litig.*,
411 F. Supp. 2d 434 (S.D.N.Y. 2006) ............................................................................ 22

*In re Gildan Activewear, Inc. Sec. Litig.*,
636 F. Supp. 2d 261 (S.D.N.Y. 2009) ................................................................. 19, 20, 21

*In re GlaxoSmithKline PLC Sec. Litig.*,
2006 WL 2871968 (S.D.N.Y. 2006)........................................................................ passim

*In re IAC/InterActiveCorp Sec. Litig.*,
478 F. Supp. 2d 574 (S.D.N.Y. 2007) ............................................................................ 21

*In re Iconix Brand Group, Inc.*,
2017 WL 4898228 (S.D.N.Y. 2017)................................................................................ 27

*In re Intrexon Corp. Sec. Litig.*,
2017 WL 732952 (N.D. Cal. 2017) ................................................................................ 15

*In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*,
2014 WL 585658 (S.D.N.Y. 2014).................................................................................. 21

*In re Keyspan Corp. Sec. Litig.*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) ............................................................................ 20

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014) .............................................................................. 24

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) ............................................................................................. 19

*In re Seadrill Ltd. Sec. Litig.*,
2016 WL 3461311 (S.D.N.Y. 2016)................................................................................ 12

*In re Sotheby's Holdings, Inc.*,
2000 WL 1234601 (S.D.N.Y. 2000)................................................................................ 23

*In re Take-Two Interactive Sec. Litig.,*
551 F. Supp. 2d 247 (S.D.N.Y. 2008) ............................................................................ 21

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993) ............................................................................................... 14

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ........................................................................................ 20

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
 195 F. Supp. 3d 528 (S.D.N.Y. 2016) ..................................................... 15

*Kalin v. Xanboo, Inc.*,
 526 F. Supp. 2d 392 (S.D.N.Y. 2007) ..................................................... 29

*Kalnit v. Eichler,*
 264 F.3d 131 (2d Cir. 2001) .......................................................... 23, 27

*Kramer v. Time Warner Inc.*,
 937 F.2d 767 (2d Cir. 1991) ................................................................ 3

*Lentell v. Merrill Lynch & Co.*,
 396 F.3d 161 (2d Cir. 2005) ............................................................... 10

*Malin v. XL Capital Ltd.*,
 499 F. Supp. 2d 117 (D. Conn. 2007)............................................ 19, 20, 21, 22

*Menaldi v. Och-Ziff Mgmt. Group LLC*,
 164 F. Supp. 3d 568 (S.D.N.Y. 2016) ..................................................... 16

*Mills v. Polar Molecular Corp.*,
 12 F.3d 1170 (2d Cir. 1993) .............................................................. 10

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*,
 2016 WL 5794774 (S.D.N.Y. 2016)......................................................... 21

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
 300 F. Supp. 3d 551 (S.D.N.Y. 2018) ..................................................... 16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
 575 U.S. 175 (2015)...................................................................... 28

*Rombach v. Chang*,
 355 F.3d 164 (2d Cir. 2004) ........................................................... 12, 17

*Rosenzweig v. Azurix Corp.*,
 332 F.3d 854 (5th Cir. 2003) .............................................................. 16

*Rothman v. Gregor*,
 220 F.3d 81 (2d Cir. 2000) ................................................................ 20

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
 573 F.3d 98 (2d Cir. 2009) ................................................................ 19

*Salim v. Mobile Telesystems PJSC*,
 2021 WL 796088 (E.D.N.Y. 2021) .......................................................... 14

# TABLE OF AUTHORITIES
## (continued)

**Page**

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc.*,
  75 F.3d 801 (2d Cir. 1996) ...................................................................................... 20

*Silsby v. Icahn*,
  17 F. Supp. 3d 348 (S.D.N.Y. 2014) .......................................................................... 3

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
  417 F. Supp. 3d 379 (S.D.N.Y. 2019) ...................................................................... 23

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
  33 F. Supp. 3d 401 (S.D.N.Y. 2014) ........................................................................ 26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................. 11, 19, 27

*Villare v. Abiomed, Inc.*,
  2021 WL 4311749 (S.D.N.Y. 2021)......................................................................... 12

**Statutes**

15 U.S.C. § 78u-4(b)(1) ............................................................................................. 11

15 U.S.C. § 78u-4(b)(2) ............................................................................................. 11

15 U.S.C. § 78u-5(c)(1)(A)(i) .................................................................................... 18

**Rules**

Fed. R. Civ. P. 9(b) .................................................................................................... 11

**Other Authorities**

Gary M. Hnath, *Section 337 Investigations at the US International Trade Commission
  Provide A Powerful Remedy Against Misappropriation of Trade Secrets*, 22 No. 6
  Intell. Prop & Tech. L. J. 1 (2010)............................................................................. 6

## PRELIMINARY STATEMENT[1]

The Amended Complaint is based on Defendants' expressions of optimism about a litigation that ultimately did not end as they had hoped. Those expressions are not actionable under the securities laws, especially when the Defendants regularly disclosed the risks and consequences of an adverse litigation outcome, and directed investors to the relevant pleadings. Nor do the securities laws require companies to adopt their litigation adversaries' pejorative views of their products and conduct. The Amended Complaint should be dismissed.

Evolus sells Jeuveau, a biologic product for aesthetic uses that is manufactured by Daewoong in South Korea. It competes with market-leader BOTOX, manufactured by Allergan, which licenses a similar product from South Korea-based Medytox. As Jeuveau neared FDA approval in 2017, Medytox and Allergan filed several lawsuits alleging that Daewoong had misappropriated Medytox's trade secrets—i.e., the bacterial strain used to make Medytox's product and its manufacturing process—and seeking to enjoin Jeuveau from competing with BOTOX in the U.S. market. Naturally, Evolus commented to the market about the lawsuits. While Evolus expressed "confidence" in its IP and the "merits of our case"—and stood by Jeuveau's "proprietary" attributes and "competitive strengths"—it also disclosed Medytox's allegations and the sobering risk that Evolus could be enjoined from selling Jeuveau.

An ITC administrative law judge recommended such an injunction in July 2020. Various shareholders responded by suing Evolus for baselessly expressing optimism about the litigation and failing to disclose that Jeuveau was the product of Daewoong's trade-secret

---

[1] This brief refers to Evolus, Inc. as "Evolus," defendants Moatazedi, Avelar, and Silvernail as the "Individual Defendants" and together with Evolus as "the Evolus Defendants," the Amended Complaint as "AC," exhibits to the accompanying Declaration of Jonathan Rosenberg, Esq. ("Rosenberg Dec.") as "Ex.," the Private Securities Litigation Reform Act of 1995 as the "PSLRA," and the U.S. International Trade Commission as the "ITC." Unless otherwise specified, all internal quotations and citations are omitted and all emphasis is added.

misappropriation. As if to rebuke that theory, the full Commission in December 2020 reversed the ALJ's key finding that Medytox's bacterial strain is a protectable trade secret, and reduced the injunction from ten years to less than two. Undeterred, plaintiffs maintain that Evolus knew all along that the outcome was a foregone conclusion. Their allegations do not state a securities-fraud claim for four reasons.

First, the AC fails to allege any materially false or misleading statements. It challenges only corporate puffery—generalized, optimistic statements that no reasonable investor would take as a guarantee. Evolus's "confidence" in its litigation prospects reflects company optimism that the market expects, just as it expects companies like Evolus to describe their products in positive terms rather than accuse themselves of wrongdoing.

Second, the AC's allegations based on Defendants' expressions of optimism are protected by the PSLRA's safe harbor for forward-looking statements and the "bespeaks caution" doctrine. These forward-looking statements were repeatedly accompanied by meaningful cautionary language about the injunction risk, and thus are not actionable.

Third, the AC does not allege particularized facts supporting a strong inference of fraudulent intent. Plaintiffs cannot dispute that Evolus's CEO, defendant David Moatazedi, did not sell *a single share* during the class period, which negates plaintiffs' core scienter theory that the Individual Defendants plotted to sell their Evolus stock at fraudulently inflated prices. And the AC does not adequately allege any unusual or suspicious sales by the other Individual Defendants or by Alphaeon, Evolus's onetime majority shareholder. On the contrary, each Individual Defendant *acquired* more shares than they sold during the class period, and Alphaeon sold shares more than a year before the class period ended to pay off maturing debts. Equally meritless are the AC's allegations that the Individual Defendants never investigated whether

2

Jeuveau was misappropriated, and thus had no reasonable basis for their litigation optimism. Plaintiffs rely solely on a confidential witness who (i) did not join Evolus until 16 months after Medytox first brought misappropriation claims, and (ii) identified no factual basis for his conclusory accusation. Plaintiffs fare no better with their third scienter theory that the Evolus Defendants knew from the ITC discovery record that Evolus was certain to lose. The ALJ's 274-page initial decision—and the full Commission's partial reversal—undercut any inference that the ITC litigation was an open-and-shut case. And the ITC protective order restricted confidential information to the parties' outside counsel, giving Evolus no access to Medytox's confidential discovery beyond the headline expert conclusions that Medytox publicly disclosed. Against the backdrop of Evolus's regular disclosures about Medytox's allegations—and the risk that Evolus could lose—the AC fails to plead an inference of fraudulent intent at least as compelling as the opposing inference that Evolus honestly believed in its case.

Fourth, it follows from plaintiffs' failure to plead scienter that they also fail to plead the falsity of the Individual Defendants' opinion statements about the ongoing litigation. Missing are any allegations that the Individual Defendants did not sincerely hold their opinions. Rather, the AC alleges only that those opinions lacked a reasonable basis, relying on the same deficient reasons that fail to support a strong scienter inference—i.e., that Defendants never investigated Medytox's claims and knew that the ITC discovery record guaranteed a loss. The AC therefore does not adequately allege that the Individual Defendants' opinions lacked a reasonable basis.

## FACTUAL BACKGROUND[2]

**Evolus Licenses Jeuveau from Daewoong**

Evolus is a medical aesthetics company that was formed in 2012. AC ¶ 50. Its first

---

[2] This section is drawn from (i) the AC, (ii) documents incorporated by reference or integral to the AC, and (iii) judicially noticeable, publicly available documents, such as SEC filings. *See,*

3

product was to be a botulinum neurotoxin ("BTX") for treating wrinkles and "frown lines" that would compete in the U.S. market against Allergan's "BOTOX." AC ¶¶ 2, 42, 47, 50. After negotiating with two South Korean companies, Medytox and Daewoong, Evolus signed an agreement in September 2013 with Daewoong to manufacture and supply its BTX product, DWP-450, to Evolus for sale in the U.S. (and other regions) through Evolus's unique technology platform under the Evolus trademark, Jeuveau. AC ¶¶ 53, 54; Ex. A; Ex. B at 3–4. That same month, Medytox signed a license and supply agreement with Allergan for Medytox's BTX product, Meditoxin. AC ¶ 49.

**Medytox Sues Daewoong and Evolus for Trade-Secret Misappropriation**

As Evolus sought FDA approval for Jeuveau, Medytox filed a lawsuit on June 6, 2017, in California Superior Court against (among others) Daewoong; a Daewoong researcher and former Medytox employee, BK Lee; and Evolus and its alleged owner, Alphaeon. AC ¶¶ 57, 106, 110. Medytox alleged that Daewoong and Lee had conspired to steal from Medytox trade secrets about Meditoxin's manufacturing process, as well as its underlying botulinum bacterial strain. Ex. L ¶¶ 40, 43, 65, 73. Medytox sought a declaratory judgment voiding the Daewoong–Evolus license agreement and to enjoin further retention or use of Medytox's botulinum strain and manufacturing process. *Id.* ¶¶ 100–03 & pp. 26–27.

After the FDA accepted Evolus's Biologics License Application on July 19, 2017, Medytox accelerated its legal challenges:

- It amended its California complaint on August 14, 2017, to add Evolus as a defendant on misappropriation and conversion claims that it had previously asserted only against Daewoong and Lee. AC ¶ 110; Ex. M ¶¶ 40, 69–70, 77.

---

*e.g.*, *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (taking judicial notice of SEC filings); *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *1 n.1 (S.D.N.Y. 2017) (courts may judicially notice publicly available information, such as earnings-call transcripts).

- It sued Daewoong in South Korea on October 30, 2017. AC ¶ 109.

- It filed on December 5, 2017, a Citizen Petition urging the FDA not to approve Evolus's Application until Evolus had submitted to the FDA its bacterial strain's entire genetic sequence. AC ¶ 111; Ex. N at 1–3.

**Evolus Discloses Medytox's Claims in Its IPO Registration Statement**

The February 1, 2018 registration statement for Evolus's February 8, 2018 initial public offering disclosed the allegations in Medytox's California lawsuit that Daewoong and Evolus had "stolen" Medytox's botulinum strain and manufacturing process, and that Medytox was seeking to enjoin Evolus from distributing DWP-450. Ex. C at 37–38; AC ¶¶ 32, 37 n.4. It also disclosed Medytox's South Korea lawsuit and FDA Citizen Petition. Ex. C at 38. All these proceedings, Evolus cautioned, "are inherently uncertain and their results may not be favorable to us." *Id.* "For example," Evolus continued, "if the Medytox Litigation has a negative outcome for us . . . it could result in us losing access to DWP-450 and the manufacturing process." *Id.*

**Medytox Files—and Evolus Discloses—Similar Claims with the ITC**

Anticipating Jeuveau's FDA approval, Medytox and Allergan filed on January 25, 2019, another complaint against Daewoong and Evolus asserting the same trade-secret-misappropriation theory based on the same allegations. AC ¶ 102; AC Ex. A ¶¶ 2, 12, 36. This time, the forum was the ITC, an administrative agency that decides claims of unfair competition in the importation of goods. AC ¶ 92. Allergan and Medytox requested an investigation, a hearing, and an order barring the U.S. importation and sale of DWP-450. AC Ex. A ¶ 17. Seven days later, on February 1, 2019, the FDA publicly approved Jeuveau for sale and denied Medytox's Citizen Petition. AC ¶ 172; Ex. A; Ex. B at 3; Ex. D at 4, 9; Ex. O at 1. One month later, on March 1, 2019, the ITC agreed to initiate an investigation. AC ¶ 112.

Evolus recapped this public news in its 2018 10-K, published on March 20, 2019. Ex. B. In addition to summarizing again Medytox's California and South Korea lawsuits, Evolus described the "substantially similar" ITC complaint. *Id*. at 26–27. It cautioned that Medytox and Allergan sought an "exclusion order forbidding entry of Jeuveau into the United States" and "a cease and desist order prohibiting Daewoong and us from" importing, marketing, distributing, or selling Jeuveau in the U.S. *Id*. at 27. Evolus warned that it was "unable to predict the likelihood of success of Medytox's claims . . . or to quantify any risk of loss." *Id*. "The Medytox Litigation and any similar claims," Evolus stated, "are inherently uncertain and their results may not be favorable to us." *Id*. "An adverse ruling by the ITC against either us or Daewoong could . . . bar sales and marketing of our sole product Jeuveau within the United States." *Id*.

**The ITC Litigation Proceeds Through a February 2020 Hearing**

The ALJ's first order was a March 6, 2019 protective order, under which any party could designate a broad array of information about its business as "confidential business information"[3] that could be viewed only by outside counsel and their experts. AC ¶ 113; Ex. P ¶ 3. As is typical in ITC trade-secret cases, the parties (in contrast to their outside counsel) were not allowed access to any of their adversary's confidential business information.[4] The discovery record remained confidential throughout the ITC proceedings. AC ¶ 113.

---

[3] Ex. P ¶ 1 ("Confidential business information is information which has not been made public and which concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or other organization, the disclosure of which information is likely to have the effect of . . . causing substantial harm to the competitive position of the [producing party] . . . .").

[4] *See* Gary M. Hnath, *Section 337 Investigations at the US International Trade Commission Provide A Powerful Remedy Against Misappropriation of Trade Secrets*, 22 No. 6 Intell. Prop & Tech. L. J. 1, 6 (2010) ("[T]he ITC has very strict protective orders, issued immediately at the start of the case by the ALJs, which permit access to a company's confidential business

The protective order's disclosure restrictions enabled the parties' outside counsel to take discovery into the alleged trade secrets without revealing those secrets to the parties themselves. For example, Daewoong's and Evolus's outside counsel requested documents about Medytox's manufacturing process. Ex. Q at 10, 14. And Medytox's and Allergan's outside counsel requested documents relating to Daewoong's botulinum strain, on which Medytox wanted its experts to conduct genetic testing and sequencing. Exs. R at 2 & S at 1. Daewoong objected on the grounds that the bacterial strain was "not a trade secret as a matter of law." Ex. R at 2. Finding the discovery relevant, the ALJ granted in part Medytox's motion to compel on May 7, 2019. Ex. R at 3–4; AC ¶ 195. Meanwhile, Evolus continued to caution investors in its May 1, 2019 quarterly SEC filing that the Medytox "proceedings are inherently uncertain and their results may not be favorable for us," and could include orders barring the importation, marketing, and sale of Jeuveau. Ex. E at 42–43.

After Daewoong produced its strain on July 12, 2019, the ALJ set the exchange of expert reports for September 20, 2019, to allow time for "sampling, testing and sequencing" the strains. Ex. S at 1–2. In the meantime, Evolus stated in its August 12, 2019 quarterly earnings call and SEC filing that while Evolus "continue[d] to remain confident in [its] IP," the outcome remained "uncertain," "may not be favorable for us," and could include orders barring the importation, marketing, and sale of Jeuveau. AC ¶¶ 115, 199–200; Ex. F at 46–47.

Medytox's and Daewoong's experts reached conflicting opinions and disputed each other's analysis. AC Ex. B at 94–103. Medytox publicly released the "Key Conclusions" of its expert, Paul Keim, that the Daewoong and Medytox strains' gene content is identical and that

---

information only by outside counsel and independent experts. Therefore, a complainant can produce discovery regarding its trade secrets without the respondents themselves having access to that information, in contrast to litigation in federal or state court . . . .").

Daewoong's strain is derived from Medytox's strain. Ex. T. Meanwhile, Daewoong's expert concluded that Keim's analysis yielded only partial results, whereas "whole-genome sequencing" revealed differences in the two strains' gene sequences. Ex. U at 1–2. Because Keim's report was designated "confidential business information" under the protective order, no Evolus employee became aware of its content beyond the headline conclusions that Medytox released publicly. Exs. T at 3 & U at 1. Expert discovery closed on October 30, 2019. AC ¶ 114. In its November 4, 2019 10-Q, Evolus reiterated to investors that the ITC litigation outcome was "uncertain" and "may not be favorable for us." Ex. G at 47–48.

The ITC held a three-day evidentiary hearing on February 4–7, 2020. AC ¶ 116. No Evolus employee was allowed to attend the presentation of testimony and evidence containing Medytox confidential business information, such as Keim's testimony about Daewoong's botulinum strain. AC ¶ 117; *see, e.g.* Ex. V at 9:5–25, 116:3–5, 121:21. Following the hearing, Evolus disclosed in its February 25, 2020 earnings call and 2019 10-K that it "remain[ed] confident in the strength of [its] IP," but "given the current stage of the ITC Action, we are unable to predict the likelihood of success of Medytox's and Allergan's claims against us or Daewoong or to quantify the risk of the imposition of an exclusion order or cease and desist order." AC ¶¶ 212–13; Exs. H at 53 & I at 9.

**The ALJ Finds for Medytox and Allergan, But the Full Commission Reverses in Part**

On July 6, 2020, the ALJ issued his 274-page Final Initial Determination. AC ¶ 21. He concluded that it "has not been established that Dr. BK Lee took [Medytox's botulinum] strain from Medytox and, for consideration or otherwise, gave it to Daewoong." AC Ex. B at 93. But the ALJ nevertheless found that Daewoong must have misappropriated the strain based on the "genetic evidence," finding "Keim's analysis to be more reliable" than that of Daewoong and

8

Evolus's expert. *Id*. at 94, 100. The ALJ also found that Daewoong had misappropriated Medytox's manufacturing process. *Id*. at 132. Although he acknowledged that every element of that process was public, he nevertheless found misappropriation because "[n]o *single* reference . . . discloses each of the specific elements of the Medytox manufacturing process." *Id*. at 118–19; AC ¶¶ 148, 151. The ALJ recommended 10-year limited exclusion and cease-and-desist orders. AC Ex. B at 258, 264.

On December 16, 2020, the full Commission reversed the ALJ's finding that Medytox's botulinum strain was a trade secret: Allergan and Medytox "fail to satisfy their burden to show that the Medytox strain is a protectable trade secret. . . . The record shows that the Medytox strain stems from a Hall A-hyper strain that was given to Medytox . . . with no restrictions as to use or confidentiality." Ex. W at 29–30; AC ¶ 235. "Under these circumstances," the Commission concluded, "where the strain was circulated without restrictions . . . the Commission finds that it does not qualify as a trade secret." Ex. W at 30. The Commission affirmed other findings that Daewoong, but not Evolus, had misappropriated Medytox's trade secrets relating to its manufacturing process. *Id*. at 44. But it reduced the length of the limited exclusion and cease-and-desist orders by 83%, from 10 years to 21 months. *Id*. at 62, 64; AC ¶ 236.

**Evolus Shareholders File Securities-Fraud Complaints**

Approximately two months before the Commission partially reversed and modified the ALJ's Initial Determination, two putative securities class-action complaints were filed against the Evolus Defendants, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. ECF No. 64 (Sept. 17, 2021) at 3; AC ¶¶ 33–35. The Court appointed a

lead plaintiff on September 17, 2021, who together with three other alleged Evolus shareholders filed an amended complaint on November 16, 2021. ECF No. 64; AC at 1.

Plaintiffs allege that the Evolus Defendants made materially false or misleading statements between February 1, 2019 (when Evolus announced that the FDA had approved Jeuveau) and July 6, 2020 (when the alleged "truth" was revealed in the ALJ's Initial Determination). The alleged misstatements fall into two categories:

- *Litigation Optimism:* The Evolus Defendants stated that they "remain confident" in the "strength" of Evolus's IP, and that "nothing changed through the case," and they "believe in the merits of our case," "are in a very solid position," "are not really worried about the outcome here," and "like our odds in this." Plaintiffs also seek to hold the Evolus Defendants liable for alleged statements by third parties attributed to unnamed Evolus personnel: (i) an online news site's reports that an "Evolus spokesman" said that Medytox's claims are "completely without merit," and (ii) an analyst's belief based on unspecified "conversations with management this morning" that the market's "negative reaction" to March 2020 Korean press reports is "overdone." AC ¶¶ 9, 16, 107, 112, 115, 118, 120, 179–81, 184–85, 199–201, 212–14, 217–18, 220–25.

- *Jeuveau Descriptions:* Evolus described Jeuveau as "proprietary," "developed" by Evolus, and enjoying "competitive strengths." AC ¶¶ 173–74, 177–78, 184, 186–87, 188–89, 190–91, 194, 196, 198, 202–03, 205–06, 209–11, 225–26.

Plaintiffs allege that these statements were knowingly misleading because (i) they lacked a reasonable basis in that Evolus had never investigated Medytox's allegations, and (ii) "evidence in the ITC litigation," including genetic testing, established that Daewoong had misappropriated Medytox's botulinum strain and manufacturing process. AC ¶¶ 121–27, 181, 185, 195, 198, 201, 203, 206, 214, 218, 224, 226.

**ARGUMENT**

Pleading a Section 10(b) claim requires particularized factual allegations that (among other things) each defendant made a materially false or misleading statement with scienter. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). Two sets of overlapping heightened pleading standards apply. Rule 9(b) requires plaintiffs to "(1) specify the statements

that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993); Fed. R. Civ. P. 9(b). And the PSLRA further requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1) & (2); *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). The AC does not satisfy these exacting standards.

## I. THE AC FAILS TO PLEAD ANY MATERIALLY FALSE OR MISLEADING STATEMENT.

Alleged misstatements must be material—i.e., there must be "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988); *see also Acito v. IMCERA Group*, 47 F.3d 47, 52 (2d Cir. 1995). To meet this threshold, the "alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014). The AC does not allege any such statements because (i) all the alleged misstatements are nonspecific puffery that contained no guarantees, and (ii) the PSLRA's safe harbor for forward-looking statements and the "bespeaks caution" doctrine further bar any claims based on the Litigation Optimism.

### A. All the AC's Alleged Misstatements Are Nonactionable Puffery.

"Statements that are too vague or general to be relied upon" are nonactionable puffery. *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 531 (S.D.N.Y. 2020). They include optimistic statements because investors expect "[p]eople in charge of an enterprise . . . to be confident about their stewardship and the prospects of the

11

business that they manage." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).[5] Corporate

officers "are not required to take a gloomy, fearful or defeatist view of the future," *id.* at 174, or

engage in "self-flagellation," *see In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 517

(S.D.N.Y. 2019). Under these standards, the alleged Litigation Optimism and Jeuveau

Descriptions are classic immaterial puffery.

      *1.     The Litigation Optimism is aspirational puffery.*

Evolus's expressions of optimism in the ITC litigation's outcome employ words that

courts have repeatedly held are not misleading:

- Statements that "we are not really worried about the outcome," "believe in the merits of our case," "are in a very solid position" and "like our odds" (*see supra* at 10) are nearly identical to other optimistic expressions about future uncertainties that courts have held cannot support a federal securities claim. *See, e.g.*, *In re Seadrill Ltd. Sec. Litig.*, 2016 WL 3461311, at *9 (S.D.N.Y. 2016) (finding statement that "we are not very worried" about potential sanctions was "sufficiently vague and equivocal that no reasonable investor could be misled into thinking that sanctions posed no risks"); *In re GlaxoSmithKline PLC Sec. Litig.*, 2006 WL 2871968, at *3, 9 (S.D.N.Y. 2006) (finding statements that patents "were rock solid" and "we feel that the courts" will recognize patents are "aspirational" and "expressions of hope").

- Statements that Evolus "remain[s] confident in" its IP and "nothing changed" (*see supra* at 10) parallel expressions of "confidence" about products or business that courts have repeatedly deemed puffery. *See Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *4–6, *13–14 (S.D.N.Y. 2021) (dismissing Section 10(b) claims based on statements that "We are confident in our future with Impella growth opportunities" and "We remain confident in our business and our short to long-term outlook"); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757–58 (S.D.N.Y. 2018) (declaring puffery statements that company is "confident about and prepared for what lays ahead," and "confident in these products and our overall commercialization strategy"); *In re GlaxoSmithKline*, 2006 WL 2871968, at *9 (dismissing claim based on puffing that company is "very confident we can defend our patents" in litigation); *see also IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 Fed. App'x 850, 858 (11th Cir. 2016)

---

[5] *See also City of Brockton Ret. Sys. v. Avon Prods., Inc.*, 2014 WL 4832321, at *15 (S.D.N.Y. 2014) (Gardephe, J.) (holding that "statements of corporate optimism do not give rise to securities violations because companies must be permitted to operate with a hopeful outlook").

(affirming dismissal of Section 10(b) claim based on statement that "nothing has really changed").

*In re GlaxoSmithKline PLC Securities Litigation* is directly on point. There, after losing patent protection in the district court, the defendant continued to make optimistic statements about its litigation prospects, including that it was "*very confident* we can defend our patents" and that its patents "were *rock solid*," and "we feel that the courts eventually will recognize the letter of the law." 2006 WL 2871968, at *3. Judge Preska dismissed Section 10(b) claims based on those statements, concluding that they "can be viewed by a reasonable investor only as mere expressions of hope." *Id.* at *9. Likewise, statements that "'we are very confident' and 'we feel,' can only be understood as aspirational, and thus no reasonable investor would understand them to be factual guarantees of patent protection." *Id.* The same reasoning applies here. All the challenged Litigation Optimism are similar "aspirational" statements that no reasonable investor would understand as guaranteeing a litigation outcome. *See supra* at 10.

Plaintiffs also allege that an online news site, StatNews, attributed to unidentified Evolus spokespeople statements that Medytox's claims are "completely without merit." *See supra* at 10. These allegations are inadequate for two reasons. *First*, like other puffery, statements that a case is "without merit" are nonactionable routine corporate responses to litigation. *See, e.g.*, *Crutchfield v. Match Group, Inc.*, 529 F. Supp. 3d 570, 594 (N.D. Tex. 2021) (dismissing claims based on statements that "the FTC's legal claims . . . were 'without merit'" because "[s]uch contentions are clearly routine and aspirational opinions regarding the success of the litigation and not statements of fact"). Adding the adverb "completely" only further signals puffery. *See, e.g.*, *Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1084 (N.D. Cal. 2017) (dismissing fraud claim because adding "unbelievably" and "positively" before "nutritious" was greater signal of "advertising, blustering, and boasting upon which no reasonable buyer would rely").

13

*Second*, these statements are not attributed to any specific Evolus agent. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir. 1993) (affirming Rule 9(b) dismissal of fraud claims based on reports of statements by unidentified insiders); *In re Gaming Lottery Sec. Litig.*, 1998 WL 276177, at *6 (S.D.N.Y. 1998) ("[C]orporate defendants cannot be held liable for overly optimistic statements in analysts' articles that are not attributed to specific corporate agents."). The AC's additional attempt to hold Evolus liable for an analyst's opinion based on unspecified "conversations" with unidentified Evolus "management" (AC ¶¶ 219–20) fails for the same reason.

Dismissing claims based on expressions of litigation optimism is not only sound law, it is also sound policy: To hold that "a legal position taken by a publicly traded company, or an expression of confidence in a legal position, may be converted by hindsight into an actionable misrepresentation if the company later loses the lawsuit would have a chilling effect on publicly traded companies seeking to defend their interests in litigation." *GlaxoSmithKline*, 2006 WL 2871968, at *10. Because companies have no duty to self-accuse[6] or otherwise disclose "unadjudicated wrongdoing,"[7] they would likely say nothing at all, contrary to the securities' laws purpose of promoting disclosure.

2.      *The Jeuveau Descriptions are nonspecific puffery.*

Plaintiffs fault Evolus's descriptions of Jeuveau as "proprietary," "developed" by Evolus, and featuring "competitive strengths," because Evolus did not state that Jeuveau was the product of trade-secret misappropriation. *See supra* at 10. This theory cannot support a Section 10(b)

---

[6] *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("[F]ailure to disclose that . . . revenues were derived from 'unsustainable and illegitimate sources'" did not violate Section 10(b) because "the federal securities laws do not require a company to accuse itself of wrongdoing").

[7] *See, e.g.*, *Salim v. Mobile Telesystems PJSC*, 2021 WL 796088, at *9 (E.D.N.Y. 2021).

claim because, as explained above, companies have no duty to accuse themselves of wrongdoing or engage in self-flagellation. *See supra* at 12. Accepting plaintiffs' theory would effectively prevent companies from disputing unadjudicated allegations against them.

In any event, none of the alleged misstatements is specific enough to support a Section 10(b) claim, especially when viewed in context.[8] The broad description that "Jeuveau® is a proprietary 900kDa purified botulinum toxin type A formulation"[9] is "too general"[10] and lacks "any meaningful particularities."[11] No reasonable investor could have been misled by that characterization because Evolus had repeatedly disclosed Medytox's claims that DWP-450 was *not* proprietary to Daewoong or Evolus, but was misappropriated from Medytox. *See supra* at 5–8. And Evolus's generalized use of "proprietary" must be read together with its subsequent uses of the same word in the same filings to describe specific aspects of Jeuveau that plaintiffs do not allege were false. Evolus (i) identified as "proprietary information" Daewoong's manufacturing patent, which plaintiffs nowhere allege that Daewoong did not possess; (ii) described Evolus's "proprietary technology platform" and "proprietary 'Evolus Practice' app," neither of which plaintiffs allege was not proprietary; (iii) contrasted the proprietary name Jeuveau "for our

---

[8] *See Constr. Laborers*, 433 F. Supp. 3d at 531 (assessing puffery also by "the context in which it is made").

[9] AC ¶¶ 173, 177, 186–87, 190, 194, 196, 202, 205, 210, 225; *supra* at 10.

[10] *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 538 (S.D.N.Y. 2016) (descriptions of "proprietary" algorithmic model were "too general to cause a reasonable investor to rely upon them"); *see also In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *3 (N.D. Cal. 2017) (dismissing as puffery references to "proprietary" technologies because they lack specificity).

[11] *Hampton v. Root9B Tech., Inc.*, 2016 WL 9735744, at *3 n.5 (D. Colo. 2016) ("[T]he absence of any meaningful particularities suggests that the phrase ['proprietary hardware'] might more properly be understood to be non-factual puffery, rather than a specific assertion of fact that [defendant] intended potential investors to rely upon"), *aff'd*, 897 F.3d 1291 (10th Cir. 2018).

approved product" with its "non-proprietary name, prabotulinumA-xvfs." Ex. H at 2, 4, 37; *see also* Ex. B at 4, 45.

Evolus's statements about Jeuveau's "competitive strengths" are deficient for similar reasons. *First*, the phrase itself is puffery. *See, e.g.*, *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398–99 (S.D.N.Y. 2018) (dismissing as puffery statements that company's "technology, knowledge, experience, and scientific resources provide . . . competitive advantages").[12] *Second*, when read in context, the list of Jeuveau's "competitive strengths" includes attributes that plaintiffs do not allege were false or based on misappropriation: Evolus's comprehensive clinical program for Jeuveau, "enhanced" physician interaction due to its aesthetics-only marketing strategy, "unique technology platform," "strong relationships with aesthetic key opinion leaders," and management's "significant experience and expertise." Exs. B at 4 & H at 4. Nor do plaintiffs explain why, in view of all the specific Jeuveau descriptions they do not dispute, alleged May 8, 2019 statements during an analyst call that Evolus "developed" Jeuveau were false or misleading. AC ¶¶ 188–89. Those statements, too, appear in the context of describing Jeuveau attributes that plaintiffs do not dispute, such as its use of "proprietary" "high-pure technology" and "unique" filtration process. Ex. J at 5, 13–14.

---

[12] *See also Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569 (S.D.N.Y. 2018) (company's "belief in its competitive advantage" is puffery); *Menaldi v. Och-Ziff Mgmt. Cap. Group LLC*, 164 F. Supp. 3d 568, 580 (S.D.N.Y. 2016) (claim that "transparency" is "competitive strength" is puffery); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003) (holding that "generalized, positive statements about [defendant's] competitive strengths . . . are not actionable because they are immaterial" and "not specific enough to perpetuate a fraud on the market").

**B.**      **The Evolus Defendants' Litigation Optimism Is Protected by the PSLRA's Safe Harbor for Forward-Looking Statements and the Bespeaks Caution Doctrine.**

The securities laws protect forward-looking statements from liability under two separate but related doctrines. First, the PSLRA protects statements that are identified as forward-looking and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]." 15 U.S.C. § 78u-5(c)(1)(A)(i). Second, the "bespeaks caution" doctrine protects forward-looking statements when no "reasonable investor could consider them important in light of adequate cautionary language." *Rombach*, 355 F.3d at 173. Both further protect the Evolus Defendants' Litigation Optimism from liability.

Statements about ongoing litigation are deemed forward-looking. *See, e.g.*, *GlaxoSmithKline*, 2006 WL 2871968, at *10 ("optimism that [the company] would prevail in the litigation is a classic example of a forward-looking statement").[13] Thus, both the PSLRA safe harbor and the bespeaks caution doctrine can apply to the alleged Litigation Optimism that Evolus (i) "remain[s] confident" in the "strength" of its IP, (ii) "believe[s] in the merits of our case" (and believes Medytox's claims are "completely without merit"), (iii) states that "nothing changed through the case," (iv) is "in a very solid position" and "not really worried about the outcome," and (v) "likes our odds in this."

Beginning before the class period even started, Evolus identified such statements about Medytox's claims as forward-looking: "Forward-looking statements include" statements about "the results of the Medytox Litigation, the Citizen Petition and any future legal proceedings." Ex.

---

[13] *See also Grobler v. Neovasc Inc.*, 2016 WL 6897760, at *3 (D. Mass. 2016) (statements that adversary's claims were "without merit or baseless" are forward-looking "because they were predictions about the future outcome of the pending litigation").

17

C at 56; *see also* Ex. B at 1 ("Forward-looking statements include" statements about "the results of current and any future legal proceedings"). Evolus cautioned that its forward-looking statements were "not guarantees," but subject to "significant risks and uncertainties" to which Evolus directed investors in its 10-Ks, 10-Qs, and prospectuses. Ex. B at 1; *see also* Ex. C at 56–57. Evolus also prefaced earnings calls by announcing that management would make forward-looking statements and directing listeners to the "detailed discussion of the risks and uncertainties" in the 10-Ks and 10-Qs.[14] *See, e.g.*, Ex. K at 2. And those filings included specific caution about Medytox's claims and the ITC litigation. *See supra* at 5–8. After reviewing Evolus's stream of consistent disclosures and cautionary words, no reasonable investor could have believed that the Litigation Optimism was a guarantee that Evolus would prevail or faced no risk of an import or sale ban. *See GlaxoSmithKline*, 2006 WL 2871968 at *11 ("In the face of these disclosures in GSK's SEC filings, no reasonable investor can claim to have been deceived into believing that Paxil and Augmentin would remain free of generic competition until 2006 or beyond.").[15]

---

[14] As to the one alleged statement that was not expressly described as forward-looking—Defendant Silvernail's optimistic statements during a March 11, 2020 health-care conference (AC ¶¶ 120, 221–24)—she cautioned about "drawing any conclusions" and noted that some publicized facts "are going to look like the case is swinging to Daewoong and some are going to make it look like it's swinging to Medytox." AC ¶ 221.

[15] *See also Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 759 (S.D.N.Y. 2018) (dismissing Section 10(b) claim because cautionary language was "sufficient to alert Republic's shareholders to possible uncertainties" that led to litigation); *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *11, *13–14 (N.D. Cal. 2015) (dismissing under PSLRA safe harbor Section 10(b) claim based on statement that "nothing has really changed" regarding future-revenue guidance); *Eshelman v. Orthoclear Holdings Inc.*, 2009 WL 506864, at *6, *14 (N.D. Cal. 2009) (dismissing 10(b) claim because "the disclosures made were sufficient warning to investors" of litigation risks).

**II.      THE AC FAILS TO PLEAD PARTICULARIZED FACTS SUPPORTING A STRONG SCIENTER INFERENCE.**

A securities-fraud complaint must "state with particularity facts giving rise to a strong inference" of scienter for each defendant—i.e., "facts (1) showing that the defendant[] had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *In re BISYS Sec. Litig.,* 397 F. Supp. 2d 430, 438, 441 (S.D.N.Y. 2005). The scienter inference must be "cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs, Inc.*, 551 U.S. at 324; *see S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110–11 (2d Cir. 2009). The AC comes nowhere close.

**A.      The AC Does Not Adequately Plead Motive and Opportunity.**

Pleading "motive and opportunity" requires allegations of "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009). Plaintiffs try to plead "concrete benefits" in two ways, each of which fails.

The first is that the alleged misstatements allowed Evolus to sell shares at a higher price in its November 6, 2019 secondary offering. AC ¶¶ 204–05. But "a desire to complete a successful public offering is not a 'concrete benefit[ ] sufficient to demonstrate motive.'" *Hawaii Structural Ironworks Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 848–49 (S.D.N.Y. 2019).

Plaintiffs' second deficient theory is that the alleged misstatements allowed the Individual Defendants to sell their Evolus stock at higher prices. On their own, "insider stock sales . . . [do] not suffice to establish scienter." *Gildan*, 636 F. Supp. 2d at 270. A complaint must allege particularized facts indicating that the sales are "unusual" or suspicious in amounts or

timing. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001); *Acito*, 47 F.3d at 54. Plaintiffs allege no such facts with respect to any Individual Defendant.

*David Moatazedi.* It is "wholly inconsistent with fraudulent intent" when defendants— especially those who made most of the alleged misstatements—"increase their total holdings." *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 152 (D. Conn. 2007); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 289 (S.D.N.Y. 2006) ("[T]he biggest problem with these allegations is that neither [the CEO nor CFO] completed any stock sales" even though CEO "actually made most of the alleged misstatements during the class period.").[16] That is exactly the case with defendant Moatazedi, Evolus's CEO, who made six of the alleged misstatements and signed all the allegedly misleading SEC filings. AC ¶¶ 199–200, 202, 212–13, 225. Moatazedi *acquired* 182,070 Evolus shares during the class period, and *did not sell a single share*. Exs. X & Y. Moatazedi's lack of sales negates the scienter inference not only as to him, but as to *all* the Evolus Defendants. *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) ("[T]he fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive.").

*Lauren Silvernail.* Defendant Silvernail, Evolus's CFO, likewise *increased* her total holdings throughout the class period, acquiring 66,000 shares while selling only 2,612. Exs. Z & AA. The sold shares represented only 9% of her total holdings on the sale date,[17] and the sale

---

[16] *See also Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1336 (S.D. Fla. 2004) ("In fact, the absence of allegations against key players refute any inference of scienter."); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383–84 (E.D.N.Y. 2003) (failure of CEO to sell any shares is "significant" to the scienter analysis).

[17] *See Rothman v. Gregor*, 220 F.3d 81, 94–95 (2d Cir. 2000) (sales of 9.9% and 9.3% "weaken the inference of fraudulent intent" because they are "only a small fraction" of holdings); *Malin*, 499 F. Supp. 2d at 153 (net sales of 6.38%, 14.42%, and 30.84% of total class-period holdings do

was (i) "solely for the purpose of covering tax withholding obligations in connection with the vesting and settlement of certain restricted stock units"[18] (Ex. BB), and (ii) occurred more than a year before the end of the class period.[19]

   *Rui Avelar.*   Defendant Avelar, Evolus's Chief Medical Officer, also acquired more stock than he sold during the class period, negating any inference of scienter. *See, e.g.*, *Malin*, 499 F. Supp. 2d at 152. Avelar acquired more than 76,000 shares during the class period—including 26,000 just two weeks after his lone sale of 39,442 shares. *Compare* Exs. CC, DD, & EE *with* AC ¶ 228. Further undercutting any scienter inference, his sale (i) was "pursuant to a Rule 10b5-1 trading plan adopted by [Avelar] in the fourth quarter of 2019 and represent[ed] shares required to be sold by [Avelar] to cover tax withholding obligations in connection with the vesting of certain Restricted Stock Units"[20] (Ex. FF); (ii) occurred six months before the end of

---

not support scienter inference, and 6.38% sale in fact "weakens" any such inference); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271 n.5 (S.D.N.Y. 2009) (sales of 25% and 53% of stock holdings do not support scienter inference); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (sales of 38% of aggregate holdings not unusual).

[18] *See In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, 2014 WL 585658, at *13 (S.D.N.Y. 2014) (holding that stock sales "to cover the tax withholding obligations due upon the vesting of shares of restricted stock" are "not indicative of fraud"); *see also N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, 2016 WL 5794774, at *20 (S.D.N.Y. 2016) ("Courts in this District have held that the exercise of expiring stock appreciation rights and the disposition of shares to pay taxes do not demonstrate a defendant's motive to defraud.").

[19] *See N. Collier Fire Control*, 2016 WL 5794774, at *19 ("Courts in this District have consistently held that stock sales occurring even a few months before the alleged revelation of the fraud do not raise a strong inference of scienter"); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008) (finding that allegations of stock sales four months before end of class period do not support scienter inference); *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 345 (W.D.N.Y. 2008) ("[T]he law in this Circuit is clear that . . . stock sales are not indicative of scienter when they are more than two months before the announcement in question.").

[20] *Gildan,* 636 F. Supp. 2d at 272 (holding that sale "pursuant to a non-discretionary Rule 10b5-1 trading plan . . . undermines any allegation that the timing or amounts of the trades was unusual or suspicious"); *see also Fishbaum v. Liz Claiborne, Inc.*, 1999 WL 568023, at *4 (2d Cir. 1999) (two defendants' stock sales not unusual because they were made pursuant to periodic

21

the class period[21]; and (iii) amounted to 22% of his total class-period holdings of 176,244 shares.[22]

*Alphaeon Corporation.* Nor do sales by Alphaeon, Evolus's alleged controlling shareholder, of 6.6 million shares support any scienter inference, because plaintiffs do not allege any particularized facts showing that Alphaeon made or directed any alleged misstatements. *See Malin*, 499 F. Supp. 2d at 154 (alleged unusual sale by defendant who did not make "any of the misleading statements at issue" weighs against scienter inference). In any event, plaintiffs fail to allege that the sales were unusual or suspicious: (i) like Silvernail's sale, they occurred more than a year before the July 6, 2020 end of the class period; (ii) Alphaeon retained more than 8.6 million shares (approximately 57% of its holdings); and (iii) it sold shares in May 2019 to pay off debt that was due the next month to "existing noteholders who elected to receive payment of certain outstanding amounts under their notes . . . in the form of shares of common stock" (Exs. GG & HH). Alphaeon's latest sale, in June 2019, is even less suggestive of scienter because Alphaeon's controlling shareholder acquired the shares in repayment of a debt. (Exs. II & JJ at 76.) If Alphaeon knew that Evolus was certain to lose the ITC litigation, as plaintiffs allege, Alphaeon's controller would not have accepted Evolus shares in lieu of cash. *See Frankfurt-Trust Inv. Luxemburg AG v. United Tech. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018) ("'substantial share repurchases' tend to 'negate a finding of scienter' because it would make no economic sense for a company to buy back its stock at a price it knows to be inflated"); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 446 n.83 (S.D.N.Y. 2006) (observing that

---

divestment plans); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 604 (S.D.N.Y. 2007) (trades under 10b5-1 plan "do not raise a strong inference of scienter").

[21] *See supra* note 19.

[22] *See supra* note 17.

"[c]ourts often refuse to infer scienter . . . when confronted with illogical allegations" and collecting cases).

> **B.      The AC Fails to Allege the Individual Defendants' Conscious Misbehavior or Recklessness.**

Because plaintiffs fail to allege motive and opportunity, they "must produce a stronger inference of recklessness." *Kalnit v. Eichler,* 264 F.3d 131, 143 (2d Cir. 2001); *see also ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) (absent motive allegations, strength of alleged circumstantial evidence "must be correspondingly greater"). Plaintiffs offer three theories, none of which supports *any* inference of conscious misbehavior or recklessness, let alone the "stronger inference" required.

> 1.      *The Evolus Defendants' prior positions at Allergan do not support a scienter inference.*

Plaintiffs allege that the Individual Defendants must have known that Jeuveau was misappropriated from Medytox because they were senior executives at Allergan, Medytox's distribution partner. AC ¶¶ 33–35, 45, 60, 62–66. But "allegations that defendants knew or should have known of fraudulent conduct" because of their "executive positions are insufficient to plead scienter." *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 403-04 (S.D.N.Y. 2019).[23] In any event, the AC provides no factual allegations that would explain how the Individual Defendants' employment at *Allergan* could have given them inside knowledge about how *Daewoong* acquired and manufactured the strain it licensed to Evolus.

> 2.      *The AC's allegations based on a confidential witness are inadequate.*

Plaintiffs' second recklessness theory is based on a confidential witness's alleged statement that Evolus declined to investigate Medytox's claims. AC ¶¶ 121–27. A plaintiff

---

[23] *See also In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *7 (S.D.N.Y. 2000) (collecting cases).

relying on a confidential witness (CW) must allege facts "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589 (S.D.N.Y. 2011). This obligation includes pleading facts showing that the CW was employed at the relevant time[24] and communicated with the defendants or was otherwise "privy to" their knowledge.[25]

The AC does not allege particularized facts showing the CW's basis to know whether Evolus had investigated Medytox's claims. *First*, he joined Evolus in October 2018, 16 months after Medytox first sued Evolus, 14 months after Medytox amended its complaint to assert a misappropriation claim directly against Evolus, and 10 months after Medytox filed its Citizen Petition with the FDA. AC ¶ 122; *supra* at 4–5. The AC alleges nothing from which to infer that Evolus had not *already* investigated Medytox's sixteen-month-old claims by the time the CW joined Evolus. *Second*, the AC does not allege particularized facts showing that the CW would have known of Evolus's investigation in any event. It does not allege any specific communications with the Individual Defendants (on the contrary, it alleges that Avelar "was not transparent"). AC ¶ 123. Nor did the CW's job as Director of Medical Affairs entail investigating Medytox's claims or interacting with those who did. Rather, he was a self-described "figurehead" who interacted with physicians. AC ¶¶ 122–23.

---

[24] *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 581 n.18 (S.D.N.Y. 2014) (finding that "CWs do not allege any internal information contradicting defendants' public statements" because "all of the CWs had left the company").

[25] *See Glaser,* 772 F. Supp. 2d at 589–90 (rejecting confidential-witness statements without factual allegations "that the witness communicated with the individual defendants . . . or else that the witness was privy to the individual defendants' knowledge"); *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009) (dismissing for lack of scienter when confidential witnesses "left the company before the Class Period and none had any contact" with defendants), *aff'd*, 371 F. App'x 212 (2d Cir. 2010).

> 3.    *The ITC litigation discovery record cannot support an inference of recklessness.*

Plaintiffs' third theory is that the Evolus Defendants must have known, by the time ITC litigation fact and expert discovery closed in July and October 2019, respectively, that Daewoong had misappropriated Meditoxin. AC ¶¶ 14–16, 128–31. These allegations do not support a scienter inference for three reasons: (i) discovery alone does not determine a litigation's outcome, particularly where, as here, any inference of a one-sided record is undercut by the ALJ's analysis and the full Commission's partial reversal of his decision; (ii) the ITC protective order barred the Individual Defendants access to the discovery record; and (iii) Evolus's extensive disclosure of Medytox's allegations undercuts the inference that Evolus sought to conceal material information about Medytox's claims.

First, Plaintiffs' characterization of the discovery record cannot support an inference that the Evolus Defendants knew they would lose the ITC litigation, because litigation outcomes often depend on subjective judgments,[26] legal defenses, or procedural issues beyond the discovery record.[27] Here, the ALJ's 274-page opinion resolving Medytox and Allergan's claims—and Daewoong and Evolus's defenses—defies plaintiffs' allegation that the outcome was a foregone conclusion. The ALJ concluded, contrary to plaintiffs' allegations of a clear and

---

[26] *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 756 (S.D.N.Y. 2018) (observing that "[p]erhaps in the most obvious cases . . . an assertion that a party is not in breach of contract would be a verifiable fact," but "in many cases" it "depends on one or more somewhat subjective judgments").

[27] *See, e.g.*, *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *19 (D.N.J. 2019) ("Notably, even assuming as true that there was asbestos in J&J's Talc Products, the Company may very well have defenses to the lawsuits premised on other bases such as lack of causation, or procedural issues occurring at trial."); *see also Crutchfield v. Match Group, Inc.*, 529 F. Supp. 3d 570, 594 (N.D. Tex. 2021) (holding that plaintiffs had not pleaded "Defendants' actual knowledge of . . . Match's ability (or inability) to vigorously defend against such claims" because Match may have "certain legal defenses shielding it from liability separate and apart from disputing head-on the truthfulness of the FTC's factual allegations").

one-sided record, that Medytox did not establish that Dr. Lee took Medytox's strain and gave it to Daewoong, so the alleged misappropriation boiled down to competing expert testimony. *See supra* at 9. Confirming the merit of Daewoong's and Evolus's defenses, the full Commission—in a final decision that plaintiffs mention only in passing (AC ¶ 235)—*reversed* the ALJ, concluding that Medytox's botulinum strain was not a trade secret and cutting the length of the exclusion order from ten to less than two years. *See supra* at 9. That decision contradicts the AC's conclusory allegation that the Evolus Defendants knew they had "no defense." AC ¶ 152.

Second, plaintiffs fail to plead specific facts showing that any Individual Defendant actually reviewed or even had access to any confidential discovery that allegedly contradicted their Litigation Optimism. *See, e.g.*, *Hall,* 2019 WL 7207491, at *19 (dismissing for failure to allege "specific facts indicating that any of the Defendants possessed information regarding the viability of the lawsuits against the Company or suggesting that Defendants knew they had no viable defenses against the lawsuit").[28] By the ITC protective order's terms, the Individual Defendants had no access to confidential business information, such as the report of Medytox's expert. Ex. P ¶ 3; Ex. T. Plaintiffs allege no facts showing that the Individual Defendants reviewed or could have reviewed any such information other than the publicly released bottom-line genetic-testing conclusions of Medytox's expert. *See supra* at 7–8. While plaintiffs allege that Evolus's General Counsel attended and defendant Moatazedi testified at the evidentiary hearing (AC ¶¶ 63, 116), they do not allege that either was present when confidential business

---

[28] *See also Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 426 (S.D.N.Y. 2014) (requiring plaintiffs to (i) "specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements," and (ii) "specifically identify the reports or statements containing this information").

information was presented, for which the ALJ cleared the parties from the courtroom (*see, e.g.*, Ex. V at 9:5–25, 116:3–5, 121:21).

Third, Evolus's regular disclosures about Medytox's claims, allegations, and requested relief (*see supra* at 5–8) further undermine any inference that the Evolus Defendants sought to conceal material information about the ITC litigation from investors. *See, e.g.*, *In re Iconix Brand Group, Inc.*, 2017 WL 4898228, at *19 (S.D.N.Y. 2017) (Gardephe, J.) (holding disclosure contributes to "a more cogent and compelling inference of non-fraud"). Summarizing and directing investors to Medytox's filings in three forums (California Superior Court, the FDA, and the ITC) is inconsistent with an alleged intent to mislead investors by concealing material information about Medytox's claims.

### C.    The AC's Allegations, Viewed Holistically, Fail to Plead Scienter.

The AC's scienter allegations are just as inadequate when viewed holistically. *See Tellabs, Inc.*, 551 U.S. at 326 (scienter analysis requires "assess[ing] all the allegations holistically"). Plaintiffs fail to raise even a hint of a fraudulent motive because all the Individual Defendants acquired more stock than they sold—and the CEO sold no shares whatsoever. Nor do they support any inference—let alone the required "stronger inference"—of recklessness. *Kalnit*, 264 F.3d at 143. The AC pleads no basis for the CW's statements that Evolus did not investigate Medytox's claims. And the ITC discovery record (i) did not assure a Medytox victory, as the final Commission decision demonstrates; and (ii) was not available in any event to the Evolus Defendants, who had already disclosed the allegations and potential remedies that the ITC rulings addressed. Viewed separately or together, the scienter inference from these allegations is not "at least as compelling" as the opposing inference—namely, that the Evolus Defendants believed in Evolus's rights to Jeuveau and its defense of Medytox's claims. *See Tellabs, Inc.*, 551 U.S. at 324.

27

### III.    THE AC DOES NOT ADEQUATELY ALLEGE THAT THE EVOLUS DEFENDANTS' OPINION STATEMENTS WERE FALSE OR MISLEADING.

The Evolus Defendants' statements of Litigation Optimism are also opinions. *See Hall*, 2019 WL 7207491, at \*19 (holding that "Defendants' statements regarding the viability of the lawsuits against J&J clearly constitute opinions").[29] Opinion statements are analyzed differently than fact statements, because "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). Pleading an opinion's falsity requires factual allegations showing that the speaker either did not hold the opinion, supplied untrue supporting facts, or omitted facts about the speaker's basis for the opinion that rendered the opinion misleading. *Axar*, 308 F. Supp. 3d at 753. "This is no small task for an investor," *Omnicare*, 575 U.S. at 194, and plaintiffs have not satisfied it.

Plaintiffs' allegations that the Litigation Optimism lacked a reasonable basis rest on the same deficient scienter allegations that the Evolus Defendants never investigated Medytox's claims and knew from the ITC litigation discovery record that Medytox would prevail. AC ¶¶ 181, 185, 198, 201, 203, 206, 214, 218, 224, 226. As described above, plaintiffs fail to plead either premise adequately. Nor was the Litigation Optimism misleading in the context of Evolus's many cautionary statements (*see supra* at 5–8) that it could be enjoined from selling Jeuveau. *See Omnicare*, 575 U.S. at 190–91 (holding that "[t]he reasonable investor understands a statement of opinion in its full context," "including hedges, disclaimers, and apparently conflicting information"). Thus, Plaintiffs fail their burden to plead that Evolus's opinion statements are actionable.

---

[29] *See also Crutchfield*, 529 F. Supp. 3d at 539 (reporting that "district courts have routinely found that a company-issued statement regarding its belief that a pending lawsuit is unfounded or without merit is an opinion").

**IV.     PLAINTIFFS' SECTION 20(a) CLAIM AGAINST THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED.**

There is no Section 20(a) "control person" liability without allegations of (i) a primary Section 10(b) violation; (ii) the defendant's control of the primary violator; and (iii) the defendant's culpable participation in the primary violation. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). Culpable participation is, like scienter, a required state of mind that must be pleaded through "particularized facts of the controlling person's conscious misbehavior or recklessness." *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 254 (S.D.N.Y. 2018) (Gardephe, J.).

The AC's Section 20(a) claim against the Individual Defendants should be dismissed because plaintiffs (i) fail to state a primary Section 10(b) claim, *see, e.g.*, *ATSI*, 493 F.3d at 108; and (ii) fail to plead any Individual Defendant's conscious misbehavior or recklessness (*see supra* at 24–28), *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 406 (S.D.N.Y. 2007) (dismissing Section 20(a) claim for lack of particularized factual allegations raising a "strong inference of scienter" and thus "culpable participation").

## CONCLUSION

The AC's defects are not mere pleading deficiencies. The statements it challenges are not materially misleading as a matter of law, and the allegations on which it attempts to plead fraudulent intent actually *undermine* any such inference. Its claims should therefore be dismissed with prejudice.

Dated: January 18, 2022                    Respectfully submitted:


/s/ Jonathan Rosenberg
Jonathan Rosenberg (jrosenberg@omm.com)
B. Andrew Bednark (abednark@omm.com)
O'MELVENY & MYERS LLP
Seven Times Square
New York, New York  10036
(212) 326-2000

*Attorneys for Defendants Evolus, Inc., David Moatazedi, Rui Avelar, and Lauren Silvernail*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 18, 2022, the Memorandum of Law in Support of the Evolus Defendants' Motion to Dismiss the Amended Complaint was served via E-mail on the following:

THE ROSEN LAW FIRM, P.A.
Sara Fuks
Laurence Rosen
Phillip Kim
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: sfuks@rosenlegal.com
        lrosen@rosenlegal.com
        pkim@rosenlegal.com

*Lead Counsel for Plaintiffs*

/s/ Jonathan Rosenberg
Jonathan Rosenberg
jrosenberg@omm.com
Seven Times Square
New York, New York 10036
(212) 326-2000

31