# EXHIBIT D

**S&P Global**
Market Intelligence

# Evolus, Inc. NasdaqGM:EOLS
# Special Call
## Monday, February 04, 2019 1:00 PM GMT

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

**spglobal.com/marketintelligence**

1

# Table of Contents

Call Participants .................................................................. 3

Presentation .................................................................. 4

Question and Answer .................................................................. 9

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**    **2**

# Call Participants

**EXECUTIVES**

**Ashwin K. Agarwal**
*Vice President of Finance, Investor Relations & Treasury*

**David Moatazedi**
*President ,CEO & Director*

**Lauren P. Silvernail**
*CFO & Executive VP of Corporate Development*

**Michael Mazen Jafar**
*Chief Marketing Officer*

**Rui Avelar**
*Chief Medical Officer & Head of Research and Development*

**ANALYSTS**

**Annabel Eva Samimy**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

**Ashwani Verma**
*SunTrust Robinson Humphrey, Inc., Research Division*

**Donald Bruce Ellis**
*JMP Securities LLC, Research Division*

**Irina Rivkind Koffler**
*Mizuho Securities USA LLC, Research Division*

**Louise Alesandra Chen**
*Cantor Fitzgerald & Co., Research Division*

**Umer Raffat**
*Evercore ISI Institutional Equities, Research Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Good day, ladies and gentlemen, and welcome to the Evolus conference call. [Operator Instructions] And as a reminder, today's conference call is being recorded.

I would now like to introduce your host for today's conference, Mr. Ashwin Agarwal, Vice President Finance, Investor Relations and Treasury. Sir, please go ahead.

**Ashwin K. Agarwal**
*Vice President of Finance, Investor Relations & Treasury*

Thank you, operator, and welcome everyone participating in today's call. This call is being broadcast live over the Internet at www.evolus.com. The webcast and the company's slides can be accessed from the Events & Presentations page in the Investors section of Evolus' website at www.evolus.com. A replay of the call will be available on the company's website for 30 days.

With me on today's call are David Moatazedi, President and Chief Executive Officer; Rui Avelar, M.D., Chief Medical Officer and Head of R&D; Michael Jafar, Chief Marketing Officer; and Lauren Silvernail, Chief Financial Officer and EVP Corporate Development.

During today's call, management will include statements that are considered forward-looking statements within the meaning of United States securities laws. Forward-looking statements are based on management's current assumptions and expectations of future events and trends, which may affect the company's business, strategy, operations or financial performance. A detailed discussion of the risks and uncertainties that the company faces is contained in the periodic reports we file with the SEC. Actual results may differ materially from those expressed in or implied by the forward-looking statements. The company undertakes no obligation to update or review any estimate, projection or forward-looking statement made today.

Let me hand the call over to David Moatazedi.

**David Moatazedi**
*President ,CEO & Director*

Good morning, and thank you all for joining us. For those of you viewing our slide deck, I will begin on Slide 4. Let me start by saying that we are -- all joined Evolus to arrive at this moment in time. The FDA approval of Jeuveau marks the inflection point in our transition to a commercial stage company. With the approval, we will be the first company with a neurotoxin to enter the U.S. market in nearly a decade and leverage our strategic advantage of being the first-ever aesthetic-only neurotoxin free from reimbursement constraints. To do so, we will remain deliberate and calculated in every measure we take in executing an aggressively corporate -- aggressive corporate strategy. Our clear path forward has been forged by and will be grounded in the quality of our extensive clinical work. Over the past year, we have assembled, what I believe, to be the highest quality and most experienced management team in the aesthetic industry. Together, we spent the back half of 2018 further building an exceptional team of experts to prepare for commercialization of Jeuveau.

Today, you will hear for the first time from our Chief Marketing Officer, Mike Jafar, who will preview our brand. Rui Avelar will review our TRANSPARENCY global clinical program, which we unveiled alongside our FDA approval on Friday. The name TRANSPARENCY was chosen because we believe physicians value data transparency, and we are committed to sharing our entire dataset of greater than 2,100 patients over the course of the coming months. What makes the TRANSPARENCY program uniquely compelling is that Jeuveau will be the first neurotoxin to enter the U.S. market with the largest head-to-head Phase III aesthetic trial ever conducted versus BOTOX. We believe this dataset will provide the utmost level of confidence to physicians as they consider recommending Jeuveau to their patients.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Beginning immediately, we are extending offers to sales reps, and we plan to have our entire sales force hired and trained prior to our spring launch. In a few moments Mike will provide a curtain raise on how we are branding the company and Jeuveau. Mike has extensive experience building brands in aesthetics, and he will preview how Evolus and Jeuveau will stand out from the existing companies and products in this space.

As we look toward our spring launch, you can expect to learn more about our commercialization efforts. We have an internal project with the codename FUSE, designed with a goal of catapulting Jeuveau to be #2 in the U.S. market within 24 months of launch. These activities will all be supported by our frictionless, entirely new digital platform, which will power the company. We look forward to providing a full picture of all commercial activities at our Investor Day prior to spring launch.

Moving to Slide 5. We're excited to share with you today our label for Jeuveau and a preview of the TRANSPARENCY program, both of which Rui will review. It's important to give credit to Rui and the entire R&D team. From the outset, we designed our clinical trials recognizing the challenges other competitors have faced against BOTOX. Instead of measuring duration, we focused on the measurement of responder rates. We believe this ultimately will be one of the key deciding factors for the success of Jeuveau. We have an experienced management team that recognized the traps for the unwary and knew the challenges faced by other competitors who fell into those traps.

What ultimately matters at launch is how we can promote to both providers and consumers. To providers, we will be able to promote Jeuveau using the largest Phase III head-to-head aesthetic study versus BOTOX. We've received tremendous response from the physician community as we've shared this data in advisory board meetings. To consumers, we plan to market Jeuveau based on the language in our label, which states that in our open-label repeat dose safety studies, patients received 3 treatments on average in 1 year. We believe physicians will value this promotional effort as it aligns with their consumer messaging.

Let me turn the call over to Rui Avelar. Rui will discuss our TRANSPARENCY global clinical dataset and our FDA approved label for Jeuveau. Rui?

**Rui Avelar**
*Chief Medical Officer & Head of Research and Development*

Great. Thank you, David. And yes, we are excited. We did receive the Jeuveau indication, which is for appearance of moderate-to-severe glabellar lines associated with corrugator and procerus muscle activity in adult patients.

I'd like to provide a quick overview of the clinical program that was used to gain approval, consisted of 2 identical Phase III studies in the U.S., which were the primary studies and supported by a Phase III head-to-head Canadian/European-based study. The application was also supported by 2 Phase II long-term repeat treatment studies, EV-004 and EV-006. You'll also note that the formulation varied between studies we saw on Slide 7.

The initial prabotulinum formulation was freeze-dried. This process is known to denature proteins in the EV-004 study, the initial study, and it used a freeze-dried formulation. From there, we moved into our commercial formulation, which is vacuum-dried. Now vacuum drying has the benefit of causing very little to no protein denaturing. This represents our final commercial formulation, and you'll notice it was used in all our Phase III studies and in the EV-006 repeat treatment open-label 1-year study.

On Slide 8. Our proprietary Jeuveau formulation is manufactured in a brand-new state-of-the-art facility using a Hi-Pure technology. The facility began manufacturing Jeuveau last year in anticipation of the approval and the launch. You may recall, in May of last year, we received from the FDA an Establishment Inspection Report. This, of course, was a very important milestone for the company.

Slide 10. The primary endpoint of both U.S. pivotal trials were composed of 2-point composite improvement measured at day 30. This measurement represents a high statistical bar. Clinically, it's less meaningful; however, from a statistical standpoint, it's considered a rigorous hurdle. By definition, a responder -- to be a responder both the investigator and the subject must simultaneously agree that a 2-

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

point improvement at maximum frown using the Glabellar Line Scale had occurred. The responder rates were 67.5% and 70.4% in EV-001 and EV-002 trials, respectively, clearly, compared to placebo. On the right-hand side of the slide, you can see the individual components of the composite score, specifically the investigator and the subject responders broken out individually for both trials.

Slide 11. Given the 2-point composite responder definition is considered a rigorous statistical test, we asked the question, if at 4 months and 5 months, the treatment arm was still statistically superior to placebo? You can see here that in both Phase III studies, Jeuveau remained statistically superior to placebo both at 4 months and at 5 months. Again, a 2-point composite is considered a statistically rigorous test. Now, however, it does not give a clinician a sense of how the drug performs clinically over time.

On Slide 12, we have a 1 point improvement on the Glabellar Line Scale. Now a 1 point improvement on this scale, by definition, is considered to be clinically significant improvement. In these graphs, you can see both the investigator and the subject assessment. The small bars are in the placebo arms and the taller bars are the treatment arms. And you can see the response over time from the beginning of the trial out to the end of the study at day 150.

Slide 13. We have the Global Aesthetic Improvement Scale. It's a balance scale looking at aesthetic outcomes. Patients can either be much improved, improved, no change, worse or much worse. Here you can see the responders defined as improved or much improved. Once again, the assessments are from both the investigator and the subjects and go until the end of the study at 150 days.

Slide 14 shows the Subject Satisfaction Scale. Once again, a balance scale where subjects can be very satisfied, satisfied, no change, unsatisfied or very unsatisfied. A responder was defined as a subject who was satisfied or very satisfied. And again, you can see the results right out to 150 days.

Slide 16. We have the responder rates for the head-to-head Canadian/European Phase III study. A responder was defined as a 0, no wrinkle; or a 1, mild wrinkles at maximum frown using the GLS at day 30 as assessed by the investigator. 87.2% of Jeuveau subjects were responders compared to 82.8% of BOTOX subjects.

On Slide 17, you can see the results of the primary endpoint noninferiority analysis. The difference between the 2 treatments was in favor of Jeuveau at 4.4%, and you can see the lower limit of the two-sided confidence interval was well above the noninferiority. So clearly, the study met the primary endpoint of noninferiority.

Slide 18. We showed some of the secondary endpoints at day 2 at the beginning of the study and at day 150 at the end of the study. Jeuveau was statistically superior to placebo as measured by a 1 point improvement on the GLS scale by investigator assessment. We also looked at subject satisfaction on day 30. And again, you could see that Jeuveau is superior to placebo, 91% versus 6% in the placebo arm.

On Slide 19, we get a sense of how Jeuveau performs over time. Looking at a 1 point GLS improvement or more, as assessed by both investigators and subjects out to 150 days. Once again, the small bars are the placebo arms and the large bars are the treatment arms.

Slide 20 gives you the Global Aesthetic Improvement Scale perspective. You can see the assessment from the beginning to the end of the study.

On Slide 21, you can see the subjects' assessment of subject satisfaction over the course of the entire study.

Slide 22 has a summary of the adverse events for all Phase III studies. The top line represents all adverse events, which includes both drug-related and unrelated, and the bottom line has drug-related adverse event rates for comparison.

On Slide 23, in our label you see all adverse events with a rate of greater than 1%, where the Jeuveau group was higher than placebo. Again, this is all adverse events, which includes both Jeuveau-related and unrelated events. As the label provides limited information, in the second table below in the slide, we have

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

provided additional information for you, and you can see the adverse events related to Jeuveau, where the overall rate was greater than 1%. Also, as you all know, in our label, we have a black box warning, and this is standard for this class of drugs in this indication.

On Slide 24, our open-label repeat treatment studies also gave us some additional insight. With retreatment, we did not see worsening of adverse events. In fact, you can see what happens with adverse events after retreatment. A common question that we're getting is what's the duration claim in our label? As I'm sure you know, the way duration is calculated in the various labels is different from sponsor to sponsor and, therefore, duration claims cannot really be compared from product to product unless there's actually a head-to-head study where the same calculations apply. When clinician asks to compare duration, what they're really asking is, how does your product compare to another product? This is why we did a head-to-head and look forward to publishing the entire results. Given this compelling data, we did not need to study duration. One way to look at overall clinical performance of the product is how often patients get retreated. When we look at our open-label repeat treatment safety studies, which include 922 subjects, the average number of treatments was 3 over the course of 1 year.

On Slide 25, we outline our immunogenicity results. As I previously mentioned, the EV-004 formulation was freeze-dried and represented a transitional formulation and will not be commercialized. In this study, there were 2 seroconversions and no cases of neutralizing antibodies. Our commercial formulation is vacuum-dried. We chose this because unlike freeze drying, with vacuum drying, there's little to no protein denaturing. You can see that in our Phase III U.S. studies and in the EV-006 1-year repeat treatment study, there were over 2,200 treatments and there were 0 cases of seroconversion and 0 cases of neutralizing antibodies.

Slide 25 (sic) [ Slide 26 ]. As you know, labels have very limited information. And fortunately, the rules have changed. Promotional material is no longer restricted to the information in the FDA-approved label. It can also now include published data from well-controlled and statistically sound studies. As such, we have submitted our 3 Phase III studies for publication, both the placebo-controlled U.S. studies and our Phase III Canadian/European study, where you'll be able to see head-to-head results any way you like, by Glabellar Line Scale, by Global Aesthetic Scale or subject satisfaction. These publications will complement our label, provide clinically relevant information and give physicians a transparent look into our data.

Now with that, let me turn it over to Mike Jafar to discuss what it takes to build a brand.

**Michael Mazen Jafar**
*Chief Marketing Officer*

Thanks, Rui. It's a pleasure and honor to be with you today. I'm excited to be here at an opportune time in our space. The excitement is palpable, our walls are filled with energy, and customers are actively calling to engage with us.

It's a great time to be at Evolus and in the most exciting market in health care. The medical aesthetics business is one of the fastest-growing segment; and within this market, neurotoxins represent the most frequently administered procedure.

I'll start on Slide 28 by saying, our purpose is to make the beauty experience delightful and achievable. Our unique position and singular beauty lens are the reasons why we can deliver on that promise. It's important to note we are a beauty company by design, not by default.

If I could draw your attention on Slide 29. I'll begin by defining the name Evolus. The name derived from the phrase, evolve with us, representing a market longing for a company to evolve with it.

Slide 30 captures what it means to have a design orientation. Our design-driven strategy is central to every decision we make. Over the past several months, the design team at Evolus has developed the following: our company branding; introducing a new and memorable marker representing movement, evolution and beauty; we applied a custom font and brought color to the name Jeuveau, which stems from the word nouveau meaning modern and up-to-date. Our FDA-approved packaging gives us one of the most aesthetically pleasing products in this category and with a specific mention that's designed by Evolus. Based on tremendous customer feedback, we credentialed our science under the trademark

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Hi-Pure. The 2,100 patient dataset has been branded TRANSPARENCY, a platform upon which we can disseminate the data physicians are asking for. Lastly, technology is often used to enhance the overall experience, and we have designed a platform to limit friction within the market. This is a highly differentiated company with a premium brand consumers will want to experience and ask for by name.

Shifting your attention to Slide 31. While I won't go into too much detail, I'll say that our proprietary platform was designed and guided by some of the smartest individuals outside of the aesthetic industry. We recruited a team out of the tech industry from companies, like Facebook, Tesla and Microsoft. Their work has been guided and validated by an all-female Digital Advisory Board chaired by Jessica Federer, former Bayer Chief Digital Officer; and several key executives from companies, such as GE and Google. As we near our spring launch, you will hear more about the platform and more from these individuals.

As represented on Slide 32, we know that it's never been easier to start a brand, especially in the beauty category. The catch is, it's never been more difficult to stand apart. We know exactly how to charter our path and our success will be driven off of our singular focus.

On Slide 33, that focus is on the user, not the buyer, a really important distinction. Our aesthetic focus may be underappreciated today, but will be our key differentiator tomorrow.

On Slide 34, you can see where our focus lies. It is against one gender, the female, who represents over 90% of this market. Demographically speaking, she is in her 30s with an average household income of $40,000 to $50,000. She is part of the fastest-growing generation with a very different approach to beauty. She grew up in the social and selfie movement, she is more open to treatments and starting to use aesthetics products at a younger age. More importantly, she is part of the first generation to influence up to Gen X and boomers. Approximately 1.7 million females between the ages of 30 and -- to 39 are considering a neurotoxin treatment in the next 12 months. While she doesn't like to be called millennial, it's the millennial mindset that we are focusing on.

On Slide 35, that mindset will be reflected in our communication style, model selection and emotion. Based on what you see on Slide 36, we consider ourselves a premium challenger brand. We will deliver an experience that's unrivaled, build awareness in both traditional and nontraditional forms and establish a new voice in a market long seeking one. I encourage you all to visit our site and follow our social handles to feel the Evolus experience.

I'll close by saying, our purpose is to make the beauty experience delightful and achievable.

Let me turn the call back over to David.

**David Moatazedi**
*President ,CEO & Director*

Thanks, Mike. We have accomplished a tremendous amount over the past year and have an exciting launch around the corner. In the immediate term, we have several catalysts, beginning with the highly anticipated U.S. launch of Jeuveau in spring; the anticipated publications of our Phase III trial data and our EU and Canada head-to-head data versus BOTOX; we expect European approval midyear and plan to launch with our partner in Canada in the first half of this year; we are committed to establishing Evolus as a performance beauty company with a customer-centric approach focused on delivering breakthrough products.

I would like to thank all the Evolus employees, clinical investigators, patients and our partner, Daewoong, for their diligent efforts in bringing Jeuveau to the market.
With that, I'll turn the call over for questions. Operator?

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] And our first question comes from Louise Chen of Cantor Fitzgerald.

**Louise Alesandra Chen**
*Cantor Fitzgerald & Co., Research Division*

And congratulations on the approval. So I had a few questions for you here. First question I had was at the AAD, the upcoming meeting, what data will you present on Jeuveau? Is there anything new? Will you have any more details on your 150-day head-to-head study? And then the other question I had was if you could provide more color on denial of the recent CP by Medytox -- the recent denial of the CP by Medytox? And is there any readthrough from that to the other claims that they're asserting against you? Then I have a few other additional questions, but I just wanted to start there.

**David Moatazedi**
*President ,CEO & Director*

Great. Thanks for the questions, Louise. I'll take them individually here starting with your question around medical meetings. As you know, the front half of the year has a number of significant meetings, including the American Academy of Dermatology, which is coming up in the near term as well as the American Society of Aesthetics and Plastic Surgery in the month of May. We will have a presence at both meetings, and we will continue to reinforce the value proposition of Evolus. As far as data releases, at this time, the publications are the next 2 sets of data and that's where you can expect, as they become available to the broader market, we'll make you aware of those. They will not be centered around the medical meetings but rather around the publication dates, which we anticipate will take place prior to the launch in the spring. Now as it relates to the citizens petition, we were pleased to see that the FDA declined the citizens petition with the approval of Jeuveau on Friday. As you may know, Louise, the claims behind the citizens petition are similar to the ones that are present in the court case between Daewoong and Medytox and also present in the ITC case that was recently brought forward. So we were pleased to see that the FDA declined that.

**Louise Alesandra Chen**
*Cantor Fitzgerald & Co., Research Division*

Okay. And then just 2 other quick questions here. Where are you with your plans to expand to additional aesthetic offerings? And then another question we will be getting a lot is, where is your current cash balance? And where does that take you out until?

**David Moatazedi**
*President ,CEO & Director*

Sure. I'll start by taking the question around the portfolio and then turn it over to Lauren. As mentioned before, one of our priorities is to build out a quality portfolio of aesthetic products. And that's something, from the very beginning, the board has been encouraging us to actively look for high-quality assets. And you may know that our head of R&D, Rui Avelar, here, has extensive experience developing products not just neurotoxins but facial fillers as well as other devices in this space. And we are actively in -- searching for different assets. And as we learn more and we're in a position to share that, we certainly will. I'll turn it over to Lauren.

**Lauren P. Silvernail**
*CFO & Executive VP of Corporate Development*

Good morning, Louise. Our cash at the end of the year was at $93 million, our well funds us for the launch in an excellent position. We're quite dilution-sensitive going forward. Thanks for the question.

**Operator**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And our next question comes from Annabel Samimy of Stifel.

**Annabel Eva Samimy**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Congratulations also. Just want to ask a couple questions. The first you mentioned that you hadn't had any duration data in your label. I just want to make sure I understand the reason being is because you have the head-to-head data, so for that reason you don't feel like there's any need to have that duration data in the label. So that's the first question. The second question, you're focusing on the user. I just want to understand a little bit how you are focusing on the actual purchaser of the toxin, which is the physician? So maybe you can talk to us about how you focus on the physician? And at what point you focus on the user and maybe how you roll that out?

**David Moatazedi**
*President ,CEO & Director*

Great. Thanks, Annabel, for the questions. I'll start with the first question around duration in the label, and then turn it over to Mike to talk about the consumer. As you mentioned, we did not measure duration. We did measure responder rates. There are several reasons for this: the first is the definition of duration has evolved over time with FDA, and we did not want a comparison of apples-to-oranges as a result of that shifting of the definition. We believe that the doctor will make the decision of bringing Jeuveau to the practice based on the comprehensive TRANSPARENCY data. As you know, that includes the U.S. Phase III data that Rui walked you through, which follow patients out to 5 months with responder rates at each time point as well as the European and Canadian Phase III head-to-head data compared to BOTOX, which also follow patients out to 5 months. And we feel the combination of that data is adequate to assess the clinical profile of our product.

**Michael Mazen Jafar**
*Chief Marketing Officer*

Yes. I think you summarized it well. Every clinician wants to talk about the duration in a different way. And this way, you can pick whatever way you like. And with the data coming out from the head-to-head, you can look at whatever day, be it 120, be it 150, whatever you want, you can make whatever comparison you like. Again, it's important, a head-to-head study.

**David Moatazedi**
*President ,CEO & Director*

Great. Rui?

**Rui Avelar**
*Chief Medical Officer & Head of Research and Development*

Great question. The biggest difference between a user and a buyer really sits in the experience. When you focus on the buyer, you're mainly focused on the bottom line. When you focus on the user, you enhance both the top and bottom line. That obsession of the experience stems to both customers and consumers. As it pertains to customers purchasing our products, our user-centric focus here is to enhance that entire operation and the experience in which accounts are created and transacted with. As it pertains to the consumer, we aim to make her life easier and delight that experience in and outside the office.

**Annabel Eva Samimy**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Sorry, just to clarify, are you rolling it out strictly as a user experience? Or are you working with the physicians who have, I guess, become fatigued with some of the ways that manufacturers have been interacting with them?

**David Moatazedi**
*President ,CEO & Director*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Annabel, these are all great questions. And as we get closer to commercialization, Mike will provide more color around how we plan to execute the details of our plan. At this point, I think Mike did a great job of outlining how design has impacted our strategy and how we're thinking about the consumer in that mindset. The details around how we'll deploy that will come out in the spring launch.

**Operator**

And our next question comes from Ashwani Verma of SunTrust.

**Ashwani Verma**
*SunTrust Robinson Humphrey, Inc., Research Division*

Congratulations for the approval. So I have 2 questions, really. So the first one is, so one of the pushback that we've been getting from investors is around the assumption that Evolus is aiming to capture #2 position by volume by the end of 24 months. So if you can just instill some confidence there, why the other prior Dysport, assuming we're not able to do that, and how Evolus would be able to achieve that position in the market? So that's the first question. Second question is just around EU partnership. As you head into the CHMP opinion or EU approval, if you can give any update on where the EU partnership discussions are? That would be really great.

**David Moatazedi**
*President ,CEO & Director*

Great. Thanks for the questions, Ashwani. First off, I would say that we are very confident in our entry into market and the rapid uptake that we've observed with other products in this space. This category generally doctors will look -- will assess the product, will trial the product and then determine how much of the market share they'll ascribe to it. If you use other launch products as an analog, generally the first 12 to 18 months is where they achieve the majority of their market share. We believe the combination of our TRANSPARENCY data, our focus around branding and messaging and building this in the aesthetic market, with our commercial experience, will lead to a very rapid uptake and adoption of our product. And that is a significant distinction from other toxins that have entered that did not have head-to-head data when they entered or a focus on building a brand and a company with a differentiated aesthetic-only platform. As it relates to the EU partnership, that is something that we are continuing to explore our options, and we are expecting an approval closer to the middle of this year and you can anticipate we'll be able to provide more color around that time line.

**Operator**

[Operator Instructions] And our next question comes from Irina Koffler of Mizuho.

**Irina Rivkind Koffler**
*Mizuho Securities USA LLC, Research Division*

Congrats from me as well. Can you just update us on the pricing strategy of this product? Also what type of competitive response do you expect from smaller players, like Galderma and Merz?

**David Moatazedi**
*President ,CEO & Director*

Great. On the pricing, Irina, we are sticking with the messaging that we have provided prior, we're not providing an update. And as you know, we communicated historically that we anticipate pricing at a 20% to 25% discount relative to the market leader. As we get closer to launch, I can assure you we'll provide a more detailed view on how we think about pricing. We've done extensive work to understand how competitive pricing models have been developed as well as how we could maximize the value of Jeuveau in this marketplace today. Clearly, profitability of this procedure has been under pressure for some time. And given this is the #1 procedure in medical aesthetics, there's a high degree of attention around Jeuveau's entry as well as the pricing dynamics. And so we're going to be very thoughtful about how we navigate through that. And of course, we'll provide more detail in due time. The second part of the question...

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**Irina Rivkind Koffler**
*Mizuho Securities USA LLC, Research Division*

Was about competitive response...

**David Moatazedi**
*President ,CEO & Director*

Related to competitive -- look, I think for all 3 competitors, right, as we would expect that all 3 competitors will be actively prepared and will develop their respective plans in order to limit the share potential loss that comes from the entry of Jeuveau. In the end, we believe this market has a very low penetration of consumers, less than 10% of consumers in the office. You saw Mike's focus on that millennial mindset, it's not just the younger demographic but it's how they influence even above. And that focus, we believe, in the end, will continue to fuel the growth of this category. In the end, of course, there's going to be some share loss attributed from the relative competitive set. But longer term, this market is all about growth, and we want to establish Evolus and Jeuveau as a company dedicated to the aesthetic space with a plan to help build this category for the long-term.

**Irina Rivkind Koffler**
*Mizuho Securities USA LLC, Research Division*

And just one follow-up. In the label, it says that there's 3 treatments on average over the course of 1 year. Can you frame that for us? Is that -- how does that compare relative to brands like BOTOX and Dysport? Is that generally in line, or is it slightly better?

**David Moatazedi**
*President ,CEO & Director*

Yes. So the way I'd answer it is, first, if you were to speak with a group of doctors in this space, what they would tell you is they're consistently reinforcing to patients that they should come in on -- at a frequency of every 4 months and which works out to 3x per year. And so having that safety data in our label, where patients came back 3x over the course of 1 year, further reinforces what's occurring already in the marketplace. And we believe that messaging, getting out to the consumer, is meaningful both to the doctor who is already reinforcing that, but also supported in the label of our product. As it relates to how a doctor might assess our product relative to the competitive set, that's why the head-to-head data was designed. It was designed to show exactly how Jeuveau compares directly against the market leader, BOTOX Cosmetic. That was captured at every time point over the course of 5 months, and we look forward to sharing with the market the publication that has the responder rates at each time point.

**Operator**

And our next question comes from Donald Ellis of JMP Securities.

**Donald Bruce Ellis**
*JMP Securities LLC, Research Division*

Also, I want to congratulate you on the approval. I've got a couple of questions. And one is going back to this duration claim that Rui was referencing back on Slide 12, I guess, where you were showing 42% to 43%, 1 point response at 5 months. All the other 3 toxins have duration claims in their label. So are you saying that you're not going to have a duration claim in the label? Or that you believe the FDA has moved the goalpost on what they require for a duration claim? In other words, Kaplan-Meier analysis is 0 to 1, a 2-point improvement, the primary endpoint? Which one is it? Has the FDA moved the goalpost on duration? Or are you going to have a duration claim unlike the other 3?

**Rui Avelar**
*Chief Medical Officer & Head of Research and Development*

Yes. So our opening position, and just like David explained why we're not having a duration claim in our label, and to your point, that's exactly right. If you look at the way duration is calculated for the various competitors, it has consistently changed. BOTOX is the first one, and approved in 2002. They had 1

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

metric; Dysport came in, they had a different metric; and then Xeomin came in and had a different metric. So as tempting as it is to try and compare a duration claim in a label, it's actually misleading because the calculation behind it, and as you mentioned, Don, the Kaplan-Meier base has changed because the responder definition has changed. And so David made -- kind of, I think, really explained it really well in terms of what people really want to understand is how do I compare it to another product? And one way to compare it is to look at the responder rates at any time interval you choose using whatever metric you choose. So we, with the publication of the head-to-head study, will -- people can pull it out and they can actually look at the different time intervals and then take whatever metric they want and they can compare it, say at, 4 months, 5 months, whatever you want. So it changed the way that we've approached it. And then retreatment, if we're trying to get a sense of retreatment, how often that takes place? Again, David outlined it very nicely. In our open-label study, you can see that the average patient over the course of the year came in 3x.

**Donald Bruce Ellis**
*JMP Securities LLC, Research Division*

Okay. Great. My second question is regarding the discount. Have you talked to physicians and been able to determine roughly what percent of those physicians will pass on all or part of that discount to the patient?

**David Moatazedi**
*President ,CEO & Director*

Yes. What we found in our research, and it's consistent with what we see with other products that are at a discount, is that roughly half of the market will take any discount provided to them and they will absorb that, meaning that, that discount will improve the profitability of the procedure for the doctor. The other half will do a range of passing along some portion of it back to the consumer. And that seems to be the consistent theme with products in this category, not unique to toxins, but fillers and other brands in this space. We don't think that it will be any different with Jeuveau. Thanks for the questions, Don.

**Operator**

And our next question comes from Umer Raffat of Evercore ISI.

**Umer Raffat**
*Evercore ISI Institutional Equities, Research Division*

Congrats on the approval. David, Ashwin, maybe a quick one for both of you. Can you remind us what the economics are for a -- for an average injector out there using a BOTOX versus, let's say, one of the Dysports or Xeomins versus what it will be for your product?

**David Moatazedi**
*President ,CEO & Director*

Thanks for the question. I think, first off, I'd try to frame it as the following, which is as you know, there are 3 competitors in the marketplace, and so the economics could vary greatly not just by product but by customer type. And so as we start to talk about averages, those don't pertain to the doctor on an individual level. What we do know is that when you look at neurotoxin profitability over time, it has declined. As an example, BOTOX in 2002, the price per unit was $4 and has increased to $6.12 in 2018. That's based on their list price. The patient price per unit during that same window of time has increased by roughly 10%. So when you juxtapose the 53% increase in price per unit against the 10% increase for price, as you can imagine, what you're seeing is a profit margin degradation over time. And that is what you continue to hear in research from doctors is that the profitability of the procedure has declined. Of course, that number could vary depending on the market or the customer volume, but the trend is consistent across the country.

**Operator**

Thank you. And that concludes our question-and-answer session for today. I'd like to turn the conference back over to David Moatazedi for closing remarks.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**David Moatazedi**
*President ,CEO & Director*

Great. Thank you all for taking the time to join the line. We are looking forward to the spring launch of Jeuveau, and our upcoming Investor Day prior to that launch, and we'll update you on that date once we have it confirmed. Thank you.

**Operator**
Ladies and gentlemen, thank you for participating in today's conference. This does conclude the program, and you may all disconnect. Everyone, have a great day.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**EVOLUS, INC. SPECIAL CALL | FEB 04, 2019**

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.