# EXHIBIT H

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2019

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number: 001-38381

# EVOLUS, INC.

(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | | **46-1385614** |
| (State or other jurisdiction of incorporation or organization) | | (I.R.S. Employer Identification Number) |

520 Newport Center Dr., Suite 1200
Newport Beach, California 92660
(949) 284-4555
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.00001 par value per share | EOLS | The Nasdaq Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act:

None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards pursuant to Section 13(a) of the Exchange Act. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

The aggregate market value of the registrant's common stock held by non-affiliates of the registrant as of the last business day of the registrant's most recently completed second fiscal quarter was approximately $238.7 million, based on the closing price of the registrant's common stock on the Nasdaq Global Market of $14.62 per share for such date.

As of February 21, 2020, 33,728,035 shares of the registrant's sole class of common stock were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's Proxy Statement for the 2020 Annual Meeting of Stockholders are incorporated herein by reference in Part III of this Annual Report on Form 10-K to the extent stated herein. Such proxy statement will be filed with the Securities and Exchange Commission within 120 days of the registrant's fiscal year ended December 31, 2019.

**EVOLUS, INC.**

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---:|
| **PART I** | | |
| Item 1 | Business | 3 |
| Item 1A | Risk Factors | 14 |
| Item 1B | Unresolved Staff Comments | 52 |
| Item 2 | Properties | 52 |
| Item 3 | Legal Proceedings | 52 |
| Item 4 | Mine Safety Disclosures | 53 |
| **PART II** | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 53 |
| Item 6 | Selected Financial Data | 55 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 56 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 66 |
| Item 8 | Financial Statements and Supplementary Data | 67 |
| Item 9 | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 101 |
| Item 9A | Controls and Procedures | 101 |
| Item 9B | Other Information | 101 |
| **PART III** | | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 103 |
| Item 11 | Executive Compensation | 103 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 103 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 103 |
| Item 14 | Principal Accounting Fees and Services | 103 |
| **PART IV** | | |
| Item 15 | Exhibits, Financial Statement Schedules | 103 |
| Item 16 | Form 10-K Summary | 105 |
| | Signatures | |

i

**Special Note Regarding Forward-Looking Statements**

This Annual Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, or the Securities Act, and Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act, that involve risks and uncertainties, including statements based on our current expectations, assumptions, estimates and projections about future events, our business, financial condition, results of operations and prospects, our industry and the regulatory environment in which we operate. Any statements contained herein that are not statements of historical facts may be deemed to be forward-looking statements. In some cases, you can identify forward-looking statements by terms such as "anticipate," "believe," "could," "estimate," "expect," "intend," "may," "plan," "potential," "predict," "project," "should," "will," "would" or the negative of those terms, or other comparable terms intended to identify statements about the future. Forward-looking statements include, but are not limited to, statements about:

- our ability to successfully commercialize our sole product Jeuveau® including our ability to successfully market and sell Jeuveau® to our customers;

- our ability to maintain regulatory approval of Jeuveau® and comply with any related restrictions, limitations and warnings in the label of Jeuveau® and any relevant regulatory requirements;

- the potential market size, opportunity and growth potential for Jeuveau®;

- the attractiveness of the product characteristics of Jeuveau® (including the benefits of a 900 kilodalton, or kDa, botulinum toxin type A complex) and the rate and degree of physician and patient acceptance of Jeuveau®;

- the pricing of Jeuveau®, and the flexibility of our pricing and marketing strategy compared to our competitors;

- the performance of our third-party licensors, suppliers, manufacturers and distributors;

- our expectations regarding our future development of Jeuveau® for other indications and approval in other jurisdictions;

- the accuracy of our estimates regarding the amount and timing of expenses, revenue, capital requirements and needs for additional financing;

- regulatory and legislative developments in the United States, European Union, or EU, Canada and other countries;

- developments and projections relating to our competitors and our industry, including competing products and procedures;

- the loss of key management personnel;

- our future financial performance and our ability to continue as a going concern; and

- the results and impact of current and any future legal proceedings.

The forward-looking statements included herein are not guarantees of future performance or events and are based on current expectations of our management based on available information and involve a number of risks and uncertainties, all of which are difficult or impossible to predict accurately and many of which are beyond our control. As such, our actual results may differ materially from those expressed in any forward-looking statements. Factors that may cause or contribute to such differences include, but are not limited to, those discussed in more detail in Item 1. "Business" and Item 1A. "Risk Factors" of Part I and Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" of Part II of this Annual Report on Form 10-K. Readers should carefully review these risks, as well as the additional risks described in other documents we file from time to time with the Securities and Exchange Commission, or SEC. In light of the significant risks and uncertainties inherent in the forward-looking statements included herein, the inclusion of such information should not be regarded as a representation by us or any other person that such results will be achieved, and readers are cautioned not to place undue reliance on such forward-looking statements. Except as required by law, we undertake no obligation to revise the forward-looking statements contained herein to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events. You should read this Annual Report on Form 10-K and the documents we file with the SEC, with the understanding that our actual future results, levels of activity, performance and achievements may be materially different from what we expect. We qualify all of our forward-looking statements by these cautionary statements.

1

Unless the context indicates otherwise, as used in this Annual Report on Form 10-K, the terms "Evolus," "company," "we," "us" and "our" refer to Evolus, Inc., a Delaware corporation, and our subsidiaries taken as a whole, unless otherwise noted.

EVOLUS™, Jeuveau®, Evolux™ are three of our trademarks that are used in this Annual Report on Form 10-K. Jeuveau® is the trade name in the United States for our approved product with non-proprietary name, prabotulinumtoxinA-xvfs. The product has different trade names outside of the United States, but is referred to throughout this Annual Report on Form 10-K as Jeuveau®. This Annual Report on Form 10-K also includes trademarks, trade names and service marks that are the property of other organizations, such as BOTOX® and BOTOX® Cosmetic, which we refer to throughout this Annual Report on Form 10-K as BOTOX. Solely for convenience, trademarks and trade names referred to in this Annual Report on Form 10-K may appear without the ® and ™ symbols, but those references are not intended to indicate that we will not assert, to the fullest extent under applicable law, our rights, or that the applicable owner will not assert its rights, to these trademarks and trade names. We do not intend our use or display of other companies' trade names or trademarks to imply a relationship with, or endorsement or sponsorship of us by, any other companies.

2

**Part I**

**Item 1.    Business.**

**Overview**

We are a performance beauty company with a customer-centric approach focused on delivering breakthrough products in the self-pay aesthetic market.

Our first product, Jeuveau®, is a proprietary 900 kDa purified botulinum toxin type A formulation indicated for the temporary improvement in the appearance of moderate to severe glabellar lines, also known as "frown lines," in adults. Our primary market is the self-pay aesthetic market, which includes medical products purchased by physician and other customers that are then sold to consumers or used in procedures for aesthetic indications that are not reimbursed by any third-party payor, such as Medicaid, Medicare or commercial insurance. We believe we offer customers and consumers a compelling value proposition with Jeuveau®. Currently, onabotulinumtoxinA (BOTOX) is the neurotoxin market leader, and prior to the approval of Jeuveau®, was the only known 900 kDa botulinum toxin type A complex approved in the United States. We believe aesthetic physicians generally prefer the performance characteristics of the complete 900 kDa neurotoxin complex and are accustomed to injecting this formulation.

*United States*

In February 2019, we received the approval of our first product Jeuveau® (prabotulinumtoxinA-xvfs) from the U.S. Food and Drug Administration, or FDA. In May 2019, we commercially launched Jeuveau® in the United States.

As part of our commercial launch in the United States, we introduced the Jeuveau® Experience Treatment, or J.E.T., an exclusive program for aesthetic providers and consumers to be the first to experience Jeuveau®. J.E.T. offered aesthetic providers the opportunity to receive multiple shipments of Jeuveau® through August 2019. The program was made available through our technology platform, "Evolus Practice", which allows providers to open a new account, order Jeuveau®, pay invoices and engage with our customer experience team and medical affairs representatives. We enrolled over 5,000 customer accounts in JET.

In addition to the J.E.T program, in 2019, we launched marketing programs designed to increase the adoption of Jeuveau® by customer accounts and to drive consumer demand for Jeuveau®. The next phase of our U.S. launch will be the release of our customer loyalty program, branded Evolux™, and our consumer loyalty program in 2020.

*International*

In August 2018, we received approval from Health Canada for the temporary improvement in the appearance of moderate to severe glabellar lines in adult patients under 65 years of age. We began marketing Jeuveau® in Canada in October 2019 through our distribution partner, Clarion Medical Technologies, Inc., or Clarion.

In September 2019, we received approval from the European Commission, to market the product in all 28 EU member states, Iceland, Norway and Liechtenstein. We plan to launch Jeuveau® in Europe in 2020.

**Our Market**

Our primary market is self-pay aesthetic healthcare, which includes medical products purchased by physicians that are then sold to consumers or used in procedures for aesthetic indications that are not reimbursed by any third-party payor, such as Medicaid, Medicare or commercial insurance. By focusing on the self-pay medical aesthetics market, we believe we are not exposed to reimbursement risk associated with a reliance on payments from such third-party payors, and we are subject to fewer regulations that place limits on the types of marketing and other interactions we have with physicians.

Within the self-pay aesthetic market, the global aesthetic neurotoxin market was estimated to generate approximately $2.7 billion of revenue in 2019 and is estimated to grow to approximately $3.9 billion in 2022. The U.S. aesthetic neurotoxin market was estimated to generate $1.4 billion in sales in 2019 and is expected to grow to approximately $2.0 billion in 2022.

We believe the growth in the medical aesthetics market is driven by a number of factors, including:

- increased use by millennials who are increasingly seeking medical aesthetic treatments and utilizing neurotoxins as an entry point for aesthetic procedures due to their minimally invasive nature;

3

- an aging population together with an increasing life expectancy, which is resulting in more consumers with a desire for improved appearance and well-being over a longer period of time;

- rising disposable income, with the U.S. Bureau of Economic Analysis reporting that real disposable income in the United States increased approximately 19% from December 2012 to December 2019;

- growing awareness, utilization and acceptance of elective or minimally invasive aesthetic procedures; and

- continued innovation and improved accessibility to these treatments due to an increase in the number of physicians who perform these procedures.

Within the multiple age groups that receive aesthetic neurotoxin treatments, we strategically focus our marketing efforts on the millennial segment which is the largest cohort in the U.S. population. In 2019 there are estimated to be approximately 73 million millennials, defined as individuals born between 1981 and 1996. We believe that approximately 1.7 million females between the age of 30 and 39, which includes many individuals we define as millennials, are considering neurotoxins in the next twelve months.

**Our Competitive Strengths**

We offer physicians and consumers a compelling value proposition because:

- *Jeuveau® offers the U.S. market the first known 900 kDa neurotoxin alternative to BOTOX.* The manufacture of both Jeuveau® and BOTOX starts with a 900 kDa complex, includes adding the excipients human serum albumin, or HSA, and sodium chloride, and finishes by vacuum drying. We believe Jeuveau® is the only known neurotoxin product in the United States with a 900 kDa neurotoxin complex other than BOTOX. We also believe an important component of competitiveness in the neurotoxin market relates to the characteristics associated with the 900 kDa complex and the potential of the accessory proteins to increase the effectiveness of the active toxin portion of the complex.

- *Results from our TRANSPARENCY global clinical program in more than 2,100 patients provides robust data to physicians evaluating the purchase of Jeuveau®.* We believe the comprehensive TRANSPARENCY clinical data set, including a head-to-head Phase III study comparing Jeuveau® and BOTOX, provides physicians with confidence in recommending Jeuveau® to their patients.

- *We offer a unique technology platform.* We provide a simple, personal and connected experience for physicians utilizing our proprietary technology platform. We have built and continue to improve our platform with the goal of limiting friction and enhancing the overall experience for physicians and ultimately consumers. We are modernizing the customer engagement with our proprietary "Evolus Practice" app. We not only leverage technology for operational efficiency, but more importantly, to enhance a customer's experience. The combination of a highly specialized sales force and our technology platform is an effective and competitive model.

- *Enhanced level of physician-customer interaction through a self-pay, aesthetic-only marketing strategy.* We have elected to specifically target the self-pay aesthetic market. With a reduced regulatory burden compared to third-party payor reimbursed therapeutic products, there is a number of benefits that market participants in reimbursed markets are unable to achieve, such as an enhanced level of interaction with our physician-customers. Jeuveau® is the only U.S. neurotoxin without a therapeutic indication. We believe pursuing an aesthetic-only non-reimbursed product strategy creates meaningful strategic advantages in the United States, including pricing and marketing flexibility. We utilize this flexibility to drive market adoption through programs such as promotional events, experience product programs and pricing strategies.

- *We have strong relationships with aesthetic key opinion leaders, or KOLs.* We have established relationships with aesthetic KOLs as a result of our management team's industry experience and engagement of our clinical trial investigators. KOLs are important information resources to the general physician-customer market due to their clinical expertise, academic reputations, active clinical practices and their status as medical innovators. The broader physician community often looks to KOLs for their experience with products and procedures as part of their new product and procedure adoption process.

- *Our management team has significant experience and expertise in medical aesthetics.* Our management team has extensive experience in self-pay healthcare markets, in the development, market launch and commercialization of major medical products, execution and integration of business development transactions, identification of and

4

partnerships with KOLs, and understanding of the regulatory environment of the healthcare markets. Key members of our leadership team have also served in relevant senior leadership positions with leading aesthetic companies.

**Our Strategy**

In May 2019, we launched Jeuveau® in the United States with our own specialty sales organization now consisting of over 150 positions between representatives, management and other sales employees and in Canada through our distribution partner, Clarion. We plan to expand our product offerings over time through in-licensing, partnerships and acquisitions. The key components of our strategy are:

- Partner outside of the United States to reach and serve physicians and consumers in those territories.

- Pursue an aesthetic-only strategy to enhance marketing and pricing flexibility along with improving transparency for our customers.

- Leverage our strong KOL relationships to assist in scientific presentations, publications, and other methods to drive success of our commercial launch of Jeuveau®.

- Leverage our differentiated digital platform to efficiently open new accounts, personalize the purchasing process and efficiently deploy marketing programs at scale.

- Establish a leading medical aesthetics company by in-licensing technology, developing partnerships and potentially acquiring products.

**Jeuveau® Overview**

Jeuveau® is an injectable formulation of a 900 kDa botulinum toxin type A complex designed to address the needs of the large and growing facial aesthetics market. We completed the TRANSPARENCY global clinical program which enrolled over 2,100 adult subjects. The results of the TRANSPARENCY global clinical program were used to support our applications for regulatory approvals in the United States, EU and Canada.

As demonstrated in the figure below, Jeuveau® contains a 900 kDa botulinum toxin type A complex produced by the bacterium *Clostridium botulinum.* The active part of the neurotoxin is the 150 kDa component, and the remaining 750 kDA of the complex is made up of accessory proteins that we believe help with the function of the active portion of the toxin. Jeuveau® has the same mechanism of action as other type A botulinum toxins. When injected intramuscularly at therapeutic doses, botulinum toxin causes a chemical denervation of the muscle resulting in localized reduction of muscle activity. Botulinum toxin type A specifically blocks peripheral acetylcholine release at presynaptic cholinergic nerve terminals by cleaving SNAP-25, a protein integral to the successful docking and release of acetylcholine from vesicles situated within the nerve endings leading to denervation and relaxation of the muscle.

5

**Risks Related to Intellectual Property**

*If we or any of our current or future licensors, including Daewoong, are unable to maintain, obtain or protect intellectual property rights related to Jeuveau® or any of our future product candidates, we may not be able to compete effectively in our market.*

We and our current licensor, Daewoong, currently rely upon a combination of trademarks, trade secret protection, confidentiality agreements and proprietary know-how. Botulinum toxin cannot be patented, as it is produced by *Clostridium botulinum,* a gram-positive, rod-shaped, anaerobic, spore-forming, motile bacterium with the ability to produce the neurotoxin botulinum. Only the manufacturing process for botulinum toxin can be patented, for which Daewoong has obtained a U.S. patent. Our trade secrets and other confidential proprietary information and those of our licensors could be disclosed or competitors could otherwise gain access to our trade secrets or independently develop substantially equivalent information and techniques. Further, the laws of some foreign countries do not protect proprietary rights to the same extent or in the same manner as the laws of the United States. As a result, we or any of our current or future licensors may encounter significant problems in protecting and defending our or their intellectual property both in the United States and internationally. If we or any of our current or future licensors are unable to prevent material disclosure of the non-patented intellectual property related to Jeuveau® to third parties, we may not be able to establish or maintain a competitive advantage in our market, which could adversely affect our business.

In addition to the protection afforded by trademarks, confidentiality agreements and proprietary know-how, we may in the future rely upon in-licensed patents for any future product offerings. The strength of patents we may in-license in the technology and healthcare fields involves complex legal and scientific questions and can be uncertain. The patent applications that we may in-license may fail to result in issued patents with claims that cover any of our future product candidates in the United States or in other foreign countries, and the issued patents that we may in-license may be declared invalid or unenforceable.

We are reliant on the ability of Daewoong, as the licensor of our only product, and will be reliant on future licensors of any future product candidates, to maintain their intellectual property and protect their intellectual property against misappropriation, infringement or other violation. We may not have primary control over our future licensors' patent prosecution activities. Furthermore, we may not be allowed to comment on prosecution strategies, and patent applications may be abandoned by the patent owner without our knowledge or consent. With respect to patents that are issued to our licensors, or patents that may be issued on patent applications, third parties may challenge their validity, enforceability or scope, which may result in such patents being narrowed or invalidated. As a licensee, we are reliant on Daewoong and our future licensors to defend any third-party claims, including Daewoong's defense in connection with the Medytox Litigation, which is defined below. Our licensors may not defend or prosecute such actions as vigorously or in the manner that we would have if entitled to do so, and we will be subject to any judgment or settlement resulting from such actions. Also, a third-party may challenge the validity of our in-licensing transactions. Furthermore, even if they are unchallenged, any of our future in-licensed patents and patent applications may not adequately protect the licensors or our intellectual property or prevent others from designing around their or our claims.

*We may become involved in lawsuits to protect or enforce our intellectual property or the patents and other intellectual property of our licensors, which could be expensive and time-consuming.*

Competitors may infringe our intellectual property, including any future patents we may acquire, or the patents and other intellectual property of our licensors, including Daewoong. As a result, we or any of our current or future licensors may be required to file infringement claims to stop third-party infringement or unauthorized use. This can be expensive, particularly for a company of our size, and time-consuming. In addition, in an infringement proceeding, a court may decide that a patent of ours or any of our current or future licensors is not valid or is unenforceable, or may refuse to stop the other party from using the technology at issue on the grounds that our patent claims do not cover its technology or that the factors necessary to grant an injunction against an infringer are not satisfied.

An adverse determination of any litigation or other proceedings could put one or more of such patents at risk of being invalidated or interpreted narrowly. Interference, derivation or other proceedings brought at the USPTO may be necessary to determine the priority or patentability of inventions with respect to any of our future patent applications or those of our licensors or collaborators. Litigation or USPTO proceedings brought by us or any of our current or future licensors may fail or may be invoked against us or our licensors by third parties. Even if we are successful, domestic or foreign litigation or USPTO or foreign patent office proceedings may result in substantial costs and distraction to our management or the management of any of our current or future licensors, including Daewoong. We may not be able, alone or with any of our

37

current or future licensors or collaborators, to prevent misappropriation of our proprietary rights, particularly in countries where the laws may not protect such rights as fully as in the United States.

Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation or other proceedings, there is a risk that some of our confidential information could be compromised by disclosure during this type of litigation or proceedings. In addition, during the course of this kind of litigation or proceedings, there could be public announcements of the results of hearings, motions or other interim proceedings or developments or public access to related documents. If investors perceive these results to be negative, the market price for our common stock could be significantly harmed.

Most of our competitors are larger than we are and have substantially greater resources. They are, therefore, likely to be able to sustain the costs of complex patent litigation longer than we could. Accordingly, despite our efforts, we may not be able to prevent third parties from infringing upon or misappropriating our intellectual property. In addition, the uncertainties associated with litigation could compromise our ability to raise the funds necessary to continue our clinical trials, continue our internal research programs, or in-license needed technology or other product candidates. There could also be public announcements of the results of the hearing, motions, or other interim proceedings or developments. If securities analysts or investors perceive those results to be negative, it could cause the price of shares of our common stock to decline.

***We may not be able to protect our intellectual property rights throughout the world.***

Filing, prosecuting and defending patents on product candidates in all countries throughout the world would be prohibitively expensive, and our intellectual property rights in some countries outside the United States can be less extensive than those in the United States. In addition, the laws of some foreign countries do not protect intellectual property rights to the same extent as federal and state laws in the United States and in some cases may even force us to grant a compulsory license to competitors or other third parties. Consequently, we may not be able to prevent third parties from using our inventions in all countries outside the United States or from selling or importing products made using our inventions in and into the United States or other jurisdictions. Competitors may use our technologies in jurisdictions where we have not obtained patent protection to develop their own products and further, may export otherwise infringing products to territories where we have patent protection, but enforcement is not as strong as that in the United States. These products may compete with our products and our patents or other intellectual property rights may not be effective or sufficient to prevent them from competing.

Many companies have encountered significant problems in protecting and defending intellectual property rights in foreign jurisdictions. The legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents and other intellectual property protection, particularly those relating to biopharmaceuticals, which could make it difficult for us to stop the infringement of our patents or marketing of competing products in violation of our proprietary rights generally. Proceedings to enforce our patent rights in foreign jurisdictions could result in substantial costs and divert our efforts and attention from other aspects of our business, could put our patents at risk of being invalidated or interpreted narrowly and our patent applications at risk of not issuing and could provoke third parties to assert claims against us. We may not prevail in any lawsuits that we initiate and the damages or other remedies awarded, if any, may not be commercially meaningful. Accordingly, our efforts to enforce our intellectual property rights around the world may be inadequate to obtain a significant commercial advantage from the intellectual property that we develop or license.

In addition, our ability to protect and enforce our intellectual property rights may be adversely affected by unforeseen changes in domestic and foreign intellectual property laws.

***If we are unable to protect the confidentiality of our trade secrets, our business and competitive position would be harmed.***

In addition to seeking patents for our product candidates, we also rely on trade secrets, including unpatented know-how, technology and other proprietary information, to maintain our competitive position.

We seek to protect our trade secrets, in part, by entering into non-disclosure and confidentiality agreements with parties who have access to them, such as our employees, collaborators, consultants, advisors and other third parties. We expect to enter into confidentiality and invention assignment agreements with our employees and consultants. Despite these efforts, any of these parties may breach the agreements and disclose our proprietary information, including our trade secrets, and we may not be able to obtain adequate remedies for such breaches. Enforcing a claim that a party illegally disclosed or misappropriated a trade secret is difficult, expensive and time-consuming, and the outcome is unpredictable. In addition, some courts within and outside the United States are less willing or unwilling to protect trade secrets. If any of our trade secrets were to be lawfully obtained or independently developed by a competitor, we would have no right to prevent them, or

38

those to whom they communicate it, from using that technology or information to compete with us. If any of our trade secrets were to be disclosed to or independently developed by a competitor, our competitive position would be harmed.

***We may be subject to claims that our employees, consultants or independent contractors have wrongfully used or disclosed confidential information of third parties.***

We employ individuals who were previously employed at other pharmaceutical or medical aesthetic companies. We may be subject to claims that we or our employees, consultants or independent contractors have inadvertently or otherwise used or disclosed confidential information of our employees' former employers or other third parties. We may also be subject to claims that former employers or other third parties have an ownership interest in our patents. Litigation may be necessary to defend against these claims. We may not be successful in defending these claims, and even if we are successful, litigation could result in substantial cost and be a distraction to our management and other employees. Any litigation or the threat thereof may adversely affect our ability to hire employees. A loss of key personnel or their work product could diminish or prevent our ability to commercialize product candidates, which could have an adverse effect on our business, results of operations and financial condition.

***We may need to license intellectual property from third parties, and such licenses may not be available or may not be available on commercially reasonable terms.***

A third party may hold intellectual property, including patent rights that are important or necessary to the development of our future product candidates. It may be necessary for us to use the patented or proprietary technology of third parties to commercialize our product candidates, in which case we would be required to obtain a license from these third parties on commercially reasonable terms, or our business could be harmed, possibly materially.

***If our trademarks and trade names are not adequately protected, then we may not be able to build name recognition in our markets of interest and our business may be adversely affected.***

Our registered or unregistered trademarks or trade names may be challenged, infringed, circumvented or declared generic or determined to be infringing on other marks. We may not be able to protect our rights to these trademarks and trade names, which we need to build name recognition by potential partners or customers in our markets of interest. Over the long term, if we are unable to establish name recognition based on our trademarks and trade names, then we may not be able to compete effectively and our business may be adversely affected.

Third parties may assert that we are using trademarks or trade names that are confusingly similar to their marks. If any third party were able to establish that our trademarks or trade names were infringing their marks, that third party may be able to block our ability to use the infringing trademark or trade name. In addition, if a third party were to bring such a claim, we would be required to dedicate time and resources to fight the claim, which time and resources could otherwise be used toward the maintenance of our own intellectual property.

Parties making claims against us may request and obtain injunctive or other equitable relief, which could prevent our ability to use the subject trademarks or trade names. Defense of these claims, regardless of their merit, would involve substantial litigation expense and would be a substantial diversion of employee resources from our business. In the event of a successful claim of infringement against us, we may have to pay substantial damages, including treble damages and attorneys' fees for willful infringement. We may be required to re-brand one or more of our products, product candidates, or services offered under the infringing trademark or trade name, which may require substantial time and monetary expenditure. Third parties could claim senior rights in marks which might be enforced against our use of trademarks or trade names, resulting in either an injunction prohibiting our sales under those trademarks or trade names.

**Risks Related to Government Regulation**

***Our business and products are subject to extensive government regulation.***

We are subject to extensive, complex, costly and evolving regulation by federal and state governmental authorities in the United States, the EU, Canada and other countries, principally by the FDA, the U.S. Drug Enforcement Administration, the Centers for Disease Control and Prevention, the EMA and other similar regulatory authorities. Daewoong is also subject to extensive regulation by the FDA and the South Korean regulatory authorities as well as other regulatory authorities. Our failure to comply with all applicable regulatory requirements, or Daewoong's failure to comply with applicable regulatory requirements, including those promulgated under the Federal Food, Drug, and Cosmetic Act, the Public Health Service Act, and the Controlled Substances Act, may subject us to operating restrictions and criminal prosecution, monetary penalties and

39

**Item 1B.    Unresolved Staff Comments.**

Not applicable.

**Item 2.    Properties.**

Our corporate headquarters is located at 520 Newport Center Drive, Suite 1200, Newport Beach, CA 92660, in a facility that we lease, encompassing approximately 17,758 square feet of space. The lease for this facility expires on January 31, 2025. We believe our facilities are sufficient for our current needs. When our lease expires, we may exercise our renewal option or look for additional or alternate space for our operations, and we believe that suitable additional or alternative space will be available in the future on commercially reasonable terms.

**Item 3.    Legal Proceedings.**

*Medytox Litigation*

On June 7, 2017, Medytox Inc., or Medytox, filed an initial complaint in the Superior Court of the State of California, or the Medytox Litigation, against, us, Alphaeon, SCH, Daewoong, Byung Kook Lee, Jae Chun Yoon, Jae Seung Yoon and Chang Woo Suh, among others, or collectively, the defendants. On August 14, 2017, Medytox filed an amended complaint against the defendants, or the amended complaint. The amended complaint alleges, among other things, that Daewoong stole Medytox's botulinum toxin bacterial strain, or the BTX strain, that Daewoong misappropriated certain trade secrets of Medytox, including the process used to manufacture Jeuveau® (which Medytox claims is similar to its biopharmaceutical drug, Meditoxin) using the BTX strain, and that Daewoong thereby interfered with Medytox's plan to license Meditoxin to us. Medytox claims that as a result of Daewoong's conduct, we entered into the Daewoong Agreement instead of an agreement with Medytox to license Meditoxin.

Daewoong filed a motion to dismiss or stay for forum non conveniens, claiming that the place where the complaint has been filed, in the Superior Court of the State of California, is not the proper place for the trial of the claims in the complaint because, among other reasons, the underlying facts that gave rise to the complaint occurred in South Korea. Daewoong's motion to dismiss was granted by the Superior Court of the State of California on October 12, 2017. As a result, the action filed with the Superior Court of the State of California is stayed pending resolution of the proceedings in South Korea. In October 2017, Medytox initiated a civil lawsuit against Daewoong and its parent company, Daewoong Co. Ltd., in the Seoul Central District Court in Seoul, South Korea, related to the same subject matter in the Medytox Litigation and is seeking, among other things, money damages, injunctive relief and destruction of related documents and products. We are not a party to the litigation in the Seoul Central District Court.

On April 27, 2018, pursuant to a motion to dismiss brought by Daewoong, the Superior Court of the State of California dismissed Medytox's suit against Daewoong, without prejudice, on the basis that Medytox had brought a substantially similar proceeding against Daewoong in South Korea. The proceedings against us remain stayed in the Superior Court of the State of California pending resolution of the proceedings between Medytox and Daewoong in South Korea.

With specific regard to us, Medytox alleges that (i) we have violated California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 because Daewoong's alleged knowledge of the misappropriation of certain trade secrets of Medytox is imputed to us as a result of our relationship with Daewoong, (ii) we have stolen the BTX strain through our possession of and refusal to return the BTX strain, (iii) we have engaged in unlawful, unfair and fraudulent business acts and practices in violation of California Bus. & Prof. Code § 17200, including conversion of the BTX strain and misrepresentations to the public regarding the source of the botulinum toxin bacterial strain used to manufacture Jeuveau®, and (iv) the Daewoong Agreement is invalid and in violation of Medytox's rights.

Medytox seeks, among other things, (i) actual, consequential and punitive damages, (ii) a reasonable royalty, as appropriate, (iii) a declaration that the Daewoong Agreement is void and unenforceable and that Medytox is entitled to disgorgement of all property wrongfully and unjustly retained or acquired by the defendants, including unlawfully gained profits, (iv) injunctive relief prohibiting us from using the license under the Daewoong Agreement and distributing Jeuveau®, and (v) attorneys' fees and costs.

We are vigorously defending Medytox's claims against us. Given the early stage in the Medytox Litigation, we are unable to predict the likelihood of success of Medytox's claims against us or Daewoong or to quantify any risk of loss. The litigation could go on for an extended period of time and require us to dedicate significant financial and management resources to those efforts. While we are entitled to indemnity under the Daewoong Agreement, the indemnity may not be sufficient. An adverse ruling against either us or one of the other defendants could materially and adversely affect our business, consolidated

52

financial position, results of operations, or cash flows and could also result in reputational harm. Even if we are successful, the litigation may result in delays in our product development, reputational damage or other collateral consequences.

### *ITC Complaint*

On January 30, 2019, Allergan and Medytox filed a complaint against us and Daewoong in the U.S. International Trade Commission, or the ITC, containing substantially similar allegations to the Medytox Litigation, specifically that Jeuveau® is manufactured based on misappropriated trade secrets of Medytox and therefore the importation of Jeuveau® is an unfair act. The ITC matter is entitled *In the Matter of Certain Botulinum Toxin Products*, or the ITC Complaint. On March 6, 2019, the ITC instituted an investigation as ITC Inv. No. 337-TA-1145, or the ITC Action. The ITC complaint calls for an investigation by the ITC Office of Unfair Import Investigations, or OUII, under Section 337 of the Tariff Act of 1930. The ITC complaint seeks (i) an investigation pursuant to Section 337 of the Tariff Act of 1930, (ii) a hearing with the ITC on permanent relief, (iii) issuance of a limited exclusion order forbidding entry of Jeuveau® into the United States, (iv) a cease and desist order prohibiting Daewoong and us from engaging in the importations, sale for importation, marketing, distribution, offering for sale, the sale after the importation of, or otherwise transferring Jeuveau® within the United States, (v) a bond issued during the presidential review period, (vi) the return of Medytox's trade secrets and other confidential information including the alleged stolen BTX Strain, and (vii) exclusion and cease and desist orders. In January 2020, the three sets of parties to the ITC action, (i) the Complainants - Allergan and Medytox, (ii) the Respondents - us and Daewoong and (iii) the OUII, each submitted pre-hearing briefs to the Administrative Law Judge assigned to the ITC Action setting forth each parties positions on the substantive issues and preliminary conclusions prior to the evidentiary hearing. From February 4-7, 2020, the Administrative Law Judge held an evidentiary hearing on the ITC Action. An initial determination by the Administrative Law Judge is due by June 5, 2020 and the target date for the final determination by the ITC is October 6, 2020.

We intend to defend the claims contained in the ITC complaint and the related ITC Action vigorously. Given the current stage of the ITC Action, we are unable to predict the likelihood of success of Medytox's and Allergan's claims against us or Daewoong or to quantify the risk of the imposition of an exclusion order or cease and desist order. The ITC Action could require us to dedicate significant financial and management resources to those efforts. While we are entitled to indemnity under the Daewoong Agreement, the indemnity may not be sufficient. An adverse ruling by the ITC against either us or Daewoong could result in the imposition of an exclusion order which would bar imports of Jeuveau® within the United States and a cease and desist order which would bar sales and marketing of Jeuveau® within the United States, either of which would materially adversely affect the Company's ability to carry out its business and which would have a material adverse effect on the Company's business, financial position, results of operations, or cash flows and could also result in reputational harm. Even if we are successful, the ITC Action may result in reputational damage or other collateral consequences.

### *Other Matters*

In January 2017, Medytox initiated a criminal investigation into the foregoing matter in South Korea, which appears to target one or more of the above defendants, but does not appear to target us.

In addition to the Medytox Litigation and the ITC Complaint, from time to time, we may be subject to other legal proceedings and claims in the ordinary course of business.

### Item 4.    Mine Safety Disclosures.

Not applicable.

## Part II

### Item 5.    Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.

### Market Information

Our common stock has been listed and traded on the Nasdaq under the symbol "EOLS" since February 12, 2018.

### Holders of Record

As of February 21, 2020, we had approximately 38 holders of record of our common stock. This number does not include beneficial owners whose shares were held in street name. The actual number of holders of our common stock is greater than this number of record holders and includes stockholders who are beneficial owners, but whose shares are held in street name

53

**Exhibit 32.1**

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER AND
CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. § 1350 AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

Each of the undersigned hereby certifies, pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, in his or her capacity as an officer of Evolus, Inc., that, to his or her knowledge:

(1) the Annual Report on Form 10-K of Evolus, Inc. for the fiscal year ended December 31, 2019 (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Evolus, Inc.

Date: February 25, 2020

By:    /s/ David Moatazedi

David Moatazedi

President and Chief Executive Officer

*(Principal Executive Officer)*

Date: February 25, 2020

By:    /s/ Lauren Silvernail

Lauren Silvernail

Chief Financial Officer and Executive Vice President, Corporate Development

*(Principal Financial Officer)*