# EXHIBIT L

ELECTRONICALLY FILED
Superior Court of California,
County of Orange

**06/07/2017** at 09:57:38 PM
Clerk of the Superior Court
By Jeanette Torres-Mendoza, Deputy Clerk

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
SEONG H. KIM, Cal. Bar No. 166604
REBECCA EDELSON, Cal. Bar No. 150464
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:    310.228.3700
Facsimile:    310.228.3701
Email:        shkim@sheppardmullin.com
              redelson@sheppardmullin.com

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
HWAN KIM (*pro hac vice* application pending)
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, DC  20006-6801
Telephone:    202.747.1900
Facsimile:    202.747.1901
Email:        hkim@sheppardmullin.com

Attorneys for Plaintiff MEDYTOX INC.

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

| | |
|---|---|
| MEDYTOX INC., a Korean corporation,<br><br>Plaintiff,<br><br>vs.<br><br>DAEWOONG PHARMACEUTICALS CO., LTD., a Korean corporation, DAEWOONG CO., LTD., a Korean corporation, ALPHAEON CORP., a California corporation, SCH-AEON, LLC, a Delaware limited liability company, EVOLUS, INC., a Delaware corporation, BYUNG KOOK LEE, an individual, JAE CHUN YOON, an individual, JAE SEUNG YOON, an individual, CHANG WOO SUH, an individual, Does 1 through 25,<br><br>Defendants. | CASE NO.  30-2017-00924912-CU-IP-CJC<br><br>Judge Geoffrey T. Glass<br><br>**COMPLAINT FOR:**<br><br>1. **VIOLATION OF CALIFORNIA UNIFORM TRADE SECRET ACT**<br>2. **CONVERSION**<br>3. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**<br>4. **UNJUST ENRICHMENT**<br>5. **BREACH OF WRITTEN CONTRACT**<br>6. **VIOLATION OF CAL. BUS & PROF. CODE SECTION 17200**<br>7. **DECLARATORY RELIEF**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff Medytox Inc. ("Medytox") alleges as follows for its Complaint against Daewoong Pharmaceuticals Co., Ltd., Daewoong Co., Ltd. (together, "DWP"), Evolus, Inc., Alphaeon Corp., and SCH-AEON, LLC (together, "Alphaeon"), Messrs. Byung Kook Lee, Jae Chun Yoon, Jae Seung Yoon, Chang Woo Suh, and Does 1 through 25 (collectively, all defendants are referred to as "Defendants"):

## INTRODUCTION

1.     Medytox filed this lawsuit because of Defendants' theft of Medytox's biopharmaceutical drug "Meditoxin," which is botulinum toxin drug used to treat certain muscular conditions and to remove skin wrinkles, much like the commonly-known drug called "Botox." Medytox is a world-renowned producer of BTX drugs. For example, the producer of Botox, non-party Allergan, Inc., is Medytox's licensee. Meditoxin is produced by use of C. botulinum toxin Type A neurotoxin ("BTX"), its underlying bacterial strain, and confidential and proprietary manufacturing process, know-how, and technology owned by Medytox. Meditoxin is used commercially in medicine and cosmetics. The global market for the botulinum toxin drug is estimated to be $3 billion per year and expected to be nearly $6 billion by 2023.

2.     DWP misappropriated Medytox's valuable assets and related intellectual property so that DWP could avoid incurring the risk, time, and expense of independently developing their own drug. DWP then embarked on a scheme to steal Medytox's customer. Specifically, Medytox was in negotiations to supply and license Meditoxin to Alphaeon. Following the theft, DWP entered into agreement to supply and license what they stole from Medytox to Alphaeon. Ultimately, this calculated theft reportedly netted DWP and Alphaeon hundreds of million dollars and allowed them to enter the lucrative botulinum toxin drug market, all at Medytox's expense and to Medytox's detriment.

3.     Medytox brings this lawsuit to prevent further misuse of its proprietary information and other property (including anything Defendants wrongfully derived therefrom), to secure return or destruction of the BTX bacterial strain and intellectual property stolen by Defendants, to prevent Defendants from licensing or selling Medytox's

-2-

drug that Medytox worked so long and hard to develop, and to obtain compensation for its damages, as well as disgorgement of Defendants' unjust enrichment resulting from their unlawful conduct, among other appropriate remedies.

## THE PARTIES

4.    Plaintiff Medytox Inc. is a Korean corporation publicly traded on the Korean stock exchange KOSDAQ, with its principal place of business located at 626 Tehran Road, Gangnam, Seoul, Korea.  Medytox is a biopharmaceutical company that pioneered the development of botulinum toxin type A drugs.  Medytox owns all of the bacterial strain, trade secrets, and confidential information relating to Meditoxin which were stolen by Defendants.

5.    Defendant Daewoong Pharmaceuticals Co., Ltd. ("DW Pharmaceuticals") is a Korean corporation with its principal place of business located at Bongeunsaro 114-gil 12, Gangnam, Seoul, Korea.

6.    Medytox is informed and believes that Defendant Daewoong Co., Ltd. ("DW Holding") is a Korean corporation that holds a controlling interest in DW Pharmaceuticals.

7.    Medytox is informed and believes that Defendant SCH-AEON, LLC ("SCH-AEON") is a Delaware limited liability company with its principal place of business located at 4040 Macarthur Boulevard, Suite 210, Newport Beach, California.

8.    Medytox is informed and believes that Defendant Evolus, Inc. ("Evolus") is a Delaware corporation with its principal place of business located at 1270 Via Brigitte, Santa Barbara, California.

9.    Medytox is informed and believes that Alphaeon Corporation ("Alphaeon Corporation") is a Delaware corporation with its principal place of business located at 18191 Von Karman Ave., Suite 500, Irvine, California.

10.    Medytox is informed and believes that Alphaeon Corporation acquired Evolus in October 2013, and that SCH-AEON, in turn, wholly owns Alphaeon Corporation.

-3-

11.    Medytox is informed and believes that Mr. Byung Kook Lee ("BK Lee") is a Korean national currently working as a post-doctoral research associate at Purdue University, College of Engineering located at Ross Enterprise Center, Suite Q, Office RSSQ 101, 3459 Kent Avenue, West Lafayette, Indiana.

12.    Medytox is informed and believes the Jae Seung Yoon ("S Yoon") is a Korean national and presently, the Chairman of DW Pharmaceuticals.

13.    Medytox is informed and believes that Jae Chun Yoon ("C Yoon") is a Korean national and presently, the CEO of DW Holding.

14.    Medytox is informed and believes that S Yoon is the controlling shareholder of DW Pharmaceuticals.

15.    Medytox is informed and believes that Chang Woo Suh ("CW Suh") is a Korean national and presently, an employee of DW Pharmaceuticals working in Seoul, Korea.

16.    Medytox conducts business in California through a supply and license agreement with a non-party Allergan, Inc. ("Allergan") company with its principal place of business in California.

17.    Medytox is informed and believes that DW Pharmaceuticals conducts business in California, including through a supply and license agreement with Alphaeon Corporation (and/or its predecessors in interest).

18.    Medytox is informed and believes that BK Lee, S. Yoon, C. Yoon, and CW Suh conspired with DW Pharmaceuticals and DW Holding to engage in the misconduct described herein. S. Yoon, C. Yoon, and CW Suh are personally liable for their employers' wrongs because, based on information and belief, they knew or had reason to know about the wrongful nature of the conduct and/or personally acted in furtherance of the wrongs and conspiracy alleged herein. Their employers (DW Pharmaceuticals and DW Holding) are liable for these individuals' wrongs which, based on information and belief, were committed in in furtherance of the conspiracy alleged herein and in the course of their employment and for the employers' benefit. DW Holding is liable for DW

-4-

Holding Pharmaceuticals' wrongs alleged herein because, based on information and belief, DW Holding was aware of the wrongful nature of the conduct and could have stopped the conduct, but did not and instead permitted such conduct to proceed in furtherance of the conspiracy alleged herein.

19.    Defendants John Does 1-25 ("Doe Defendants") are persons, corporations, partnerships, or business entities who acted in conspiracy with DW Pharmaceuticals, BK Lee, S. Yoon, C. Yoon, and CW Suh, in a wrongful or tortious manner which proximately caused or contributed to injuries and damages sustained by Medytox. Plaintiff has been unable to ascertain the names and identities of the above-mentioned Doe Defendants from investigations that has been conducted to date. Accordingly, Medytox has sued these Doe Defendants herein with fictitious names, and Medytox will substitute the true names, identities, acts and/or omissions of Doe Defendants when they are ascertained.

## JURISDICTION AND VENUE

20.    Jurisdiction in this Court is proper because the amount in controversy exceeds $25,000.

21.    Venue is proper in this district under California Code of Civil Procedure sections 395(a) and 395.5 because Defendants Alphaeon Corporation and SCH-AEON reside in and are doing business in Orange County.

## FACTUAL ALLEGATIONS

**A.    Medytox Pioneers Meditoxin**

22.    Medytox has invested tens of millions of dollars and many years of research and development to successfully commercialize and to bring its BTX drug Meditoxin to market. Medytox became one of the first companies to successfully develop the botulinum type A drug for global distribution, including in the United States and California, specifically. Today, Medytox is one of the industry's leaders in the BTX drug market.

23.    Medytox was the first Korean company that attempted and successfully developed a toxin drug from BTX. No such drug developer or manufacturer existed in Korea at the time Medytox was founded. The lethality of BTX requires sophisticated

-5-

technology and highly specialized skills to handle, develop, and commercialize into a usable drug. Through sustained research and development efforts, as well as through substantial investments in money and human resources, Medytox was able to successfully develop and obtain product approval for Meditoxin, its first toxin product, from the Korea's Ministry of Food and Drug Safety in 2006. In 2009, Medytox went public. As of end of May 2017, the market capitalization of Medytox exceeds $2.5 billion.

24. Medytox executed supply and license agreement with non-party Allergan for its BTX drugs, with intent to sell them in the United States, including in California.

**B.    Use of BTX Drugs**

25. Meditoxin is a neurotoxin protein produced by the bacterium C. botulinum and related species. It prevents the release of the neurotransmitter acetylcholine from axon endings at the neuromuscular junction and, thus, causes flaccid paralysis. BTX is the most acutely lethal toxin known, initially developed for use as biological weapon by the U.S. Government, but also has been found to be useful and of commercial value. For example, "Botox" is a commercial form of the toxin offered by Allergan.

26. There are many applications for BTX drugs. BTX drugs are broadly used for medical and cosmetic purposes. For example, BTX drugs are used to treat pediatric leg spasms in cerebral palsy patients. BTX drugs are also used as a prophylactic treatment of chronic migraine headaches.

27. The cosmetic use for BTX is well-known. The BTX is injected to smooth the wrinkles of the face. The toxin is injected around the eyes and upper face to diminish facial glabellar lines ("frown lines" between the eyebrows), the highly-popular cosmetic use of the toxin.

**C.    Medytox's Development of Meditoxin**

28. Medytox spent tens of millions of dollars to develop and commercialize Meditoxin. It took over seventeen years to bring Meditoxin to market.

29. Through many years of research and development, Medytox made fundamental advances to develop what is Meditoxin. Importantly, Medytox accumulated

-6-

SMRH:483097980                                                                    COMPLAINT

confidential and proprietary intellectual property that it uses in the implementation and manufacture of Meditoxin. The manufacturing process is unique to, and fully optimized for, the particular drug characteristics of Meditoxin. Because Meditoxin is extremely lethal, a specialized process for handling Meditoxin makes maximizing safety and minimizing cost particularly challenging. In the course of overcoming these challenges, Medytox developed confidential and proprietary intellectual property via its production optimization experiments. Furthermore, the lessons learned from years of research and development for Meditoxin constitute trade secrets that are highly valuable to Medytox and would be highly valuable to any competitor in the BTX drug business. Medytox's trade secrets would allow these competitors to produce competing drugs without the investment that Medytox had to make for many years.

30.    Medytox's substantial and sustained investment in BTX drug development totaling over seventeen years – and the intellectual property that resulted – have made Meditoxin one of the most advanced drugs in the BTX industry. It is unparalleled in performance and safety in all respects.

31.    In order to produce Meditoxin, two things are necessary – the botulinum toxin bacterial strain (the "BTX Strain") and its related manufacturing process, know-how, and technology. Such information related to the manufacturing process is recorded in its entirety in a manual known in the drug industry as the Master Production and Control Records. If a drug manufacturer has access to the BTX Strain and the corresponding Master Production and Control Record for Meditoxin ("Master Record"), the drug manufacturer has the ability to produce Meditoxin. For example, the Master Record contains, *inter alia*, the name and weight and measure of each active ingredient per dosage unit of Meditoxin; a complete list of components designated by name sufficiently specific to indicate any special quality characteristics; and complete manufacturing and control instructions, sampling and testing procedures, specifications, special notations, and precautions to be followed for production of Meditoxin. A drug manufacturer that had access to the BTX Strain and the Master Record would be able to offer it in unfair

-7-

competition with Medytox at an artificially low price (because the drug manufacturer would neither have spent the resources nor the time to develop the product on its own and, instead, could piggyback off of Medytox's efforts).

32.     The Master Record reflects information Medytox considers and treats as trade secrets: the complete and detailed instruction for production; detailed and comprehensive diagrams showing the process and the sequence of the production; the complete list and the amount of chemical and bacterial elements required for the production; the control process for optimizing the production; the detailed instructions and directions for quality control; directions for safely handling BTX throughout the production process; and cost and safety optimization methodology.  Putting aside Defendants' wrongful access which is the subject of this lawsuit, such information has not been known, including by those who can derive value from being able to access it.  That is one of the reasons that Medytox has jealously guarded at all times the BTX Strain and Master Record against access by others who could use them to Medytox's detriment.  For these reasons and others, Medytox's BTX Strain and intellectual property associated with Meditoxin are some of Medytox's most valuable assets.

33.     At all relevant times, Medytox has taken reasonable efforts to safeguard from theft the BTX Strain as its most valuable asset and to vigorously protect from disclosure the Master Record as containing some of its most precious trade secrets.  Medytox stores and has stored at all relevant times, its BTX Strain in a high security storage facility.  Any movement or use of the BTX Strain has been strictly controlled and permitted only on a need-to-use basis.  That is not only because the BTX Strain incredibly valuable, but also it is a highly toxic bacterium, initially developed for use as biological weapon by the U.S. Government.  Its use, storage, and production is (and has been) also regulated by law in Korea, where Medytox maintains its BTX bacteria cell bank and where its primary production facility is located.

-8-

**D.      Medytox Learns BK Lee And DWP Stole Its Intellectual Property And The BTX Strain**

34.      In February 2017, Mr. Kwang-Jun Ryu joined Medytox as an executive director from DWP.  Mr. Ryu advised Medytox that CW Suh, an employee of DWP, had often boasted during DWP's company social hour that he was responsible for acquiring the BTX Strain from his university friend.  This was shocking information because Medytox had been recently informed by Dr. Junho Lee, a Medytox employee, that BK Lee (who was formerly an employee of Medtox) and CW Suh, were close university friends.

35.      Having discovered the link between BK Lee and DWP, Medytox immediately began investigating into their possible misappropriation of confidential information.  BK Lee had been an employee of Medytox and had left Medytox on good terms to pursue his graduate degree, receiving a scholarship to do so before then, Medytox did not know and Medytox had no reason to suspect BK Lee breached his confidentiality agreement and stole valuable company trade secrets and other property.

36.      BK Lee had security clearance to access the master cell bank and the working cell bank where the BTX Strain was stored because his job required it.  It was his job to retrieve the vials of BTX Strains for production testing purposes.  BK Lee also had full access to the Master Record because his job required him to help write portions of the Master Record in connection with the development and creation of the manufacturing production line and the trial and error process involved in perfecting the production process at Meditoxin drug production facility.

37.      In response to learning of the link between BK Lee and DWP, Medytox reviewed the information technology security records pertaining to computer activities of BK Lee, including the nature of the files he had downloaded onto an external drive, the files he had printed, and record of his emails.  Medytox was surprised to discover, *inter alia*, that BK Lee had printed several copies of the *entire* Meditoxin Master Record.

38.      Medytox also discovered then (in 2017) that Mr. BK Lee had emailed to his personal email account the entire list of the hardware equipment that constituted the

-9-

Meditoxin production line, blueprints for key hardware components, equipment specifications, diagrams for the production process, and the drug substance record that detailed the exact specifications for the production of Meditoxin. In sum, BK Lee misappropriated all of the information necessary for the efficient production of Meditoxin. Based on information and belief, this misconduct occurred beginning in early 2008 and through August 2008, preceding BK Lee's departure from Medytox in August 2008. Mr. BK Lee had taken the complete set of documents that allows for the exact replication of the Meditoxin manufacturing facility. BK Lee went to great lengths to take what he needed and to hide his wrongful activities from Medytox. Upon information and belief, BK Lee took efforts (such as sending pieces of the confidential information to his private email under an innocuous subject line) to surreptitiously remove proprietary confidential information from the Medytox's computers and to conceal his unlawful activities from Medytox.

39.     Based on information and belief, the other Defendants DWP, S Yoon, C Yoon, CW Suh, and Does 1-25 engaged in purposeful conduct to conceal their misconduct from Medytox. DWP repeatedly stated in its regulatory filings before the U.S. Federal Drug Administration and the Korea Ministry of Drug and Food Safety as well as on its website that DWP discovered the BTX bacterial strain from a soil sample in June 2010. Further, on or about April 14, 2016, at Dubai World Dermatology and Laser Conference, Mr. Chung Sei Kim, one of DWP's scientists overseeing the BTX drug development at DWP, represented to Medytox (through Mr. Hyunho Jung, the founder of Medytox) that he had personally isolated DWP's BTX bacterial strain from the soil samples that DWP had accumulated over the years and he had conducted a 205-point sampling of the soils before he was able to discover and isolate the BTX bacterial strain. Based on information and belief, Defendants S Yoon, C Yoon, CW Suh, and Does 1-25 directed or caused that concealment conduct by DWP, including in furtherance of their conspiracy to misappropriate the Meditoxin Trade Secret and Medytox's BTX Strain and unfair competition against Medytox.

-10-

40.    Medytox further discovered then, in 2017 that Messrs. BK Lee and CW Suh, one of DWP's employees in charge of R&D at DWP, had been in communications with each other during BK Lee's employment at Medytox.  Based on information and belief, Mr. CW Suh was instructed and directed by Mr. C Yoon, the CEO of DW Holding, and Mr. S Yoon, Chairman and CEO of DWP, to use BK Lee to misappropriate from Medytox the manufacturing plant layout, the hardware specification list, and the Meditoxin Master Record (collectively, "Meditoxin Trade Secret") and to steal the Medytox's BTX Strain. Based on information and belief, C Yoon and S Yoon gave those instructions and directions on behalf of DW Holding and DW Pharmaceuticals.  Further, based upon information and belief, BK Lee did as they instructed, knowing that it was in violation of his obligations to Medytox, including to hold the Master Record trade secret information in trust for Medytox and not to otherwise use or disclose it without Medytox's consent.

41.    Based on information and belief, C Yoon, S Yoon, and DWP knew or were on notice that such activity was in breach of BK Lee's obligations to Medytox and otherwise contrary to law.  Based on information and belief, in engaging in the above alleged conduct and in stealing the Meditoxin Trade Secret and the Medytox's BTX Strain for DWP and taking purposeful steps to conceal his misconduct from Medytox, BK Lee was acting in his individual capacity and personal gain.  Based on information and belief, in engaging in the above alleged conduct and in stealing the Meditoxin Trade Secret and the Medytox's BTX Strain for DWP and concealing his misconduct from Medytox, BK Lee was also acting in his capacity as the agent of Defendants DWP, S Yoon, C Yoon, and CW Suh and Does 1-25 or, alternatively, they and BK Lee conspired with one another to misappropriate the Meditoxin Trade Secret and Medytox's BTX Strain and then to conceal that misconduct from Medytox.  Medytox is informed and believes that before and after emailing, downloading and removing the Meditoxin Trade Secret while still a Medytox employee, BK Lee met with Mr. CW Suh to finalize the terms for the transfer of, *inter alia*, the BTX Strain and the Meditoxin Trade Secret to DWP.  Upon information and belief, in consideration for stealing, misappropriating and delivering the BTX Strain, the

-11-

Meditoxin Trade Secret, and for providing related advice, DWP paid BK Lee over $120,000 and made available to BK Lee paid positions during his post-doctorate at Purdue University through professors who were and are closely-tied to DWP (*e.g.*, through research grants or other form of professional relationships). In exchange for these considerations, upon information and belief, after unlawfully transferring the BTX Strain and the Meditoxin Trade Secret to DWP, BK Lee continued to breach his confidentiality obligations by continuing to advise DWP in the construction of the manufacturing facility to produce DWP's drug named "Nabota," which essentially is Meditoxin under a different name, using the stolen Medytox BTX Strain and Meditoxin Trade Secret.

42.    Medytox is informed and believes Mr. S Yoon, the CEO of DWP, had authorized cash payment and other considerations to Mr. BK Lee in exchange for the delivery of the stolen BTX Strain and Meditoxin Trade Secret that allowed for DWP to produce Nabota. Based on information and belief, Mr. S Yoon gave that authorization on behalf of DWP. Based on information and belief, he and all of the other defendants who conspired with him (*e.g.*, DWP, C Yoon, and CW Suh) knew or were on notice that such activity was in breach of Mr. BK Lee's obligations to Medytox and otherwise contrary to law.

43.    In sum, DWP misappropriated both the BTX Strain and Meditoxin Trade Secret from Medytox by bribing BK Lee, who had been involved in the development of Meditoxin and the Meditoxin manufacturing production line. BK Lee and DWP had secretly conspired to misappropriate the Meditoxin Trade Secret and to steal the BTX Strain in order to launch a competing BTX drug, which would be later licensed to Alphaeon (and/or its predecessors in interest).

44.    Upon information and belief, BK Lee continues to provide consulting advice to DWP to this day regarding the same.

45.    By unlawfully obtaining through BK Lee the BTX Strain and Meditoxin Trade Secret, DWP misappropriated some of the most important assets of Medytox – the formula and the recipe – and acquired everything required to produce Meditoxin. The

-12-

scale, the method, and the concealment of the theft are astounding. Because Defendants concealed their misconduct so well, Medytox could not reasonably discover their misconduct earlier than it did in 2017, when it first learned of the link between BK Lee, CW Suh, and DWP. Defendants BK Lee, DWP and S Yoon, C Yoon, and CW Suh and Does 1-25 actively misled Medytox and Medytox had neither actual nor constructive knowledge of the facts constituting its claims despite Medytox's diligence in trying to discover the pertinent facts. Therefore, this action is brought within all applicable statute of limitations after the misappropriation and other wrong-doing and their causes were discovered or by the exercise of reasonable diligence could have been discovered. Medytox acted with reasonable diligence to discover the misappropriation and other wrong-doing and their causes. All applicable statute of limitations were tolled because Medytox did not and could not reasonably have discovered the misappropriation and other wrong-doing and their causes any earlier than it did.

**E.      BK Lee Was And Remains Under A Confidentiality Agreement For The Benefit Of Medytox**

46.      BK Lee executed a confidentiality agreement on December 16, 2007, which all employees of Medytox were required to sign as a condition of their employment at Medytox. The agreement expressly states that the obligation of confidentiality is on-going during and after termination of employment at Medytox. Specifically, the confidentiality agreement states the following: "I [BK LEE] shall return without fail all information assets of the Company [Medytox] upon termination of my employment, and *even after* the termination of my employment, I shall not disclose, in its entirety, not only any trade secret of the Company, but also various information which may cause harm to the Company by disclosure, which I have obtained prior to the termination of my employment." (Emphasis added.) The agreement also states that "I [BK LEE] shall not disclose information owned by the Company [Medytox] to a person . . . to whom the Company has not authorized disclosure of relevant information."

-13-

47.     The confidentiality agreement leaves no doubt about the obligation to protect the company's trade secret and other valuable assets:  "I [BK Lee] confirm that I have the obligation to protect the Company's information asset such as trade secrets. . . ."  The confidentiality agreement is clear about the consequences:  "In the event of any breach of the confidentiality terms of this covenant, I shall accept . . . criminal and civil liabilities in accordance with relevant laws and regulations . . .  and pledge to compensate the Company for damages and restitution without delay. . . ."  Upon information and belief, DWP and the individual defendants sued herein knew of BK Lee's continuing confidentiality obligations but nonetheless engaged in the wrongful conduct described herein.

**F.     DWP Unfairly and Tortiously Interferes With the Business and Business Opportunity of the Plaintiff Medytox**

48.     In January 2013, Medytox and Evolus began discussions about a supply and license agreement whereby Medytox would sell and supply Meditoxin to Evolus for distribution in the United States, including in California.  Medytox and Evolus exchanged a term sheet and proceeded to negotiate the terms and conditions of the potential agreement.  According to the last exchanged term sheet, Medytox was to supply to Evolus Meditoxin at 30% of U.S. retail price.  Furthermore, Evolus would make additional significant milestone payments throughout the term of the license.

49.     After the initial meeting between the CEOs of Meditoxin and Evolus in Korea on March 19, 2013, the CEO of Medytox visited Evolus in California for a follow-up meeting on May 7, 2013.  But thereafter Evolus, without explanation or reason, suddenly stopped communicating.

50.     Upon information and belief, on September 30, 2013, Evolus and DWP signed a contract whereby DWP granted Evolus the license and the global distribution rights to Nabota, the name DWP gave to Meditoxin.  Upon information and belief, the contract was valued to be approximately $250 million.

51.     Medytox was not on notice until 2017 that DWP wrongfully interfered with Medytox's prospective business with Evolus, was not aware of the theft of its trade secrets

-14-

or of its BTX Strain until 2017, and could not have reasonably discovered such interference earlier than it did.

52.     In September 2014, the U.S. Food and Drug Administration ("FDA") accepted DWP's Investigational New Drug application submitted by Evolus to conduct clinical trials on Nabota, which was renamed as "Evosyal" for use in the U.S. market, including but not limited to California.

53.     Upon information and belief, not only did DWP misappropriate the BTX Strain and Meditoxin Trade Secret from Medytox, but also used the stolen BTX Strain to unfairly compete and tortiously interfere with the prospective business of Medytox.  Upon information and belief, Evolus would have consummated the transaction with Medytox but for DWP's wrongful interference.

54.     Plaintiff Medytox seeks to prevent Evolus and/or its successor Alphaeon from using the license and selling Nabota or Evosyal, which are produced by misappropriation of the Meditoxin Trade Secret and by the theft of the BTX Strain from Medytox.  They should not be permitted to benefit from DWP's theft of property and from a license DWP had no right to grant to Evolus.

**G.     SCH-AEON Acquires Evolus**

55.     On October 3, 2013, SCH-AEON announced that it acquired Evolus, just few days after Evolus had entered into a supply and license agreement with DWP.  As part of the transaction, SCH-AEON's wholly-owned subsidiary, Alphaeon Corporation, received the license to market Evosyal, which is another name for the Nabota drug produced by DWP's thefts of Medytox's property.

56.     Upon information and belief, Alphaeon wrongly claims an interest in Evosyal, including the right to market and distribute under the license DWP granted to Evolus.  DWP did not have the the right to grant a license because the subject matter of the license are trade secrets and other property stolen from Medytox.

-15-

**H.    Medytox Has Been, And Will Be, Severely Harmed By Defendants' Wrong-Doing**

57.    Medytox developed Meditoxin and related trade secrets at great expense, and through years of painstaking research, experimentation, and trial and error.  If Defendants are not enjoined from their on-going misappropriation, misrepresentations to consumers, and unjust exploitation of Medytox's property, they will cause severe and irreparable harm to Medytox and Medytox has no adequate remedy at law.

58.    The global markets for BTX drugs are vast and on the cusp of rapid development.  The impending period of drastic market growth, which is expected to double in the next six or so years, will set the competitive landscape for the industry going forward.  The growth, profitability, and even survival of individual firms will likely be determined by what happens now and in the coming period.  Defendants' exploitation of the stolen Meditoxin Trade Secret and its BTX Strain irreparably harms Medytox during its growth process.  Allowing the conduct to continue, and awarding monetary compensation after the fact, will not sufficiently unravel the harm caused to Medytox by Defendants' conduct.  With this action, Medytox seeks to vindicate its rights, prevent any further wrongful disclosure or further misuse of its property, and obtain compensation for its damages to the extent that they are ascertainable, and for Defendants' unjust enrichment resulting from their unlawful conduct.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Violation of California Uniform Trade Secret Act, Cal. Civ. Code § 3426, *et seq.***

**(Against BK Lee, DW Pharmaceuticals, DW Holding, S Yoon, C Yoon, CW Suh, and Does 1-25)**

59.    Medytox incorporates paragraphs 1 through 58 as though fully set forth herein.

-16-

60.     Medytox is the rightful owner of the Meditoxin Trade Secret, identified above, which constitutes protectible trade secrets as defined by California's Uniform Trade Secrets Act.

61.     These trade secrets relate to the process for efficiently handling and producing botulinum toxin drug, which is licensed, sold, shipped and/or used in interstate and foreign commerce, including California, which is one of the largest markets for such drugs.

62.     Medytox developed the Meditoxin Trade Secret through many years of hard work, research and development. The Meditoxin Trade Secret derives independent economic value from being kept a secret, and not being readily ascertainable through proper means.

63.     At all relevant times, Medytox has taken reasonable measures to keep the information secret. Among other things, Medytox restricts access to the Meditoxin Trade Secret to only those who "need to know." Medytox computers, tablets, and smart phones provided to Medytox employees are restricted and password protected, and subject to other security measures. Medytox secures its physical facilities by restricting access and then monitoring actual access with security cameras and guards. Medytox also requires employees, contractors, and consultants to sign confidentiality agreements.

64.     Medytox revealed the Meditoxin Trade Secret to BK Lee while he was employed at Medytox, subject to his agreement and duty to safeguard the Meditoxin Trade Secret and use the information solely for Medytox's benefit. BK Lee knew and acknowledged that he was subject to a duty to maintain the secrecy and limit the use of Medytox's trade secrets. In fact, BK Lee signed a written confidentiality agreement, which all employees of Medytox were required to sign as a condition of their employment at Medytox. The agreement specifically recites that the confidentiality obligation is on-going during and continues even after termination of employment at Medytox. The confidentiality agreement also states, among other things, that BK Lee shall return all information assets of Medytox upon termination of his employment, that he shall not

-17-

disclose or otherwise use any trade secrets of Medytox even after termination, and that BK Lee will accept criminal and civil liabilities in the event of any improper disclosure or use.

65.    Nonetheless, as described above, BK Lee, DW Pharmaceuticals and DW Holdings (acting through S Yoon, C Yoon and CW Suh) conspired with each other to steal the Meditoxin Trade Secret, to use the same to compete with Medytox, and to conceal their theft and misappropriation from Medytox.  At all relevant times, each of these defendants knew that their disclosure, possession, and use of Medytox's trade secrets were wrongful, without Medytox's consent, and in breach of BK Lee's obligations to hold the Meditoxin Trade Secret confidential.

66.    As alleged above, BK Lee disclosed and used Medytox's Meditoxin Trade Secret without Medytox consent (express or implied consent), even though he acquired access to the Meditoxin Trade Secret under circumstances giving rise to a duty to maintain its secrecy or limit its use for Medytox.  His disclosure to and use for DWP, S Yoon, C Yoon, CW Suh, and Does 1-25 of Medytox's Meditoxin Trade Secret was in breach of that duty.  Based on information and belief, in doing so, BK Lee was acting in his individual capacity and for personal gain as well as in his capacity as the agent of Defendants DWP, S Yoon, C Yoon, and CW Suh and Does 1-25 or, alternatively, they and BK Lee conspired with one another to misappropriate the Meditoxin Trade Secret.

67.    As alleged above, DWP, S Yoon, C Yoon, CW Suh, and Does 1-25 acquired the Meditoxin Trade Secret through BK Lee, knowing or having reason to know that they were acquiring it by improper means, including: (i) breach of BK Lee's obligations to maintain the Meditoxin Trade Secret in trust for Medytox, (ii) BK Lee's theft, and (iii) inducement of BK Lee to breach his obligations to Medytox.  As alleged above, DWP, S Yoon, C Yoon, CW Suh, and Does 1-25 have used and/or disclosed the Meditoxin Trade Secret without Medytox's consent (express or implied) after acquiring from BK Lee through improper means knowledge of the Meditoxin Trade Secret.  At the time of their disclosure or use, they knew or had reason to know that BK Lee's knowledge of the trade secret was derived from BK Lee who had utilized improper means to acquire it, including

-18-

in breach of his duty to Medytox to maintain its secrecy and limit its use for Medytox. Based on information and belief, to the extent that any of these Defendants did not directly engage in such conduct themselves, those who directly engaged in such conduct were acting as the agents of the others, or in furtherance of a conspiracy among them and BK Lee to misappropriate the Meditoxin Trade Secret.

68.    Defendants' misconduct is continuing in nature, for which Medytox has no adequate remedy at law. Unless and until enjoined and restrained by order of this Court, Defendants will continue to misappropriate the Meditoxin Trade Secret to unjustly enrich themselves and damage Medytox, including by diverting business away from Medytox. Medytox seeks an injunction to prevent the ongoing misappropriation, and for the return of all trade secrets that rightfully belong to Medytox.

69.    As a direct and proximate result of Defendants' misconduct, Medytox has and continues to suffer injuries in an amount in excess of the jurisdictional minimum of this Court, and Defendants were and are continuing to be unjustly enriched thereby. Medytox seeks recovery of its actual damages, restitution/disgorgement of Defendants' unjust enrichment, reasonable royalty, as appropriate, and award of attorneys' fees and costs incurred in connection with its efforts to seek redress for Defendants' misconduct.

70.    Defendants' theft and misappropriation of the Meditoxin Trade Secret was and continues to be intentional, knowing, willful, malicious, fraudulent, oppressive, and in bad faith, justifying the award of exemplary damages against Defendants, as well as Medytox's attorneys' fees and costs.

**SECOND CAUSE OF ACTION**

**Conversion**

**(Against BK Lee, DW Pharmaceuticals, DW Holding, S Yoon, C Yoon, CW Suh, and Does 1-25)**

71.    Medytox incorporates paragraphs 1 through 58 as though fully set forth herein.

72.    Medytox owns the BTX Strain, which it maintains in a secure storage facility.

73.    Separate and apart from the misappropriation of Medytox's trade secrets, Defendants also stole from and continue to possess and use Medytox's BTX Strain, which Medytox uses to produce its botulinum toxin drug "Meditoxin."

74.    Pursuant to the aforementioned conspiracy, Defendant BK Lee stole Medytox's BTX Strain from Medytox's secured storage facility without Medytox's knowledge or consent, and delivered the same to DW Pharmaceuticals and DW Holding, which now possess and use the same to manufacture its "Nabota/Evosyal" drug to compete with Medytox's "Meditoxin" drug.

75.    These Defendants' misconduct is continuing in nature, for which Medytox has no adequate remedy at law.  Unless and until enjoined and restrained by order of this Court, these Defendants will continue to use Medytox's BTX Strain to unjustly enrich themselves and damage Medytox, including by diverting business away from Medytox. Medytox seeks an injunction to prevent the ongoing misconduct, and for the return of its BTX Strain (and all derivative thereof), which rightfully belongs to Medytox.

76.    As a direct and proximate result of these Defendants' misconduct, Medytox has and continues to suffer injuries in an amount in excess of the jurisdictional minimum of this Court while, at the same time, these Defendants were and are continuing to be unjustly enriched.  Medytox seeks recovery of its actual damages, and restitution/disgorgement of these Defendants' unjust enrichment, as well as award of attorneys' fees and costs incurred in connection with its efforts to seek redress for these Defendants misconduct.

77.    These Defendants engaged in the aforementioned misconduct with the intent to deprive Medytox of its rights, to otherwise cause injury to Medytox, and/or with conscious disregard of Medytox's rights.  These Defendants' acts and omissions constitute despicable, outrageous, oppressive and malicious conduct and justify an award of exemplary and punitive damages against these Defendants.

-20-

## THIRD CAUSE OF ACTION

### Intentional Interference with Prospective Economic Relations

### (Against DW Pharmaceuticals, DW Holding, S Yoon, C Yoon, CW Suh, and

### Does 1-25)

78.    Medytox incorporates paragraphs 1 through 58 and 71 through 77 as though fully set forth herein.

79.    Medytox and Evolus, the predecessor to Alphaeon, were negotiating a supply and license agreement whereby Medytox would benefit by selling and licensing its "Meditoxin" drug to Evolus/Alphaeon for distribution in the United States, including California.

80.    On information and belief, these Defendants knew of the foregoing business relationship between Medytox and Evolus/Alphaeon, and sought to disrupt the same in order to enrich themselves by entering into such a supply and license agreement, in place of Medytox.

81.    On information and belief, the Defendants therefore engaged in the misconduct to steal Medytox's BTX Strain in the manner alleged herein, and approached Evolus/Alphaeon to license the same, in place of Medytox.

82.    These Defendants' scheme worked.  Shortly thereafter, Evolus/Alphaeon terminated its negotiations with Medytox, and instead entered into a licensing agreement with DWP for approximately $250 million.

83.    As a direct and proximate result of these Defendants' misconduct, Medytox has and continues to suffer injuries in an amount in excess of the jurisdictional minimum of this Court while, at the same time, these Defendants were and are continuing to be unjustly enriched.  Medytox seeks recovery of its actual damages, and restitution/disgorgement of these Defendants' unjust enrichment, as well as award of attorneys' fees and costs incurred in connection with its efforts to seek redress for these Defendants misconduct.

-21-

84.    These Defendants engaged in the aforementioned misconduct with the intent to deprive Medytox of its rights, to otherwise cause injury to Medytox, and/or with conscious disregard of Medytox's rights.  These Defendants' acts and omissions constitute despicable, outrageous, oppressive and malicious conduct and justify an award of exemplary and punitive damages against Defendants.

## FOURTH CAUSE OF ACTION

### Unjust Enrichment

### (Against DW Pharmaceuticals, DW Holding, S Yoon, C Yoon, CW Suh, and Does 1-25)

85.    Medytox incorporates paragraphs 1 through 58 and 71 through 84 as though fully set forth herein.

86.    Defendants have been unjustly enriched at Medytox's expense by their theft and use of Medytox's BTX Strain, by causing Evolus/Alphaeon to terminate its negotiations with Medytox, and instead enter into a licensing agreement with DWP, valued at approximately $250 million.

87.    Medytox has experienced harm in lost business opportunity and royalties from the licensing agreement it would have executed with Evolus/Alphaeon.

88.    Equity and good conscience require that these Defendants disgorge to Medytox their unjust enrichment and make restitution be made to Medytox at least in the amount of $250 million.

89.    Defendants engaged in the aforementioned misconduct with the intent to deprive Medytox of its rights, to otherwise cause injury to Medytox, and/or with conscious disregard of Medytox's rights.  Defendants' acts and omissions constitute despicable, outrageous, oppressive and malicious conduct and justify an award of exemplary and punitive damages against Defendants.

-22-

## FIFTH CAUSE OF ACTION

### Breach of Written Contract

### (Against Defendant BK Lee)

90. Medytox incorporates paragraphs 1 through 89 as though fully set forth herein.

91. BK Lee entered into a valid written contract with Medytox, the confidentiality agreement, which specifically requires BK Lee to keep Medytox's trade secrets confidential and use the same solely as authorized by Medytox, not disclose them to third parties, and return them upon completion of services rendered at the request of Medytox, and not to steal company property like the BTX Strain.

92. Except as excused by Defendants' conduct, Medytox has performed all conditions, covenants and promises required by it in accordance with the terms and conditions of the confidentiality agreement.

93. BK Lee, on the other hand, breached the confidentiality agreement by disclosing Medytox's Meditoxin Trade Secret information and stealing the BTX Strain and conspiring with Defendants to do so. Upon information and belief, BK Lee is continuing to breach the confidentiality agreement in connection with his continuing consulting role with DWP.

94. As a direct and proximate result of Defendants' misconduct, Medytox has and continues to suffer injuries in an amount in excess of the jurisdictional minimum of this Court while, at the same time, Defendants were and are continuing to be unjustly enriched. Medytox seeks recovery of its actual damages, as well as award of attorneys' fees and costs incurred in connection with its efforts to seek redress for Defendants misconduct.

-23-

## SIXTH CAUSE OF ACTION

### Violation of California Bus. & Prof. Code § 17200, *et seq.*

### (Against All Defendants)

95. Medytox incorporates paragraphs 1 through 58 and 71 through 94 as though fully set forth herein.

96. Separate and apart from its misappropriation of Medytox's trade secrets, Defendants have engaged in unlawful, unfair, and fraudulent business acts and practices in violation of California Bus. & Prof. Code § 17200, et sq., including conversion (of Medytox's BTX Strain), tortious interference (with Medytox's business relationship with Alphaeon/Evolus), and misrepresentations made to the public about the source of the bacterial strain used to manufacture Defendants' "Nabota" drug product (*e.g.*, passing off "Nabota" as Defendants' own product, when it is in reality a product of the BTX Strain stolen from Medytox).

97. Medytox has lost money and property as a result of Defendants' unfair competition. Medytox has and continues to suffer direct injury as a result of Defendants' misconduct, including but not limited to the $250 million contract with Alphaeon/Evolus that Defendants diverted from Medytox.

98. Defendants' misconduct is continuing in nature, for which Medytox has no adequate remedy at law. Unless and until enjoined and restrained by order of this Court, Defendants will continue to engage in violations of California Bus. & Prof. Code § 17200, et seq. to unjustly enrich themselves at Medytox's expense. Medytox seeks injunction to prevent further act of unfair competition by Defendants, restitution of the property wrongfully acquired by Defendants through violations of California Bus. & Prof. Code § 17200, as well as an award of attorneys' fees and costs incurred in connection with its efforts to seek redress for Defendants misconduct.

-24-

## SEVENTH CAUSE OF ACTION

### Declaratory Relief

### (Against DW Pharmaceuticals, DW Holding, S Yoon, C Yoon, CW Suh, SCH-AEON, and Alphaeon and Does 1-25)

99. Medytox incorporates paragraphs 1 through 98 as though fully set forth herein.

100. Upon information and belief, an actual controversy has arisen and now exists between the parties concerning their respective rights and duties. Medytox contends that it maintains interest in the BTX Strain as well as the information used to create the drug Meditoxin, which DWP has been marketing as Nabota. Any license or transfer from DWP to Evolus or Alphaeon of such interests or rights to market and distribute Nabota or Evosyal is improper and in violation of Medytox's rights and void.

101. Medytox desires a judicial determination of the parties' rights and duties with respect to ownership interests in the BTX Strain and the information used to create the drug Meditoxin, including a declaration that:

(a) Medytox holds the interest and accompanying rights to the information and strain used to create the Meditoxin and Nabota/Evosyal drugs;

(b) DWP owns no interest in the BTX Strain or any of Meditoxin' Trade Secrets;

(c) The licensing agreement between DWP and Alphaeon is invalid as it purports to convey Medytox's interest without Medytox's consent and Defendants have no rights to market or distribute Nabota/Evosyl;

(d) The agreement between DWP and Alphaeon is void and unenforceable; and

(e) Medytox is entitled to disgorgement of all amounts and property wrongfully and unjustly retained or acquired by Defendants as a result of the license, sale or marketing of products created with the BTX Strain and/or Meditoxin Trade Secret and Defendants

-25-

may not retain the BTX Strain and/or Meditoxin Trade Secret or any products derived therefrom.

102.    On information and belief, DW Pharmaceuticals, DW Holding, S Yoon, C Yoon, CW Suh, SCH-AEON, and Alphaeon dispute Medytox's position with respect to these issues.

103.    A judicial declaration is necessary and appropriate at this time under the circumstances.  DWP has been marketing the drug Nabota to the public and is preparing to sell Nabota to the consumers without Medytox's consent.

## PRAYER FOR RELIEF

WHEREFORE, Medytox prays for judgment against Defendants, and each of them, as follows:

1.    Judgment in Medytox's favor and against Defendants on all causes of action alleged herein;

2.    For compensatory damages in an amount to be further proven at trial;

3.    For enhanced (*e.g.*, trebled) and exemplary or punitive damage as permitted by law;

4.    For disgorgement of Defendants' unlawfully gained profits and unjust enrichment;

5.    For a reasonable royalty, as permitted by law;

6.    For preliminary and permanent injunction against Defendants (and all others acting in concert or participation with Defendants), including but not limited to prohibiting any further disclosure, retention, or use of Medytox's Meditoxin Trade Secret and BTX Strain and any further acts of unfair competition;

7.    For a declaration that:

(a) Medytox holds the interest and accompanying rights to the information and strain used to create the Meditoxin and Nabota/Evosyal drugs;

(b) DWP owns no interest in the BTX Strain or any of Medytoxin's Trade Secrets;

-26-

SMRH:483097980                                                                COMPLAINT

(c) the licensing agreement between DWP and Alphaeon is invalid as it purports to convey Medytox's interest without Medytox's consent and Defendants have no rights to market or distribute Nabota/Evosyl;

(d) The agreement between DWP and Alphaeon is void and unenforceable;

(e) Medytox is entitled to disgorgement of all amounts of property wrongfully and unjustly retained or acquired by Defendants as a result of the license, sale and marketing of products created with the BTX Strain and/or Meditoxin Trade Secret and Defendants may not retain the BTX Strain and/or Meditoxin Trade Secret or any products derived therefrom.

8.    For punitive damages for Defendants' despicable, outrageous, oppressive and malicious conduct;

9.    For costs of suit incurred herein, as permitted by law;

10.    For attorneys' fees as permitted by law;

11.    For prejudgment interest; and

12.    For such other and further relief as the Court may deem to be just and proper.

Dated:  June 7, 2017              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


                                  By    _____
                                        SEONG H. KIM
                                        REBECCA EDELSON
                                        HWAN KIM
                                        Attorneys for MEDYTOX INC.

-27-

## DEMAND FOR JURY TRIAL

Plaintiff MEDYTOX INC. demands a trial by jury on all claims and issues so triable.

Dated:  June 7, 2017                    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By   _____
                          SEONG H. KIM
                          REBECCA EDELSON
                          HWAN KIM
                     Attorneys for MEDYTOX INC.

-28-