# EXHIBIT O


**FDA** **U.S. FOOD & DRUG**
ADMINISTRATION

**FEB 0 1 2019**

Ms. Areta L. Kupchyk
Foley Hoag LLP
1717 K Street, N.W.
Washington, DC 20006-5350

Re: Docket No. FDA-2017-P-6745

Dear Ms. Kupchyk:

This letter responds to the citizen petition you submitted on behalf of Medytox, Inc., which was received by the Food and Drug Administration (FDA or Agency) on December 5, 2017 (Petition). In the Petition, you request that FDA (quoting in relevant part):

(1)     [R]efrain from approving the Evolus [biologics license application] (BLA) for DWP-450 until FDA determines whether the strain from which DWP-450 is produced is in fact the *C. botulinum* type A Hall strain, whether it is produced from a *C. botulinum* strain isolated from soil in South Korea, in which case it must be an entirely different type A strain than the Hall strain, or whether it is an entirely different botulinum strain altogether.

(2)     Based on a finding that the Evolus BLA may include or includes an untrue statement of material fact as to the source and/or the identity of the *C. botulinum* strain used to produce DWP-450, . . . invoke the [application integrity policy] (AIP) and defer substantive scientific review of the Evolus BLA until FDA validates the preclinical and clinical data and information in the BLA to support the safety, purity, and potency, *i.e.*, effectiveness, of DWP-450.

(3)     [R]equire that source and identity information include a [single nucleotide polymorphism] (SNP) analysis of the whole genome sequence of the botulinum strain in any BLA application for a botulinum toxin product, including in the Evolus BLA.

(4)     [C]onfirm and disclose in a response to this Citizen Petition the true source and identity of the strain from which the Evolus botulinum toxin product is produced to assure the public of the safety and effectiveness of DWP-450 if the BLA is approved and, regardless of approval, to correct the public record.

(Petition at 2-3).

We have carefully considered your Petition, as well as the supplement you submitted on May 4, 2018, which describes how "a SNP analysis can determine the identity and the source of a *C. botulinum* strain." For the reasons explained below, your Petition is denied.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

Docket No. FDA-2017-P-6745

## I.    BACKGROUND

### A.    Evolus Biologics License Application

Evolus, Inc. (Evolus) submitted a BLA for prabotulinumtoxinA (DWP-450), a botulinum toxin product, to treat adult patients with glabellar lines. Among other data, Evolus's BLA for DWP-450 contained clinical and chemistry, manufacturing, and controls (CMC) data developed in coordination with Daewoong Pharmaceutical Company, Ltd. (Daewoong). Following a fulsome review, FDA approved Evolus's BLA for DWP-450 on February 1, 2019.

### B.    Botulinum Toxin Type A

In the United States, all approved Type A botulinum toxin products are derived from different sources of *C. botulinum* strains and are of the A1 strain variant. *C. botulinum* A1 strains are a group of Gram-positive, spore-forming anaerobic bacteria that produce a genetically and biologically identical 150 kilodalton (kD) toxin protein that is the active ingredient of botulinum products.[1],[2]  Botulinum toxin type A (BoNT/A) is one of the most common serotypes.

### C.    Biologics License Application Requirements

For FDA to approve a Biologics License Application (BLA), the applicant must demonstrate, among other things, that:

(1)    [T]he biological product that is the subject of the application is safe, pure, and potent.

(2)    [T]he facility in which the biological product is manufactured, processed, packed, or held meets standards designed to assure that the biological product continues to be safe, pure, and potent.[3]

To do so, the applicant must provide, among other things, "a full description of manufacturing methods."[4]  This description should contain a description and characterization of the drug substance, including:

- "The biological name (including strain and/or clone designation) . . . [and] the source of the cells, including microbes, from which the drug substances were derived."[5]

---

[1] Theresa J. Smith et al. (2007) PloS One 2(12): e1271. Doi:10.1371/journal.pone.0001271 Analysis of the Neurotoxin Complex genes in Clostridium botulinum A1-A4 and B1 Strains.

[2] P-K Fang, et al. BMC genomics 2010, 11:725. Analysis of genomic differences among Clostridium botulinum Type A1 stains.

[3] Section 351(a)(2)(C)(i) of the Public Health Service Act (PHSA) (42 U.S.C. 262(a)(2)(C)(i)).

[4] 21 CFR 601.2(a).

[5] See FDA's guidance for industry *Content and Format of Chemistry, Manufacturing and Controls Information and Establishment Description Information for a Vaccine or Related Product* at 3 (January 1999). We update guidances

Docket No. FDA-2017-P-6745

- "[A] description of all analytical testing performed to characterize the drug substance."[6]

In addition, for each drug substance, the BLA should include the history and a description of the general characteristics of the cell lines used to produce the drug substance.[7] This should include the origin of the strain, the species and strain identifier, specific identifying characteristics (serotype, etc.) of the strain, the strain's genetic characterization, if known (markers, inserts, deletions, etc.) and genetic stability.[8]

## D.     Application Integrity Policy

On September 10, 1991, FDA published its application integrity policy (AIP).[9] The AIP outlines FDA's "general approach to applications that have been called into question by [an applicant's] wrongful acts and applications found to contain fraudulent data."[10] The AIP states that "[i]f the wrongful acts [raise] a significant question regarding reliability of data in some or all of [an] applicant's pending applications, FDA will ordinarily conduct [a] validity assessment[] of those applications."[11] While FDA is conducting a validity assessment, "FDA generally intends to defer substantive scientific review of the data in [any] pending application[s] . . . until the assessment is complete and questions regarding reliability of the data are resolved."[12]

However, the mere allegations of wrongful acts,[13] or even a finding of the commission of a wrongful act, does not automatically trigger a validity assessment and deferred application review under the AIP. Rather, the purpose of the AIP is:

> . . . to determine the extent to which the wrongful acts may have affected approved or pending applications. . . . If the wrongful acts [raise] significant questions regarding the reliability of data in some or all of the applicant's pending applications, FDA ordinarily will conduct a validity assessment of those applications.[14]

---

periodically.  For the most recent version of a guidance, check the FDA guidance web page at https://www.fda.gov/RegulatoryInformation/Guidances/default.htm.

[6] Id.

[7] Id. at 7.

[8] Id. at 8.

[9] 56 FR 46191 (Sept. 10, 1991).

[10] Id. at 46199.

[11] Id.

[12] Id.

[13] In general, "wrongful acts" under the AIP include "[a]ctions on the part of an applicant to subvert the integrity of an FDA review process through acts such as submitting fraudulent applications, making untrue statements of material facts, or giving or promising bribes or illegal gratuities [that] may call into question the integrity of some or all of the applicant's submissions to the agency."

[14] Id.

3

Docket No. FDA-2017-P-6745

Accordingly, the Agency generally intends to invoke the AIP only when there is a "*pattern or practice of wrongful conduct* that raises a significant question about the reliability of the data."[15] FDA's AIP procedures state that "[u]sually, when the AIP is invoked, there are two or more applications affected."[16] In contrast, if questions regarding the reliability of the data are raised in only a single application, a validity assessment typically will not be used and FDA will typically attempt to resolve the issue through the review process.[17]

## E.    FDA's Information Disclosure Regulations

FDA has implemented the Freedom of Information Act (FOIA) (5 U.S.C. 552) through regulations that include both general provisions (codified at 21 CFR part 20) and specific provisions that apply to certain categories of information.[18] One general provision exempts from public disclosure "[d]ata and information submitted or divulged to the [FDA] which fall within the definitions of a trade secret or confidential commercial or financial information."[19]

In addition, FDA has promulgated regulations exempting certain information related to biological products from public disclosure. When a BLA is approved, several categories of information in a biological product file become available for public disclosure.[20] However, even after a BLA is approved, FDA's regulations provide that "[m]anufacturing methods or processes, including quality control procedures" remain unavailable for public disclosure unless the information was previously disclosed to the public or "relates to a product or ingredient that has been abandoned" and "no longer represent[s] a trade secret or confidential commercial or financial information."[21]

---

[15] See Application Integrity Policy Procedures 1-1-6, available at
https://www.fda.gov/downloads/ICECI/EnforcementActions/ApplicationIntegrityPolicy/ucm072631.pdf (emphasis added).

[16] Id.

[17] Id.

[18] See 39 FR 44602 (Dec. 24, 1974).

[19] § 20.61(c). FDA's regulations define "trade secret" as "any commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort. There must be a direct relationship between the trade secret and the productive process." § 20.61(a). FDA's regulations define "confidential commercial or financial information" as "valuable data or information which is used in one's business and is of a type customarily held in strict confidence or regarded as privileged and not disclosed to any member of the public by the person to whom it belongs." § 20.61(b).

[20] See generally § 601.51 (defining "biological product file" as "all data and information submitted with or incorporated by reference in any application for a biologics license, IND's incorporated into any such application, master files, and other related submissions").

[21] § 601.51(f).

4

Docket No. FDA-2017-P-6745

## II. DISCUSSION

### A.    Invoking the Application Integrity Policy Was Unnecessary

As noted above, FDA approved Evolus's BLA for DWP-450 on February 1, 2019. The Agency reviewed the information about the source and identity of the strain used to produce DWP-450 that was submitted by Evolus as part of the BLA and concluded it was sufficient to support approval. Despite the allegations raised in your Petition, we did not identify wrongful acts that would warrant invoking the AIP.

Your Petition requested that we invoke the AIP with respect to Evolus's BLA based on your allegation of false statements made publicly and in the Evolus BLA that you allege raise significant questions about the reliability of the data submitted by the firm. Among other allegations, your Petition alleges that Daewoong, the manufacturer of DWP-450 and sponsor of the studies submitted in support of Evolus's BLA for DWP-450, made false statements about the source of the strain used to produce DWP-450 (Petition at 2).

Specifically, the Petition alleges that Daewoong claimed that the strain used to produce DWP-450 was "a unique *C. botulinum* type A Hall strain, known as 'the Hall strain,' and that it isolated this type A Hall strain from soil in South Korea" (Petition at 2). You contend that this statement is false because the Hall Strain could not be isolated from soil because the Hall Strain does not form spores (Petition at 15).[22] Therefore, according to the Petition, either the strain used to produce DWP-450 is not 'the Hall Strain,' or it was not isolated from soil in South Korea (Petition at 15).

Your Petition identifies the following three instances where you allege Daewoong identifies the strain used to produce DWP-450 as 'the Hall Strain':

(1)    In the GenBank database, the strain is identified as BoNT/A1 Hall (Daewoong), and the source is described as South Korean soil (Petition at 6).

(2)    In a patent application, Daewoong identified the strain used to produce DWP-450 as being the same as 'the Hall Strain' because the patent table includes a table comparing the "substantially identical characteristics" of the strain used to produce DWP-450 and 'the Hall Strain' (Petition at 8).

(3)    Daewoong made statements on www.clinicaltrials.gov claiming that "DWP-450 is 'equal to' 'wild-type Clostridium botulinum (type A, Hall strain)'

---

[22] There is disagreement regarding whether the inability to produce spores is a property of 'the Hall Strain.' *See* Couesnon A, et al. Microbiol. 2006; 152: 759-770. Expression of botulinum neurotoxins A and E, and associated non-toxin genes, during the transition phase and stability at high temperature: analysis by quantitative reverse transcription-PCR; Ng V and Lin W. Adv Biotech & Microbiol. 2018 Nov; 11(5):555822. Comparison of Transcriptomes and Sporulation of Two Clostridium botulinum A1 Strains. However, we do not need to address this disagreement in our response to the Petition because we do not agree with your claim that Daewoong intended to refer to 'the Hall Strain' when it used the term 'Hall' or phrase 'Hall strain' in relation to the *C. botulinum* type A strain used to produce DWP-450.

Docket No. FDA-2017-P-6745

> based on 'characteristic analysis (genotype analysis,
> morphological/biochemical characteristic verification test, toxicity test,
> etc[.]) of the identified fungi, [sic]' which 'confirmed . . . the biological and
> chemicophysical properties' of DWP-450" (Petition at 8).

You speculate that "[p]resumably, Evolus repeated Daewoong's false and inconsistent statements about the source and/or identity of the botulinum toxin strain that Daewoong has made publically and in GenBank" in its regulatory submissions to FDA, or, in the alternative, that "Evolus provided source and/or identity information about the DWP-450 strain that is inconsistent with Daewoong's public statements and its GenBank listing" (Petition at 15). You argue that "[i]n either case, such false statements and inconsistencies raise significant questions about the integrity of the manufacturer, Daewoong, the integrity of all the data that Daewoong prepared or helped prepare, and the integrity of the all the data and information that submitted in its DWP-450450 BLA to FDA" (Petition at 15-16).

We disagree with your contention that the three public statements by Daewoong that you cited constitute wrongful acts that call into question the integrity of the data submitted in the Evolus BLA, and accordingly, we did not believe it was appropriate to invoke the AIP.

First, we do not agree that these statements are intended to be representations that the strain used to produce DWP-450 is the same strain as 'the Hall strain.' As you note in the Petition, multiple strains of *C. botulinum* discovered by Dr. Ivan C. Hall between 1920 and 1942 are collectively and commonly referred to as "Hall strains" (Petition at 4). Thus, using the term 'Hall' or phrase 'Hall strain' in association with a strain of *C. botulinum* would not always refer to 'the Hall strain.'

In addition, these statements by Daewoong include information that distinguish its *C. botulinum* strain from 'the Hall strain.' For example, despite identifying the strain in the GenBank database as 'BoNT/A1 Hall (Daewoong)', the source is listed as South Korean soil, 2010. This listing appears to be consistent with other *C. botulinum* listings in the GenBank database that are distinguishable from 'the Hall Strain.' As you note, "source information and other characteristics" in a GenBank listing can serve to distinguish a strain from 'the Hall strain' (Petition at 7).[23] Accordingly, the source information and other characteristics for BoNT/A1 Hall (Daewoong) indicate that it is not the Hall strain.

Furthermore, neither the patent nor the statements on www.clinicaltrials.gov expressly claim that the strain used to produce DWP-450 is 'the Hall strain.' Rather, the patent merely compares characteristics of the strain used to produce DWP-450 to the characteristics of 'the Hall Strain.' Moreover, the patent does not appear to claim that the Daewoong strain is the same as, or even identical to, 'the Hall Strain,' but instead only claims to have "substantially identical characteristics" (Petition at 8). Similarly, in its statements on www.clinicaltrials.gov, Daewoong merely compares the two strains by stating that its strain is "equal to" the Hall Strain with respect to certain characteristics (Petition at 15). The fact that Daewoong claimed that its strain and the

---

[23] Table 1 on Page 7 of the Petition includes another *C. botulinum* strain, ATCC3502 (Hall 174) that has "100% Identity w/ BoNT/A1 Hall." The Petition notes that "[t]he source information and other characteristics for ATCC3502 (Hall 174) and ATCC19397 [sic] indicate that they are not the Hall strain." (Petition at 7).

6

Docket No. FDA-2017-P-6745

Hall strain have "equal" or "substantially identical" *characteristics* does not necessarily mean that Daewoong claimed that the two strains themselves are identical.

We instead interpret these statements as preliminary characterizations of the strain used to produce DWP-450, particularly in light of Daewoong's disclosures regarding the source of this strain. We agree that Daewoong could have been more precise in how it referred to its strain. But we do not believe that its use of the term 'Hall' or phrase 'Hall strain' when referring to its strain of *C. botulinum* was an untrue statement of material fact that raised significant questions regarding the reliability of the data submitted in Evolus's BLA. Therefore, we did not invoke the AIP and defer substantive review of Evolus's BLA.[24]

### C.    Single Nucleotide Polymorphism Analysis

In your Petition, you request that FDA require that "any BLA application for a botulinum toxin product, including in the Evolus BLA, include a single nucleotide polymorphism ('SNP') analysis of the whole genome sequence ('WGS') of the *C. botulinum* strain to establish its source and identity" (Supplement to Petition at 1). We do not agree with the Petition's argument that an SNP analysis of the whole genome sequence of the botulinum strain identified in a BLA is needed to support a finding that the manufactured product meets prescribed requirements for safety, purity, and potency. Also, an SNP analysis is not needed to develop appropriate specifications for identity and sterility testing of the toxin produced by the strain.

There are other standard techniques that can serve this purpose. For example, 16S rRNA gene sequencing is a standard technique used to study bacterial phylogeny and taxonomy that is capable of distinguishing between *C. botulinum* A1 strains. Additionally, all *C. botulinum* A1 strains encode an indistinguishable *C. botulinum* toxin A gene and produce identical *C. botulinum* type A toxins. Thus, appropriate specifications for identity and sterility of the toxin produced by the strain can and should be established irrespective of the genetic sequence of the specific strain.

### D.    Disclosure

In your Petition, you request that FDA disclose "the true identity and source of the DWP-450 botulinum strain . . . to assure patients and physicians of safety and effectiveness of the DWP-450 product in the event FDA approves the Evolus BLA" and "to correct the public record in GenBank" (Petition at 25). Insofar as your request concerns information that constitutes "trade secret or confidential commercial or financial information" and/or "manufacturing methods or

---

[24] We note that even if certain questions were to be raised regarding the integrity of data in an application, FDA would not necessarily invoke the AIP. As noted above, in certain circumstances, data integrity issues can be appropriately addressed during the review process for an application. The purpose of the AIP is to prevent FDA from wasting scientific resources on reviewing fraudulent data, particularly where fraud may not be detectable during the review of the data. However, FDA generally does not invoke the AIP where its concerns regarding data integrity are specific to a single application and involve issues that are suitable to discovery during the normal NDA or BLA review process. Where the Agency believes it would expend the same resources reviewing data integrity issues during its substantive review of an application or under the AIP, it may choose to review the application rather than invoke the AIP.

Docket No. FDA-2017-P-6745

processes" within Evolus's BLA for DWP-450, such information is not available for public disclosure and your request is denied.[25]

## II.    CONCLUSION

We have carefully considered your Petition, as well as the supplement you submitted on May 4, 2018. For the reasons explained above, your Petition is denied.

Sincerely,

Janet Woodcock, M.D.
Director
Center for Drug Evaluation and Research

---

[25] See 21 CFR §§ 20.61, 601.51.

8