# EXHIBIT W

PUBLIC VERSION

### UNITED STATES INTERNATIONAL TRADE COMMISSION
### Washington, D.C.

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN BOTULINUM TOXIN PRODUCTS, PROCESSES FOR MANUFACTURING OR RELATING TO SAME AND CERTAIN PRODUCTS CONTAINING SAME** | **Inv. No. 337-TA-1145** |

### COMMISSION OPINION

The Commission has determined that there has been a violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("section 337"), based on misappropriation of trade secrets, on review of the final initial determination ("FID") of the presiding administrative law judge ("ALJ"). This opinion sets forth the Commission's reasoning in support of its determination. The Commission affirms all findings in the FID that are not inconsistent with this opinion.

## I.    BACKGROUND

### A.    Procedural Background

On March 6, 2019, the Commission instituted this investigation under section 337 based on a complaint filed by Medytox Inc. of Seoul, South Korea ("Medytox"); and Allergan plc[1] of Dublin, Ireland and Allergan, Inc. of Irvine, California (collectively, "Allergan").[2]  *See* 84 Fed. Reg. 8112-13 (Mar. 6, 2019).   The complaint, as supplemented, alleges a violation of section

---

[1] On July 1, 2020, the ALJ issued an initial determination granting an unopposed motion to amend the complaint and notice of investigation to reflect a corporate name change from Allergan plc to Allergan Limited.  *See* Order No. 43 (July 1, 2020), *unreviewed*, Comm'n Notice (July 20, 2020).

[2] "Complainants" refers to Medytox and Allergan, collectively.

]. *See* Respondents' Pet. at 27 (citing JX-50C at §§ 1.51. 1.60, 2.4(a)).    Thus, Respondents conclude, "Allergan has [

].   *See id.* at 28 (citing *WiAv Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265-67 (Fed. Cir. 2010) ("[A]n exclusive licensee lacks standing to sue a party who has the ability to obtain . . . a license from another party with the right to grant it."); *see also* Complainants' Pet. Resp. at 31 ("The license is exclusive as to MT10109L and [

].") (citing JX-50C.14).

*WiAv Solutions*, however, applies to standing in federal courts and, as discussed above, the Commission Rule requires only that "at least one complainant"–not every complainant–be the owner or exclusive licensee of the subject intellectual property.   *See* 19 C.F.R. § 210.12(a)(7); *see also Certain Diltiazem Hydrochloride & Diltiazem Preparations*, Inv. No. 337-TA-349, Order No. 35, 1994 WL 930265, *2 (Sept. 2, 1994) (finding that a purchaser, manufacturer, and seller of pharmaceutical products had "sufficient commercial and legal interest" to appear as a joint complainant with the patent owner); *accord* Complainants' Pet. Resp. at 23.

Thus, the Commission has determined to affirm the FID with the modified analysis discussed above.

## C.    Trade Secret Misappropriation

### 1.    The Medytox Strain

#### (i)    Existence of a Trade Secret

The FID finds that "the Medytox BTX strain . . . is genetically unique from other strains, distinguishable from other Hall A-hyper strains, and is commercially valuable."   *See* FID at 64. The FID analyzes the six *Sausage Casings* factors (*see supra* section II(B)) and concludes that

the Medytox strain is a protectable trade secret. *See id.* at 65-87. Specifically, which respect to factors 1 and 2, the FID finds that, while the DNA sequence of Hall A-hyper strains may be known, it is the embodiment of the DNA in the bacteria, *i.e.*, "the viable bacterial cell capable of reproduction" that gives the Medytox strain its value. *See id.* at 67-68. As to factor 3, the FID finds (and Respondents do not dispute) that "Medytox took adequate precautions to protect its Hall A-hyper strain from disclosure." *See id.* at 69-70.

With respect to factor 4, the FID finds that "Medytox's strain is commercially valuable" and that "[t]he strain is an essential element of Medytox's manufacturing process for BTX." *See* FID at 73-74 (citing CX-11C (Rhee WS) at Q/A 10; CX-13C (Jung WS) at Q/A 37). The FID also discusses the "qualities that make [Medytox's strain] particularly valuable for commercial manufacture" but finds that such qualities appear to result from the fact that "[t]he Medytox strain is derived from the Hall A-hyper strain," rather than any improvement by Medytox itself. *See id.* at 74-76 (citing CX-13C (Jung WS) at Q/As 21, 35; CX-15C (Keim[26] WS) at Q/A 4).

As to factor 5, the FID states that "there is no requirement that a trade secret be the product of any particular amount of investment." *See id.* at 80 (citing *Learning Curve*, 342 F.3d at 728). The FID further finds that while "[t]he strain passed without monetary compensation (at least at the time of transfer) between people connected by close relationships, . . . [t]he value of a gift is not . . . diminished by the fact that it is given without monetary payment." *See id.* at 81 (citing Hr'g Tr. (Jung) at 332-333; *Liautaud v. Liautaud*, 221 F.3d 981, 986 (7th Cir. 2000)).

Lastly, as to factor 6, the FID finds "no evidence that Medytox ever made its strain available for sale or available to others outside of Medytox for any purpose." *See id.* at 87.

---

[26] Dr. Paul S. Keim was retained as a technical expert for Complainants.

The FID does not address whether A-hyper strains were previously available but finds that "Daewoong's internal contemporaneous records further reflect that [



]." *See id.* at 86 (citing CX-2180C.9-11 (2009 BTA Memo)).   The FID thus concludes that "the Medytox strain is protectable as a trade secret, because:   (a) the strain has economic value, (b) it is not generally known or readily ascertainable, and (c) Medytox has taken reasonable precautions to maintain its secrecy."   *See id.* at 87 (citing *Rubber Resins*, Comm'n Op. at 10, 2014 WL 7497801, at *5).

Respondents argue that "[t]he unprotected sharing of the strain extinguished any claim to trade secret protection for it."   *See* Respondents Pet. at 52 (citing 1 Milgrim on Trade Secrets §1.05[1] at 1-316 ("Since secrecy is a requisite element of a trade secret, it follows that unprotected disclosure of the secret will terminate that element and, at least prospectively, forfeit the trade secret status.")).   Respondents further contend that "from the time Dr. Ivan Hall found the strain in soil in the 1920s until government restrictions on transfer of dangerous bacteria heightened in 2001, the Hall-A Hyper strain passed between and through an innumerable array of academic, government, and private entities—without consideration or documentation, and without any effort to impose confidentiality obligations, including restrictions on further disclosure and use, on those who were granted access to the strain."   *See id.*

Respondents further argue that "trade secret eligibility is applied to information—it does not apply to a material object or living organism."   *See id.* at 53-54.   Respondents contend that "the Medytox botulinum strain does not embody any information that is secret" but that "[t]he strain is a copy of the so-called Hall-A Hyper strain—a well-known cell line that traces back to Dr. Ivan Hall's study of the organism almost a century ago."   *See id.* at 56.   In particular,

27

**PUBLIC VERSION**

Respondents explain, "the Medytox strain only differs from the Hall-A Hyper sequence published on GenBank by six nucleotides or 'SNPs'[27] out of 3.6 million" and "these infinitesimally small differences do not imbue the Medytox strain with any distinguishing or superior characteristics as compared to any other Hall-A Hyper strain." *See id.* (citing CX-15C.15, 29 (Keim WS) at Q/As 48-49, 112); *see also* CX-15C (Keim WS) at Q/A 118 (testifying that SNPs are caused by mutations that develop as a strain is grown and replicated).

Still further, Respondents argue that "Medytox fails the competitive advantage requirement [for trade secrets]" because "Medytox is far from alone in using the Hall-A Hyper strain to produce commercial botulinum toxin," and "the majority of competitors in the botulinum market (past, present, and in the foreseeable future) use exactly the same strain." *See id.* at 58. Lastly, Respondents contend that "Medytox's copy of the Hall-A strain also cannot be a trade secret because the strain is available for purchase on the open market for relatively inexpensive prices." *See id.* at 62.

Complainants rebut Respondents' contention that trade secret protection cannot apply to a live organism. Complainants explain that "the valuable characteristics of Medytox's strain are the product of . . . 'genetic messages'—that is, information that is encoded in the strain's genetic makeup." *See* Complainants' Pet. Resp. at 45-46 (citing FID at 62; CX-10C (Pickett WS) at Q/A 113; *Certain Coamoxiclav Prods. Potassium Clavulanate Prods., & Other Prods. Derived From Clavulanic Acid*, Inv. No. 337-TA-479, ID, 2003 WL 1793272, at *7 (Mar. 6, 2003) (finding that the "reason that the [bacterial] strain has an 'independent significant commercial value' is that it allegedly contains a highly valuable trade secret, *i.e.*, its genetic information."); *Pioneer Hi-Bred*, 35 F.3d at 1235-41 (affirming the district court's finding that the genetic

---

[27] "SNP" refers to a single nucleotide polymorphism. *See* FID at 100.

28

messages of Pioneer's hybrid seed corn were trade secrets)); *see also Salsbury Labs., Inc. v. Merieux Labs., Inc.*, 735 F. Supp. 1555, 1569 (1989) (finding the use of a particular strain of a virus to constitute trade secret information); *accord* IA's Pet. Resp. at 19-20.

Complainants contend that "the Medytox strain is unique . . . and different from all other strains, including those published on GenBank." *See* Complainants' Pet. Resp. at 52 (citing FID at 64, 67-68); *see also* IA's Pet. Resp. at 21 ("Daewoong did not create a commercially viable strain from the Hall A-hyper strain CP000727.1 that was available on GenBank, was unable to find a company from which to license a commercially viable strain and then resorted to misappropriating Medytox's BTX strain."); *see also* Complainants' Resp. Br. at 18 (agreeing that "the genetic sequence of the Hall A-hyper strain held at the Fort Detrick Army base has been published" but arguing that "[c]reation of bacterial strains such as *C. botulinum* using a published DNA sequence simply is not possible") (citing FID at 67-68). Complainants further argue that "[t]here is no evidence that at the time Daewoong sought a strain for commercial BTX production, it could have obtained Medytox's strain or any other version of the Hall A-hyper [strain]." *See* Complainants' Pet. Resp. at 47-48 (citing CX-10C (Pickett WS) at Q/As 89, 99).

The Commission finds that Complainants fail to satisfy their burden to show that the Medytox strain is a protectable trade secret. In particular, Complainants' expert failed to demonstrate that the Medytox strain is distinct from its parent Hall A-hyper strain that Medytox was freely gifted with no restrictions, including no obligations of confidentiality. *See* FID at 90-91; CX-10C (Pickett WS) at Q/As 110-113; CX-13C (Jung WS) at Q/A 22; CX-14C (Yang WS) at Q/As 7-8. The record shows that the Medytox strain stems from a Hall A-hyper strain that was given to Medytox by Dr. Kyu Hwan Yang with no restrictions as to use or confidentiality. *Id*. Dr. Yang had acquired the Hall A-hyper strain that he gifted to Medytox from the

PUBLIC VERSION

University of Wisconsin in 1979, again free of any restrictions. The record also shows that the Hall A-hyper strain held by the University of Wisconsin was freely circulated to other entities as well. Under these circumstances, where the strain was circulated without restrictions, and because as explained below there is no evidence in the record that the Medytox strain is distinct from the parent strain given to Medytox, the Commission finds that it does not qualify as a trade secret.

Complainants appear to focus on the 2009-2010 timeframe when Daewoong sought a Hall A-hyper strain. However, they fail to address Respondents' argument that the strain was widely and freely available before the anthrax attacks of 2001, which caused governments to tighten regulations on the transfer of dangerous bacteria. *See* Respondents' Pet. at 51-52; *see also* CX-10C (Pickett WS) at Q/As 70-109. Complainants also focus on the period after the 1980s when "commercial applications for botulinum neurotoxin were discovered" and "the limited number of companies and institutions that held the Hall A-hyper strain took steps to secure their strains." *See* Complainants' Resp. Br. at 23-24 (citing RX-3506.4 (Pickett); CX-10C (Pickett WS) at Q/A 61, 67-85; CX-16C (Neervannan WS) at Q/As 7, 10, 15); *accord* IA's Resp. Br. at 10-14.

The fact that the strains became valuable after the discovery of commercial applications or the tightening of government regulations does not salvage the loss of trade secret status of the strains before the 1980s. Indeed, as Respondents correctly note, "once trade secret status is lost it cannot be regained." *See* Respondents' Pet. at 61 (citing 1 Milgrim on Trade Secrets § 1.03 at 1-299). Complainants respond that, unlike the present case, "trade secret protection was lost [in the cases cited by Respondents] because the trade secret holder itself disclosed it to third parties without appropriate confidentiality provisions." *See* Complainants' Pet. Resp. at 55.

**PUBLIC VERSION**

Thus, the Commission finds that the evidence supports the FID's findings that Daewoong acquired the Medytox strain by improper means.   However, because the Commission finds that the Medytox strain does not qualify as a protectable trade secret, Complainants cannot establish the unfair act of trade secret misappropriation by Daewoong as to the Medytox strain.

### 2.    The Medytox Manufacturing Processes

Complainants assert 13 trade secrets in connection with Medytox's manufacturing processes, namely:

Trade Secrets 1 and 2:   The use of [


] of the manufacturing process.

Trade Secret 3:   The [

] of the manufacturing process.

Trade Secret 4:   The use of [


].

Trade Secret 5:   [


]

Trade Secret 6:   The use of [


].

Trade Secret 7:   The use of [


].

Trade Secret 8:   The use of a [

].

40

PUBLIC VERSION

Trade Secret 9:   The [

].

Trade Secret 10:   The use of [

].

Trade Secret 11:   The use of [

].

Trade Secret 12:   The use of a second [

].

Trade Secret 13:   [          ].

*See* FID at 112-13 (citing CX-2572C (Complainant Medytox's Disclosure Pursuant to Order No. 17) at 2-3; CX-10C (Pickett WS) at Q/As 194-203).

The FID finds that Daewoong misappropriated Medytox's trade secrets in its manufacturing processes.   *See* FID at 132-52.   The FID finds that "[t]he evidence establishes that Dr. BK Lee had access to, and knowledge of, numerous details of Medytox's manufacturing process, and also worked with Daewoong when it was trying to develop its own process."   *See id.* at 132.   The FID finds that "an abundance of evidence establishes that the Daewoong process is derived from, and in many ways identical to, Medytox's trade secret process."   *See id.* Specifically, the FID finds, "three factors demonstrate that Daewoong misappropriated the manufacturing process from Medytox:   (1) the similarity of Daewoong's process to Medytox's; (2) the lack of evidence of Daewoong's independent development; and (3) the implausibly fast timeline by which Daewoong achieved BTX production at commercial scale."   *See id.*

The FID further finds that Daewoong's manufacturing process substantially overlaps with Medytox's manufacturing process.   *See id.* at 134-136 (citing CDX-10C.2 (reproduced below); CX-10C (Pickett WS) at Q/As 243-54).

41

PUBLIC VERSION

[




]

In particular, the FID discusses "three key similarities" between the Daewoong and Medytox processes.  *See id.* at 136.   First, the FID finds, "[


]."   *See id.* (citing CX-2068C.9 (Medytox Batch Record Version No. 5); JX-22.19 (Daewoong 450DC-010 Batch Record)).   The FID notes that [

] and that [


]  *See id.* at 136-37.   Second, the FID continues, [


]  *See id.* at 137 (citing CX-2064C.10 (BK Lee Email Attach., 11/02/07); JX-22.64-67 (450DS-010 Batch Record); CX-10C (Pickett WS) at Q/As 251, 253, 257).   The FID finds that [

]  *See id.*

42

The FID further notes [

,30

]  *See id.* at 138 (citing CX-1727.12

(Daewoong U.S. Patent 9,512,418); JX-7C.6 (BLA Submission Section 3.2.S.2.6)).   Third, the

FID notes that [

]  *See id.* at 139-

40 (citing JX-7C.6 (Daewoong FDA Submission section 3.2.S.2.6)).

The FID finds that "Daewoong has not provided sufficient evidence demonstrating its

own independent development of its manufacturing process."  *See id.* at 143.   The FID also

finds "a lack of any contemporaneous documentation of citations to the disparate published

scientific literature dating back to as early as the 1940s on which Daewoong purportedly relied to

piece together the steps of the manufacturing process for the DWP-450 drug substance."  *See id.*

at 142.   The FID further notes that [

]  *See id.* at 148 (citing JX-26C-JX-29C; CX-2598C, JX-17C).   The FID

finds that "it is not credible to reach the milestone of a commercial scale batch in such a short

period of time."  *See id.* (citing CX-10C (Pickett WS) at Q/As 303-16).   Rather, the FID credits

Dr. Pickett's testimony that "it would take at least three months for an inexperienced team

seeking to develop a manufacturing process from scratch to review the academic literature and

an additional 18 months to conduct small scale process research experimentation before

proceeding to a commercial-scale batch."  *See id.* (citing CX-10C (Pickett WS) at Q/As 320-25).

---

30 [

]

The Commission has determined to affirm the FID's findings regarding the existence and misappropriation of Medytox's trade secrets relating to its manufacturing processes.

### D.    Domestic Industry

#### 1.    Existence of "an Industry in the United States"

During the investigation, Complainants asserted the existence of "an industry in the United States" under section 337(a)(1)(A)(i) in connection with:   (1) Medytox's MT10109L (which is an animal-protein-free BTX product that Medytox licensed to Allergan for commercialization in the United States); and (2) Allergan's BOTOX® products (which are non-animal-protein free BTX products that were developed and commercialized solely by Allergan and are not encompassed by Medytox's license to Allergan).   The FID finds that an industry exists in the United States with respect to both MT10109L and BOTOX®.   *See* FID at 158-90. However, the FID finds that injury or threat of injury to such industries is established with respect to BOTOX® but not MT10109L.   No party petitioned for review of the FID's finding of no injury as to MT10109L.   Therefore, the Commission has determined that Complainants have abandoned seeking relief as to MT10109L by failing to file a petition for review of the no injury finding of the FID.   Accordingly, on review, the Commission terminates Complainants' claim of a Section 337 violation based on MT10109L and the FID's findings on domestic industry as to MT10109L are therefore moot.

As to BOTOX®, the FID finds that "[u]nder Commission precedent, a complainant may rely upon investments by unrelated licensees [(*e.g.*, not related corporate entities)] to prove the existence of a domestic industry requirement."   *See* FID at 158 (citing *Certain Electronic Imaging Devices*, Inv. No. 337-TA-726, Order No. 18, 2011 WL 826919 (Feb. 7, 2011) ("*Electronic Imaging*"), *unreviewed*, Comm'n Notice (Mar. 8, 2011)).

44

FID at 206-07.   Respondents have shown no error in the FID's findings as to this pricing relationship.

As discussed above, the FID correctly finds actual and threatened injury to the industry related to BOTOX®.   As noted by Complainants, "Commission precedent confirms that financial harms, such as lost sales and price erosion, are indeed sufficient to support a finding of actual substantial injury."   *See* Complainants' Pet. Resp. at 92-93 (citing *Rubber Resins*, Comm'n Op. at 63, 2014 WL 7497801, at *32; *Certain Light-Emitting Diode Prods.*, Inv. No. 337-TA-947, Initial Determination at 482-83 (July 29, 2016)); *accord* IA's Pet. Resp. at 37-38.

Thus, the Commission has determined to affirm the FID's finding of injury with respect to the domestic industry related to BOTOX®.   In particular, the Commission finds that there is a causal nexus between the unfair act asserted (*i.e.*, importation of articles that impinge upon the asserted trade secrets) and injury and threat of injury to the domestic industry as found in the FID.

For the foregoing reasons, the Commission finds a violation of section 337 with respect to the importation and sale of Respondents' botulinum neurotoxin products.

## IV.    REMEDY, PUBLIC INTEREST, AND BONDING

The RD recommends that the Commission issue an LEO barring entry of botulinum neurotoxin products that are imported or sold by Respondents Daewoong and Evolus and a CDO against Evolus.    The RD also recommends that the Commission set a bond based on price differential during the period of Presidential review.

As discussed below, the Commission has determined to adopt the RD with respect to remedy and bonding except that the Commission limits the duration of the LEO and CDO to 21 months and sets the bond during the period of Presidential review in an amount of $441 per

**PUBLIC VERSION**

100U vial (based on price differential).    The Commission further finds that the public interest will not be adversely affected by the issuance of the remedial orders.

### A.    Remedy

The Commission has "broad discretion in selecting the form, scope, and extent of the remedy."    *Viscofan, S.A. v. USITC*, 787 F.2d 544, 548 (Fed. Cir. 1986).

### 1.    Limited Exclusion Order

Section 337 requires the Commission to issue LEOs against named respondents that have imported or sold unfairly traded articles:

> If the Commission determines, as a result of an investigation under this section, that there is a violation of this section, it shall direct that the articles concerned, imported by any person violating the provision of this section, be excluded from entry into the United States . . . .

*See* 19 U.S.C. § 1337(d)(l).    *See also Spansion, Inc. v. ITC*, 629 F.3d 1331, 1358 (Fed. Cir. 2010) ("[T]he Commission is required to issue an exclusion order upon the finding of a Section 337 violation absent a finding that the effects of one of the statutorily-enumerated public interest factors counsel otherwise.").

The RD recommends that the Commission issue an LEO excluding botulinum neurotoxin products that are imported or sold by Respondents Daewoong and Evolus.    *See* RD at 257-58. The RD further states that "[t]he duration of an order in a trade secret misappropriation case is set as the time it would have taken to independently develop the trade secrets."    *See id.* at 257 (citing *Rubber Resins*, Comm'n Op., 2014 WL 7497801, at *43).    The RD recommends that the LEO have a ten-year duration if the Commission finds both Medytox's strain and Medytox's manufacturing process to be trade secrets.    *See* RD at 257-58.

The RD further states that "[i]f the misappropriation of the Medytox manufacturing process is considered independently, . . . the duration of the [LEO] . . . should be for a period of

at least 21 months from the time of issuance of the exclusion order." *See id.* (citing CX-18C (Malackowski WS) at Q/A 205; CX-10C (Pickett WS) at Q/A 320-25); *accord* Complainants' Resp. Br. at 53; IA's Resp. Br. at 23.

Because the Commission finds that Complainants failed to establish that Medytox's strain is a trade secret, the Commission finds that the record supports issuing an LEO for a duration of 21 months as recommended in the RD. *See* RD at 258 (citing CX-18C (Malackowski WS) at Q/A 205; CX-10C (Pickett WS) at Q/A 320-25); *accord* Complainants' Resp. Br. at 53; IA's Resp. Br. at 23.

Accordingly, the Commission has determined to issue an LEO with a 21-month duration. The Commission declines to limit the LEO to aesthetic applications. Both aesthetic and therapeutic versions of BOTOX® have been considered in the domestic industry analysis and while Respondents' products may be currently sold for aesthetic applications only, the scope of the investigation (botulinum neurotoxin products) is not so limited. *See* 84 Fed. Reg. at 8112.

Furthermore, under the specific facts of this case involving trade secret misappropriation, and where it is not readily apparent by inspection at the border whether an imported product is manufactured using the misappropriated trade secrets, the Commission has determined to require Respondents to obtain a ruling (via an advisory opinion or a modification proceeding) from the Commission prior to the importation of any accused products. *See Canadian Tarpoly Co. v. USITC*, 640 F.2d 1322, 1326 (C.C.P.A. 1981) (affirming the Commission's authority to require an advisory opinion); *see also* 19 C.F.R. § 210.79 (advisory opinions); 19 C.F.R. § 210.76 (modification proceedings).

Thus, the Commission has determined to: (1) issue an LEO covering certain botulinum toxin products that are imported or sold in the United States by Respondents Daewoong and

62

Evolus; and (2) require Respondents to obtain a ruling from the Commission under Commission Rules 210.76 or 210.79 (19 C.F.R. §§ 210.76, 210.79) prior to the importation of any articles at issue.

### 2.    Cease and Desist Order

Section 337(f)(1) provides that in addition to, or in lieu of, the issuance of an exclusion order, the Commission may issue a CDO as a remedy for violation of section 337.    *See* 19 U.S.C. § 1337(f)(1).    CDOs are generally issued when, with respect to the imported infringing products, respondents maintain commercially significant inventories in the United States or have significant domestic operations that could undercut the remedy provided by an exclusion order.[43] *See, e.g., Certain Table Saws Incorporating Active Injury Mitigation Technology & Components Thereof* ("*Table Saws*"), Inv. No. 337-TA-965, Comm'n Op. at 4-6 (Feb. 1, 2017); *Certain Protective Cases & Components Thereof,* Inv. No. 337-TA-780, USITC Pub. No. 4405, Comm'n Op. at 28 (Nov. 19, 2012) (citing *Certain Laser Bar Code Scanners & Scan Engines, Components Thereof & Prods. Containing Same,* Inv. No. 337-TA-551, Comm'n Op. at 22 (June 24, 2007)).    Complainants bear the burden on this issue.    "A complainant seeking a cease and desist order must demonstrate, based on the record, that this remedy is necessary to address the violation found in the investigation so as to not undercut the relief provided by the exclusion order."    *Table Saws*, Comm'n Op. at 5 (citing *Certain Integrated Repeaters, Switches,*

---

[43] When the presence of infringing domestic inventory or domestic operations is asserted as the basis for a CDO under section 337(f)(1), Commissioner Schmidtlein does not adopt the view that the inventory or domestic operations needs to be "commercially significant" in order to issue the CDO.    *See, e.g., Certain Magnetic Tape Cartridges and Components Thereof,* Inv. No. 337-TA-1058, Comm'n Op. at 65, n.24 (Mar. 25, 2019); *Table Saws*, Comm'n Op. at 6-7, n.2 (Feb. 1, 2017).    In Commissioner Schmidtlein's view, the presence of some infringing domestic inventory or domestic operations, regardless of its commercial significance, provides a basis to issue a CDO. *Id.*    Commissioner Schmidtlein supports issuance of the CDO against Evolus due to its maintenance of domestic inventory of Jeuveau.

**PUBLIC VERSION**

*Transceivers, & Prods. Containing Same*, Inv. No. 337-TA-435, USITC Pub. No. 3547 (Oct. 2002), Comm'n Op. at 27 (Aug. 16, 2002); *see also* H.R. REP. No. 100-40, at 160 (1987)).

The RD recommends that the Commission issue a CDO against Evolus.   *See* RD at 264. The RD finds that "Evolus, as of year-end 2019, maintained a domestic inventory of [     ] vials of 100U of Jeuveau® having an imported value of [          ]."   *See id.* (citing JX-139C (Stipulation of Material Facts Relating to Importation and Inventory) at ¶ 6).   The RD concludes that Evolus maintains "a commercially significant domestic inventory."   *See id.*   As to Daewoong, however, the RD finds that "[C]omplainants did not provide admissible evidence of the existence of a domestic inventory of any accused product held by Daewoong or its agents."   *See id.*   Complainants no longer appear to seek a CDO against Daewoong.   *See* Complainants' Br. at 49; *accord* IA's Resp. Br. at 25-26.

Respondents argue that "the value of the domestic inventory of Jeuveau®, discounting sales of Xeomin and Dysport, comprises at most [     ] of the value of the domestic market for cosmetic neurotoxin products."   *See* Respondents' Br. at 43.   Respondents, however, do not provide any evidence to contradict Complainants' assertion that the inventory is commercially significant relative to Jeuveau®'s market share.   *See* Complainants' Reply Br. at 26 ("Evolus's inventory is commercially significant in the context of its imports and sales over time.") (citing CX-18C (Malackowski WS) at Q/As 208-11).

Thus, the Commission finds that a CDO is warranted as to Evolus.   As noted, Complainants are no longer seeking a CDO with respect to Daewoong. Accordingly, the Commission has determined to issue a CDO against Evolus with the same 21-month duration as the LEO discussed *supra* section IV(A)(1).