**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **IN RE: EVOLUS INC. SECURITIES LITIGATION** | Case No.: 1:20-cv-08647-PGG |

**MEMORANDUM OF LAW IN SUPPORT OF AEON BIOPHARMA, INC.'S MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

DATED: February 10, 2022

Respectfully Submitted,

THEODORA ORINGHER PC

By:/s/ *Todd C. Theodora*
    Todd C. Theodora (admitted *pro hac vice*)
    CA State Bar No. 120426
    Edward E. Johnson (admitted *pro hac vice*)
    CA State Bar No. 241065
    Michelle Monroe (admitted *pro hac vice*)
    CA State Bar No. 311776
    THEODORA ORINGHER PC
    535 Anton Boulevard, Ninth Floor
    Costa Mesa, CA 92626-7109
    Telephone: (714) 549-6200
    Email: ttheodora@tocounsel.com
    ejohnson@tocounsel.com
    mmonroe@tocounsel.com

    Attorneys for Defendant AEON Biopharma, Inc.

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     ALLEGATIONS OF THE AMENDED COMPLAINT ......................................2

III.    LEGAL ARGUMENT...........................................................................................7

    A.    The AC Fails to Adequately Plead a Violation by AEON of Section 10(b) of the Exchange Act and Rule 10b-5. ......................................................7

        1.    Plaintiffs Have Not Adequately Alleged an Actionable Misstatement. ..............................................................................7

        2.    Plaintiffs Have Not Adequately Alleged that AEON Made Any of the Alleged Misstatements in the AC. ..........................................7

        3.    Plaintiffs Have Not Adequately Alleged Facts Giving Rise to a Strong Inference of Scienter. ......................................................10

            (a)    The AC Does Not Adequately Allege Motive and Opportunity. ...........................................................10

            (b)    The AC Does Not Adequately Allege Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness. ...................13

    B.    The AC Fails To Adequately Plead a Control Person Claim Under Section 20(a). .......................................................................................15

        1.    Plaintiffs Have Not Adequately Alleged a Primary Violation....................15

        2.    Plaintiffs Have Not Adequately Alleged Control Over the Primary Violator's Alleged Misrepresentations. ......................................16

        3.    Plaintiffs Have Not Adequately Alleged Culpable Participation with Particularity......................................................................17

    C.    The AC Fails to Adequately Plead a Claim for Insider Trading Under Section 20A of the Exchange Act. .......................................................20

    D.    Granting Leave to Amend Would be Futile..........................................22

IV.     CONCLUSION....................................................................................................22

<u>**TABLE OF AUTHORITIES**</u>

**Page**

<u>**Cases**</u>

*Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*,
  18 F. Supp. 3d 482 (S.D.N.Y. 2014) ...................................................................... 17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ...................................................................... 10, 15

*Chill v. General Elec. Co.*,
  101 F.3d 263 (2d Cir.1996) ...................................................................... 13

*Firebird Republics Fund, Ltd. v. Moore Capital Mgmt. LLC*,
  2009 WL 955050 (S.D.N.Y. 2009) ...................................................................... 15

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
  68 F. Supp. 3d 530 (S.D.N.Y. 2014) ...................................................................... 9

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) ...................................................................... 17

*In re Bayer AG Sec. Litig.*,
  2004 WL 2190357 (S.D.N.Y. Sept. 30, 2004) ...................................................................... 18

*In re Bear Stearns Co., Inc. Sec., Derivative, and ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ...................................................................... 20

\\*In re Cannavest Corp. Sec. Litig.*,
  307 F. Supp. 3d 222 (S.D.N.Y. 2018) ...................................................................... 19

*In re Express Scripts Holding Co. Sec. Litig.*,
  2017 WL 3278930 n.1 (S.D.N.Y. 2017) ...................................................................... 6

*In re Gildan Activewear, Inc. Sec. Litig.*,
  636 F. Supp. 2d 261 (S.D.N.Y. 2009) ...................................................................... 11

*In re Global Crossing Ltd. Sec. Litig.*,
  2005 WL 1875445 (S.D.N.Y. Aug. 5, 2005) ...................................................................... 17

*In re Health Mgmt. Sys., Inc. Sec. Litig.*,
  1998 WL 283286 (S.D.N.Y., June 1, 1998) ...................................................................... 14, 21

*In re IAC/InterActiveCorp Sec. Litig.*,
  695 F. Supp. 2d 109 (S.D.N.Y. 2010) ........................................................ 6

*In re Lions Gate Ent. Corp. Sec. Litig.*,
  165 F. Supp. 3d 1 (S.D.N.Y. 2016) ........................................................ 16

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
  423 F. Supp. 2d 364 (S.D.N.Y. 2006) .................................................... 15

*In re NQ Mobile, Inc. Sec. Litig.*,
  2015 WL 1501461 (S.D.N.Y. Mar. 27, 2015) ........................................ 18

*In re Openwave Sys. Sec. Litig.*,
  528 F. Supp. 2d 236 (S.D.N.Y. 2007) .................................................... 21

*In re Prestige Brands Holding, Inc.*,
  2006 WL 2147719 (S.D.N.Y. July 10, 2006) ......................................... 11

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ..................................................................... 11

*In re ShengdaTech, Inc. Sec. Litig.*,
  2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014) ....................................... 18

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) ............................... 13, 20, 21, 22

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*,
  32 F.3d 697 (2d Cir. 1994) ..................................................................... 20

*Janus Capital Group, Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) ........................................................................ 8, 9, 10

*Kalnit v. Eichler*,
  85 F. Supp. 2d 232 (S.D.N.Y. 1999) ..................................................... 13

*Kinsey v. Cendant*,
  2005 WL 1907678 (S.D.N.Y. Aug. 10, 2005) ....................................... 15

*Kramer v. Time Warner Inc.*,
  937 F.2d 767 (2d Cir. 1991) ..................................................................... 6

*Maverick Fund, L.D.C. v. Converse Tech., Inc.*,
  801 F. Supp. 2d 41 (E.D.N.Y. 2011) ..................................................... 17

*McIntire v. China MediaExpress Holdings, Inc.*,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013) ................................................................. 10, 18

*Moss v. Morgan Stanley, Inc.*,
  719 F.2d 5 (2d Cir. 1983) ................................................................................. 16

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*,
  2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ....................................................... 13

*Oklahoma Law Enforcement Ret. Sys.*,
  517 F. Supp. 3d 196 (S.D.N.Y. 2021) ............................................................ 16, 22

*Pac. Inv. Mgmt. Co. L.L.C. v. Mayer Brown LLP*,
  603 F.3d 144 (2d Cir. 2010) ............................................................................... 8

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  347 F. App'x 617 (2d Cir. 2009) ......................................................................... 22

*Schwartz v. Novo Indus. A/S*,
  658 F. Supp. 795 (S.D.N.Y. 1987) ........................................................................ 9

*SEC v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996) ............................................................................. 18

*SEC v. McNulty*,
  137 F.3d 732 (2d Cir. 1998) .............................................................................. 13

*Silsby v. Icahn*,
  17 F. Supp. 3d 348 (S.D.N.Y. 2014) ..................................................................... 6

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
  33 F. Supp. 3d 401 (S.D.N.Y. 2014) .................................................................... 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 US 308 (2007) .......................................................................................... 10

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) .............................................................................. 18

**Rules**

F.R.C.P. 9(b) ................................................................................................... 20

**Statutes**

15 U.S.C. § 78 ............................................................................................ 15, 20

**<u>Regulations</u>**

17 C.F.R. § 240.10b-5(b) ........................................................................................... 8

17 C.F.R. § 240.12b–2 ............................................................................................... 17

Defendant AEON Biopharma, Inc.[1] respectfully submits this Memorandum of Law in support of its Motion to Dismiss Plaintiffs' First Amended Class Action Complaint ("AC") with prejudice.

## I.  **<u>INTRODUCTION</u>**

AEON should not have been named as a defendant in this action.  The gravamen of Plaintiffs' AC is that a different company, Evolus, Inc. ("Evolus"), and three of its executives made allegedly false statements to the market about a proceeding involving Evolus in the U.S. International Trade Commission ("ITC").  In the ITC proceeding, the Korean supplier of Evolus' neurotoxin product was accused of misappropriating trade secrets from a competing Korean neurotoxin company that supplies toxin to Evolus' competitor, Allergan.  While the proceeding was pending, Evolus stated that it was "confident" in its litigation position, while also making clear that the outcome of the litigation was uncertain and describing the risks of an adverse result.  As detailed in Evolus' Motion to Dismiss, the claim that this statement can give rise to a securities fraud claim fails as a matter of law:  among other reasons, it is corporate puffery which is expected by the market and upon which no reasonable investor would rely.  Courts routinely dismiss Rule 10b-5 claims based on statements of this kind.

Plaintiffs' claims against AEON are largely derivative of their deficient claim against Evolus, but even weaker.  AEON's only alleged connection to this action is that at the outset of the class period it held a majority of the shares of Evolus, and then during the class period it sold part of its Evolus holdings to repay debt.[2]  Although Plaintiffs inexplicably assert a direct claim

---

[1] Although the AC names "Alphaeon Corporation" as a defendant, Alphaeon Corp. changed its name to AEON Biopharma, Inc. on December 19, 2019.  For simplicity, this brief will refer to AEON Biopharma, Inc., both before and after its name change, as "AEON."

[2] The "class period" is defined as February 1, 2019 to July 6, 2020, inclusive.  (AC ¶ 1.)

against AEON under Rule 10b-5, there is no allegation that AEON actually made any of the allegedly false statements identified in the AC—the AC unequivocally attributes the statements to Evolus. Nor do Plaintiffs allege any involvement by AEON in the alleged misstatements—there is not a single allegation that AEON ever drafted, authorized or even reviewed any of the alleged statements.

Plaintiffs' scienter allegations against AEON are deficient as well. AEON's stock sales were not suspicious—they occurred long before the end of the class period, when the ITC proceeding was still in its early stages, and AEON had well-documented reasons for them unrelated to the ITC case. Moreover, the AC contains no particularized allegations establishing that the information that supposedly put AEON on notice that Evolus' statements were false— discovery and expert materials produced by Medytox in the ITC proceeding—was ever provided to or reviewed by AEON. Plaintiffs' failure to allege with the required particularity that AEON ever received non-public information or that it participated in any way in Evolus' statements requires dismissal of their control person and insider trading claims as well.

In short, Plaintiffs have no claim, and if they did, it would not be against AEON. The Amended Complaint should be dismissed as to AEON without leave to amend.

## II.    ALLEGATIONS OF THE AMENDED COMPLAINT[3]

AEON Biopharma is a bio-pharmaceutical company focused on developing a proprietary neurotoxin for therapeutic uses. At the beginning of the class period, AEON held 56% of the outstanding stock of Evolus. (AC ¶ 36.)

---

[3] This discussion of Plaintiffs' allegations focuses principally on the few allegations that address AEON specifically. For a complete description of the allegations of the AC, AEON respectfully refers the Court to the January 18, 2022 Memorandum of Law filed by Defendants Evolus, Inc., Moatazedi, Avelar, and Silvernail (together, the "Evolus Defendants") in support of their Motion to Dismiss (the "Evolus Motion to Dismiss").

The AC alleges that in 2013, Evolus signed a license and supply agreement with Daewoong, a Korean company, under which Daewoong would manufacture and supply to Evolus a neurotoxin which Evolus ultimately sold under the name Jeuveau. (AC ¶¶ 3, 5, 53, 54.) Starting in 2017, a different Korean company, Medytox, began pursuing litigation in California, Korea, and through a petition with the FDA, in which it claimed that Daewoong had misappropriated trade secrets concerning Medytox's own neurotoxin (licensed in the US by Allergan) and manufacturing process. (AC ¶¶ 109-111.)

On January 25, 2019, Medytox and Allergan filed a complaint with the ITC making substantially similar trade secret misappropriation allegations as in the previous litigation. (AC ¶ 102.) Among other relief, the complaint requested an order barring the importation of the Daewoong toxin licensed to Evolus. (AC ¶ 103.) AEON was not named as a defendant in the ITC complaint and was not a party to the proceeding. (AC ¶ 102.) A redacted version of the ITC complaint was made public and Evolus disclosed that it could not predict the likelihood of success in the proceeding and that an unfavorable ruling could bar the sale of its sole product. (AC ¶ 102; Declaration of Edward E. Johnson, Esq. ("Johnson Decl.") Ex. A; Evolus Motion to Dismiss at 5-8.)

The ITC agreed to initiate an investigation on March 1, 2019. (AC ¶ 112.) The ITC promptly issued a protective order that permitted access to confidential discovery only to the parties' respective outside counsel, not the parties themselves (Evolus Motion to Dismiss at 6-7), and "the evidence the parties produced in fact and expert discovery remained confidential throughout the course of the Investigation." (AC ¶ 113, Johnson Decl. Ex. G.) Although the AC alleges conclusorily that "Defendants" were privy to all of the evidence produced in discovery (AC ¶ 113), there is no allegation explaining how AEON, a non-party to the proceeding, could

3

have accessed confidential information that was subject to the ITC's broad protective order.  Nor is there any allegation specifying who at AEON accessed such information, who reviewed the information, when the information was accessed or reviewed, or what specific information was accessed or reviewed.

Fact discovery in the ITC proceeding closed on July 19, 2019 and expert discovery closed on October 30, 2019.  (AC ¶ 114.)  Plaintiffs claim that it was through this fact and expert discovery that Defendants became aware Daewoong had misappropriated trade secrets and therefore that Evolus was likely to lose in the ITC proceeding.  (AC ¶ 128.)  Specifically, the AC alleges that by the end of fact and expert discovery, Defendants knew that the Daewoong and Medytoc toxin strains were nearly identical, based on the genetic analysis performed by Medytox's expert witness.  (AC ¶ 128.)  Again, other than non-specific references to "Defendants," there is no allegation that AEON knew of the genetic analysis, and there is no allegation that AEON discovered or could have discovered the alleged similarities in the toxin strains through any source other than discovery in the ITC proceeding.

The ITC held an evidentiary hearing on February 4-7, 2020.  (AC ¶ 116.)  The hearing was closed and no one from AEON attended.  (AC ¶ 116.)  Nor is there any allegation that AEON received any information about the hearing or the evidence presented from Evolus' representatives, who did not have access to confidential information in any event.

The Administrative Law Judge ("ALJ") issued his Final Initial Determination on July 6, 2020.  (AC ¶ 241.)  In a 274-page ruling, he concluded that Daewoong had misappropriated Medytox's toxin based on the expert testimony about the genetic similarities between the toxins, and had misappropriated Medytox's manufacturing process.  (AC ¶ 241.)  The ALJ recommended a limited exclusion order barring importation of the Daewoong toxin for ten years.  (AC ¶ 241.)

On December 16, 2020, however, the full Commission partially reversed the ALJ, holding that the Medytox toxin strain was not a protectible trade secret. (AC ¶ 235.) The Commission affirmed the ruling that Daewoong had misappropriated trade secrets related to the manufacturing process. (AC ¶ 235.) The importation ban was reduced from ten years to twenty-one months. (AC ¶ 236.)

The alleged misstatements that comprise the basis for Plaintiffs' Rule 10(b) claim were made between February 1, 2019 and July 6, 2020, and consist of (i) generic statements by Evolus that the toxin it licensed from Daewoong is "proprietary" and similar language (*e.g.*, AC ¶ 173); and (ii) statements by Evolus about the ITC proceeding, such as that Evolus was "confident" in its position and believed in the merits of its case (*e.g.*, AC ¶ 9). None of the alleged misstatements were attributed to AEON and there are no specific facts alleged suggesting that AEON drafted, reviewed, authorized or otherwise participated in the statements.

In addition to alleging no statements by AEON, the AC is devoid of allegations of any involvement with, or knowledge of, the ITC proceeding on the part of AEON. Indeed, after the AC alleges the identities of the parties, through Paragraph 45, AEON is not mentioned again until 38 pages later, in Paragraph 193.

The few allegations in the AC concerning AEON primarily relate to AEON's supposed control over Evolus and its sales of Evolus stock in 2019. As noted above, at the beginning of the class period AEON owned 56% of Evolus' stock. (AC ¶ 36.) Although the AC identifies five directors of Evolus who were also on the board of directors of AEON (AC ¶ 272), none of them are defendants in this action and two of those directors left AEON's board prior to the class period such that the companies had only three common board members during the class period. (AC ¶¶ 41, 42.) Since 2019, Evolus' board of directors has consisted of seven members. (Johnson Decl. Ex. B.) Thus, during the class period, only a minority of Evolus' board had any alleged tie

to AEON.  The AC contains no specific allegations of AEON directing or controlling Evolus' conduct at any time.

With respect to stock sales, the AC alleges that on March 22, 2019, AEON caused Evolus to file a shelf registration statement that enabled AEON to sell Evolus shares to the market.  (AC ¶ 276.)  Pursuant to that registration statement, AEON sold 4 million shares of Evolus stock from May 17-20, 2019.  (AC ¶ 228.)  As publicly disclosed by AEON at the time, the shares were sold so that AEON could pay off debt obligations that were due in June 2019.  (Johnson Decl. Ex. C[4].) These debt obligations had been publicly disclosed long before the obligation became due and before the initiation of the ITC proceeding.  (Johnson Decl. Ex. H.)  AEON continued to hold approximately 11.3 million shares of Evolus stock, representing 41.2% of Evolus' outstanding shares.  (AC ¶ 193.)

Shortly thereafter, AEON transferred a total of approximately 2.6 million shares to repay debt.  On May 20 and 22, 2019, AEON distributed approximately 1.3 million Evolus shares to AEON noteholders who elected to receive Evolus shares for their notes instead of cash.  (AC ¶ 228; Johnson Decl. Exs. C, D.)   After distributing these shares, AEON held 36% of Evolus' shares. (Johnson Decl. Ex. E.)  And on June 3, 2019, AEON transferred approximately 1.3 million Evolus shares to its majority shareholder, Strathspey Crown Holding Group, LLC, in a private transaction. (AC ¶ 228; Johnson Decl. Ex. F.)  These shares were transferred as partial repayment of debt owed

---

[4] For information about AEON's stock sales, AEON relies on SEC filings available at the SEC website and a press release available on the PRNewswire website.  The Court may take judicial notice of these documents as matters of public record.  *See, e.g.*, *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (judicial notice of SEC filings); *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 123 (S.D.N.Y. 2010) (judicial notice of press release); *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *1 n.1 (S.D.N.Y. 2017) (courts may judicially notice publicly available information).

by AEON to Strathspey. (Johnson Decl. Ex. E.)

## III. <u>LEGAL ARGUMENT</u>

The AC purports to allege three causes of action against AEON: fraud under Section 10(b) of the Exchange Act and Rule 10b-5; control person liability under Section 20(a); and insider trading under Section 20A. Each of these claims suffers from multiple, irredeemable defects and must be dismissed.

### A. The AC Fails to Adequately Plead a Violation by AEON of Section 10(b) of the Exchange Act and Rule 10b-5.

#### 1. Plaintiffs Have Not Adequately Alleged an Actionable Misstatement.

Count I of the AC purports to allege a claim for violations of Section 10(b) and Rule 10b-5 against all Defendants, including AEON. However, as established by the Evolus Motion to Dismiss, none of the supposed misstatements upon which Plaintiffs' 10b-5 claim is based can support a securities-fraud claim because they (i) are corporate puffery, upon which no reasonable investor would rely; (ii) fall within the PSLRA's safe harbor for forward-looking statements, especially given the company's extensive and consistent cautionary language; and (iii) are non-actionable opinion statements under the Supreme Court's *Omnicare* decision. (Evolus Motion to Dismiss at 11-18, 28.)

Because the alleged misstatements by AEON in the AC are identical to the alleged misstatements by Evolus in the AC, and to avoid unnecessary duplication of the arguments thoroughly addressed in the Evolus Motion to Dismiss, AEON hereby incorporates by reference the Evolus Defendants' brief and joins in the arguments therein.

#### 2. Plaintiffs Have Not Adequately Alleged that AEON Made Any of the Alleged Misstatements in the AC.

Plaintiffs' Rule 10b-5 claim must be dismissed as to AEON for the independent reason that the AC fails to allege any statements by AEON. In order to state a claim for a violation of Section

7

10(b) and Rule 10b-5 by AEON, Plaintiffs must allege, and pursuant to the PSLRA specify with particularity, a false or misleading statement of material fact <u>attributable to AEON</u>. The AC fails to allege any such statement.

Under Rule 10b–5, it is unlawful for "any person, directly or indirectly, . . [t]o **make** any untrue statement of a material fact" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5(b) (emphasis added). Liability under Section 10(b) only extends to the person or entity "making" the material misstatement—meaning "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). As the Supreme Court confirmed in *Janus*, in the ordinary case, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Janus*, 564 U.S. at 142-43; *see also Pac. Inv. Mgmt. Co. L.L.C. v. Mayer Brown LLP*, 603 F.3d 144, 155 (2d Cir. 2010) ("To be cognizable, a plaintiff's claim against a secondary actor must be based on that actor's own 'articulated statement,' or on statements made by another that have been explicitly adopted by the secondary actor."). Put simply, "[o]ne 'makes' a statement by stating it." *Janus*, 564 U.S. at 142.

AEON did not "make" any of the alleged misstatements identified in the AC. Not a single one of the numerous statements alleged in the AC was attributed to AEON. To the contrary, the statements were directly attributed to Evolus or an "Evolus spokesman." As such, they were made by Evolus, not AEON. *See* 564 U.S. at 142-43.

To the extent Plaintiffs argue that AEON had "ultimate authority" over the alleged misstatements, and that this is therefore one of the extraordinary cases in which a statement

8

attributed to one party was actually "made" by a different party for Rule 10b-5 purposes, the allegations of the AC do not even begin to establish that. There are no allegations that AEON was involved in the drafting, preparation, review, or dissemination of any of the press releases, prospectus filings, or other alleged statements in question. *See Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 68 F. Supp. 3d 530, 539 (S.D.N.Y. 2014), aff'd, 639 F. App'x 664 (2d Cir. 2016) ("Any role [defendant] played in the drafting process or in distributing the offering materials is insufficient to impose primary liability under *Janus*"). Likewise, no AEON employees signed, approved, or republished any of the alleged statements. *See Schwartz v. Novo Indus. A/S*, 658 F. Supp. 795, 799 (S.D.N.Y. 1987) ("[P]laintiff fails to demonstrate how . . . it would be fair to draw an inference of fraud from a statement appearing in a news article over which defendant had less than complete control.").

In fact, Plaintiffs' allegations are far weaker than those deemed insufficient to support a claim for direct liability in *Janus*. There, the Supreme Court rejected the argument that an investment fund advisor and parent capital group were liable for alleged misstatements in the prospectuses of a legally distinct fund they owned and administered. The advisor and parent company were allegedly "significantly involved in preparing" the statements at issue, unlike AEON here. *Janus*, 564 U.S. at 148. Nevertheless, the Court held that the mutual fund—which alone "bears the statutory obligation to file the prospectus with the SEC"—was the sole maker of the alleged misstatements. *Id.* at 147.

The only alleged facts relating to AEON—that it had (for part of the class period) a majority stake in Evolus and had three overlapping board members—are manifestly insufficient to infer that AEON had ultimate authority over Evolus' statements. *See McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 136–37 (S.D.N.Y. 2013) (rejecting plaintiffs' argument that

because defendant allegedly "dominated and controlled" the maker, defendant had the ultimate authority over the statement).  Indeed, permitting Plaintiffs' Rule 10b-5 claim to move forward against AEON would be tantamount to holding that every parent company and majority shareholder is directly liable under the securities laws for the subsidiary's statements, in direct contravention of *Janus* and the PSLRA.

### 3. Plaintiffs Have Not Adequately Alleged Facts Giving Rise to a Strong Inference of Scienter.

Plaintiffs' Rule 10b-5 claim against AEON also must be dismissed because the AC does not contain particularized factual allegations giving rise to a strong inference of scienter as to AEON.  In determining whether a plaintiff has sufficiently pleaded scienter, the Court must consider "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 US 308, 314 (2007) ("To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent").  To survive a motion to dismiss, a plaintiff must allege, with respect to each defendant, "facts (1) showing that the defendant[] had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  The AC alleges neither.

(a)     The AC Does Not Adequately Allege Motive and Opportunity.

To establish motive and opportunity, a plaintiff must specifically allege "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."  *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009).  Plaintiffs' attempt to allege concrete benefits through AEON's sale of Evolus stock fails.

*First*, stock sales only support an inference of scienter if a plaintiff alleges particularized facts indicating that the sales are unusual or suspicious. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001). AEON's sales were not suspicious—to the contrary, they had nothing to do with the ITC proceeding. Plaintiffs point to AEON's sale in May 2019 of 4 million shares of Evolus stock, but that stock was sold to pay off debt obligations that were due in June 2019. (Johnson Decl. Ex. C.) Thus, both the timing and amount of the sale were dictated by AEON's debt obligations rather than any inside knowledge about the ITC proceeding. AEON disposed of another 1.3 million shares in May 2019 (AC ¶ 228) because certain holders of AEON notes chose to convert the notes into Evolus shares. (Johnson Decl. Exs. C, D.) This likewise is not suspicious and does not support a strong inference of scienter—it was the AEON noteholders, not AEON, who made the election. Finally, Plaintiffs point to AEON disposing of another approximately 1.3 million shares in June 2019, but that transaction actually undermines any inference of scienter. (AC ¶ 228.) As disclosed by AEON in SEC filings, those shares were transferred to AEON's controlling shareholder to repay debt. (Johnson Decl. Exs. F & E.) The fact that AEON's controlling shareholder chose to acquire the shares strongly suggests that AEON <u>was</u> confident in Evolus' prospects for winning the ITC proceeding and believed in Evolus' proprietary toxin. *See In re Prestige Brands Holding, Inc.*, 2006 WL 2147719, at \*5 (S.D.N.Y. July 10, 2006) (finding plaintiff failed to demonstrate stock sales were suspicious and unusual where individual defendants purchased stock during the class period).

*Second*, Evolus' stock sales do not contribute to an inference of scienter for the additional reason that they preceded any possible knowledge on the part of AEON that Evolus was likely to lose the ITC proceeding. Plaintiffs' scienter theory is that through some unalleged means, some unidentified person at AEON gained access to discovery and expert materials produced by

Medytox in the confidential ITC proceeding, and concluded or was reckless in not concluding that Evolus' defenses were baseless. (AC ¶¶ 12-14, 113-114, 116-117, 128-171, 290.) As discussed further below, the AC entirely lacks particularized allegations establishing that AEON had any non-public information from or about the ITC proceeding. But even passing that, Plaintiffs' theory falls apart with a glance at the timeline. The ITC announced it was initiating an investigation on March 1, 2019; fact discovery closed on July 19, 2019 and expert discovery closed on October 30, 2019. (AC ¶¶ 112, 114.) The stock sales alleged in the AC occurred in May and June of 2019, and were planned even earlier—AEON "caused Evolus to file a shelf registration statement on March 22, 2019 enabling [AEON] to sell its shares to the market." (AC ¶ 276.)

Thus, AEON was preparing to dispose of Evolus shares just three weeks after the ITC proceeding began, and all of the alleged sales of Evolus stock were completed well before the end of fact discovery and before expert discovery even began. There is no allegation in the AC identifying information produced in discovery (much less shared with AEON) prior to the stock sales, and in fact, the AC alleges the opposite: that Defendants were aware of that Daewoong had misappropriated trade secrets "by the time discovery in the ITC Investigation concluded [*i.e.*, July or October 2019] at the very latest." (AC ¶ 129.) Indeed, the centerpiece of the information that supposedly should have put AEON on notice that Evolus would lose—the DNA sequencing that allegedly showed the similarities in the toxins—was based on Medytox's expert opinions. (AC ¶ 128.) By Plaintiffs' own allegations, this key information was unknown to AEON at the time it sold Evolus stock. (AC ¶ 128.)

It is well established that stock sales occurring more than a few months in advance of the end of the class period or the alleged revelation of the fraud do not raise a strong inference of scienter. *See N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners,*

*Inc.*, 2016 WL 5794774, at *19 (S.D.N.Y. Sept. 30, 2016); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008). Here AEON's stock sales occurred over a year before the end of the class period and at a time when there is no specific allegation that AEON possessed or had access to the information that supposedly showed Evolus' statements were false. This does not come close to meeting the stringent requirements of the PSLRA.

(b)  The AC Does Not Adequately Allege Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness.

Fraudulent intent can also be established by alleging facts which constitute "strong circumstantial evidence" of conscious misbehavior or recklessness. *Kalnit v. Eichler*, 85 F. Supp. 2d 232, 243 (S.D.N.Y. 1999). Recklessness is "conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care.'" *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998). "[T]here is a significant burden on the plaintiff in stating a fraud claim based on recklessness." *Chill v. General Elec. Co.*, 101 F.3d 263, 270 (2d Cir.1996). Where, as here, the plaintiffs fail to adequately allege motive and opportunity, they "must produce a stronger inference of recklessness." *Kalnit,* 264 F.3d at 143.

The AC does not meet this exacting pleading standard. Again, Plaintiffs' theory is that Defendants knew or should have known that Evolus' statements were false based on their review of discovery and expert opinions in the ITC proceeding. (AC ¶¶ 13-14, 113-114. 116-117, 128-171.) Critically, however, the AC pleads no specific facts establishing that AEON was provided with or reviewed discovery materials from the ITC proceeding. There is no identification of specific information provided, who provided it or to whom, or when or how it was provided. Nor is there any allegation that anyone from AEON, including any legal counsel, attended the ITC evidentiary hearing. (AC ¶ 116 (alleging the attendance of various people at parts of the hearing, but none from AEON).) This falls far short of alleging access to the information with enough

particularity to survive a motion to dismiss. *See Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 426 (S.D.N.Y. 2014) (requiring plaintiffs to "specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements," and "specifically identify the reports or statements containing this information").

Moreover, the AC alleges that the ITC proceedings were sealed. (AC ¶ 94.) And as detailed in Evolus' Brief (at p. 6-7), even the <u>parties</u> to the ITC proceeding were precluded from accessing the confidential discovery and expert materials that Plaintiffs claim should have made clear that Medytox would win, since the Protective Order limited access to that information to outside counsel, which solely represented Evolus and not AEON. (Johnson Decl., Ex. G at p.1-3.) As a non-party, AEON certainly had no access to this confidential information, and the AC alleges no facts suggesting otherwise.

Finally, the Court should reject any attempt by Plaintiffs to impute knowledge of the ITC proceedings to AEON because three members of AEON's board were also directors of Evolus. Courts have routinely rejected attempts to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they must have had access to information. *See In re Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL 283286, at *6 (S.D.N.Y., June 1, 1998) (refusing to infer defendants' knowledge of misstatements based on four individual defendants' overlapping board positions); *Firebird Republics Fund, Ltd. v. Moore Capital Mgmt. LLC*, 2009 WL 955050 (S.D.N.Y. 2009) (". . . it is well-established in this Circuit that such generalized or boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their positions within the Company are not sufficient to plead scienter"); *Kinsey v. Cendant*, 2005 WL 1907678, at *5 (S.D.N.Y. Aug. 10, 2005) (collecting

cases) ("conclusory allegations that a corporate officer had 'access' to information that contradicted the alleged misstatements are insufficient to raise a strong inference of recklessness"); *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) (generalized allegations that defendants knew or should have known that they were misrepresenting material facts based on their senior positions in the company are insufficient to establish scienter.)

Likewise, here, Plaintiffs fail to explain with sufficient particularity how the three individuals serving on the boards of Alphaeon and Evolus knew or recklessly failed to know from confidential ITC litigation documents that the alleged statements were false. Simply assuming they must have known is insufficient to demonstrate the requisite strong inference of scienter with respect to AEON.

**B.**      **The AC Fails To Adequately Plead a Control Person Claim Under Section 20(a).**

Section 20(a) extends liability for violations of Section 10(b) and Rule 10b-5 to "control persons"—those who, "directly or indirectly, control[] any person liable under" the Exchange Act. 15 U.S.C. § 78t(a). To state a claim against a control person under Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The AC fails to allege any of the three elements.

**1.**      **Plaintiffs Have Not Adequately Alleged a Primary Violation.**

As to the first element, "[i]f a plaintiff has not adequately alleged a primary violation— that is, a claim under another provision of the Exchange Act—the derivative Section 20(a) claim must fall." *E.g., Oklahoma Law Enforcement Ret. Sys.,* 517 F. Supp. 3d 196, 206 (S.D.N.Y. 2021); *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 16-17 (2d Cir. 1983) ("Where Section 10(b) claims

against controlled individuals are dismissed, the derivative Section 20(a) claims against the controlling persons must also be dismissed."); *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 25 (S.D.N.Y. 2016) ("[T]he plaintiffs have not alleged a primary violation of Section 10(b) and Rule 10b-5. Accordingly, the plaintiffs have not satisfied the first element of a Section 20(a) claim, and that claim must also be dismissed").

For the reasons set forth above and in the Evolus Motion to Dismiss, the AC fails to adequately plead securities fraud under Section 10(b)(5) and Rule 10b-5. Because Plaintiffs have not stated a claim for a primary violation of the Exchange Act by any controlled person, Plaintiffs' derivative claim against AEON based on control person liability under Section 20(a) also must be dismissed. *See Oklahoma Law Enforcement Retirement Sys.,* 517 F. Supp. 3d at 214.

### 2. Plaintiffs Have Not Adequately Alleged Control Over the Primary Violator's Alleged Misrepresentations.

The AC also fails to adequately allege control over the primary violator. The AC alleges that AEON had control over Evolus because, up until May 20, 2019, it held a majority ownership interest in Evolus and three representatives from AEON's board of directors also served on Evolus' seven-person board of directors during the class period. (AC ¶¶ 38-42, 272-273; Johnson Decl., Ex. B.) These allegations are insufficient for two reasons.

*First*, while control over a primary violator may be established by showing the defendant possessed "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise," 17 C.F.R. § 240.12b–2, Plaintiffs must also demonstrate AEON's control over Evolus' alleged misrepresentations to prevail on a control-person claim under Section 20(a). *See Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482 (S.D.N.Y. 2014). In *Arkansas Teacher Ret. Sys.,* the court held that "to satisfy a Section 20(a) claim, the 'defendant must not only have

16

actual control over the primary violator, but have 'actual control over the ***transaction*** in question.' " *Id.* (emphasis in original); *see also In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005); *In re Global Crossing Ltd. Sec. Litig.*, 2005 WL 1875445, at \*3 (S.D.N.Y. Aug. 5, 2005). That the defendant controlled more than 50% of the primary violator's stock and had three sitting representatives on the primary violator's seven-person board during the class period was not enough to establish control for purposes of Section 20(a). *See Arkansas Teacher Ret. Sys.*, 18 F. Supp. 3d at 486. Likewise here, AEON's onetime majority ownership and three overlapping directors (on Evolus's seven-member board) do not plead control. Nor is there any allegation that AEON had control over the statements in question. Indeed, as discussed further below with respect to the "culpable participation" element, there is no allegation that AEON was involved in the statements in any way. For that reason too, Plaintiffs have not adequately alleged control.

*Second*, even if Plaintiffs could allege control based solely on AEON owning a majority of Evolus' stock, AEON may not be liable as a control person for alleged misrepresentations that occurred after the sale of its majority interest on May 20, 2019. *See Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 61 (E.D.N.Y. 2011) (corporate officers "cannot be liable as control persons for the period after they left the Company").) Plaintiffs have only pled eight alleged misrepresentations that pre-date AEON's May 20, 2019 sale of Evolus stock, most of which are generic references to Jeuveau as "proprietary." (AC ¶¶ 172-73; 177; 180; 184; 186; 188; 190; 193-194.) At a bare minimum, the Section 20(a) claim must be dismissed as to any subsequent alleged statement.

### 3. Plaintiffs Have Not Adequately Alleged Culpable Participation with Particularity.

Plaintiffs have also failed to allege "culpable participation" by AEON in any of the alleged

misstatements by Evolus.  To plead a control person claim under Section 20(a), a plaintiff must allege that "that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996).  Moreover, this element must be pled with particularity and is subject to the heightened pleading standards of the PSLRA—in other words, a control person claim under Section 20(a) can survive a motion to dismiss only if the challenged pleading includes particularized allegations giving rise to a strong inference of scienter.  *See In re NQ Mobile, Inc. Sec. Litig.*, 2015 WL 1501461, at *3- 4 (S.D.N.Y. Mar. 27, 2015); *In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014) ("Most courts in this district have held that . . . culpable participation is a scienter requirement for which a plaintiff must allege some level of culpable participation at least approximating recklessness in the section 10(b) context in order to survive a motion to dismiss."); *In re Bayer AG Sec. Litig.*, 2004 WL 2190357, at *16 (S.D.N.Y. Sept. 30, 2004) (the PSLRA requires that "plaintiffs must demonstrate a defendant's culpable state of mind to establish a claim for control person liability"); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 122–23 (S.D.N.Y. 2013) ("[T]o withstand a motion to dismiss, a § 20(a) claim must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness."); *Tongue v. Sanofi*, 816 F.3d 199, 209, n.12 (2d Cir. 2016) ("Because § 20(a) of the Exchange Act imposes derivative liability on parties controlling persons who commit Exchange Act violations, scienter is also required for Plaintiffs' § 20(a) claim to succeed.").

The AC does not meet this standard with respect to AEON.

*First*, the AC is entirely devoid of factual allegations that AEON in any way participated in the Evolus statements that Plaintiffs claim were false.  There is no allegation in the AC that AEON provided input into Evolus' statements, or was consulted about the statements, or even was

told in advance that Evolus planned to make the statements. In the absence of any specific allegation of any involvement by AEON in any alleged misstatement, Plaintiffs have not sufficiently alleged participation, much less culpable participation. *See In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 255 (S.D.N.Y. 2018) (Although the plaintiffs alleged a number of material misstatements and omissions based on the primary violator's financial reporting, the plaintiffs did not plead facts demonstrating that the alleged controller was a participant in those misstatements or omissions).

*Second*, the AC's generic allegations that AEON had (for part of the class period) a majority interest in Evolus, that the companies had a few overlapping board members, and therefore that AEON "exercised control over the general operations of Evolus" and "possessed the power to control the specific activities which comprise the primary violations" do not support any conclusion that AEON culpably participated in the misstatements. (AC ¶¶ 280, 281.) If boilerplate allegations such as these were sufficient, the culpable participation element of Section 20(a) claims would be effectively eliminated and, contrary to the PSLRA, any parent company could be dragged into securities litigation against its subsidiary without any particularized allegations creating a strong inference of scienter.

*Third*, any participation by AEON in Evolus' statements—and, again, no participation is specifically alleged—could be "culpable" only if AEON knew or was reckless in not knowing that Evolus' statements were false. As discussed above in connection with the lack of adequate scienter allegations for the 10b-5 claim, the AC fails to plead particularized facts showing AEON had access to or reviewed the discovery and expert materials from the ITC proceeding which Plaintiffs claim made clear that Evolus' position before the ITC would be unsuccessful.

*Fourth*, to the extent Plaintiffs argue that AEON's stock sales show culpability, that

19

argument fails for the same reason the stock sales do not support an inference of scienter. As set forth in Part II(A)(3), *supra*, AEON's stock sales were not suspicious and occurred before the information was even produced in the ITC proceeding—more than six weeks before the close of fact discovery and before expert discovery even began. As such, the AC fails to allege culpability on the part of AEON as required to plead a control person claim.

### C. The AC Fails to Adequately Plead a Claim for Insider Trading Under Section 20A of the Exchange Act.

Section 20A of the Exchange Act provides a private right of action against a person who violates the Exchange Act "by purchasing or selling a security while in possession of material, nonpublic information." 15 U.S.C. § 78t–1(a). In order to state a claim for insider trading under Section 20A, a plaintiff must allege: (1) a predicate insider trading violation of the Exchange Act, and (2) sufficient facts showing that the defendant traded the security at issue contemporaneously with the plaintiff. *See In re Take-Two Interactive Sec. Litig.,* 551 F. Supp. 2d at 309. The predicate act must be an act of insider trading, *i.e.* the purchase or sale of a security while in possession of material, nonpublic information, that violates the Exchange Act. *See Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994).

Because insider trading is a violation of Rule 10b–5(a)'s prohibition on deceptive devices, it sounds in fraud and the heightened pleading requirements of F.R.C.P. 9(b) and the PSLRA apply. *See In re Take-Two Interactive Sec. Litig.,* 551 F. Supp. 2d at 310, n.50; *In re Bear Stearns Co., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 487 (S.D.N.Y. 2011); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255 n.10 (S.D.N.Y. 2007).

The same pleading deficiencies that doom Plaintiffs' scienter and control-person allegations are fatal to its insider trading claim. Plaintiffs' Section 20A claim is based on the allegation that at the time of its May 20, 2019 stock sale, AEON "was aware of or recklessly

disregarded the evidence demonstrating that Jeaveau was the product of misappropriation." (AC ¶¶ 289-90.) But as detailed above, there is no allegation that non-public information from the ITC proceeding was provided to or reviewed by anyone at AEON, and the protective order in the action precluded AEON from being given access to such information. Nor can plaintiffs impute knowledge to AEON through the common board members shared by AEON and Evolus—as discussed above, courts consistently reject attempts to plead scienter through imputing knowledge based on an individual's position in the company. *See In re Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998).

Moreover, AEON's May 2019 sale of Evolus stock came just two months after commencement of the ITC proceeding, months before the close of fact discovery and before expert discovery even began. As such, even if the AC alleged that all discovery materials from the ITC proceeding were somehow funneled directly to AEON (which it does not), there is no allegation that any material information was disclosed in the opening weeks of the discovery period, and therefore no allegation sufficient to plead that AEON was in possession of non-public, material information when it sold Evolus stock.

Plaintiffs' insider trading allegations are similar to the allegations found to be insufficient in *In re Take-Two Interactive Securities Litigation*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008). There, the defendants in an insider-trader claim, two directors and an officer of Take-Two, were allegedly aware of sexually explicit code in a Take-Two video game, the discovery of which later allegedly caused the stock price to drop, from emails written by officers of a Take-Two subsidiary. But "Lead Plaintiffs fail[ed] to allege that this e-mail, or its contents, ever reached" the parent company, and failed to explain "why knowledge of this e-mail should be imputed to an officer or directors of Take-Two." *Id*. at 310-11. The Court dismissed the Section 20A claim because the

complaint was "devoid of particularized allegations tending to show that these defendants knew about" the code, or knew that it had been or would be discovered when they made the stock sales at issue. 551 F. Supp. 2d at 310. Likewise here, there is no allegation that information from the ITC proceeding ever reached AEON, and no basis to impute non-public knowledge of the proceeding to AEON. As such, the AC fails to plead insider trading and the Section 20A claim must be dismissed.

### D. Granting Leave to Amend Would be Futile.

There is no reason to believe that an amendment can cure the AC's deficiencies, because the alleged misstatements are not actionable and were not made by AEON, and the AC does not even begin to plead the particularized facts necessary to create a strong inference of scienter or establish control person or insider trading liability as to AEON. Permitting Plaintiffs to file an amended complaint under these circumstances would be futile and would needlessly burden counsel and the Court. *See Oklahoma Law Enforcement Ret. Sys.*, 517 F. Supp. 3d at 215; *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) ("Granting leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim.").

## IV. CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed without leave to amend as to AEON.

DATED: February 10, 2022

Respectfully Submitted,

THEODORA ORINGHER PC

By: /s/ *Todd C. Theodora*

Todd C. Theodora (admitted *pro hac vice*)
CA State Bar No. 120426
Edward E. Johnson (admitted *pro hac vice*)
CA State Bar No. 241065
Michelle Monroe (admitted *pro hac vice*)
CA State Bar No. 311776
THEODORA ORINGHER PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, CA  92626-7109
Telephone: (714) 549-6200
Email: ttheodora@tocounsel.com
ejohnson@tocounsel.com
mmonroe@tocounsel.com

Attorneys for Defendant AEON Biopharma, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on February 10, 2022, a copy of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF AEON BIOPHARMA, INC.'S MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT** was served via E-mail on the following:

THE ROSEN LAW FIRM, P.A.
Sara Fuks
Laurence Rosen
Phillip Kim
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: sfuks@rosenlegal.com
      lrosen@rosenlegal.com
      pkim@rosenlegal.com

*Lead Counsel for Plaintiffs*


Jonathan Rosenberg
B. Andrew Bednark
O'MELVENY & MYERS LLP
Seven Times Square
New York, New York 10036
Email:  jrosenberg@omm.com
      abednark@omm.com

*Attorneys for Defendants Evolus, Inc.,*
*David Moatazedi, Rui Avelar, and Lauren Silvernail*


               /s/ Edward E. Johnson
               Edward E. Johnson