# EXHIBIT "A"

10-K 1 evolus12311810-k.htm 10-K

---

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

---

# FORM 10-K

---

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2018**
or

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from           to**

**Commission File Number: 001-38381**

---

# EVOLUS, INC.
**(Exact name of registrant as specified in its charter)**

---

| | |
|---|---|
| **Delaware** | **46-1385614** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification Number)** |

**520 Newport Center Dr., Suite 1200**
**Newport Beach, California 92660**
**(949) 284-4555**
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

---

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock, $0.00001 par value per share | The Nasdaq Stock Market LLC |

**Securities registered pursuant to Section 12(g) of the Act:**

None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| | | | ☒ |
| Non-accelerated filer | ☒ | Smaller reporting company | |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial statement accounting standards provide pursuance to Section 13(a) of the Exchange Act. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐    No ☒

The aggregate market value of the registrant's common stock held by non-affiliates of the registrant as of the last business day of the registrant's most recently completed second fiscal quarter was approximately $141.5 million, based on the closing price of the registrant's common stock on the Nasdaq Global Market of $27.99 per share for such date.

As of March 20, 2019, 27,274,991 shares of the registrant's sole class of common stock were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**
None

**EVOLUS, INC.**

**TABLE OF CONTENTS**

|  |  | **Page** |
|---|---|---|
| **PART I** | | |
| Item 1 | Business | 3 |
| Item 1A | Risk Factors | 23 |
| Item 1B | Unresolved Staff Comments | 61 |
| Item 2 | Properties | 61 |
| Item 3 | Legal Proceedings | 61 |
| Item 4 | Mine Safety Disclosures | 62 |
| **PART II** | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 63 |
| Item 6 | Selected Financial Data | 64 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 65 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 76 |
| Item 8 | Financial Statements and Supplementary Data | 77 |
| Item 9 | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 108 |
| Item 9A | Controls and Procedures | 108 |
| Item 9B | Other Information | 108 |
| **PART III** | | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 110 |
| Item 11 | Executive Compensation | 114 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 123 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 125 |
| Item 14 | Principal Accounting Fees and Services | 133 |
| **PART IV** | | |
| Item 15 | Exhibits, Financial Statement Schedules | 134 |
| Item 16 | Form 10-K Summary | 137 |
|  | Signatures | |

Table of Contents

Oxford, as collateral agent, could exercise remedies against us and the collateral securing the credit facility, including foreclosure against the property securing the credit facility, including cash. Any such action could materially and adversely affect our business and results of operations.

***We currently rely solely on Daewoong to manufacture Jeuveau™, and as such, any production or other problems with Daewoong could adversely affect us.***

We depend solely upon Daewoong for the manufacturing of Jeuveau™. Although alternative sources of supply may exist, the number of third-party suppliers with the necessary manufacturing and regulatory expertise and facilities is limited, and it could be expensive and take a significant amount of time to arrange for and qualify alternative suppliers, which could have a material adverse effect on our business. Suppliers of any new product candidate would be required to qualify under applicable regulatory requirements and would need to have sufficient rights under applicable intellectual property laws to the method of manufacturing the product candidate. Obtaining the necessary FDA approvals or other qualifications under applicable regulatory requirements and ensuring non-infringement of third-party intellectual property rights could result in a significant interruption of supply and could require the new manufacturer to bear significant additional costs which may be passed on to us.

In addition, our reliance on Daewoong entails additional risks, including reliance on Daewoong for regulatory compliance and quality assurance, the possible breach of the Daewoong Agreement by Daewoong, and the possible termination or nonrenewal of the Daewoong Agreement at a time that is costly or inconvenient for us. Our failure, or the failure of Daewoong, to comply with applicable regulations could result in sanctions being imposed on us, including fines, injunctions, civil penalties, delays, suspension or withdrawal of approvals, license revocation, seizures or recalls of products, operating restrictions and criminal prosecutions, any of which could significantly and adversely affect supplies of Jeuveau™. Our dependence on Daewoong also subjects us to all of the risks related to Daewoong's business, which are all generally beyond our control. Daewoong's ability to perform its obligations under the Daewoong Agreement is dependent on Daewoong's operational and financial health, which could be negatively impacted by several factors, including changes in the economic, political and legislative conditions in South Korea and the broader region in general and the ability of Daewoong to continue to successfully attract customers and compete in its market. Furthermore, Daewoong's recently constructed manufacturing facility is Daewoong's only facility meeting FDA and EMA cGMP requirements. Daewoong's lack of familiarity with, or inability to effectively operate, the facility and produce products of consistent quality, may harm our ability to compete in our market.

Additionally, although we are ultimately responsible for ensuring compliance with regulatory requirements such as cGMPs, we are dependent on Daewoong for day-to-day compliance with cGMP for production of drug substance and finished products. Facilities used by Daewoong to produce the drug substance and materials or finished products for commercial sale must pass inspection and be approved by the FDA and other relevant regulatory authorities. If the safety of Jeuveau™ is compromised due to a failure to adhere to applicable laws or for other reasons, we may not be able to successfully commercialize our product and we may be held liable for injuries sustained as a result. In addition, the manufacturing facilities of certain of our suppliers are located outside of the United States. This may give rise to difficulties in importing our product into the United States or other countries as a result of, among other things, regulatory agency approval requirements, taxes, tariffs, local import requirements such as import duties or inspections, incomplete or inaccurate import documentation or defective packaging. Any of these factors could adversely impact our ability to effectively commercialize Jeuveau™.

Any failure or refusal by Daewoong or any other third party to supply Jeuveau™ or any other product candidates or products that we may develop could delay, prevent or impair our clinical development or commercialization efforts.

***Third-party claims of intellectual property infringement may prevent or delay our development and commercialization efforts.***

Our commercial success depends in part on our avoiding infringement of the proprietary rights of third parties. Competitors in the field of dermatology, aesthetic medicine and neurotoxins have developed large portfolios of patents and patent applications in fields relating to our business. In particular, there are patents held by third parties that relate to the treatment with neurotoxin-based products for the indication we are currently developing. There may also be patent applications that have been filed but not published that, when issued as patents, could be asserted against us. There is a substantial amount of litigation, both within and outside the United States, involving patent and other intellectual property rights in the technology, medical device and pharmaceutical industries, including patent infringement lawsuits, interferences, oppositions and inter-party reexamination proceedings before the U.S. Patent and Trademark Office, or USPTO. Numerous U.S. and foreign issued patents and pending patent applications, which are owned by third parties, exist in the fields in which we are developing

25

Table of Contents

Jeuveau™. As the technology, medical device and pharmaceutical industries expand and more patents are issued, the risk increases that our product candidates may be subject to claims of infringement of the patent rights of third parties.

Third parties may assert that we or any of our current or future licensors, including Daewoong, are employing their proprietary technology without authorization. There may be third-party patents or patent applications with claims to materials, methods of manufacture or methods for treatment related to the use or manufacture of Jeuveau™ or any future product candidates. Because patent applications can take many years to issue, there may be currently pending patent applications that may later result in issued patents that Jeuveau™ or any future product candidates may infringe. In addition, third parties may obtain patents in the future and claim that use of our technologies infringes upon these patents. If any third-party patents were held by a court of competent jurisdiction to cover the manufacturing process of Jeuveau™ or any future product candidates, the holders of any such patents may be able to block our ability to commercialize such product candidate unless we obtain a license under the applicable patents or until such patents expire. Similarly, if any third-party patent were held by a court of competent jurisdiction to cover aspects of our methods of use, the holders of any such patent may be able to block our ability to develop and commercialize the applicable product candidate unless we obtain a license or until such patent expires. In either case, such a license may not be available on commercially reasonable terms or at all.

In addition to claims of patent infringement, third parties may bring claims against us asserting misappropriation of proprietary technology or other information in the development, manufacture and commercialization of Jeuveau™ or any of our future product candidates. Defense of such a claim would require dedicated time and resources, which time and resources could otherwise be used by us toward the maintenance of our own intellectual property and the development and commercialization of Jeuveau™ and any of our future product candidates or by any of our current or future licensors for operational upkeep and manufacturing of our products. Presently, we are a defendant in a lawsuit brought by Medytox, Inc., or Medytox, on June 7, 2017 in the Superior Court of the State of California, alleging, among other things, that Daewoong stole Medytox's botulinum toxin bacterial strain, or the BTX strain, that Daewoong misappropriated certain trade secrets of Medytox, including the process used to manufacture Jeuveau™ (which Medytox claims is similar to its biopharmaceutical drug, Meditoxin) using the BTX strain, and that Daewoong thereby interfered with Medytox's plan to license Meditoxin to us, or the Medytox Litigation. Medytox claims that as a result of Daewoong's conduct, we entered into the Daewoong Agreement instead of an agreement with Medytox to license Meditoxin.

Daewoong filed a motion to dismiss or stay for forum non conveniens, claiming that the place where the complaint has been filed, in the Superior Court of the State of California, is not the proper place for the trial of the claims in the complaint because, among other reasons, the underlying facts that gave rise to the complaint occurred in South Korea. Daewoong's motion to dismiss was granted by the Superior Court of the State of California on October 12, 2017. As a result, the action filed with the Superior Court of the State of California is stayed pending resolution of the proceedings in South Korea. In October 2017, Medytox initiated a civil lawsuit against Daewoong and its parent company, Daewoong Co. Ltd., in the Seoul Central District Court in Seoul, South Korea, related to the same subject matter in the Medytox litigation and is seeking, among other things, money damages, injunctive relief and destruction of related documents and products. None of us, ALPHAEON or SCH are parties to the litigation in the Seoul Central District Court.

On April 27, 2018, pursuant to a motion to dismiss brought by Daewoong, the Superior Court of the State of California dismissed Medytox's suit against Daewoong, without prejudice, on the basis that Medytox had brought a substantially similar proceeding against Daewoong in South Korea. The proceedings against us, ALPHAEON and SCH remain stayed in the Superior Court of the State of California pending resolution of the proceedings between Medytox and Daewoong in South Korea.

With specific regard to us, Medytox alleges that (i) we have violated California Uniform Trade Secrets Act, Cal. Civ. Code Section 3426 because Daewoong's alleged knowledge of the misappropriation of certain trade secrets of Medytox is imputed to us as a result of our relationship with Daewoong, (ii) we have stolen the BTX strain through our possession of and refusal to return the BTX strain, (iii) we have engaged in unlawful, unfair and fraudulent business acts and practices in violation of California Bus. & Prof. Code Section 17200, including conversion of the BTX strain and misrepresentations to the public regarding the source of the botulinum toxin bacterial strain used to manufacture Jeuveau™, and (iv) the Daewoong Agreement is invalid and in violation of Medytox's rights.

Medytox seeks, among other things, (i) actual, consequential and punitive damages, (ii) a reasonable royalty, as appropriate, (iii) a declaration that the Daewoong Agreement is void and unenforceable and that Medytox is entitled to disgorgement of all property wrongfully and unjustly retained or acquired by the defendants, including unlawfully gained profits, (iv) injunctive relief prohibiting us from using the license under the Daewoong Agreement and distributing Jeuveau™, and (v) attorneys' fees and costs.

Table of Contents

Given the early stage in the Medytox Litigation, we are unable to predict the likelihood of success of Medytox's claims against us, ALPHAEON, SCH or Daewoong or to quantify any risk of loss. The Medytox Litigation and any other similar claims, suits, government investigations, and proceedings are inherently uncertain and their results may not be favorable for us. For example, if the Medytox Litigation has a negative outcome for us, ALPHAEON or Daewoong, it could result in us losing access to Jeuveau™ and the manufacturing process and require us to negotiate a new license with Medytox for continued access to Jeuveau™. We may not be able to successfully negotiate such license on terms acceptable to us or at all. If we are unable to license Jeuveau™, we may not be able to find a replacement product, if at all, without expending significant resources and being required to seek additional regulatory approvals, which would be uncertain, time consuming and costly. Regardless of the outcome, such proceedings can have an adverse impact on us because of legal costs, diversion of management resources, and other factors. An adverse ruling against either us or one of the other defendants of any such proceedings could adversely affect our business, financial position, results of operations, or cash flows and could also result in reputational harm. Any of these consequences could adversely affect our business and results of operations.

On January 30, 2019, Allergan and Medytox filed a complaint against us and Daewoong in the U.S. International Trade Commission, or the ITC, containing substantially similar allegations to the Medytox Litigation, specifically that Jeuveau™ is manufactured based on misappropriated trade secrets of Medytox and therefore the importation of Jeuveau™ is an unfair act. The ITC matter is entitled *In the Matter of Certain Botulinum Toxin Products*, or the ITC Complaint. The ITC instituted an investigation as ITC Inv. No. 337-TA-1145. The ITC complaint calls for an investigation by the ITC under Section 337 of the Tariff Act of 1930. The ITC complaint seeks (i) an investigation pursuant to Section 337 of the Tariff Act of 1930, (ii) a hearing with the ITC on permanent relief, (iii) issuance of a limited exclusion order forbidding entry of Jeuveau™ into the United States, (iv) a cease and desist order prohibiting Daewoong and us from engaging in the importations, sale for importation, marketing, distribution, offering for sale, the sale after the importation of, or otherwise transferring Jeuveau™ within the United States, (v) a bond issued during the presidential review period, (vi) the return of Medytox's trade secrets and other confidential information including the alleged stolen BTX Strain, and (vii) exclusion and cease and desist orders. The Company intends to defend itself vigorously in the proceedings. An adverse ruling by the ITC against either us or Daewoong could result in the imposition of an exclusion order which would bar imports of Jeuveau™ into the United States and a cease and desist order which would bar sales and marketing of our sole product Jeuveau™ within the United Sates either of which would adversely affect our ability to carry our out our business and which would have an adverse effect on our business, financial position, results of operations, or cash flows and could also result in reputational harm. Any of these consequences could adversely affect our business and results of operations. Additionally, in certain cases if there is preliminary or permanent relief granted under the Medytox Litigation or the ITC matter, it may constitute an event of default under our credit facility. Under the credit facility, in the event of default, a default interest rate equal to the applicable rate plus 5.0% would apply and Oxford, as collateral agent, could exercise remedies against us and the collateral securing the credit facility, including foreclosure against the property securing the credit facility, including cash. Any such action could materially and adversely affect our business and results of operations.

Parties making claims against us or any of our current or future licensors may request and obtain injunctive or other equitable relief, which could effectively block our ability to further develop and commercialize one or more of our product candidates. Defense of these claims, regardless of their merit, would involve substantial litigation expense and would be a substantial diversion of employee resources from our business. In the event of a successful claim of infringement, we or any of our current or future licensors may have to pay substantial damages, including treble damages and attorneys' fees for willful infringement, obtain one or more licenses from third parties which may not be commercially or more available, pay royalties or redesign our infringing products or manufacturing processes, which may be impossible or require substantial time and monetary expenditure. Furthermore, even in the absence of litigation, we may need to obtain licenses from third parties to advance our research, manufacture clinical trial supplies or allow commercialization of Jeuveau™ or any future product candidates. We may fail to obtain any of these licenses at a reasonable cost or on reasonable terms, if at all. In that event, we would be unable to further develop and commercialize one or more of our product candidates, which could harm our business significantly. Similarly, third-party patents could exist that might be enforced against our products, resulting in either an injunction prohibiting our sales, or with respect to our sales, an obligation on our part to pay royalties and/or other forms of compensation to third parties.

***Borrowings under our credit facility could adversely affect our financial condition and restrict our operating flexibility.***

On March 15, 2019, or the closing date, we entered into the credit facility with Oxford, or the lender, pursuant to which the lender will make term loans available to us of up to $100.0 million, or the credit facility. The credit facility provides that the term loans will be funded in two advances. The first tranche of $75.0 million was funded on the closing date, and the second tranche of $25.0 million may be drawn, at our request, no later than September 30, 2020, upon achieving specified minimum net sales milestones and no event of default is occurring. The credit facility bears an annual interest rate equal to the greater

Table of Contents

**Item 1B.    Unresolved Staff Comments.**

Not applicable.

**Item 2.    Properties.**

Our corporate headquarters is located at 520 Newport Center Drive, Suite 1200, Newport Beach, CA 92660, in a facility that we sublease, encompassing approximately 17,758 square feet of space. The sublease for this facility expires on January 20, 2020. We also maintain a corporate office located at 1027 Garden Street, Santa Barbara, California 93101, in a facility we lease encompassing approximately 4,450 square feet of space. The lease for this facility expires on May 31, 2020. We believe our facilities are sufficient for our current needs. When our lease expires, we may exercise our renewal option or look for additional or alternate space for our operations, and we believe that suitable additional or alternative space will be available in the future on commercially reasonable terms.

**Item 3.    Legal Proceedings.**

*Medytox Litigation*

On June 7, 2017, Medytox Inc., or Medytox, filed an initial complaint in the Superior Court of the State of California, or the Medytox Litigation, against, us, ALPHAEON, SCH, Daewoong, Byung Kook Lee, Jae Chun Yoon, Jae Seung Yoon and Chang Woo Suh, among others, or collectively, the defendants. On August 14, 2017, Medytox filed an amended complaint against the defendants, or the amended complaint. The amended complaint alleges, among other things, that Daewoong stole Medytox's botulinum toxin bacterial strain, or the BTX strain, that Daewoong misappropriated certain trade secrets of Medytox, including the process used to manufacture Jeuveau™ (which Medytox claims is similar to its biopharmaceutical drug, Meditoxin) using the BTX strain, and that Daewoong thereby interfered with Medytox's plan to license Meditoxin to us. Medytox claims that as a result of Daewoong's conduct, we entered into the Daewoong Agreement instead of an agreement with Medytox to license Meditoxin.

Daewoong filed a motion to dismiss or stay for forum non conveniens, claiming that the place where the complaint has been filed, in the Superior Court of the State of California, is not the proper place for the trial of the claims in the complaint because, among other reasons, the underlying facts that gave rise to the complaint occurred in South Korea. Daewoong's motion to dismiss was granted by the Superior Court of the State of California on October 12, 2017. As a result, the action filed with the Superior Court of the State of California is stayed pending resolution of the proceedings in South Korea. In October 2017, Medytox initiated a civil lawsuit against Daewoong and its parent company, Daewoong Co. Ltd., in the Seoul Central District Court in Seoul, South Korea, related to the same subject matter in the Medytox litigation and is seeking, among other things, money damages, injunctive relief and destruction of related documents and products. We are not a party to the litigation in the Seoul Central District Court.

On April 27, 2018, pursuant to a motion to dismiss brought by Daewoong, the Superior Court of the State of California dismissed Medytox's suit against Daewoong, without prejudice, on the basis that Medytox had brought a substantially similar proceeding against Daewoong in South Korea. The proceedings against us remain stayed in the Superior Court of the State of California pending resolution of the proceedings between Medytox and Daewoong in South Korea.

With specific regard to us, Medytox alleges that (i) we have violated California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 because Daewoong's alleged knowledge of the misappropriation of certain trade secrets of Medytox is imputed to us as a result of our relationship with Daewoong, (ii) we have stolen the BTX strain through our possession of and refusal to return the BTX strain, (iii) we have engaged in unlawful, unfair and fraudulent business acts and practices in violation of California Bus. & Prof. Code § 17200, including conversion of the BTX strain and misrepresentations to the public regarding the source of the botulinum toxin bacterial strain used to manufacture Jeuveau™, and (iv) the Daewoong Agreement is invalid and in violation of Medytox's rights.

Medytox seeks, among other things, (i) actual, consequential and punitive damages, (ii) a reasonable royalty, as appropriate, (iii) a declaration that the Daewoong Agreement is void and unenforceable and that Medytox is entitled to disgorgement of all property wrongfully and unjustly retained or acquired by the defendants, including unlawfully gained profits, (iv) injunctive relief prohibiting us from using the license under the Daewoong Agreement and distributing Jeuveau™, and (v) attorneys' fees and costs.

We are vigorously defending Medytox's claims against us. Given the early stage in the Medytox Litigation, we are unable to predict the likelihood of success of Medytox's claims against us or Daewoong or to quantify any risk of loss. The litigation

Table of Contents

could go on for an extended period of time and require us to dedicate significant financial and management resources to those efforts. While we are entitled to indemnity under the Daewoong Agreement, the indemnity may not be sufficient. An adverse ruling against either us or one of the other defendants could materially and adversely affect our business, consolidated financial position, results of operations, or cash flows and could also result in reputational harm. Even if we are successful, the litigation may result in delays in our product development, reputational damage or other collateral consequences.

### *ITC Complaint*

On January 30, 2019, Allergan and Medytox filed a complaint against us and Daewoong in the U.S. International Trade Commission, or the ITC, containing substantially similar allegations to the Medytox Litigation, specifically that Jeuveau™ is manufactured based on misappropriated trade secrets of Medytox and therefore the importation of Jeuveau™ is an unfair act. The ITC matter is entitled *In the Matter of Certain Botulinum Toxin Products*, or the ITC Complaint. On March 6, 2019, the ITC instituted an investigation as ITC Inv. No. 337-TA-1145, or the ITC Action. The ITC complaint calls for an investigation by the ITC under Section 337 of the Tariff Act of 1930. The ITC complaint seeks (i) an investigation pursuant to Section 337 of the Tariff Act of 1930, (ii) a hearing with the ITC on permanent relief, (iii) issuance of a limited exclusion order forbidding entry of Jeuveau™ into the United States, (iv) a cease and desist order prohibiting Daewoong and us from engaging in the importations, sale for importation, marketing, distribution, offering for sale, the sale after the importation of, or otherwise transferring Jeuveau™ within the United States, (v) a bond issued during the presidential review period, (vi) the return of Medytox's trade secrets and other confidential information including the alleged stolen BTX Strain, and (vii) exclusion and cease and desist orders.

We intend to defend the claims contained in the ITC complaint and the related ITC Action vigorously. Given the early stage in the ITC Action, we are unable to predict the likelihood of success of Medytox's and Allergan's claims against us or Daewoong or to quantify the risk of the imposition of an exclusion order or cease and desist order. The ITC Action could require us to dedicate significant financial and management resources to those efforts. While we are entitled to indemnity under the Daewoong Agreement, the indemnity may not be sufficient. An adverse ruling against either us or one of the other defendants could materially and adversely affect our business, consolidated financial position, results of operations, or cash flows and could also result in reputational harm. Even if we are successful, the ITC Action may result in reputational damage or other collateral consequences.

### *Other Matters*

In January 2017, Medytox initiated a criminal investigation into the foregoing matter in South Korea, which appears to target one or more of the above defendants, but does not appear to target us.

In addition to the Medytox Litigation and the ITC Complaint, from time to time, we may be subject to other legal proceedings and claims in the ordinary course of business.

### Item 4.   Mine Safety Disclosures.

Not applicable.

Table of Contents

**Evolus, Inc.**

**Notes to Financial Statements**

The Daewoong Agreement also includes certain minimum annual purchases the Company is required to make in order to maintain the exclusivity of the license. The Company may, however, meet these minimum purchase obligations by achieving certain market share in its covered territories. These potential minimum purchase obligations are contingent upon the occurrence of future events, including receipt of governmental approvals and the Company's future market share in various jurisdictions, which have not yet been obtained as of December 31, 2018.

*Legal Proceedings*

The Company, from time to time, is involved in various litigation matters or regulatory encounters arising in the ordinary course of business that could result in unasserted or asserted claims or litigation. The Company is not subject to any currently pending legal matters or claims that would have a material adverse effect on its accompanying financial position, results of operations or cash flows.

In the normal course of business, the Company enters into contracts and agreements that contain a variety of representations and warranties and provide for general indemnifications. The Company's exposure under these agreements is unknown because it involves claims that may be made against the Company in the future, but have not yet been made. The Company accrues a liability for such matters when it is probable that future expenditures will be made and such expenditures can be reasonably estimated. No amounts were accrued as of December 31, 2018 and 2017.

*Medytox Litigation*

The Company, ALPHAEON, SCH and Daewoong are defendants to a lawsuit brought by Medytox, Inc. ("Medytox") alleging, among other things, that Daewoong stole Medytox's botulinum toxin bacterial strain and that Daewoong misappropriated certain trade secrets of Medytox, including the process used to manufacture the Product (the "Medytox Litigation"). The Company believes it has meritorious defenses and intends to vigorously defend Medytox's claims. Given the early stage in the Medytox Litigation, the Company is unable to determine the likelihood of success of Medytox's claims against the Company, and an estimate of the possible loss or range of loss cannot be made. While the Company is entitled to indemnity under the Daewoong Agreement, the indemnity may not be sufficient.

*Citizen Petition*

In December 2017, Medytox filed a Citizen Petition (the "Citizen Petition") with the FDA. The Citizen Petition seeks to delay approval of the Biologics License Application submitted by the Company to the FDA in May 2017 for the Product until the FDA determines the identity and source of the botulinum strain for the Product and validates the integrity of the data and information in the Biologics License Application. Medytox further requests that the FDA require the source and identity information in the Biologics License Application to include a single nucleotide polymorphism analysis of the whole genome sequence of the botulinum strain for the Product. In connection with the FDA approval of the Product, on February 1, 2019 the Citizen Petition was dismissed.

*ITC Case*

On January 30, 2019, Allergan, plc and Allergan, Inc. (collectively, "Allergan") and Medytox filed a complaint against us and Daewoong in the U.S. International Trade Commission (the "ITC"), containing substantially similar allegations to the Medytox Litigation, specifically that the Product is manufactured based on misappropriated trade secrets of Medytox and therefore the importation of the Product is an unfair act. The ITC matter is entitled *In the Matter of Certain Botulinum Toxin Products* (the "ITC Complaint"). The ITC instituted an investigation as ITC Inv. No. 337-TA-1145. The ITC complaint calls for an investigation by the ITC under Section 337 of the Tariff Act of 1930. The ITC complaint seeks (i) an investigation pursuant to Section 337 of the Tariff Act of 1930, (ii) a hearing with the ITC on permanent relief, (iii) issuance of a limited exclusion order forbidding entry of the Product into the United States, (iv) a cease and desist order prohibiting Daewoong and us from engaging in the importations, sale for importation, marketing, distribution, offering for sale, the sale after the importation of, or otherwise transferring the Product within the United States, (v) a bond issued during the presidential review period, (vi) the return of Medytox's trade secrets and other confidential information including the alleged stolen botulinum toxin bacterial strain, and (vii) exclusion and cease and desist orders. The Company intends to defend itself vigorously in the proceedings. An adverse ruling by the ITC against either us or Daewoong could result in the imposition of

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on March 20, 2019.

**EVOLUS, INC.**

By:  /s/ David Moatazedi
     David Moatazedi
     President and Chief Executive Officer

**POWER OF ATTORNEY**

The undersigned directors and officers of Evolus, Inc. constitute and appoint David Moatazedi and Lauren P. Silvernail, and each of them, as their true and lawful attorneys and agents with power of substitution, to do any and all acts and things in our name and behalf in our capacities as directors and officers and to execute any and all instruments for us and in our names in the capacities indicated below, which said attorneys and agents may deem necessary or advisable to enable said corporation to comply with the Securities Exchange Act of 1934, as amended, and any rules, regulations and requirements of the Securities and Exchange Commission, in connection with this Annual Report on Form 10-K, including specifically but without limitation, power and authority to sign for us or any of us in our names in the capacities indicated below, any and all amendments hereto; and we do hereby ratify and confirm all that said attorneys and agents shall do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ David Moatazedi<br>David Moatazedi | President, Chief Executive Officer and Member of the Board of Directors (Principal Executive Officer) | March 20, 2019 |
| /s/ Lauren P. Silvernail<br>Lauren P. Silvernail | Chief Financial Officer and Executive Vice President of Corporate Development (Principal Financial and Accounting Officer) | March 20, 2019 |
| /s/ Vikram Malik<br>Vikram Malik | Chairman of the Board of Directors | March 20, 2019 |
| /s/ Simone Blank<br>Simone Blank | Director | March 20, 2019 |
| /s/ Bosun Hau<br>Bosun Hau | Director | March 20, 2019 |
| /s/ Kristine Romine, M.D.<br>Kristine Romine, M.D. | Director | March 20, 2019 |

Table of Contents

| **Signature** | **Title** | **Date** |
|---|---|---|
| /s/ Robert Hayman<br>———————————————<br>Robert Hayman | Director | March 20, 2019 |
| /s/ David Gill<br>———————————————<br>David Gill | Director | March 20, 2019 |