**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re EVOLUS, INC. SECURITIES LITIGATION | Civil Action No. 20-cv-8647-PGG |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE EVOLUS DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL SUMMARY ........................................................................................................... 4

    Evolus's Business ............................................................................................................ 4

    Defendants Become Aware of Allegations that Jeuveau is the Product of Misappropriation ..... 4

    Evidence in the ITC Litigation Establishes Misappropriation to a "Virtual Certainty" .............. 7

    Defendants Continue to Lie to Investors After the ITC Hearing ................................................. 8

    The Truth Fully Emerges .................................................................................................... 9

    Post-Class Period Events Confirm the Fraud ........................................................................... 9

ARGUMENT .......................................................................................................................... 9

    I.   THE COMPLAINT ADEQUATELY ALLEGES FALSITY ............................................... 9

        A.  Defendants' Statements About the ITC Litigation Are Actionable ................................. 10

            1.   Defendants' Statements about the Litigation Are Actionable Under Omnicare ............ 10

            2.   Defendants' Statements about the ITC Litigation Were Material to Investors, And Cannot Be Dismissed as Immaterial or "Aspirational Puffery" ................................... 13

            3.   The PSLRA Safe Harbor and "Bespeaks Caution Doctrine" Do Not Apply ................ 16

        B.  Defendants' Jeuveau Descriptions and Statements about Competition are Actionable ... 17

    II.  THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER ....................... 21

        A.  By October 2019 At the Latest Defendants Had Actual Knowledge Jeuveau Was the Product of Illegal Misappropriation ................................................................................. 22

        B.  Investors Frequently Asked About, And Defendants Professed Knowledge Concerning the ITC Litigation and Evolus's Intellectual Property ....................................................... 25

        C.  Multiple Lawsuits and CW1's Testimony Support Scienter ........................................... 26

        D.  Core Operations Supports Scienter ................................................................................. 27

        E.  Defendants' Stock Offerings and Insider Sales Support Scienter ................................... 28

F.   Evolus's Desire to Compete with Allergan and The Individual Defendants' Prior Positions at Allergen Supports Scienter............................................................................. 29

III. THE INDIVIDUAL DEFENDANTS ARE LIABLE AS CONTROL PERSONS ................ 30

CONCLUSION.................................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ........................................................................................... 21

*Barilli v. Sky Solar Holdings, Ltd.*,
    No. 17 CV 4572-LTS-DCF, 2020 WL 2848179 (S.D.N.Y. June 1, 2020) ........................ 10, 12

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
    2021 WL 3675180 (D. Conn. Aug. 19, 2021) .......................................................... 18

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
    496 F. Supp. 3d 952 (E.D. Va. 2020) .......................................................... 11, 12, 19

*Chamberlain v. Reddy Ice Holdings, Inc.*,
    757 F. Supp. 2d 683 (E.D. Mich.2010) ................................................................... 19

*Chill v. General Elec. Co.*,
    101 F.3d 263 (2d Cir.1996) ...................................................................................... 26

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) ................................................................. 13, 17

*City of Warren Police & Fire Ret. Sys. v. WWE Inc.*,
    477 F. Supp. 3d 123 (S.D.N.Y. 2020) ................................................................. 27, 29

*Crutchfield v. Match Grp., Inc.*,
    529 F. Supp. 3d 570 (N.D. Tex. 2021) ................................................................. 15

*Freidus v. ING Groep N.V.*,
    736 F. Supp. 2d 816 (S.D.N.Y. 2010) ................................................................... 16

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) .......................................................... 9, 16, 28

*Halman Albudi Provident and Pension Funds Ltd. v. Teva Pharmaceuticals Industries Limited*,
    2022 WL 889158 (E.D. Pa. Mar. 25, 2022) .......................................................... 2, 18

*Hampton v. Root9B Tech., Inc.*,
    2016 WL 9735744 (MTD fn. 11) ......................................................................... 21

*In re AnnTaylor Stores Sec. Litig.*,
    807 F. Supp. 990 (S.D.N.Y. 1992) ....................................................................... 12

*In re Bayer AG Sec. Litig.*,
   No. 03 Civ.1546 WHP, 2004 WL 2190357 (S.D.N.Y. Sept. 30, 2004) ............................. 12, 14

*In re BHP Billiton Ltd. Sec. Litig.*,
   276 F. Supp. 3d 65 (S.D.N.Y. 2017) ...................................................................................... 21

*In re Complete Mgmt. Inc. Sec. Litig.*,
   153 F. Supp. 2d 314 (S.D.N.Y. 2001) ..................................................................................... 16

*In re Electrobras Sec. Litig.*,
   245 F. Supp. 3d 450 (S.D.N.Y. 2017) ..................................................................................... 21

*In re Flowers Foods, Inc. Sec. Litig.*,
   No. 7:16-CV-222 (WLS), 2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) .......................... 14, 24

*In re Gen. Elec. Co. Sec. Litig.*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012) ..................................................................................... 25

*In re GlaxoSmithkline PLC*,
   2006 WL 2871968 (S.D.N.Y. 2006) ....................................................................................... 14

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
   20 F.4th 131 (2d Cir. 2021) .................................................................................................... 29

*In re Henry Schein, Inc. Sec. Litig.*,
   2019 WL 8638851 (E.D.N.Y. Sept 27, 2019) ......................................................................... 20

*In re Iconix Brand Grp., Inc.*,
   2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017) ......................................................................... 24

*In re MBIA, Inc., Sec. Litig.*,
   700 F. Supp. 2d 566 (S.D.N.Y. 2010) ..................................................................................... 20

*In re Moody's Corp. Sec. Litig.*,
   599 F.Supp.2d 493 (S.D.N.Y. 2009) ....................................................................................... 21

*In re Mylan N.V. Securities Litig.*,
   2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ......................................................................... 19

*In re Nevsun Resources Ltd.*,
   2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013) ...................................................................... 27, 28

*In re Pall Corp.*,
   2009 WL 3111777 (E.D.N.Y. Sept. 21, 2009) ........................................................................ 22

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015) ................................................................................... 12, 13

*In re Salix Pharm.*,
  2016 WL1629341 (S.D.N.Y. 2016) ................................................................................ 10

*In re Seadrill Ltd. Sec. Litig.*,
  2016 WL 3461311 (S.D.N.Y. 2016) .............................................................................. 15

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 U.S. Dist. LEXIS199809 (S.D.N.Y. Nov. 26, 2018) ........................................... 12

*In re Signet Jewelers Ltd. Sec. Litig.*,
  389 F. Supp. 3d 221 (S.D.N.Y. 2019) ........................................................................... 13

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2019 WL 3001084 (S.D.N.Y. July 10, 2019) ........................................................... 3, 20

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
  2000 WL 1234601 n.2 (S.D.N.Y. 2000) ........................................................................ 19

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005) ........................................................................... 26

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
  195 F. Supp. 3d 528 (S.D.N.Y. 2016) ........................................................................... 19

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) .................................................................................... 16, 24

*Institutional Investors Group v. Avaya, Inc.*,
  564. F.3d 242 (3d Cir. 2009) ......................................................................................... 23

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016) ........................................................................... 18

*Menkes v. Stolt-Nielsen S.A.*,
  2005 WL 3050970 (D. Conn. Nov. 10, 2005) ............................................................... 19

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir.  2014) ......................................................................................... 10

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ............................................................................... 26, 27

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .......................................................................................... 26

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019) ............................................................................. 27

*Omnicare Inc. v. Dist. Council Const. Ind. Pension Fund*,
   135 S.Ct.  (2015) ...................................................................................................... 10

*Rosenbaum Cap. LLC v. Bos. Commc'ns Grp., Inc.*,
   445 F. Supp. 2d 170 (D. Mass. 2006) ...................................................................... 13

*Skiadis v. Acer Therapeutics Inc.*,
   2020 WL 3268495 (S.D.N.Y. 2020) ........................................................................ 28

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*,
   775 F. Supp. 2d 227 (D. Mass. 2011) ...................................................................... 14

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) .................................. 21, 22

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976) ................................................................................................... 9

*Van Dongen v. CNinsure Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013)....................................................................... 28

## Statutes

15 U.S.C. § 78u-5(c)(1)(B) ............................................................................................ 16

**PRELIMINARY STATEMENT**

Prior to and during the Class Period Defendants knew or recklessly disregarded that Jeuveau, Evolus's BOTOX alternative and only asset, was the product of illegal misappropriation. When Allergan and Medytox sued Evolus seeking to enjoin Evolus from selling Jeuveau Defendants decried the litigation as "completely without merit" telling investors the suit was an effort to "stifle competition" because Jeuveau was a "competitive threat" to Allergan and Medytox. Yet the ITC agreed to institute an investigation on March 5, 2019, causing Evolus's stock to fall 5%. In truth, Evolus's top management- former *Allergan* executives *who worked on BOTOX*- knew the claim that Daewoong (the South Korean pharmaceutical company from whom Evolus exclusively licensed Jeuveau) discovered the strain for Jeuveau in the soil in Korea was implausible. Despite multiple suits prior to the Class Period Defendants refused to investigate the allegations because, as a former top Evolus executive told Plaintiffs' investigator, it would not be beneficial for Evolus to know Jeuveau was misappropriated: it could put Evolus out of business.

The ITC Litigation proceeded through fact and expert discovery, which closed in July and October 2019, respectively. Defendants, but not the public, were privy to the proceedings. DNA evidence proved that the BTX strain for Jeuveau was derived from Medytox's strain, that the strains are genetically identical, and that the possibility of this occurring by chance is less than one in a few million. Evolus and Daewoong produced virtually no evidence to show their independent development of the manufacturing process for Jeuveau. Just like the BTX strain, the manufacturing process for Jeuveau was identical to that of Allergan/Medytox's. This too could not be a coincidence. While in possession of this material non-public information Evolus conducted a secondary offering in November 2019 selling investors Evolus shares at artificially inflated prices and netting Evolus $63.5 million in much needed cash. Evolus's controlling shareholder Alphaeon unloaded 43% of its Evolus shares while the case was pending- netting it $126 million.

1

Faced with the above facts Defendants misrepresented the developments in the ITC Litigation as they emerged, claiming "nothing changed through the case." In truth, as investors would later discover, the evidence "reasonably point[ed] *only* to a finding of misappropriation." When analysts questioned Defendants about negative developments in the ITC Litigation they deflected or denied, stating they "remain[ed] confident in Evolus's IP and Jeuveau's proprietary manufacturing process."

In addition, throughout the Class Period Defendants attributed Jeuveau's "competitive strength" to being the only neurotoxin product in the U.S. with a 900 kDA complex other than BOTOX, repeatedly touting Evolus's "proprietary Jeuveau formulation." Because Defendants "repeatedly attributed [Jeuveau's] success to legitimate business factors" and "put the sources of [Jeuveau's] success into play" Defendants' failure to disclose their misconduct made these statements materially misleading.[1] When the ITC Court issued a determination finding Evolus liable for misappropriation and recommending a cease-and-desist order preventing Evolus from selling Jeuveau for ten years Evolus's stock fell 37%.

Confronted with the Complaint's detailed allegations Defendants raise a series of arguments none of which warrant dismissal. First, Defendants relegate all of the alleged misstatements to corporate "puffery." But Defendants statements concerning the ITC Litigation were critical to investors. Likewise, Defendants' statements concerning Jeuveau's competitive strengths and the proprietary nature of Jeuveau's formulation were highly material given that Evolus's existence was threatened by a suit alleging that Jeuveau was not in fact proprietary to Evolus.

Second, the PSLRA's safe harbor and bespeaks caution doctrine do not apply because Defendants' representations that the ITC Litigation was without merit overshadowed their

---

[1] *Halman Albudi Provident and Pension Funds Ltd. v. Teva Pharmaceuticals Industries Limited*, 2022 WL 889158 at *10 (E.D. Pa. Mar. 25, 2022).

boilerplate disclosures. Further, the Court cannot rule as a matter of law that Defendants' disclosure of the existence of the ITC Litigation was sufficient to counter-balance their misrepresentations. Where a disclosure is accompanied by a denial, it is "no disclosure at all.[2]"

Third, to the extent Defendants' statements are opinions they are actionable under the Supreme Court's *Omnicare* decision because Defendants omitted key facts about both their inquiry into and knowledge concerning their statements. These facts directly conflict with what investors would take from Defendants' statements: namely that Defendants had investigated the allegations and that they had some evidence to back up the claim that they independently developed Jeuveau.

Defendants' scienter arguments fare no better. As to insider sales, Defendants virtually ignore Evolus's secondary offering and try to account for Alphaeon's sales by inserting factually unsupported explanations for why Alphaeon sold 43% of its Evolus shares. Defendants also misleadingly claim that the Individual Defendants acquired more shares during the Class Period than they sold, omitting to tell the Court that Evolus gave them the shares *at no cost*. Defendants also incredibly try to refute the allegation that they were aware of the facts and evidence in the ITC Litigation because only their lawyers had access to confidential discovery. The notion that Evolus's own lawyers would not have apprised it of the implications of the evidence beggars belief, and the Court is not required to credit such an untenable assertion. This is also true because Defendants made statements about the litigation, and were thus required to inform themselves of the details before speaking on the subject. Finally, Defendants contend that the Commission's final decision reducing the length of the injunction "rebukes" Plaintiff's theory. Not so. Despite the reduced ban, the harm to Evolus was profound, as analysts noted, and the Commission's decision affirmed the finding of misappropriation as to the manufacturing process.

For these reasons and those set forth below, the Court should deny Defendants' MTD.

---

[2] *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *16 (S.D.N.Y. July 10, 2019).

## FACTUAL SUMMARY

*Evolus's Business*

Evolus is a medical aesthetics company founded in 2013 with the sole objective of developing a product to compete with BOTOX. ¶¶2, 69, 188.[3] BOTOX is the "gold standard" in injectable botulinum neurotoxin ("BTX") products for wrinkles. ¶47. Allergan developed the U.S. market for BTX products over the course of 30 years. ¶3. Defendant David Moatazedi worked at Allergan for thirteen years as the senior most person in charge of BOTOX. ¶33. Moatazedi left Allergan to head Evolus as President and CEO in May 2018, two months after Evolus's IPO. ¶¶33, 52. At the same time, Defendant Lauren Silvernail joined as Evolus's CFO, leaving her 8-year career as Allergan's VP of Business Development. ¶35. Defendant Rui Avelar joined Evolus as its Chief Medical Officer in 2014, having spent the past ten years as Allergan's CMO. ¶34. Six of the nine members of Evolus's management team previously worked at Allergan on BOTOX. ¶¶65.

Other companies have tried, unsuccessfully, to develop a product competitive with BOTOX. These companies failed because they could not develop a BTX product with a 900-kilodalton ("900 kDa") molecule, the "scientific gold standard" and *sine qua non* for a true BOTOX alternative (AC, Exh. B p. 192-93). Allergan is the exclusive licensee for Medytox, the South Korean manufacturer of its BTX products. ¶49. Evolus is the exclusive licensee for its BTX product Jeuveau, which South Korean company Daewoong manufactures. ¶54. Jeuveau is the first ever 900 kDA neurotoxin alternative to BOTOX. ¶81. Aside from Jeuveau, Evolus has no products, and has operated at a loss since its inception. ¶50; 2018 10-K, p. 23; 2019 10-K, p. 14.[4]

***Defendants Become Aware of Allegations that Jeuveau is the Product of Misappropriation***

Defendant Avelar headed the clinical trials for Jeuveau that finished in 2017, at which point the FDA accepted, for filing, Evolus's Biologics License Application ("BLA") for Jeuveau. ¶¶60-

---

[3] All references to ¶ are to paragraphs in the Amended Class Action Complaint ("Complaint" or "AC"). All capitalized terms herein have the same meanings as in the Complaint.

[4] Attached as Exhibits 1 and 2 to the Declaration of Sara Fuks ("Fuks Dec.") filed herewith.

4

61; 67. Once the FDA approved the BLA (a process that can take 1-2 years) Evolus would be able to sell it. In approximately June, 2017, Defendants officially became aware of allegations that Jeuveau was the product of misappropriation. In June 2017 Medytox sued Evolus, Daewoong, and former Medytox employee BK Lee in California Superior Court alleging Lee stole the trade secrets for Jeuveau and gave them to Daewoong. ¶110. Medytox sought to enjoin Evolus from distributing Jeuveau. *Id.* But because Medytox filed a similar case against Lee and Daewoong in Korea, the California Court stayed the case pending resolution of the Korea action. *Id.* In December 2017 Medytox filed an FDA petition seeking to delay approval of Jeuveau. ¶111. Medtyox implored the FDA to require Evolus to conduct a DNA analysis of Jeuveau's BTX strain. Doing so would enable Evolus (and the FDA) to determine the veracity of the incredible claim- which Evolus made in its BLA that Daewoong discovered the source of the BTX strain in the soil in Korea. ¶¶61, 111, 137. The FDA denied Medytox's petition and approved Jeuveau on February 1, 2019 enabling Evolus to compete head-to-head with Allergan in the $2.5 billion aesthetic neurotoxin market. ¶¶111, 70.

In October 2018 Defendant Avelar personally hired CW1 as Evolus's Director of Medical Affairs. ¶122. In this executive role, CW1 interacted with the Individual Defendants daily: his job was to educate the Company and clinicians about Jeuveau. *Id.* CW1 stated with certainty that Evolus did not investigate the allegations that Jeuveau was the product of misappropriation. ¶126. Despite the implausible claim that the strain for Jeuveau was found in soil in Korea, CW1 stated that Evolus had no interest in finding out that Jeuveau was the product of misappropriation. *Id.*

Nevertheless, throughout the Class Period Evolus described Jeuveau as Evolus's "***proprietary*** 900 kDA purified botulimun toxin type A formulation." ¶¶173, 177, 184, 186, 188, 190, 194, 196, 202, 205, 209, 210, 225. Defendants attributed Evolus's success to its ability to market the "first known 900kDa neurotoxin alternative to BOTOX." ¶¶67, 69, 74, 186, 210.

5

The litigation landscape began to escalate in January 2019 when Allergan and Medytox asked the ITC to investigate whether Evolus and Daewoong had in fact misappropriated the BTX strain and manufacturing process for Jeuveau. ¶¶102-106. In response to the ITC Complaint, Evolus assured investors the "claims are completely without merit and the timing reflects the competitive threat Jeuveau presents to the Botox franchise." ¶¶107, 180. Evolus characterized the suit as "another legal maneuver in a long litany of attempts by Allergan and Medytox to stifle competition and limit physician and consumer choice…Given this history, we have been prepared and will vigorously defend our intellectual property." *Id.* On March 1, 2019 the ITC announced it would initiate an investigation (the "ITC Litigation"). ¶182. On this news, Evolus's stock fell 5%. ¶183. Defendants insisted that the "claims are completely without merit," reassuring investors they remained "confident in our intellectual property and ***proprietary*** manufacturing process." ¶184.

Discovery in the ITC Litigation was strictly confidential. Only the parties' lawyers had access to the trade secret information produced. ¶113. The ITC assigned an attorney from the Office of Unfair Important Investigations ("OUII") to the case. ¶93. The attorney provides opinions to the ALJ, which the ALJ heavily relies on in deciding cases. ¶94.

On July 19, 2019 fact discovery in the ITC Litigation closed. ¶114. On August 12, 2019 Defendant Moatazedi updated investors on the ITC Litigation stating "as we've said from the beginning, we remain very confident in our IP…" ¶¶115, 200. Two months before the close of discovery, between May 17-20, 2019 Evolus's controlling shareholder Alphaeon sold 4 million shares of Evolus stock netting $77 million in proceeds. ¶¶227-29. On October 30, 2019 expert discovery closed. ¶13. A week later Evolus conducted a secondary public offering of 5,217,000 shares, netting $63.5 million. ¶204. The Offering came on the heels of Evolus's November 4 announcement of "exceptional" $13.2mm in revenue from Jeuveau, Evolus's "proprietary 900kDa purified botulinum toxin type A formulation." ¶202.

6

*Evidence in the ITC Litigation Establishes Misappropriation to a "Virtual Certainty"*

Unbeknownst to investors, the facts and evidence adduced in discovery, of which Defendants were fully aware, demonstrated to a "virtual certainty" that Jeuveau was the product of misappropriation. ¶¶144, 234. The manufacturing process for a BTX product is "amongst the most closely guarded [trade] secrets of any commercial BTX company." ¶149. Three factors conclusively demonstrated that Evolus and Daewoong misappropriated the manufacturing process for Jeuveau from Medytox: 1) the similarity of the two processes; 2) the lack of evidence that Evolus and Daewoong independently developed a manufacturing process for Jeuveau and 3) the implausibly fast timeline by which Jeuveau achieved commercial production. ¶¶158-166. First, the two processes were nearly identical: this could not have been a coincidence, given the complexities of the processes and the inconsistencies in Daewoong's statements regarding how it supposedly developed its process. ¶159, FID 140. Second, in contrast to the voluminous records Medytox produced evidencing its manufacturing process, Evolus/Daewoong produced virtually nothing. ¶¶160-64. As the ITC Court stated, the "lack of contemporaneous research and development records…is highly unusual for a pharmaceutical company, especially when the drug is successfully brought to market. ¶160. Third, the assertion that Jeuveau was produced independently was implausible because "from a practical standpoint such a schedule could not be achieved…particularly [ ] in view of the team's lack of BTX experience, the purported development work was done by an intern, and the minimal amount of actual development activity recorded in that time span." ¶¶165-66.

As to the BTX strain, Defendants knew the claim that Daewoong found the strain in the soil in Korea was a lie. Scientific evidence proved the two strains were genetically identical and that Jeuveau's strain was derived from Medytox's. ¶¶137-145. Evidence proved the two strains are linked by six identical "golden" DNA mutations. ¶¶139-142. The possibility of these mutations occurring by chance is less than one in a few million. ¶143. Defendants concealed the foregoing

7

evidence from investors throughout the litigation and after the ITC Hearing, which took place from February 4-7, 2020. ¶¶207-208. About one month before the ITC Hearing, Defendant Avelar sold 36% of his total holdings in Evolus stock. ¶¶228, 230.

***Defendants Continue to Lie to Investors After the ITC Hearing***

Notwithstanding the overwhelming evidence which Defendants concealed from investors, Defendants continued to issue positive statements concerning Jeuveau's commercial success and the proprietary nature of Jeuveau, and told the market that nothing changed through the case. ¶¶118-120; 209-226. On February 25, 2020 Defendant Moatazedi updated investors on the ITC Litigation, stating Defendants "remain confident in the strength of our IP." Moatazedi assured, "nothing has changed through the case." ¶212. Accordingly, analysts concluded: "brief commentary from the ITC Litigation supports our positive view of the stock." ¶213. Then, on March 4, 2020 Medytox disclosed that the OUII Attorney thought Evolus and Daewoong were guilty. ¶216. Evolus's shares fell 7% in response. *Id.* Defendants quickly issued a press release that day calling Medytox's disclosure "*speculative and intended to create confusion*," emphasizing that, "*importantly, nothing has changed as a result of the media reports from Korea…it is fairly common for the Judge and staff attorney to disagree…*" ¶217. Evolus further emphasized it remains "*confident in the strength of our intellectual property*." *Id.* Following this false denial and based on "conversations with management" analysts upgraded Evolus shares, telling investors "*don't believe everything you read*." ¶219. Silvernail reiterated Evolus's false denials. ¶¶221-24. On March 11, 2020 an analyst stated that he corroborated the fact that the OUII Attorney sided against Evolus asking Silvernail whether that fact is in dispute. Silvernail lied: "it's very contradictory. And I'd be careful about drawing any conclusions about who sided with whom on what." Silvernail further assured investors: "*we believe in the merits of our case, we're confident in our IP*" and "*we are in a very solid position.*" "*We like our odds in this. So we are not really worried about the outcome here.*" ¶221-23.

8

*The Truth Fully Emerges*

On July 6, 2020 the ITC Court issued its Final Initial Determination (FID) ruling that Evolus misappropriated Medytox's trade secrets. ¶232. Additionally, the ITC Court found Daewoong misappropriated certain trade secrets relating to the manufacturing processes of the relevant BTX strain. *Id.* The ITC Court recommended an order preventing Evolus from importing Jeuveau into the U.S. for ten years and a cease-and-desist order preventing Evolus from marketing and selling Jeuveau for ten years. *Id.* On this news, Evolus's shared dropped $3.35 per share over the next two trading days, representing a decline of 37%, damaging investors. ¶233.

*Post-Class Period Events Confirm the Fraud*

On August 6, 2020 the ITC Court issued a 282-page public version of its FID revealing the detailed facts and evidence demonstrating Evolus's liability for misappropriation. ¶234. The FID demonstrated to investors that during the heart of the Class Period Defendants concealed the true facts from investors while unequivocally misrepresenting that Jeuveau was Evolus's proprietary formulation, asserting confidence in Evolus's IP, and assuring investors that the lawsuit had no merit. ¶234. On December 16, 2020 the ITC affirmed with modification the FID. ¶235. The ITC affirmed the finding that the manufacturing process for Jeuveau was the product of misappropriation of trade secrets but held that the bacterial strain itself was not a protectable trade secret. *Id.* Nevertheless, the result was the same: Evolus was prohibited from importing and commercializing Jeuveau. ¶236. While the ITC reduced the ban to 21 months, the damage had been done. Analysts noted that by the time the ban ended other competitors will have entered the market. Despite the reduced ban "this is clearly a very significant roadblock for the company to overcome…we think the risk reward for this stock remains unfavorable." *Id.*

## ARGUMENT

## I.    THE COMPLAINT ADEQUATELY ALLEGES FALSITY

The Court must "accept[] all factual allegations...as true and draw[] all reasonable inferences

9

in favor of the plaintiff." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010). An omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding" whether to purchase or sell the security. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Questions of materiality are mixed questions of law and fact and are inappropriate for resolution on a motion to dismiss. *Id.*

### A.  Defendants' Statements About the ITC Litigation Are Actionable

#### 1.  Defendants' Statements about the Litigation Are Actionable Under Omnicare

Defendants had no duty to discuss the ITC Litigation or the legality of Evolus's claim of ownership to Jeuveau. But Defendants went out on a limb, emphasizing that the claims in the ITC Litigation were "completely without merit" and attributed the lawsuit to Allergen's desire to "stifle competition." ¶¶107, 112, 180. Defendants also maintained that they were "very confident" in the "strength of Evolus's intellectual property" thereby representing to investors that Jeuveau was not the product of misappropriation. Even after the ITC Hearing laying bare the evidence of Defendants' illegal misappropriation, and Medytox's disclosure that the ITC Attorney thought Evolus was guilty, Defendants maintained that "nothing changed through the case." ¶213. Having chosen to address the topic of the ITC Litigation, Defendants had an obligation to be both "accurate and complete." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250-51 (2d Cir.  2014).

To the extent that Defendants' statements concerning the ITC Litigation and the strength of Evolus's IP are opinions they are actionable under *Omnicare.* An opinion is actionable where "the speaker did not hold the belief professed…or the speaker omit[ed] information that makes the statement misleading to a reasonable investor." *Barilli v. Sky Solar Holdings, Ltd.*, No. 17 CV 4572-LTS-DCF, 2020 WL 2848179, at \*3 (S.D.N.Y. June 1, 2020). In *Omnicare Inc. v. Dist. Council Const. Ind. Pension Fund*, 135 S.Ct. 1319 (2015) the Supreme Court held that although an investor "recogniz[es] that legal opinions can prove wrong in the end, [the investor] still likely expects such an assertion to rest on some meaningful legal inquiry…He expects not just that the

issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Id*. at 1328-29. A defendant is liable if he "omits material facts about [his] inquiry into or knowledge concerning a statement of [legal compliance], and if those facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 1329; *In re Salix Pharm.*, 2016 WL1629341, at *12 n.10 (S.D.N.Y. 2016). First, numerous undisclosed facts belied Defendants' repeated assurances denying the merits of the ITC Litigation and championing the strength of Evolus's IP from a legal perspective including that: 1) Evolus and Daewoong had virtually no evidence demonstrating independent development of Jeuveau; 2) the manufacturing process for Jeuveau and Medytox/Allergan's product are *identical*, sharing 10 commonalities which cannot be coincidental; 3) the "team" that supposedly developed Jeuveau had no BTX experience- most of the work was done by an intern in an impossibly short amount of time; 4) DNA fingerprinting evidence proved that Jeuveau's BTX strain was derived from Medytox's; and 5) DNA samples of Jeuveau's BTX strain show it was developed in a lab, not in the soil in Korea (as Evolus claimed).   ¶¶137-166. In short, as the ITC Court found, and as Defendants were aware, "scientific and genetic evidence established to a virtual certainty" that Jeuveau was the product of misappropriation. ¶144.

A reasonable investor would have assumed, based on Defendants' repeated assertions unequivocally denying the merits of ITC Litigation and championing the strength of Evolus's IP, that they had investigated the allegations and had evidence supporting independent development of Jeuveau's manufacturing process. But as CW1 stated, Defendants refused to investigate the allegations- of which Defendants had been aware since 2017- and produced no evidence of independently developing Jeuveau's manufacturing process, because they had none. ¶¶126, 162.

Second, Defendants could not have subjectively believed their statements denying the merits of the case and maintaining confidence in the strength of Evolus's IP, and representing that nothing

11

had changed through the course of the litigation given the above facts. Courts have held actionable opinion statements characterizing litigation as "without merit" under analogous circumstances. For example, in *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 959 (E.D. Va. 2020) defendants faced a lawsuit alleging unfair competition in violation of antitrust laws. Like Defendants here, the company acknowledged the allegations in the suit and stated its belief that the "claims lack merit." *Id.* at 960. After a federal district judge issued detailed factual findings against the company its stock price declined. *Id.* The court found defendants' statements describing the litigation as "meritless" actionable where the litigation "resulted in a $176 million verdict for [plaintiff] and resulted in the divestiture of [company's] Towanda plant." *Id.* at 963. *See also Sky Solar*, 2020 WL 2848179, at *2 (statement that claims were "without merit" and an attempt "to extort economic benefits from us" actionable under *Omnicare* where tribunal found against defendants and CEO could not have believed claims were without merit given tribunal's factual findings and failure to produce contradictory documentary evidence); *In re Bayer AG Sec. Litig.*, No. 03 Civ.1546 WHP, 2004 WL 2190357, at *14 (S.D.N.Y. Sept. 30, 2004) ("this Court cannot conclude that defendants' assertions concerning the merits of . . . litigation are not actionable as a matter of law"). Just so here: Defendants could not have reasonably believed that the lawsuit was without merit given the ITC Court's factual findings and Evolus's failure to produce evidence demonstrating independent development of Jeuveau. Even if it were conceivable that Defendants honestly believed that the ITC Litigation had no merit and that Evolus's IP was strong, their opinion statements were misleading because the information Defendants knew and possessed did not fairly align with and contradicted Defendants' statements, as explained above.[5]

---

[5] Defendants cannot escape liability for the two statements an unspecified Evolus spokesman made (MTD 14). To hold otherwise would "defeat the purpose of the securities laws since any corporation could avoid liability under the 1934 Act through the abuse of Rule 9(b), by simply issuing false and misleading statements through an anonymous spokesperson instead of a named officer or director." *In re AnnTaylor Stores Sec. Litig.*, 807 F. Supp. 990, 1004 (S.D.N.Y. 1992).

### 2. Defendants' Statements about the ITC Litigation Were Material to Investors, And Cannot Be Dismissed as Immaterial or "Aspirational Puffery"

"Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015). Even puffery "[if] made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors." *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 U.S. Dist. LEXIS 199809, at *35 (S.D.N.Y. Nov. 26, 2018), ("[m]ateriality depends upon a number of context-specific factors, including specificity, emphasis, and whether certain statements are designed to distinguish the company in some fashion that is meaningful to the investing public."). Defendants' statements concerning the ITC litigation were not puffery. These statements were essential to investors and Defendants issued them repeatedly to assure investors that the ITC Litigation which as Defendant Moatazedi stated was "top of mind for investors" would resolve in Defendants' favor and "be behind us." *Petrobras* at 381 (S.D.N.Y. 2015) (statements made repeatedly in an effort to reassure the investing public" about issues of particular importance are not puffery). The notion that an entire category of statements (e.g., statements concerning litigation against a defendant company) (MTD 12-14) is immaterial as a material of law violates the Supreme Court's "seminal decisions in *TSC Industries and Basic*…which hold that materiality turns on what a reasonable investor would consider 'important.'" *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 229–31 (S.D.N.Y. 2019) (ruling that Supreme Court jurisprudence prevents court from holding that statements in code of conduct can *never* be material). As in *Signet*, where the court held actionable statements in Signet's code of conduct in the context of sexual misconduct allegations, Defendants' statements in the context of the ITC Litigation denying the lawsuit's merit and maintaining confidence in a positive outcome and the strength of Evolus's IP are not immaterial puffery. Further, the decline in Evolus's

13

stock price following news of the ITC decision demonstrates materiality. *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012).

Indeed, courts across the country have held material and actionable opinion statements concerning litigation because "[A] company's own assessment regarding the outcome of litigation in which it is involved would certainly 'alter the total mix of information' for a reasonable investor and is not merely a 'rosy affirmation.'" *Rosenbaum Cap. LLC v. Bos. Commc'ns Grp., Inc.*, 445 F. Supp. 2d 170, 176 (D. Mass. 2006) (finding actionable statements that company believed it did not infringe on patent and had meritorious defense to suit despite company warning it could not guarantee it would prevail in the litigation). *See, e.g., Bayer AG*, 2004 WL 2190357, at *14 ("this Court cannot conclude that defendants' assertions concerning the merits of . . . litigation are not actionable as a matter of law"); *In re Flowers Foods, Inc. Sec. Litig.*, No. 7:16-CV-222 (WLS), 2018 WL 1558558, at *8 (M.D. Ga. Mar. 23, 2018) ("Plaintiff sufficiently alleges that Defendants knew the grave risks presented by the distributor lawsuits and misleadingly stated that they had no merit."); *Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 241 (D. Mass. 2011) (rejecting defendants' argument that statement of opinion as to merit of lawsuit by company's largest client was not actionable or was protected by the PSLRA's safe harbor).

Defendants' heavy reliance on *In re GlaxoSmithkline PLC*, 2006 WL 2871968, at *9 (S.D.N.Y. 2006) (MTD 12-13) is misplaced. There, the court found absent any allegations that "GSK misrepresented developments in its patent cases *as they occurred*." *Id.* at *10. Indeed, GSK described the status of each litigation, including the fact that a federal judge had found the patent invalid and were appealing the decision. Here, Defendants withheld from investors the evidence in the ITC Litigation demonstrating that both the BTX strain and manufacturing process for Jeuveau were *identical* to Medytox's. ¶131. And when confronted with evidence that the outcome for Evolus appeared unfavorable, Defendants double-downed on their lies. In response to analysts'

14

questions concerning Medytox's disclosure that the OUII Staff Attorney found Evolus guilty, Defendant Silvernail denied its significance, falsely stating that "nothing had changed," claiming this fact was "very contradictory." ¶221. When the ITC Hearing concluded and all of the evidence came to light (demonstrating, *e.g.,* that Evolus had no evidence demonstrating independent development of Jeuveau and that the BTX strain for Jeuveau was virtually identical to Medytox's strain) Moatazedi told investors that despite this "nothing has changed through the case." ¶118.

Defendants' other authority is likewise distinguishable. In *In re Seadrill Ltd. Sec. Litig.*, 2016 WL 3461311, at *9-10 (S.D.N.Y. 2016) (MTD 12) defendants' statements that they were "not very worried" about sanctions were accompanied by contemporaneous statements where defendants also stated they "ha[d] to be open" to the possibility of sanctions, that it was "terribly difficult" to determine whether they were in breach and "had not determined" whether sanctions affected their contracts. Accordingly, those statements "undermine[d] the assertion that undisclosed concerns about the sanction's impact rendered the statements false and misleading." *Id.* In *Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 593-94 (N.D. Tex. 2021), the court acknowledged that a company's opinion or prediction concerning the outcome of litigation is actionable "'if there is a gross disparity between the prediction and fact'" but found that the complaint "considered in totality" failed to plead such a disparity and failed to assert "any facts regarding Defendants' actual knowledge of the viability of these legal challenges or of Match's ability (or inability) to defend against such claims." Here, there is a gross disparity between Defendants' prediction that "we are in a very solid position," "we like our odds in this," and "we believe in the merits of our case and are very confident in the IP" and the undisclosed truth of which Defendants were aware: the manufacturing processes for Jeuveau and Allergan's product were identical; neither Evolus nor Daewoong had any evidence supporting the claim that Jeuveau was developed independently, and scientific and genetic evidence established "to a virtual

15

certainty" that Jeuveau was the product of misappropriation. Indeed, the fact alone that Daewoong had no lab notebooks documenting the development of Jeuveau when one would expect (as Medytox produced) extensive documentation and research and development records evidencing development of the manufacturing process demonstrates Defendants knew they had no viable defenses in this regard. ¶¶161-64.

### 3.   The PSLRA Safe Harbor and "Bespeaks Caution Doctrine" Do Not Apply

Defendants also err in asserting that the PSLRA safe harbor and bespeaks caution doctrine protects their statements concerning the ITC Litigation.  The safe harbor protects forward-looking statements accompanied by meaningful cautionary language. Relatedly, the "bespeaks caution doctrine" protects forward-looking statements when no "reasonable investors could consider them important in light of adequate cautionary language."  First, a mixed present/future statement is not entitled to safe harbor protection with the respect to the part of the statement that refers to the present. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) ("[A]statement may contain some elements that look forward and others that do not, and forward-looking elements may be severable from non-forward-looking elements."). Many of Defendants' statements concerning the ITC Litigation are statements of present or historical fact, *e.g*., "nothing has changed throughout the case," "we are confident in the strength of Evolus's IP." Second, to the extent Defendants' statements are forward-looking, the safe harbor protects only forward-looking statements that are accompanied by meaningful cautionary language. *E\*Trade*, 712 F. Supp. 2d at 193-94. Concomitant false and misleading reassurances negate cautionary language. *Freidus v. ING Groep N.V.*, 736 F. Supp. 2d 816, 841 (S.D.N.Y. 2010). Defendants' representations that the ITC Litigation was without merit overshadowed their boilerplate disclaimers. Because "Defendants' misleading Class Period statements are alleged to have contradicted, and thus nullified any risk disclosures," the safe harbor provision and bespeaks caution doctrine are inapplicable. *E\*Trade*, 712 F. Supp. 2d at 193. Third, the PSLRA safe harbor does not protect

statements made with "actual knowledge" that they were false and misleading (15 U.S.C. § 78u-5(c)(1)(B), *Freudenberg,* 193) and does not protect material omissions. *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001). By October 2019 at the latest Defendants knew that scientific evidence proved to a virtual certainty that Jeuveau was the product of misappropriation and thus had actual knowledge that their statements were false when made. Prior to October 2019 (when expert discovery in the ITC Litigation closed) Defendants also had actual knowledge that their statements that the Litigation had "no merit" were false when made because they consciously refused to investigate the allegations and no interest in finding out for certain that Jeuveau was the product of misappropriation. ¶126. At the very least, Defendants' failure to disclose that they never investigated the allegations, and that the evidence in the ITC Litigation showed misappropriation to a scientific certainty, constitute actionable omissions.

Finally, Defendants' assertion that no reasonable investor would have been deceived into believing that Evolus would prevail in the ITC Litigation given their cautionary statements is flatly contradicted by analyst reaction to Defendants' false denials. When Medytox revealed that the ITC Staff Attorney believed Evolus and Daewoong were guilty, Evolus's shares fell over 7%. ¶216. The same day, Evolus issued a swift denial, saying Medytox's disclosure was "speculative and intended to create confusion." ¶¶217-18. Analysts heeded Evolus's false denials, upping their price targets of Evolus, saying: "don't believe everything you read; headlines on ITC case unduly weighing on Evolus shares today," "the negative reaction is overdone" and "nothing has changed as a result of Korean media reports." ¶219. When the ITC issued the FID four months later, Evolus's shares dropped 37%. ¶233. *Lockheed Martin*, 875 F. Supp. 2d at 368 (market reaction shows materiality).

**B.  Defendants' Jeuveau Descriptions and Statements about Competition are Actionable**

17

From its inception, Evolus's sole objective was "to develop a product that was actually competitive with the gold standard (i.e. BOTOX)." ¶188. According to Evolus's 2018 10-K:

> ***Jeuveau will offer the U.S. market the first known <u>900 kDa neurotoxin</u> <u>alternative</u> to BOTOX. The manufacture of <u>both</u> Jeuveau and BOTOX starts with a <u>900 kDa complex</u>…We believe Jeuveau is the only known neurotoxin product in the United States with a <u>900 kDa neurotoxin complex other than</u> <u>BOTOX</u>. We also believe an <u>important component of competitiveness</u> in the neurotoxin market relates to the characteristics associated with the <u>900 kDa</u> <u>complex</u>…. ¶186.***

Throughout the Class Period Defendants touted Jeuveau, a "#NEWTOX on the market," in press releases, conference calls and SEC filings as Evolus's "proprietary 900 kDa purified botulinum toxin type A formulation." ¶¶190, 192, 173, 177, 184, 186, 188. Defendants' statements were false and misleading because Jeuveau was not Evolus's proprietary formulation- it was stolen from Medytox. Further, Evolus's ability to compete with BOTOX was attributable to its illegal conduct. ¶¶191, 193, 174, 178, 185, 189. "Courts in this circuit have found that statements which speak specifically about the source of a company's financial or other success are misleading when they fail to disclose illegal or unethical conduct that is a source of that success. Such statements must be closely related to a source of success alleged to have been bolstered by the illicit conduct" *Bos. Ret. Sys. v. Alexion Pharms., Inc.,* 2021 WL 3675180, at \*10 (D. Conn. Aug. 19, 2021) (statements attributing success to strong rates of patient identification and rapid treatment initiation misleading absent disclosure that key drivers of success attributable to illegal sales tactics).[6]

Here, Defendants put the reasons for Evolus's success- its ability to compete with BOTOX by developing the first proprietary 900 kDa BTX product besides BOTOX- at issue. Because

---

[6] A company has a duty to disclose illegal conduct under three circumstances: 1) "when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices"; 2) "when a defendant makes a statement that can be understood, by a reasonable investor to deny that the illegal conduct is occurring" and 3) "when a defendant states an opinion that, absent disclosure, misleads investors about material facts underlying that belief." *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016).

18

Defendants' repeatedly attributed Jeuveau's success to legitimate business factors, their failure to reveal the true reasons for Jeuveau's success rendered these statements misleading. *Teva*, 2022 WL 889158, at *10 (finding defendants were required to disclose illegal donations, regardless of defendants' "good faith belief that charitable donation program was perfectly legal and permissible"' because company "repeatedly attributed Copaxone's success to legitimate business factors, such as the quality of the product and physician choice and patient loyalty."). Defendants' statements attributing Jeuveau's success to the ability to develop the first 900kDa BOTOX alternative is sufficiently connected to Evolus's misappropriation. ¶¶69,186,188, 210,81. *See, e.g., In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 38 (S.D.N.Y. 2016) (statement that portfolio managers' investment performance was key driver of sales sufficiently connected to illegal conduct of back-testing performance history to trigger duty to disclose because company cited "proper drivers of 'sales and net flows' but omit[ted] misleading performance history.").

In the context of allegations of unfair competition courts routinely hold that a company's statements concerning competition are misleading in the absence of disclosure of anticompetitive conduct. For example, *In re Mylan N.V. Securities Litig.*, which dealt with misleading statements regarding competition in light of the defendants' collusion is instructive:

> Mylan's annual reports are replete with statements that characterize the markets for [its products] as "very competitive" and "highly sensitive to price"… If, as Plaintiffs allege, Mylan was engaged in a variety of anticompetitive practices…then these statements are misleading in the absence of disclosure of that anticompetitive conduct.

2018 WL 1595985, at *7 (S.D.N.Y. Mar. 28, 2018).[7]

---

[7] *See also In re Sotheby's Holdings, Inc. Sec. Litig.*, 2000 WL 1234601, at *4 n.2 (S.D.N.Y. 2000) (calling competition in market "intense" misleading when company fixed prices); *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 711-12 (E.D. Mich.2010) (characterizing industry as "highly competitive" misleading where company colluded); *Menkes v. Stolt-Nielsen S.A.*, 2005 WL 3050970, at *7, *10 (D. Conn. Nov. 10, 2005) ("competition" statements false because defendant "had a duty to disclose its alleged anti-competitive conduct").

19

Defendants' make semantic arguments about Evolus's "proprietary" statements as referring to specific aspects of Jeuveau that were not false, such as Evolus's "app." (MTD 15). But a reasonable investor would have understood that Defendants' statements referred to Jeuveau as a finished product because its practice app and technology platform were worthless without the actual BTX product.[8] Nor does Defendants' disclosure of the ITC Litigation (MTD at 15) relieve them of their obligation to speak completely and accurately once they invoked Evolus's purportedly "proprietary" BTX product and ability to compete with BOTOX as the driver of its success. *Jeld-Wen*, (duty to disclose illegal conduct where company affirmatively spoke about pricing strategy but omitted anticompetitive conduct despite disclosing lawsuit, because "disclosing a lawsuit's existence and allegations while also vigorously denying their validity does not satisfy a company's duty to make full, honest disclosures."). Defendants' assertion that disclosure of the ITC Litigation absolves them of liability is a "truth-on-the market" defense which presents a question of fact that the Court cannot resolve on a motion to dismiss. *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 581 (S.D.N.Y. 2010) ("corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements."). Here, Defendants' "purported disclosure [was] accompanied by a corporate denial [and] "is no disclosure at all" *In re Signet Jewelers Limited Securities Litigation*, 2019 WL 3001084, at *16.

Further, in the context of a theft of trade secret case where the sole issue is whether the BTX strain and manufacturing process for Jeuveau are in fact proprietary to Evolus, Evolus's statements underscoring the proprietary nature of Jeuveau and its 900 kDa complex are not

---

[8] *See, e.g. Jeld-Wen* 496 F.Supp.3d 952, 964 (E.D. Va. 2020) (where complaint alleged false statements concerning competitiveness of doorskin market court gave "no weight" to "semantic argument about competitiveness statements not referring specifically to doorskin market" because "a reasonable investor would have assumed that [statements about competitiveness] referred to all the markets in which Jeld-Wen competed.").

20

"puffery." (MTD 14-15). The term "proprietary" has a specific legal meaning which is highly material given this context – a lawsuit alleging misappropriation of intellectual property. Because Defendants repeatedly cited their 900 kDa proprietary formulation as the only neurotoxin product on the market competing with BOTOX as the sole basis for their success, while failing to disclose their illegal misappropriation, their representations of Jeuveau as proprietary cannot be deemed puffery.[9] Courts routinely refuse to dismiss statements as puffery, where, as here, a company makes them to differentiate itself from competitors. *See, e.g., In re Electrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463-64 (S.D.N.Y. 2017) (statements made "to reassure the investing public" not puffery); *In re Moody's Corp. Sec. Litig.,* 599 F.Supp.2d 493, 507–08 (S.D.N.Y. 2009) (statement that Moody's was an independent body publishing ratings accurately and impartially was "not puffery" because independence was a cornerstone of Moody's business).

Belying Defendants' assertion that the description of Jeuveau as proprietary is "too general" and (MTD 15) is Defendants' repeated denial of the allegations in the ITC Litigation and reassurance to investors that "we remain confident in our intellectual property and ***proprietary*** manufacturing process." Where, as here, Defendants made statements to reassure the market "about matters particularly important to the company and investors" those statements are material and do not constitute puffery." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017).[10]

## II.    THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER
A complaint may plead scienter by "by alleging facts (1) showing that the defendants had

---

[9] *See, e.g.*, *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at \*12 (E.D.N.Y. Sept 27, 2019) ("When viewed in context, Defendant' statements describing Schein's distribution market as 'highly competitive' and 'characterized by intense competition' cannot be considered puffery" where plaintiffs alleged unfair competition).

[10] In *Hampton v. Root9B Tech., Inc.* 2016 WL 9735744 (MTD fn. 11) plaintiffs failed to allege that defendants claim that its hardware was proprietary was false. Defendants' other cited authority did not concern the word "proprietary" in the context of trade secret litigation.  (MTD fn. 10).

21

both motive and opportunity to commit the fraud or (2) constituting **strong circumstantial evidence** of conscious misbehavior." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) (internal quotation marks omitted). The proper inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). Recklessness can suffice to meet pleading requirements for scienter where the complaint sufficiently alleges that the Defendants "knew facts or had access to information suggesting that their public statements were not accurate;" or "failed to check information that they had a duty to monitor." *In re Pall Corp.*, 2009 WL 3111777, at *6 (E.D.N.Y. Sept. 21, 2009). Even though only one is necessary, Plaintiffs properly allege both that there was strong circumstantial evidence of conscious misbehavior or recklessness and motive.

### A. By October 2019 At the Latest Defendants Had Actual Knowledge Jeuveau Was the Product of Illegal Misappropriation

While the evidence in the ITC Litigation is technical and voluminous, a few simple facts of which Defendants were aware or recklessly disregarded demonstrate that: 1) Jeuveau was the product of misappropriation and correspondingly 2) the ITC Litigation was not, as Defendants represented, meritless. These facts were available to Defendants even prior to the ITC Litigation and known to them by the close of discovery in the ITC Litigation, at the latest. Defendants do not, and cannot, contest the foregoing evidence. <u>First</u>, as to Jeuveau's manufacturing process: 1) the processes for Jeuveau and Medytox/Allergan's product are identical, sharing ten commonalities which statistically speaking cannot be coincidental; 2) Medytox produced extensive documentation and research and development records demonstrating its manufacturing

22

process, which took six years to develop. Evolus (and Daewoong) produced virtually no evidence demonstrating independent development of Jeuveau; and 3) the "team" that supposedly developed Jeuveau had no BTX experience and most of the work was done by an intern in an impossibly short amount of time. ¶¶146-66. As high-level executives with significant BTX experience ***at Allergan*** Defendants knew this evidence made the claim that Jeuveau was independently developed completely implausible. Second, as to the BTX strains: 1) The two strains are virtually identical genetically: DNA fingerprinting evidence shows Jeuveau's BTX strain was derived from Medytox's; 2) The two strains are linked by six identical "golden" SNP's- the possibility of these exact mutations occurring by chance is less than one in a few million; and 3) DNA samples of Jeuveau show it was developed in a lab, not discovered in soil as Evolus represented. ¶¶137-44.

In response to these incontrovertible facts Defendants contend that they lacked access to the evidence in the ITC Litigation because the Protective Order allows only a party's lawyers to be privy to confidential trade secret evidence. (MTD 26). The notion that Defendants were kept in the dark about the case is inconceivable. First, Defendants had access to all the evidence Evolus submitted – or lacked. Second, while only Evolus's lawyers had access to the substance of Medytox's trade secrets they doubtlessly shared the import of the evidence with Defendants. Defendants needn't possess the actual trade secrets to understand the facts demonstrating Evolus's liability. The FID illustrates this. For example, while the ten steps used to manufacture Medytox's BTX product (and Jeuveau) are redacted, the fact that they are identical is not. (AC Exh. B, 110-58). And if, as Defendants assert, the ITC Court is some type of Star Chamber then Defendants had no basis to speak to investors professing knowledge about the ITC Litigation in the first place. *Institutional Investors Group v. Avaya*, *Inc.,* 564. F.3d 242, 269, n. 43 (3d Cir. 2009) ("If Defendants simply had no idea whether [their repeated statements were true] and nonetheless [spoke], this would also have presented an obvious risk of misleading investors").

23

Defendants get it backwards in asserting that because Medytox failed to establish BK Lee stole the trade secrets, the misappropriation "boiled down to competing expert testimony." MTD 26. In truth, the scientific evidence was *so* strong it was unnecessary for the ITC Court to rely on evidence of physical theft. As the ITC Court found, "misappropriation has been shown through the genetic evidence discussed herein…Complainants and the Staff through, *among other things*, expert testimony, have established that the similarities between the stains used at Medytox and Daewoong did not occur by coincidence….The evidence presented by complainants, *and other parties*, **_reasonably points only to a finding of misappropriation._**" *See* FID (AC Exh. B) at 94.

Nor do Defendants' purported disclosures undermine scienter. Medytox's allegations and the ITC Complaint were public by the time Defendants "disclosed" them. Evolus's purported disclosures did nothing more than provide investors with information already known. The evidence in the ITC Litigation however was not public. Defendants' concealment of this evidence accompanied by their statements assuring investors of the strength of Evolus's IP and the meritless nature of the allegations presented a "danger of misleading investors [which was] so obvious that defendants must have been aware of it." *In re Flowers Foods, Inc. Securities Litigation*, 2018 WL 1558558, at *17–18 (finding scienter in connection with positive statements concerning litigation outcome even if defendants believed their conduct was lawful given the nature of lawsuits and questionable legal nature of business model).[11]

Finally, Defendants assert that the Full Commission's decision negates scienter because it reduced the length of the order prohibiting Evolus from marketing Jeuveau and found that Evolus was guilty of misappropriating the manufacturing process for Jeuveau but that the BTX strand was not a protectable trade secret. First, Defendants' reliance on later events is misplaced because

---

[11] *In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, at *19 (S.D.N.Y. Oct. 25, 2017) (Gardephe J.) (MTD 27) is inapposite because the disclosures at issue involved accounting judgments solely within defendants' own purview.  Here the litigations were public knowledge.

"'[f]raud depends on the state of events when a statement is made, *not* on what happens later.'" *In re Vivendi*, 838 F.3d at 262.[12] Second, the decision in no way "rebukes" Plaintiffs' allegations (MTD 2), as the statements were false and misleading regardless of penalty. As analysts noted, despite a reduced ban, the harm to Evolus was profound. ¶236.

**B. Investors Frequently Asked About, And Defendants Professed Knowledge Concerning the ITC Litigation and Evolus's Intellectual Property**

Throughout the Class Period Defendants spoke extensively about both: 1) Jeuveau from a technical/IP standpoint and 2) the ITC Litigation. As to Jeuveau, in addition to repeatedly stating "we remain confident in the strength of our IP," and claiming Jeuveau was "proprietary" to Evolus, Defendants' Class Period 10-K's described the manufacturing process and molecular make-up of Jeuveau. ¶¶186, 210. Further, Defendant Avelar spoke at length about Jeuveau, falsely stating that Evolus "developed this neurotoxin" ¶188. And in Evolus's 10-Q's Defendants discussed the "performance characteristics of the complete 900 kDa neurotoxin complex." ¶196. As to the ITC Litigation, Defendant Moatazedi acknowledged it was "top of mind for investors." ¶¶116, 213. Evolus responded to news of the ITC Complaint flatly stating it was "completely without merit," "another legal maneuver in a long litany of attempts…to stifle competition," and reflective of "the level of concern surrounding Evolus's entry as a new competitor…" ¶¶180, 184. After fact discovery in the ITC Litigation closed, Defendant Moatazedi reiterated "as we've said from the beginning, we remain confident in our IP" ¶200. Immediately after the ITC Hearing, Moatazedi again championed the strength of Evolus's IP, stating "nothing changed through the case" and that before the end of the year "this will be behind us." Demonstrating their knowledge of the evidence, and after Medytox disclosed the ITC Staff Attorney's siding against Evolus, Defendant Silvernail

---

[12] Defendants quote the Complaint as alleging Defendants knew they had "no defense." (MTD 26). The "no defense" language refers to misappropriation of the manufacturing process only. The Full Commission affirmed the ALJ's decision in this regard. Defendants did not have a defense to the allegation they misappropriated the manufacturing process: they produced no evidence demonstrating independent development of the manufacturing process. ¶¶151-52.

stated, "we are in a very solid position. We like our odds in this. We believe in the merits of the case and are very confident in the IP. So we are not really worried about the outcome here." ¶223. As discussed herein, the market accepted these assurances. ¶219. That Defendants repeatedly made detailed representations about these key topics suggests that they "must have educated" themselves about them, which supports an inference of scienter. *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011)(defendants "would have been alert to information concerning" "key" subject "about which investors and analysts often inquired," which "reinforces the inference of scienter").

### C.  Multiple Lawsuits and CW1's Testimony Support Scienter

"An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." *Chill v. General Elec. Co.,* 101 F.3d 263, 269 (2d Cir.1996). Defendants were aware of the allegations that Jeuveau was the product of misappropriation when Evolus filed the BLA - prior to the Class Period and prior to the ITC Litigation. In addition to a lawsuit in Korea and the California Action, Medytox's December 2017 FDA Citizen Petition alerted Defendants to the fraud. As the Citizen Petition implored, Evolus need only perform a DNA SNP analysis of the genome for Jeuveau's BTX strain to determine its true origin. ¶111. This is not a difficult task and could be performed by a single laboratory with the latest analysis software. (MTD Ex. N. (Citizen Petition), p. 21). The allegations in the multiple lawsuits put Defendants on notice of the fraud and support a finding of scienter. *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (pleading "defendants' knowledge of facts or access to information" "suffice[s] to state a claim based on recklessness"); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 406 (S.D.N.Y. 2005) (scienter supported by "facts which come to a defendant's attention that would place a reasonable party in defendant's position on notice" of the fraud). As CW1 states, rather than investigate the allegations Defendants were satisfied to let sleeping dogs lie: the California Action was stayed pending the resolution of the

action in Korea, and the FDA denied the Citizen Petition. ¶¶110-11; 126. CW1, the former Director of Medical Affairs at Evolus, a top-level executive who specifically worked on Jeuveau and interacted with the Individual Defendants daily, stated with certainty that Defendants did not investigate the allegations that Jeuveau was the product of misappropriation. The Court may properly rely on CW1's testimony. He is described with sufficient particularity, worked at Evolus during the Class Period, and was in a position to know the information attributed to him given his daily interactions with Defendants and work on Jeuveau. *See, e.g.*, *City of Warren Police & Fire Ret. Sys. v. WWE Inc.*, 477 F. Supp. 3d 123, 132-33 (S.D.N.Y. 2020) (crediting CW testimony based on indirect knowledge because "heightened demands of the PSLRA will often require plaintiffs to rely on testimony of confidential sources even where those sources offer indirect knowledge, that is, information and belief that is hearsay but plausible.").

Faced with these allegations Defendants posit that CW1's testimony leaves open the possibility that Evolus investigated the allegations prior to CW1 joining Evolus (MTD 24). But had they done so they would have been aware that Jeuveau was the product of misappropriation. Either way- whether Defendants investigated the allegations- and therefore had actual knowledge that their statements were false- or refused to investigate, the inference of scienter is compelling. *See, e.g., In re Nevsun Resources Ltd.*, 2013 WL 6017402, at *14 (S.D.N.Y. Sept. 27, 2013) (Gardephe, J.) ("A failure to check information Defendants had a duty to monitor may also give rise to a strong inference of scienter. Under such circumstances, defendants knew, or more importantly should have known, they were misrepresenting material facts related to the corporation.").

### D.  Core Operations Supports Scienter

The importance of a product to a corporation supports an inference of scienter as to adverse facts about that product. *See Celestica, Inc.*, 455 F. App'x at 14 n.3; *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019) ("Under the core operations theory, a court may infer that a company and its senior executives have knowledge of

information concerning the core operations of a business, such as events affecting a significant source of revenue."). Evolus's only product is Jeuveau. ¶50. Since its inception, Evolus's sole focus has been bringing Jeuveau to market, to compete with BOTOX. *Id*. As the ITC Court found, Evolus "entered the market with the specific intent of targeting Allergan. FID (AC Exh B p. 214) Evolus's SEC filings state that its ability to develop and successfully commercialize Jeuveau is critically important to its continued operations.

### E. Defendants' Stock Offerings and Insider Sales Support Scienter

Courts have found allegations of motive adequate where the company needed to raise funds to survive. *Skiadis v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. 2020). Shortly after the close of expert discovery in the ITC Litigation Evolus conducted a secondary offering reaping $63.5 million in net proceeds. ¶204. Evolus was dependent on these funds to survive. In Evolus's Class Period 10-K's Defendants warned that Evolus has operated at a loss since its inception, would continue to incur losses for the foreseeable future, and that its ability to continue as a going concern was in doubt. Fuks Dec. Ex. 2. p.14, 22, 83.

As to insider sales, Defendant Alphaeon, together with Defendants Avelar and Silvernail sold a total of nearly $128 million in Evolus stock during the Class Period. The sheer magnitude of these sales supports an inference of scienter. *See E\*Trade*, 712 F. Supp. 2d at 200 (class period sales of less than $6 million supports scienter). Defendants go to great lengths to explain why their insider sales were not suspicious. First, they assert that Moatazedi's lack of insider sales negates scienter (MTD 20). But there is no requirement that each defendant engage in insider sales. *See Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 476 (S.D.N.Y. 2013) ("the fact that multiple . . . executives sold stock outweighs the fact that one . . . did not"). Second, Defendants assert that share acquisitions during the Class Period negate scienter. (MTD 20-22). Critically however, Defendants omit that they did not spend a single dollar acquiring these shares. Evolus gave them to Defendants as part of their compensation. *See Nevsun*, 2013 WL 6017402, at *13 n.7 (scienter

not undermined by defendant's class period stock purchases because defendant acquired stock "through the exercise of stock appreciation rights" and options that were granted . . . as part of his compensation" and "did not buy any shares on the open market"). Third, Defendants assert various alternative explanations for their insider sales such as covering tax withholding. (MTD 20-21). These explanations raise factual disputes "the Court must resolve in plaintiff's favor at this stage…" *City of Warren Police & Fire Ret. Sys. v. WWE Inc.*, 477 F. Supp. 3d 123, 137 (S.D.N.Y. 2020) (refusing to credit explanation that insider sold stock to fund creation of additional sports league). Fourth, Defendants assert that the timing of Alphaeon's insider sales were not suspicious because they occurred more than a year before the end of the Class Period. Defendants ignore that these sales occurred just before the close of discovery in the ITC Litigation and after right after Defendants issued false statements announcing the launch of Jeuveau. Alphaeon, fearful that Medytox/Allergan might disclose evidence indicating Evolus's guilt (as it later did when it revealed the ITC Staff Attorney's opinion, causing Evolus stock to decline) took the opportunity to sell over 43% of its Evolus stock. ¶229. Accordingly, Evolus's secondary offering and Defendants' insider sales bolster an already strong inference of scienter. *See In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137-38 (2d Cir. 2021) (courts must "assess the total weight of the circumstantial allegations *together with* the allegations of motive and opportunity").

### F. Evolus's Desire to Compete with Allergan and The Individual Defendants' Prior Positions at Allergen Supports Scienter

As Defendants are aware, in a theft of trade secret case proof of injury to a competitor's industry is required. (AC Exh. B at 191-94; ¶¶167-171). As the ITC Court found "Evolus has formulated and executed a marketing strategy to capture market share against Allergan." *Id.* Additionally, "[f]urthering Jeuveau's ability to compete with [BOTOX] is the fact that many key members of Evolus's management team (including Mr. Moatazedi himself) are former high-level Allergan employees with significant BOTOX experience….All of these individuals -and

especially those with senior executive-level knowledge of and experience with BOTOX- give Evolus valuable insight to compete more effectively with Allergan." In a case involving theft of trade secrets and unfair competition the relevance of Defendants' senior positions at Allergan is obvious. For example, the Individual Defendants' prior employment at Allergan provided them with actual knowledge that the misappropriation allegations were not meritless. Further, Defendants' extensive experience in the industry which they gained at Allergan alerted them to the implausibility that Daewoong found the BTX strain for Jeuveau in the soil in Korea and that a team with no BTX experience that an intern headed came up with the manufacturing process for Jeuveau (While Allergan took six years to develop it). Faced with these allegations Defendants cite cases for the unremarkable proposition that executive positions are insufficient to plead scienter. (MTD 23). But Plaintiffs do not allege that Defendants' positions at Evolus support scienter. The Individual Defendants' prior roles at Allergan and the fact that almost all Evolus's management team came from Allergan is yet another piece of the scienter puzzle.

## III.    THE INDIVIDUAL DEFENDANTS ARE LIABLE AS CONTROL PERSONS

Having satisfied §10(b), Plaintiffs have also stated a §20(a) control person claim.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' MTD in its entirety. If any claims are dismissed, Plaintiffs respectfully request leave to replead.

Dated: April 20, 2022                              **THE ROSEN LAW FIRM, P.A.**

                                             /s/ *Sara Fuks*
                                             Sara Fuks
                                             Laurence Rosen
                                             Phillip Kim
                                             275 Madison Avenue, 40th Floor
                                             New York, New York 10016
                                             Telephone: (212) 686-1060
                                             Fax: (212) 202-3827

30

Email: sfuks@rosenlegal.com
        lrosen@rosenlegal.com
        pkim@rosenlegal.com

***Lead Counsel for Investors and the
Putative Class***

31