# Exhibit 2

10-K 1 evolus12311910-k.htm 10-K

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-K

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2019**
or

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from              to**

**Commission File Number: 001-38381**

# EVOLUS, INC.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **46-1385614** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification Number)** |

**520 Newport Center Dr., Suite 1200**
**Newport Beach, California 92660**
**(949) 284-4555**
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

**Securities registered pursuant to Section 12(b) of the Act:**

| <u>Title of each class</u> | <u>Trading Symbol(s)</u> | <u>Name of each exchange on which registered</u> |
|---|---|---|
| Common Stock, $0.00001 par value per share | EOLS | The Nasdaq Stock Market LLC |

**Securities registered pursuant to Section 12(g) of the Act:**
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards pursuant to Section 13(a) of the Exchange Act. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐    No ☒

The aggregate market value of the registrant's common stock held by non-affiliates of the registrant as of the last business day of the registrant's most recently completed second fiscal quarter was approximately $238.7 million, based on the closing price of the registrant's common stock on the Nasdaq Global Market of $14.62 per share for such date.

As of February 21, 2020, 33,728,035 shares of the registrant's sole class of common stock were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's Proxy Statement for the 2020 Annual Meeting of Stockholders are incorporated herein by reference in Part III of this Annual Report on Form 10-K to the extent stated herein. Such proxy statement will be filed with the Securities and Exchange Commission within 120 days of the registrant's fiscal year ended December 31, 2019.

Table of Contents

**Item 1A.    Risk Factors.**

*You should carefully consider the risks and uncertainties described below, together with all the other information in this Annual Report on Form 10-K, including Item 7"Management's Discussion and Analysis of Financial Condition and Results of Operations" and the financial statements and the related notes included in Item 8 "Financial Statements and Supplementary Data." If any of the following risks actually occurs, our business, reputation, financial condition, results of operations, revenue, and future prospects could be seriously harmed. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties that we are unaware of, or that we currently believe are not material, may also become important factors that adversely affect our business. Unless otherwise indicated, references to our business being seriously harmed in these risk factors will include harm to our business, reputation, financial condition, results of operations, revenue, and future prospects. In that event, the market price of our common stock could decline, and you could lose part or all of your investment.*

**Risks Related to Our Business and Strategy**

***We have a limited operating history and have incurred significant losses since our inception and anticipate that we will continue to incur losses for the foreseeable future. We have only one product and limited commercial sales, which, together with our limited operating history, make it difficult to assess our future viability.***

We are a performance beauty company with a limited operating history. To date, we have invested substantially all of our efforts and financial resources in the clinical development, regulatory approval, and commercial launch of Jeuveau®, which is currently our only product. We began selling Jeuveau® in the United States in May 2019 and through a distribution partner in Canada in October 2019 and have a limited history of generating revenue. We are not profitable and have incurred losses in each year since our inception in 2012. We have a limited operating history upon which you can evaluate our business and prospects. Consequently, any predictions about our future success, performance or viability may not be as accurate as they could be if we had a longer operating history or greater experience commercializing a product. In addition, we have limited experience and have not yet demonstrated an ability to successfully overcome many of the risks and uncertainties frequently encountered by companies in the medical aesthetics field. We continue to incur significant expenses related to the commercialization of Jeuveau®. We have recorded net losses of $90.0 million and $46.9 million for the years ended December 31, 2019 and 2018, respectively, and had an accumulated deficit as of December 31, 2019 of $213.1 million. We expect to continue to incur losses for the foreseeable future, and we anticipate these losses will continue as we commercialize Jeuveau®. Our ability to achieve revenue and profitability is dependent on our ability to successfully market and commercialize Jeuveau®. Even if we achieve profitability in the future, we may not be able to sustain profitability in subsequent periods. Our prior losses, combined with expected future losses, may adversely affect the market price of our common stock and our ability to raise capital and continue operations.

***We currently depend entirely on the successful commercialization of our only product, Jeuveau®. If we are unable to successfully commercialize Jeuveau®, we may never generate sufficient revenue to continue our business.***

We currently have only one product, Jeuveau®, and our business presently depends entirely on our ability to successfully commercialize it in a timely manner. While the product was commercially launched in the United States in May 2019 and through a distribution partner in Canada in October 2019, we have a limited history of generating revenue for Jeuveau®. Our near-term prospects, including our ability to generate revenue, as well as our future growth, depend entirely on the successful commercialization of Jeuveau®. The commercial success of Jeuveau® will depend on a number of factors, including the following:

- our success in educating physicians and consumers about the benefits, administration and use of Jeuveau®;

- the prevalence, duration and severity of potential side effects experienced with Jeuveau®;

- achieving and maintaining compliance with all regulatory requirements applicable to Jeuveau®;

- the ability to raise additional capital on acceptable terms, or at all, if needed, to support our operations and further commercialization of Jeuveau®;

- the acceptance by physicians and consumers of the safety and efficacy of Jeuveau®;

- our ability to successfully commercialize Jeuveau®, whether alone or in collaboration with others, including our ability to hire, retain and train sales representatives in the United States;

14

Table of Contents

***We may require additional financing to fund our future operations, and a failure to obtain additional capital when so needed on acceptable terms, or at all, could force us to delay, limit, reduce or terminate our operations.***

We have utilized substantial amounts of cash since our inception in order to conduct clinical development to support regulatory approval of Jeuveau® in the United States, EU and Canada and in connection with the launch of Jeuveau® in the United States and Canada. We expect that we will continue to expend substantial resources for the foreseeable future in order to commercialize Jeuveau® and for the clinical development of any additional product candidates we may choose to pursue.

In the near term, these expenditures will include costs associated with the development and continuation of our marketing programs and commercialization infrastructure in connection with commercializing Jeuveau® within and outside of the United States. In the long term, these expenditures will include costs associated with the continued commercialization of Jeuveau® and any of our future product candidates, such as research and development, conducting preclinical studies and clinical trials and manufacturing and supplying as well as marketing and selling any products approved for sale. In addition, other unanticipated costs may arise. Because the regulatory approval process and commercialization expenditures needed to meet our sales objectives are highly uncertain, we cannot reasonably estimate the actual amounts necessary to successfully complete the development and commercialization of Jeuveau® or any future product candidates. We expect to incur additional costs as we continue to operate as a public company, hire additional personnel and expand our operations.

We anticipate that our existing cash, cash equivalents and investments will be sufficient to fund our current operating plan for the next twelve months. However, we may require additional funds earlier than we currently expect in the event that market acceptance of Jeuveau® is slower than expected. Our currently anticipated expenditures for the commercialization of Jeuveau® may exceed existing cash, cash equivalents and investments, and we may need to seek additional debt or equity financing. Additionally, under our credit facility, in order to draw the final $25.0 million of the facility, we must meet a number of conditions including maintaining compliance with covenants under the credit facility and the achievement of specified net sales targets based on a trailing six-month basis. In the event we are unable to reach this net sales milestone, we will not be able to draw the additional $25.0 million. As of December 31, 2019, we had not yet met the net sales milestone to draw the second tranche.

We may need to raise additional capital to fund our operations and continue to support both our near and long-term expenditures.

Our future capital requirements depend on many factors, including:

- the cost of commercialization activities for Jeuveau® or if any other future product candidates are approved for sale, including marketing, sales and distribution costs;

- the scope, progress, results and costs of researching and developing any future product candidates, and conducting preclinical and clinical trials;

- our ability to accurately forecast demand for our products, the ability of our third-party manufacturers to scale production to meet that demand and our ability to effectively manage our working capital requirements including the purchase of inventory and collection of receivables;

- costs under our third-party manufacturing and supply arrangements for our current and any future product candidates and any products we commercialize;

- our ability to establish and maintain strategic collaborations, licensing or other arrangements and the terms of and timing of such arrangements;

- the timing of, and the costs involved in, obtaining and maintaining regulatory approvals for any future product candidates;

- the degree and rate of market acceptance of Jeuveau® or any future approved products;

- the emergence, approval, availability, perceived advantages, relative cost, relative safety and relative efficacy of alternative and competing products, the timing of new product introductions by competitors and other actions by competitors in the marketplace;

- costs of operating as a public company; and

- costs associated with any acquisition or in-license of products and product candidates, technologies or businesses.

22

Table of Contents

curtailment or restructuring of our operations, any of which could materially and adversely affect our ability to operate our business and our financial results.

State and federal authorities have aggressively targeted pharmaceutical companies for alleged violations of these anti-fraud statutes, based on improper research or consulting contracts with doctors, certain marketing arrangements with pharmacies and other healthcare providers that rely on volume-based pricing, off-label marketing schemes, and other improper promotional practices. Companies targeted in such prosecutions have paid substantial fines, have been ordered to implement extensive corrective action plans, and have in many cases become subject to consent decrees severely restricting the manner in which they conduct their business, among other consequences. Additionally, federal and state regulators have brought criminal actions against individual employees responsible for alleged violations. If we become the target of such an investigation or prosecution based on our contractual relationships with providers or institutions, or our marketing and promotional practices, we could face similar sanctions, which would materially harm our business.

Also, the FCPA and similar worldwide anti-bribery laws generally prohibit companies and their intermediaries from making improper payments to non-U.S. officials for the purpose of obtaining or retaining business. Our internal control policies and procedures may not protect us from reckless or negligent acts committed by our employees, future distributors, partners, collaborators or agents. Violations of these laws, or allegations of such violations, could result in fines, penalties or prosecution and have a negative impact on our business, results of operations and reputation.

***Legislative or regulatory healthcare reforms in the United States and other countries may make it more difficult and costly for us to obtain regulatory clearance or approval of any future product candidates and to produce, market, and distribute our products after clearance or approval is obtained.***

From time to time, legislation is drafted and introduced in the U.S. Congress or other countries that could significantly change the statutory provisions governing the regulatory clearance or approval, manufacture, and marketing of regulated products or the reimbursement thereof. In addition, regulations and guidance are often revised or reinterpreted by the FDA and other regulatory authorities in ways that may significantly affect our business and our products. Any new regulations or revisions or reinterpretations of existing regulations may impose additional costs or lengthen review times of any future product candidates. Such changes could, among other things, require:

- changes to manufacturing or marketing methods;

- changes to product labeling or promotional materials;

- recall, replacement, or discontinuance of one or more of our products; and

- additional recordkeeping.

Each of these would likely entail substantial time and cost and could materially harm our business and our financial results. In addition, delays in receipt of or failure to receive regulatory clearances or approvals for any future products would harm our business, financial condition and results of operations.

**Risks Related to Our Relationship with Alphaeon and Alphaeon 1, LLC**

***Alphaeon 1, LLC may exert significant influence over our business, and the concentrated ownership of our common stock and certain contractual rights of Alphaeon 1, LLC may prevent you and other stockholders from influencing significant decisions.***

As of December 31, 2019, Alphaeon owned 25.8% of our outstanding shares of common stock. Subsequent to December 31, 2019, Alphaeon contributed all of those shares to Alphaeon 1, LLC. This concentrated ownership position may provide Alphaeon 1, LLC with significant influence in determining the outcome of corporate actions requiring stockholder approval, including the election and removal of directors. This significant stock ownership may also discourage transactions involving a change-of-control of our company, including transactions in which you as a holder of our common stock might otherwise receive a premium for your shares.

***Certain of our directors may have actual or potential conflicts of interest because of their ownership of debt and equity securities in Alphaeon and Alphaeon 1, LLC and their positions with Alphaeon and Alphaeon 1, LLC.***

Vikram Malik, Simone Blank, Kristine Romine, M.D., and Robert Hayman serve on our board of directors. Such directors or entities they are affiliated with currently own and may in the future own equity, debt or convertible debt of Alphaeon and

43

Table of Contents

Alphaeon 1, LLC, which we refer to collectively as the Alphaeon entities. These individuals' or entities' holdings of debt or equity securities, options to purchase shares of Alphaeon entities or other equity awards in the Alphaeon entities may be significant for some of these persons or entities compared to these persons' or entities' total assets. Additionally, each of Mr. Malik, and Ms. Blank serve on the board of directors of Alphaeon and board of managers of Alphaeon 1, LLC. Their positions at the Alphaeon entities and the ownership of any Alphaeon entities equity, debt or equity awards may create, or may create the appearance of, conflicts of interest when these directors are faced with decisions that could have different implications for the Alphaeon entities than the decisions have for us.

These decisions include:

- corporate opportunities;

- the impact that operating decisions for our business may have on the Alphaeon entities consolidated financial statements;

- the impact that operating or capital decisions (including the incurrence of indebtedness) for our business may have on the Alphaeon entities' current or future indebtedness or the covenants under that indebtedness;

- the timing and amount of financing efforts, whether they are debt or equity, and the amount of resulting dilution to existing shareholders;

- business combinations involving us;

- our dividend policy;

- management stock ownership; and

- the related party services and agreements between Alphaeon and us.

Potential conflicts of interest could also arise if we decide to enter into any new commercial arrangements with the Alphaeon entities or SCH in the future or in connection with the Alphaeon entities desire to enter into new commercial arrangements with third parties.

Furthermore, disputes may arise between the Alphaeon entities and us relating to our past and ongoing relationship, and these potential conflicts of interest may make it more difficult for us to favorably resolve such disputes, including those related to:

- indemnification and other matters arising from our initial public offering;

- the nature, quality and pricing of services Alphaeon agrees to provide to us;

- sales or other disposal by Alphaeon 1, LLC of all or a portion of its ownership interest in us; and

- business combinations involving us.

We may not be able to resolve any potential conflicts, and even if we do, the resolution may be less favorable to us than if we were dealing with an unaffiliated party. While we are not controlled by the Alphaeon entities, we may not have the leverage to negotiate amendments to these agreements, if required, on terms as favorable to us as those we would negotiate with an unaffiliated third party.

***Alphaeon and its directors and officers will have limited liability to us or you for breach of fiduciary duty.***

Our certificate of incorporation provides that, subject to any contractual provision to the contrary, Alphaeon has no obligation to refrain from:

- engaging in the same or similar business activities or lines of business as we do;

- doing business with any of our clients or consumers; or

- employing or otherwise engaging any of our officers or employees.

44

https://www.sec.gov/Archives/edgar/data/0001570562/000157056220000061/evolus12311910-k.htm

Table of Contents

**Evolus, Inc.**
**Notes to Financial Statements**
**(in thousands, except share and per share data)**

was effective on November 5, 2018 and it did not have a material impact on the Company's financial statements upon adoption on January 1, 2019.

In July 2018, the Financial Accounting Standards Board (the "FASB") issued ASU No. 2018-09, *Codification Improvements*, which clarifies certain amendments to guidance that may have been incorrectly or inconsistently applied by certain entities and includes Amendments to Subtopic 718-740, Compensation - Stock Compensation - Income Taxes. The guidance in paragraph 718-740-35-2, as amended by the amendments in ASU 2016-09, Compensation - Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting, is unclear on whether an entity should recognize excess tax benefits (or tax deficiencies) for compensation expense that is taken on the entity's tax return. The amendment to paragraph 718-740-35-2 in this update clarified that an entity should recognize excess tax benefits in the period in which the amount of deduction is determined. The Company adopted the guidance on January 1, 2019, and such adoption did not have a material impact on its financial statements.

In February 2016, the FASB issued ASU No. 2016-02 and its related amendments which introduced *Leases (Topic 842, or* "ASC 842"*)*, a new comprehensive lease accounting model that superseded the lease guidance under *Leases (Topic 840)*. The new accounting standard required lessees to recognize ROU assets and corresponding lease liabilities for all leases with lease terms of greater than 12 months. It also changed the definition of a lease and expanded the disclosure requirements of lease arrangements. In July 2018, the FASB added a transition option for implementation that allowed companies to continue to use the legacy guidance in ASC 840, *Leases*, including its disclosure requirements, in the comparative periods presented in the year of adoption. The Company adopted the guidance effective January 1, 2019. The Company elected the transition package of three practical expedients and elected the optional transition method that allowed for a cumulative-effect adjustment in the period of adoption without a restatement of prior periods. Further, the Company elected a short-term lease exception policy, permitting the Company to not apply the recognition requirements of this standard to short-term leases (i.e. leases with terms of 12 months or less) and an accounting policy to account for lease and non-lease components as a single component for certain classes of assets. As a result of the adoption, the Company adjusted its beginning balance of 2019 by recording operating lease ROU assets and liabilities through a cumulative-effect adjustment. The adoption impacted the accompanying balance sheet, but did not have an impact on the statements of operations and comprehensive loss.

The impact of the adoption of ASC 842 on the accompanying balance sheet as of January 1, 2019 was as follows:

|  | December 31, 2018 | Adjustments Due to the Adoption of ASC 842 | January 1, 2019 |
|---|---|---|---|
| Operating lease right-of-use assets | $ — | $ 1,029 | $ 1,029 |
| Current portion of operating lease liabilities | $ — | $ 916 | $ 916 |
| Operating lease liabilities | $ — | $ 138 | $ 138 |
| Deferred rent | $ 25 | $ (25) | $ — |

*Recent Pronouncements Not Yet Adopted*

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments - Credit Losses (Topic 326)*: Measurement of Credit Losses on Financial Instruments, which modifies the measurement and recognition of credit losses for most financial assets and certain other instruments. The new standard requires the use of forward-looking expected credit loss models based on historical experience, current conditions, and reasonable and supportable forecasts that affect the collectability of the reported amount, which may result in earlier recognition of credit losses under the new standard. The new guidance also modifies the impairment models for available-for-sale debt securities and for purchased financial assets with credit deterioration since their origination. Subsequent to the issuance of ASU 2016-13, the FASB issued ASU 2018-19, *Codification Improvements to Topic 326, Financial Instruments - Credit Losses*. This ASU does not change the core principle of the guidance in ASU 2016-13, instead these amendments are intended to clarify and improve operability of certain topics included within the credit losses standard. The FASB also subsequently issued ASU No. 2019-04, *Codification Improvements to Topic 326, Financial Instruments—Credit Losses, Topic 815, Derivatives and Hedging, and Topic 825, Financial Instruments,* which did not change the core principle of the guidance in ASU 2016-13 but clarified that expected recoveries of amounts previously written off and expected to be written off should be included in the valuation account and should not exceed amounts

83

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on February 25, 2020.

**EVOLUS, INC.**

By: /s/ David Moatazedi

David Moatazedi
President and Chief Executive Officer

## POWER OF ATTORNEY

The undersigned directors and officers of Evolus, Inc. constitute and appoint David Moatazedi and Lauren P. Silvernail, and each of them, as their true and lawful attorneys and agents with power of substitution, to do any and all acts and things in our name and behalf in our capacities as directors and officers and to execute any and all instruments for us and in our names in the capacities indicated below, which said attorneys and agents may deem necessary or advisable to enable said corporation to comply with the Securities Exchange Act of 1934, as amended, and any rules, regulations and requirements of the Securities and Exchange Commission, in connection with this Annual Report on Form 10-K, including specifically but without limitation, power and authority to sign for us or any of us in our names in the capacities indicated below, any and all amendments hereto; and we do hereby ratify and confirm all that said attorneys and agents shall do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ David Moatazedi<br>David Moatazedi | President, Chief Executive Officer and Member of the Board of Directors (Principal Executive Officer) | February 25, 2020 |
| /s/ Lauren P. Silvernail<br>Lauren P. Silvernail | Chief Financial Officer and Executive Vice President of Corporate Development (Principal Financial and Accounting Officer) | February 25, 2020 |
| /s/ Vikram Malik<br>Vikram Malik | Chairman of the Board of Directors | February 25, 2020 |
| /s/ Simone Blank<br>Simone Blank | Director | February 25, 2020 |
| /s/ Bosun Hau<br>Bosun Hau | Director | February 25, 2020 |
| /s/ Kristine Romine, M.D.<br>Kristine Romine, M.D. | Director | February 25, 2020 |
| /s/ Robert Hayman<br>Robert Hayman | Director | February 25, 2020 |

| Signature | Title | Date |
|---|---|---|
| /s/ David Gill<br>David Gill | Director | February 25, 2020 |
| /s/ Peter C. Farrell, Ph.D., AM.<br>Peter C. Farrell, Ph.D., AM. | Director | February 25, 2020 |
| /s/ Karah Parschauer<br>Karah Parschauer | Director | February 25, 2020 |