**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re EVOLUS, INC. SECURITIES LITIGATION | Civil Action No. 20-cv-8647-PGG |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO AEON BIOPHARMA, INC.'S (f/k/a ALPHAEON) MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL SUMMARY ........................................................................................................ 2

ARGUMENT........................................................................................................................ 6

   I.  The Complaint Adequately Alleges that Alphaeon Violated Section 10(b).......................... 6

     A.  Alphaeon is Liable for the False Statements Contained in the Shelf Registration Statement, Including Those Incorporated by Reference Therein ...................................... 6

     B.  Alphaeon Acted with Scienter in Selling 43% of its Evolus Stock Under Highly Suspicious Circumstances.................................................................................................. 8

  II.  The Complaint Adequately Alleges a Control Person Claim Under Section 20(a)............. 12

  III. The Complaint Adequately Alleges a Claim for Insider Trading Under Section 20A of the Exchange Act ....................................................................................................................... 17

CONCLUSION.................................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)................................................................................ 12

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008).................................................................. 9

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012).................................................................. 7

*City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011)............................................................... 7, 8

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)................................................................ 12

*CompuDyne Corp. v. Shane*,
453 F. Supp. 2d 807 (S.D.N.Y. 2006)................................................................ 13

*DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*,
413 F. Supp. 3d 187 (S.D.N.Y. 2019)............................................................ 12, 13

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)................................................................................ 9

*Ellison v. Am. Image Motor Co.*,
36 F. Supp. 2d 628 (S.D.N.Y. 1999).................................................................. 13

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015)............................................................................... 11

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)................................................................ 12

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................ 11

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000)................................................................................ 9

*George v. China Auto. Sys., Inc.*,
2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) ..................................................... 12

*Gruber v. Gilbertson*,
   2019 WL 4458956 (S.D.N.Y. Sept. 17, 2019) ........................................................................ 18

*In re Adelphia Commc'ns. Corp. Secs. & Deriv. Litig.*, No.,
   03 MD 1529 (LMM), 2007 WL 2615928 (S.D.N.Y. Sept. 7, 2007) ....................................... 14

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
   529 F. Supp. 3d 111 (S.D.N.Y. 2021) .................................................................................... 18

*In re American Apparel Inc. S'holder Litig.*,
   2013 WL 10914316 (C.D. Cal. Aug. 8, 2013) ....................................................................... 16

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) .................................................................................... 14

*In re Cannavest Corp. Sec. Litig.*,
   307 F. Supp. 3d 222 (S.D.N.Y. 2018) .............................................................................. 13, 17

*In re Glob. Crossing, Ltd. Sec. Litig.*,
   322 F. Supp. 2d 319 (S.D.N.Y. 2004) ...................................................................................... 8

*In re Lernout & Hauspie Sec. Litig.*,
   230 F. Supp. 2d 152 (D. Mass. 2002) ...................................................................................... 8

*In re Nevsun Res. Ltd.*,
   2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013) ....................................................................... 11

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ........................................................................................... 11

*In re Parmalat Sec. Litig.*,
   594 F. Supp. 2d 444 (S.D.N.Y. 2009) .................................................................................... 13

*In re Pfizer Inc. Sec. Litig.*,
   584 F. Supp. 2d 621 (2008) .................................................................................................... 18

*In re Philip Servs. Corp. Sec. Litig.*,
   383 F. Supp. 2d 463 (S.D.N.Y. 2004) .................................................................................... 14

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007) .................................................................................... 14

*In re Salix Pharms., Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) .......................................................................... 9

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ..................................................................................................... 10

*In re SLM Corp. Sec. Litig.*,
   740 F. Supp. 2d 542 (S.D.N.Y. 2010)..................................................................... 12

*In re Smith Barney Transfer Agent Litig.*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012)...................................................................... 7

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008)..................................................................... 20

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) .................................................................... 17

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   195 F. Supp. 3d 528 (S.D.N.Y. 2016)..................................................................... 13

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) ............................................................................................ 6, 7

*Katz v. Image Innovations Holdings, Inc.*,
   542 F. Supp. 2d 269 (S.D.N.Y. 2008)..................................................................... 14

*Maverick Fund, L.D.C. v. Comverse Tech., Inc.*,
   801 F. Supp. 2d 41 (E.D.N.Y. 2011)....................................................................... 16

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)..................................................................................... 9

*Patel v. L-3 Commc'ns Holdings Inc.*,
   2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016)......................................................... 10

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
   645 F. Supp. 2d 210 (S.D.N.Y. 2009)..................................................................... 13

*SEC v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996).................................................................................. 13

*Stevelman v. Alias Rsch. Inc.*,
   174 F.3d 79 (2d Cir. 1999)................................................................................... 9, 10

*Takiguchi v. MRI Int'l, Inc.*,
   47 F. Supp. 3d 1100 (D. Nev. 2014) ........................................................................ 7

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
   531 F.3d 190 (2d Cir. 2008)..................................................................................... 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................................ 3, 8, 9

iv

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ........................................................................ 10, 16, 20

*United States v. Teicher*,
   987 F.2d 112 (2d Cir. 1993) ................................................................................................... 18

**Statutes**

15 U.S.C. §78t-1(a) .................................................................................................................... 17

Lead Plaintiff Raja Ahmad and named Plaintiffs Kim Keller, Mitchell Sisun, and Peter Diaferia ("Plaintiffs" or "Investors") respectfully submit this Memorandum of Law in Opposition to Defendant Aeon Biopharma Inc.'s ("Alphaeon")[1] Motion to Dismiss the Amended Class Action Complaint ("Alphaeon MTD"). This Memorandum addresses the arguments particular to Alphaeon.  In all other respects, Plaintiffs incorporate by reference the arguments set forth in the Memorandum of Law in Opposition to Motion to Dismiss filed by Evolus, Inc., ("Evolus") and the Individual Defendants ("Evolus Opp.").

## PRELIMINARY STATEMENT

With knowledge of adverse, non-public information about Evolus's claims to proprietary ownership of Jeuveau, Alphaeon sold an outsize portion of its total Evolus holdings at artificially inflated prices. Indeed, less than two weeks after issuing false and materially misleading statements claiming the ITC Litigation had no merit, Alphaeon caused Evolus to file a shelf registration statement enabling it to sell its shares.  Then, just two weeks after announcing the much anticipated launch of Jeuveau, Evolus dumped a total of $77 million in Evolus stock to unsuspecting investors, representing 41% of its total holdings. Alphaeon pre-meditated these actions:  first Evolus filed a shelf registration statement allowing Alphaeon to sell its stock. Then, about seven weeks later Evolus issued false and materially misleading statements about Jeuveau which propped up the price of Evolus stock.  Finally, less than a week later, Alphaeon unloaded the shares that were registered under the shelf registration statement in massive amounts, at artificially inflated prices. Alphaeon participated in orchestrating this not-so-coincidental series of events, its board designees signing the shelf registration statement that was the vehicle for its insider sales.

---

[1] While Alphaeon states that it changed its name to AEON Biopharma, Inc., Plaintiffs' Amended Class Action Complaint and Evolus's SEC filings refer to Alphaeon. To maintain consistency, this brief will refer to AEON Biopharma, Inc. as Alphaeon.

1

Attempting to distance itself from the fraud Alphaeon claims that it did not participate in or have control over Evolus or its actions and that its stock sales were not suspicious. But the facts are plainly to the contrary: Alphaeon was an active participant in the fraud who orchestrated the May 2019 Offering through which it sold $77 million worth of Evolus stock to investors- stock which Alphaeon acquired at a cost basis of zero- at a price artificially inflated by Defendants' false statements. Alphaeon exerted actual control over the Company through its share ownership and board positions and participated in the fraud by causing Evolus to issue false statements in the shelf registration statement, which Alphaeon benefitted from to Investors' detriment.

## FACTUAL SUMMARY

Evolus is a medical aesthetics company founded in 2013 with the sole objective of developing a product to compete with BOTOX. ¶¶2, 69, 188.[2] Defendant Alphaeon has been the primary backer of Evolus and has controlled the Company through its majority stock ownership. ¶36. At the beginning of the Class Period, Alphaeon owned 56% of Evolus's common stock. *Id.* As Evolus acknowledged in its 2018 10-K, Alphaeon controls the direction of Evolus's business and is able to determine the outcome of all actions requiring stockholder approval. *Id.* Indeed, in its SEC filings, Evolus has referred to Alphaeon as its "parent company." *Id.* Up until May 20, 2019 Evolus was a "controlled company" for purposes of the Nasdaq marketplace rules, and a majority of its board of directors was not "independent." ¶273.

At the beginning of the Class Period,[3] Alphaeon had the ability to elect a majority of Evolus's Board of Directors. *Id.* Alphaeon's President, Vikram Malik served on Evolus's board

---

[2] All references to ¶ are to paragraphs in the Amended Class Action Complaint ("Complaint"). All capitalized terms herein have the same meanings as in the Complaint. Plaintiffs incorporate by reference herein the Factual Summary contained in Plaintiffs' Memorandum of Law in Opposition to Evolus's Motion to Dismiss ("Evolus Opp.").

[3] The Class Period is between February 1, 2019 and July 6, 2020, both dates inclusive.

of directors as well as its Compensation Committee since 2018.  ¶38, 272.  Malik is in fact the Chairman of Evolus's Board of Directors. *See* Evolus 2018 10-K p. 53.[4] The Chairwoman of Alphaeon's Board of Directors, Simone Blank, has likewise served on Evolus's Board of Directors as well as on Evolus's Compensation Committee since 2018. ¶¶39, 272. Alphaeon Board Member Bosun Hau has served on Evolus's Board of Directors since January 2018 and is also a member of Evolus's Audit Committee and the chair of Evolus's Nominating and Corporate Governance Committee. ¶¶40, 272. Kristine Romine and Robert Hayman have been members of Evolus's Board of Directors since 2018 and were members of Alphaeon's Board of Directors up until February 2018. ¶¶41-42.

Just like other members of Evolus's Board, Malik, Blank, Hau, Romine and Hayman signed Evolus's annual reports and participated in the Company's business affairs. (*See* Evolus 2018 10-K p. 53, 110-111, 122, 125, 132; 2019 10-K, p. 43-44) ¶¶44, 194, 290. As Evolus acknowledged in its 2018 10-K "certain of our officers and directors may have actual or potential conflicts of interest because of their ownership of debt and equity securities in Alphaeon, and their positions within Alphaeon." Evolus 2018 10-K p. 53.

As Plaintiffs describe more fully in the Evolus Opp., unbeknownst to investors Evolus did not investigate the allegations that Jeuveau was the product of misappropriation. ¶126. Despite the implausible claim that the strain for Jeuveau was found in soil in Korea, Evolus had no interest in finding out that Jeuveau was the product of misappropriation. *Id*. Nevertheless, throughout the

---

[4] Relevant excerpts from Evolus's 2018 10-K and 2019 10-K are attached as Exhibits 1 and 2, respectively to the Declaration of Sara Fuks ("Fuks Dec.") filed herewith. In reviewing a motion to dismiss, courts may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Documents publicly filed with the SEC are the proper subject of judicial notice. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014)

Class Period, Defendants described Jeuveau as Evolus's "*proprietary* 900 kDA purified botulimun toxin type A formulation," attributed Evolus's success to its ability market the "first known 900kDa neurotoxin alternative to BOTOX," and pronounced that the allegations in the ITC Litigation were completely without merit. ¶¶173, 177, 184, 186, 188, 190, 194, 196, 202, 205, 209, 210, 226, 69, 74, 186, 210, 107, 112, 180.  Further, Defendants, but not investors, were privy to the evidence in the ITC Litigation as it emerged.

On March 22, 2019, shortly after the ITC announced that it would commence an investigation into Evolus's alleged misappropriation, Alphaeon caused Evolus to file a shelf registration statement ("Shelf Registration Statement") enabling Alphaeon to sell its shares to the market. ¶276. The Shelf Registration Statement was declared effective on April 15, 2019. Approximately one month later, Alphaeon sold 4,000,000 shares of its stock at $19.25 per share for total proceeds of $77,000,000.  ¶276.  Malik, Blank, Hau, Romine and Hayman each signed the Shelf Registration Statement. *See* Fuks Decl. Ex. 3 (Evolus Form S-3, p. 37.). The Shelf Registration Statement incorporated by reference the Company's 2018 10-K, and all Evolus's future SEC filings until the date the Company completed the offering.  Fuks Decl. Exh. 3 at p. 31-32. In addition to signing the Shelf Registration Statement, Malik, Blank, Hau, Romine and Hayman each signed Evolus's 2018 10-K which contained false and misleading statements and which was incorporated by reference in the Shelf Registration Statement.  ¶186.  *See* Fuks Decl. Ex. 1 (Evolus 2018 10-K) at Item 16.

As Plaintiffs describe in the Evolus Opp., Evolus's 2018 10-K contained false and materially misleading statements concerning Jeuveau. As to the "competitive strength" of Jeuveau, the 2018 10-K stated: Jeuveau will offer the U.S. market the first known 900 kDa neurotoxin alternative to BOTOX. The manufacture of both Jeuveau and BOTOX starts with a 900 kDa

4

complex, includes adding the excipients human serum albumin, or HSA, and sodium chloride, and finishes by vacuum drying. We believe Jeuveau is the only known neurotoxin product in the United States with a 900 kDa neurotoxin complex other than BOTOX. We also believe an important component of competitiveness in the neurotoxin market relates to the characteristics associated with the 900 kDa complex and the potential of the accessory proteins to increase the effectiveness of the active toxin portion of the complex. In the 2018 10-K Defendants described Jeuveau as Evolus's "proprietary 900 kDa purified botulinum toxin type A formulation." ¶187.  The foregoing statements in the 2018 10-K were false and misleading when made and omitted material facts necessary to make the statements not misleading. First, Evolus' "competitive strengths" were due to its misappropriation rather than the reasons suggested above. Second, the "purified 900 kDa botulinum type A formulation" was illegally misappropriated from Medytox and was not in fact Evolus's (or Daewoong's) "proprietary" formulation but instead belonged to Medytox.  ¶187.

Then, on May 15, 2019 Evolus issued a press release announcing the U.S. launch of Jeuveau. The press release stated, in part, "…there's a #NEWTOX on the market. Jeuveau was approved by the [FDA] in February 2019…Evolus is planning to launch Jeuveau Experience Treatment (J.E.T.) through approximately 3,000 accounts nationwide." In describing Jeuveau, Evolus' press release stated: "***Jeuveau is a proprietary 900 kDa purified botulinum toxin type A formulation*** indicated for the temporary improvement in the appearance of moderate to severe glabellar lines in adults."  ¶190.

Capitalizing on investor enthusiasm about the launch of Jeuveau, on May 17, 2019 Evolus filed a final prospectus allowing for the sale of 4.0 million shares of Evolus stock on the Nasdaq. ¶285. When the offering was completed on May 20, 2019, Alphaeon had sold 4,000,000 shares of Evolus stock for total proceeds of $77,000,000 ¶286. Alphaeon sold an additional 2.6 million

shares during the Class Period at the artificially inflated price of $19.25 per share, making its total proceeds from sales of Evolus stock during the Class Period $127,633,235.68. ¶228. These sales represented a sizeable reduction in Alphaeon's overall holdings in Evolus. ¶229.

The suspicious timing of these sales: first, disclosure that the ITC agreed to initiate an investigation and Evolus's false statements decrying the litigation as an attempt by Allergan to stifle competition, and Evolus's 10-K touting Jeuveau as Evolus's proprietary formulation, followed shortly by the filing of the Shelf Registration Statement; then Evolus's false and misleading May 15 press release announcing the U.S. launch of Jeuveau, followed swiftly by the offering in which Alphaeon dumped approximately $77 million in stock sold at a price artificially inflated by Defendants' positive (but false) statements about Evolus demonstrates that Alphaeon was anything but a passive participant in this fraud.

## ARGUMENT

I.    **The Complaint Adequately Alleges that Alphaeon Violated Section 10(b)**

   A.    **Alphaeon is Liable for the False Statements Contained in the Shelf Registration Statement, Including Those Incorporated by Reference Therein**

It is axiomatic that persons who signed a registration statement are liable for the false and misleading statements therein, included those incorporated by reference. Malik, Blank Hau, Romine and Hayman signed both the Shelf Registration Statement and Evolus's 2018 10-K. Alphaeon, whom Malik, Blank, Hau, Romine and Hayman represent is therefore liable for the false and misleading statements therein.

Alphaeon incorrectly asserts that under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)[5], the Court cannot attribute the alleged false and misleading

---

[5] Alphaeon MTD at 7-10.

statements to it.[6] *Janus*, however, merely holds that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Takiguchi v. MRI Int'l, Inc.*, 47 F. Supp. 3d 1100 (D. Nev. 2014). *Janus* also holds that *all* persons who sign an SEC-filed document "make" the statements it contains. *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 163 (S.D.N.Y. 2012).[7] For the reasons set forth at length in the Evolus Opp., the Complaint adequately alleges that the 2018 10-K contains materially false and misleading statements. Malik, Blank, Hau, Romine and Hayman each signed the 10-K and the Shelf Registration Statement which incorporated by reference the 2018 10-K, and were duty-bound to ensure that all information contained therein was true and not misleading.

Courts in the Second Circuit have held controlling shareholder defendants liable under Section 10(b) in accordance with *Janus* under analogous circumstances. For example, in *City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 416–18 (S.D.N.Y. 2011), in denying a motion to dismiss the court held the defendant company's controlling shareholder could be held liable under *Janus* for allegedly false and misleading statements in the company's registration statement, notwithstanding that the controlling shareholder's designees on

---

[6] In *Janus*, the  Supreme Court addressed whether a mutual fund "investment advisor" could be held liable under Exchange Act Rule 10b-5 for false statements made in mutual fund prospectuses filed by its client, a "separate legal entity owned entirely by mutual fund investors" with its "own board of trustees." *Janus*, 131 S. Ct. at 2299, 2305.  The *Janus* Court explained that the advisor was not liable because it did not have sufficient "authority" or "control" over the statements of a legally separate entity, including "its content and whether and how to communicate it."  *Id.* at 2302, 2305-06.

[7] Courts interpreting *Janus* have held that multiple persons and entities within a single company have the "authority" to make an SEC filing. "[I]t is not inconsistent with *Janus Capital* to presume that multiple people in a single corporation have the joint authority to 'make' an SEC filing, such that a misstatement has more than one 'maker.' " *See City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012).

the board of directors actually signed the registration statement.  In distinguishing *Janus*, the *City of Roseville* court reasoned: "ENV unquestionably had control over the stock being sold pursuant to the Registration Statement…[Defendant's *Janus*] argument overlooks ENVs ownership of ES, its direct control over all corporate transactions, and its authority to determine when and whether to sell the shares being sold. Although the Registration Statements did speak in the voice of ES and were signed by the Individual Defendants in their capacities as directors or officers of ES, *these explicit attributions do not preclude attribution to ENV as well*." *Id.* (emphasis added); *see also*, *In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 168 (D. Mass. 2002) ("Absolving an auditor who prepares, edits, and drafts a fraudulent financial statement knowing it will be publicly disseminated simply because [it was signed by another affiliated auditor] would stretch *Central Bank's* holding too far"); *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 333 (S.D.N.Y. 2004) (the "strict requirement of public attribution would allow those primarily responsible for making false statements avoid liability by remaining anonymous and thus would place a premium on concealment and subterfuge rather than on compliance with federal securities laws")(internal quotations omitted).

As such, this Court should find that the Complaint adequately attributes the false and misleading statements in the Shelf Registration Statement – including in the 10-K it incorporates by reference – to Alphaeon.

### B.    Alphaeon Acted with Scienter in Selling 43% of its Evolus Stock Under Highly Suspicious Circumstances

Under the PSLRA, a plaintiff needs to plead a "strong inference" of Defendants' scienter—*i.e.*, that defendants acted either with intent to defraud or with reckless disregard for the truth. In considering scienter, Plaintiffs' factual allegations must be viewed in their totality, rather than parsed piecemeal. *See Tellabs*, 551 U.S. at 323. Moreover, as with any 12(b)(6) motion, a court

8

must conduct its "comparative assessment of plausible inferences" while "constantly assuming the plaintiff's allegations to be true." *Id*. at 326-27. The requisite inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre,' or even 'the most plausible of competing inferences'"; instead, the inquiry is simply this: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326. In other words, "[a] tie . . . goes to the plaintiff." *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016); *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) (same). In this Circuit, the requisite strong inference may be established through factual allegations showing either (a) "strong circumstantial evidence of conscious misbehavior or recklessness" or (b) "motive and opportunity to commit fraud." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Since *Tellabs*, the Second Circuit has reaffirmed that a plaintiff may plead scienter by alleging facts showing that defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008). As the Second Circuit has also long held, plaintiffs need not plead scienter with "great specificity" as long as they allege "enough facts to support 'a strong inference of fraudulent intent.'" *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 169 (2d Cir. 2000) (*citing Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 84 (2d Cir. 1999)).

9

Here, looking at the totality of the circumstances, the Complaint adequately alleges a strong inference of scienter with respect to Alphaeon.  Indeed, the Complaint alleges strong motive on behalf of Alphaeon which contributes to the compelling inference of scienter.

First, Plaintiffs have alleged scienter as to Alphaeon based on the knowledge of Alphaeon's appointees to Evolus's Board of Directors, Malik, Blank and Hau.  For example, Hau- a member of Evolus's Board of Directors and three-person audit committee- is Alphaeon's President. Malik is the Chairwoman of Alphaeon's Board.  As "management-level employees" of Alphaeon their scienter establishes Alphaeon's scienter. *See, Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *12 (S.D.N.Y. Apr. 21, 2016) (holding scienter of "management-level employees is generally sufficient to attribute scienter to corporate defendants.") *See also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1051–51 (N.D. Cal. 2016) (imputing scienter of controlling shareholder appointees on defendant company's board of directors to controlling shareholder defendant where complaint alleged that controlling shareholder defendant, through audit committee appointees, had access to company's "material nonpublic and highly confidential information.").

The Second Circuit has held that "unusual" stock sales support scienter. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001). To determine whether sales are "unusual", courts consider the timing of the sales, *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 86 (2d Cir. 1999), as well as other factors like the amount and percentage of shares sold. *Scholastic*, 252 F.3d at 75.

Alphaeon's insider sales are suspicious based on a number of factors.

First, the timing of Alphaeon's sales is suspicious**.** Stock sales made shortly after false statements are suspicious because they suggest insiders are trying to profit from the statements. *Stevelman*, 174 F.3d at 86. Stock sales shortly before a corrective disclosure are also suspicious

10

because they suggest insiders are trying to cash out before the truth comes out. *In re Nevsun Res. Ltd.*, 2013 WL 6017402, at \*13 (S.D.N.Y. Sept. 27, 2013); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999).  Here, Alphaeon caused Evolus to file the Shelf Registration Statement on March 22, 2019, shortly after the March 1, 2019 partial corrective disclosure that the ITC agreed to initiate an investigation, followed by Evolus's false assurances that the claims were completely without merit. ¶¶182-84. Alphaeon ignores the Complaint's scienter allegations that pre-date the close of discovery in the ITC Litigation, *i.e.* that Defendants purposely refused to investigate the allegations so that they could remain willfully ignorant of evidence that Jeuveau was the product of misappropriation. ¶185. With five individuals on Evolus's seven-person board of directors (three Alphaeon directors and two significant equity holders) Alphaeon was doubtlessly aware of Evolus's refusal to investigate the allegations.  Then, Alphaeon executed its insider sales pursuant to the May 2019 Offering on May 20, 2019.  The Secondary Offering came shortly after Evolus's May 15, 2019 press release announcing the highly anticipated U.S. launch of Jeuveau, which falsely represented Jeuveau as Evolus's ***proprietary 900 kDa purified botulinum toxin type A formulation*** and caused Evolus stock to trade at prices artificially inflated by Defendants' fraud. ¶190.

Second, the gross proceeds Alphaeon reaped from its insider sales - $77 million - are far higher than amounts courts have ruled suspicious. *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (sales generating gross proceeds of $49 million split between two defendants and three non-defendants were suspicious); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) (two defendants each selling about $6 million).

11

Third, the net proceeds to Alphaeon from its insider sales further supports scienter. Alphaeon paid nothing for its shares, and sold them at the artificially inflated price of $19.25 per share. ¶37. Alphaeon's sales proceeds were *entirely* profit, which supports scienter. *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *10 (S.D.N.Y. Aug. 8, 2012).

Alphaeon claims that it sold its shares in the Secondary Offering to pay off debt obligations. (MTD at 11).  Courts refuse to consider alternative explanations for stock sales at the motion to dismiss stage because such explanations raise factual disputes "the Court must resolve in plaintiff's favor at this stage…" *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 137 (S.D.N.Y. 2020) (refusing to credit explanation that insider sold stock to fund creation of additional sports league). *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 555 (S.D.N.Y. 2017) ("Money is fungible; in-kind and take-home cash sales affect the seller's bottom line equally."); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 n.6 (S.D.N.Y. 2010) (similar). Even if Alphaeon had debts to pay it has not shown that it did not otherwise have enough money to pay them.  Alphaeon's argument is inappropriate until summary judgment or trial.

## II.    The Complaint Adequately Alleges a Control Person Claim Under Section 20(a)

For control person liability under Section 20(a), "'a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014). Courts within the Second Circuit broadly construe the control person provisions "as they 'were meant to expand the scope of liability under the securities laws.'" *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 220 (S.D.N.Y. 2019) (quoting

12

*CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006)). Allegations of control are not fraud claims and, therefore, are subject only to Rule 8. *See In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 543 (S.D.N.Y. 2016). "Whether a person is a 'controlling person' [under Section 20(a)] is a fact intensive inquiry, and generally should not be resolved on a motion to dismiss." *CompuDyne* 453 F. Supp. 2d 807, 829.

Control may be demonstrated by alleging that a defendant "possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Construtora*, 413 F. Supp. 3d at 220 (citation omitted); *see also In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 455-56 (S.D.N.Y. 2009) (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996)). *See also In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 253 (S.D.N.Y. 2018) (creator and majority owner of corporation was liable as a control person); *Ellison v. Am. Image Motor Co.*, 36 F. Supp. 2d 628, 638 (S.D.N.Y. 1999) (other means of establishing control include business relationships and the power to influence and control the activities of another); *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 242 (S.D.N.Y. 2009) (defendants who had the ability to influence the policies and decision-making at SafeNet were controlling persons).

Alphaeon opposes 20(a) liability on three grounds. First, Alphaeon asserts that there is no primary liability under Section 10(b). Because, as explained above, the Complaint adequately alleges primary claims, this argument fails.

Second, Alphaeon asserts that it did not exercise control Evolus. Here, multiple indicia of control are present with respect to Alphaeon. First, Alphaeon ignores that it caused Evolus to file the Shelf Registration Statement, which Malik, Bosun, Hau, Romine and Hayman signed and which incorporated by reference the false and misleading statements contained in Evolus's 2018

13

10-K. Courts have long held that the signing of registration statements suffices to allege control because "[t]he very fact that a director is required to sign these critical documents charges the director with power over the documents and represents to the corporation, its shareholders, and the public that the corporation's director has performed her role with sufficient diligence that she is willing and able to stand behind the information contained in those documents." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 638 (S.D.N.Y. 2007) (alteration in original). *See also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 504 (S.D.N.Y. 2004) (Section 15 claims against high-level officers and outside director upheld where they held those positions at the time of issuance of the prospectus supplement); *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004) (control found for outside directors who signed registration statement); *In re Adelphia Commc'ns. Corp. Secs. & Deriv. Litig.*, No. 03 MD 1529 (LMM), 2007 WL 2615928, at *10 (S.D.N.Y. Sept. 7, 2007) (the second prong of Section 20(a) (the direct/indirect control inquiry) is satisfied when a defendant signs an SEC filing subject to a well-pled Rule 10b-5 claim*), adhered to on reconsideration*, 542 F. Supp. 2d 266 (S.D.N.Y. 2008); *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008) (signing false SEC filings was sufficient after *Twombly*).   Second, Alphaeon ignores that Evolus's 2018 10-K explicitly stated that "that "Alphaeon controls the direction of our business" in addition to owning 56% of Evolus's outstanding common stock.  As Evolus stated in its 2018 10-K "[a]s long as Alphaeon beneficially owns a majority of the voting power of our outstanding stock, it will generally be able to determine the outcome of all corporate actions requiring shareholder approval, including the election and removal of directors."  Fuks Decl. Ex. 1 p. 52. Indeed, Evolus was deemed a "controlled company" for purposes of the Nasdaq marketplace rules up until May 20, 2019.  ¶273. Third, the conflicted status of five out of the seven Evolus directors as either/both

14

Alphaeon board members and holders of a significant amount of equity in Alphaeon is a strong indicator of control. A majority of Evolus's Board of Directors was not "independent" as defined by Nasdaq listing rules. ¶273. Evolus's 2018 10-K stated "certain of our officers and directors may have actual or potential conflicts of interest because of their ownership of debt and equity securities in Alphaeon, and their positions within Alphaeon." Fuks Decl. Ex. 1 p. 53. Evolus Board members Malik, Blank, Hau, Romine and Hayman have financial interests in Alphaeon which "may be significant." Malik, Hau and Blank serve on Alphaeon's Board with Malik, Evolus's Chairman of the Board serving as Alphaeon's President. *Id*. Evolus's 10-K admitted "these positions at Alphaeon and the ownership of any Alphaeon equity or equity awards may create, or may create the appearance of, conflicts of interest when these directors are faced with decisions that could have different implications for Alphaeon than the decisions have for us." *Id*. Additionally, these individuals were not mere employees of Alphaeon. Malik serves as Alphaeon's president as well as Evolus's Chairman of the Board. Additionally, Blank and Malik served on Evolus's three-member Compensation Committee during the Class Period; Hau and Hayman served on Evolus's three-member Audit Committee during the Class Period; and Hau served as the chair of Evolus's four person Nominating and Corporate Governance Committee, with Blank, Malik and Romine serving as the remaining three members. ¶272. Finally, Alphaeon ignores that it exerted actual control over Evolus causing it to file the Shelf Registration Statement so that Alphaeon could sell a total of over $77 million worth of Evolus stock at artificially inflated prices, becoming the main beneficiary of Evolus's fraud.

Further, even after Alphaeon ceased being a majority holder of Evolus's stock it continued to control Evolus through its designees on Evolus's Board of Directors. According to Evolus's 2019 10-K filed with the SEC on February 5, 2020, as of December 31, 2019 Alphaeon owned

15

28.5% of its common stock. Fuks Decl. Ex. 2, p. 43. Evolus admitted that "this concentrated ownership" could provide Alphaeon with "significant influence in determining the outcome of corporate actions requiring stockholder approval, including the election and removal of directors. This significant stock ownership may also discourage transactions involving a change-of-control our company, including transactions in which you as a holder of our common stock might otherwise receive a premium for your shares." *Id*. Evolus's 2019 10-K also reiterated that "certain of our directors may have actual or potential conflicts of interest" because of their positions within Alphaeon as well as ownership of debt/equity securities in Alphaeon, and specifically referenced Evolus directors Malik, Blank, Romine and Hayman. Additionally, Evolus noted that Malik and Blank continue to serve on both Evolus's and Alphaeon's board of directors. *Id.* at p. 44. Accordingly, this case is unlike *Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 61 (E.D.N.Y. 2011) (MTD p. 17) where the officer defendants cut ties with the company altogether once they stepped down.

Indeed, where a minority shareholder: (a) has substantial holdings of the controlled entity; (b) places its designees on the board; and (c) these designees sign a document containing false statements, courts will find that the minority shareholder is, for pleading purposes, a controlling person. *See, e.g. Magnachip*, 167 F. Supp. 3d at 1048–49 (rejecting argument that minority status precludes control for purposes of section 20(a), finding former majority shareholder who became minority shareholder liable under 20(a) where complaint alleged that company's public filings stated minority shareholder would "'continue to have significant influence over [the company's] affairs…' and 'will be able to control most matters requiring stockholder approval.'") *In re American Apparel Inc. S'holder Litig.* 2013 WL 10914316, at *36-37 (C.D. Cal. Aug. 8, 2013) (finding that a defendant owning 20% of securities whose two nominees controlled person's board

16

singed a 10-K showed that shareholder controlled the false statement made in the 10-K); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 979–80 (N.D. Cal. 2009) (control established as to defendant who was controlled person's "largest shareholder" owning 12.5% of outstanding shares, and had nominee on board who signed 10-K's containing false statements).

Finally, Alphaeon asserts that it was not a culpable participant in the fraud. First, Because Plaintiffs have pled facts sufficient to demonstrate an inference of scienter as to Alphaeon they have "necessarily pled facts sufficient to support culpable participation." *In re Cannavest Corp. Securities Litigation*, 307 F. Supp. 3d at 254 (Gardephe, J.). The Complaint pleads that Alphaeon was a participant in the false and misleading statements contained in Evolus's Shelf Registration Statements and other SEC filings which the conflicted overlapping members of Evolus/Alphaeon management signed and therefore authorized. It is a reasonable inference that as board members Malik, Blank and Hau on behalf of Alphaeon would have been made aware of the Evolus's refusal to investigate the allegations of misappropriation as well as the same evidence in the ITC Litigation which Defendants were privy to. *See, e.g., Cannvest*, (finding reasonable inference that majority owner and board member would have been made aware of deficiencies in internal controls for purposes of pleading culpable participation). Alphaeon owned 56% of Evolus's stock at the beginning of the Class Period, 43% of which it disposed of under suspicious circumstances, at a price which was artificially inflated by the false and misleading statements contained in the Shelf Registration Statement reaping extraordinary profits. Such conduct constitutes culpable participation.

III. **The Complaint Adequately Alleges a Claim for Insider Trading Under Section 20A of the Exchange Act**

Under Section 20A of the Exchange Act, individuals who sell securities while in possession of material, nonpublic information are liable to contemporaneous purchasers. 15 U.S.C. §78t-1(a).

17

A plaintiff states a claim under Section 20A if it alleges (i) a predicate securities violation of the Exchange Act, and (ii) sufficient facts showing that the defendant traded the securities at issue contemporaneously with the plaintiff. *In re Pfizer Inc. Sec. Litig*., 584 F. Supp. 2d 621, 642 (2008), abrogated on other grounds by *Dekalb Cty. Pension Fund v. Transocean Ltd*., 817 F.3d 393 (2d Cir. 2016); *Gruber v. Gilbertson*, 2019 WL 4458956, at *2 (S.D.N.Y. Sept. 17, 2019). In the Second Circuit, Section 20A requires only that a party know inside information while making a trade, not that the party actually use that information in making the trade.  In *United States v. Teicher*, 987 F.2d 112, 120 (2d Cir. 1993) the Second Circuit concluded that "a requirement of causal connection between the [inside] information and trade could frustrate attempts to distinguish between legitimate trade and those conducted in connection with inside information." 987 F.2d at 121. This "knowing possession" standard "recognizes that one who trades while knowingly possessing material inside information had an informational advantage with other traders.  Unlike a loaded weapon which may stand ready but unused, material information can not lay idle in the human brain." *Id.*   Additionally, "'there is no case law expressly requiring the pleading of a §10(b) claim to assert a § 20A claim. Rather, § 20A merely requires that an underlying violation of § 10(b) occurred. Therefore, a plaintiff may state a § 20A claim without pleading a § 10(b) claim, so long as there are factual allegations supporting a reasonable inference of a § 10(b) violation*." In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 175–77 (S.D.N.Y. 2021) (internal citations omitted) (§ 20A claim adequately alleged against party who knew about same insider information as defendant against whom plaintiff alleged 10(b) claim).  Accordingly, even if the Court finds that Alphaeon did not violate § 10(b) this in no way precludes the Court from holding that Alphaeon violated § 20A.

18

Here, Alphaeon caused Evolus to file a shelf registration statement on March 22, 2019 enabling Alphaeon to sell its shares to the market. ¶276. The shelf registration statement was declared effective on April 15, 2019. *Id.* Approximately one month later Alphaeon offered and sold 4,000,000 shares of stock at $19.25 per share for total proceeds of $77,000,000, pursuant to a final prospectus dated May 17, 2019. *Id*. The offering began no earlier than 2 pm on Friday May 17, 2019, and was completed by close of business on Monday May 20, 2019. From 2:00 pm on May 17, 2019, through 5:00 pm on May 20, 2019, Alphaeon's shares were sold on the NASDAQ to Class Members in a series of transactions. ¶286. When the offering was completed on May 20, 2019, Alphaeon had sold 4,000,000 shares of Evolus stock for total proceeds of $77,000,000. *Id.* Lead Plaintiff Raja Ahmad purchased 40,000 shares of Evolus stock on May 20, 2019 contemporaneous with Alphaeon's sale of shares in the public offering. ¶288 Named Plaintiff Mitchell Sisun purchased 2,000 shares of Evolus stock on May 20, 2019, contemporaneous with Alphaeon's sale of shares in the public offering. ¶289. Alphaeon had significant oversight over Evolus and sold its Evolus stock while in possession of material non-public information: *e.g.,* that Evolus never investigated the allegations of misappropriation despite the incredible claim that Jeuveau was found in the soil in Korea because Evolus had no interest in finding out that Jeuveau was the product of misappropriation, yet nevertheless staunchly maintained that the ITC Litigation had no merit and that Jeuveau was Evolus's proprietary product. *e.g.,* ¶¶126, 107, 112 Exercising its power as Evolus's controlling shareholder, Alphaeon appointed three of the seven members of Evolus's Board of Directors who were Alphaeon's President and two of its employees. Through its control of Evolus's Board, Alphaeon had access to and was aware of non-public and highly confidential business information.

Alphaeon does not contest that Plaintiffs have satisfied the contemporaneity requirement. Instead, it repeats the same deficient arguments it makes in contesting the Complaint's §10(b) and §20(a) claims. But the Complaint amply alleges that Alphaeon was in possession of material non-public information when it sold Evolus stock. As stated herein, Alphaeon, through its Evolus Board of Director members had access to Evolus's material non-public information, including the evidence in the ITC Litigation and the fact that Evolus never investigated the claims of misappropriation. *See, e.g. Magnachip,* 167 F.Supp.3d 1029, 1050 (imputing knowledge of individuals who simultaneously served on company's board of directors and as employees of controlling shareholder).[8]

## CONCLUSION

Plaintiffs respectfully request that the Court deny Alphaeon's MTD in its entirety. If any claims are dismissed, Plaintiffs respectfully request leave to replead.

Dated: April 20, 2022

**THE ROSEN LAW FIRM, P.A.**

/s/ *Sara Fuks*
Sara Fuks
Laurence Rosen
Phillip Kim
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: sfuks@rosenlegal.com
        lrosen@rosenlegal.com
        pkim@rosenlegal.com

---

[8] *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008) (MTD 21) is factually distinguishable. The non-public information in that case consisted of a discrete e-mail exchange that did not implicate the individuals who made insider sales. *Id.* at 310-11. Here, the relevant non-public information concerns the ITC Litigation and allegations that the Company's only asset was the product of illegal misappropriation which concerns the Company's core operations.

*Lead Counsel for Investors and the*
*Putative Class*

21