

**The Rosen Law Firm**

I N V E S T O R   C O U N S E L

Sara Fuks
sfuks@rosenlegal.com

August 7, 2023

**VIA ECF**

Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse, Courtroom 705
40 Foley Square
New York, NY 10007

Re:    *In re Evolus, Inc. Securities Litigation, No.* **20-cv-8647-PGG (S.D.N.Y.)**

Dear Judge Gardephe:

We represent Plaintiffs in the above-captioned action, and respectfully submit the attached supplemental authority, *City of Ft. Lauderdale Police and Firefighters Ret. Sys. v. Pegasystems Inc.*, No. 22-11220-WGY, 2023 WL 4706741 (D. Mass. Jul. 24, 2023) ("*Pegasystems*"), in further opposition to the Evolus Defendants' pending motion to dismiss. *See* ECF No. 100.

In *Pegasystems* Judge Young denied dismissal, holding actionable defendants' statements disclosing a lawsuit against the company for misappropriation of trade secrets, and stating that the "claims 'are without merit, [that the company] "has 'strong defenses to these claims,' and that 'any alleged damages claims [..] are not supported by the necessary legal standard.'" *Pegasystems*, at *4.

The *Pegasystems* Court held Defendants' opinion statement actionable under *Omnicare*[1] because "a reasonable investor could have justifiably understood [the CEO's] message that Appian's claims were 'without merit' as a denial of the facts underlying Appian's claims – as opposed to a mere statement that Pega had legal defenses against those claims." *Pegasystems*, at *10.  The court further explained that its ruling did "not mean that Pega was under the obligation to 'confess to the wrongdoing' when it disclosed the Virginia Litigation. An issuer may

---

[1] *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015).

1

THE ROSEN LAW FIRM, P.A. ♦ 275 MADISON AVENUE, 40TH FLOOR ♦ NEW YORK, NY 10116 ♦ TEL: (212) 686-1060 ♦ FAX: (212) 202-3827

legitimately oppose a claim against it, even when it possesses subjective knowledge that the facts underlying the claims against it are true. *When it decides to do so, however, it must do so with exceptional care, so as not to mislead investors.*" *Id.* at \*10 (emphasis added). Because Defendants "categorically denied that Appian's claims had any merit—despite possessing substantial information about the viability of those claims" their "opinion statement that Appian's claims were 'without merit' was [ ] misleading. *Id.* at \*11.

*Pegasytems* further supports denying Defendants' Motion to Dismiss in this Action, in its entirety. As in *Pegasystems*, Defendants assured investors that its competitor's "claims are completely without merit," that they were "very confident in our IP," "in a very solid position" and "not really worried about the outcome here." *See* ECF No. 108 at 1-2, 7-8. Defendants did so despite possessing substantial information, including the evidence in the ITC Litigation (which "reasonably point[ed] *only* to a finding of misappropriation") about the viability of those claims. *Id.* at 1-2, 7-8, 10-16.

Respectfully submitted,

*/s/ Sara Fuks*
Sara Fuks

cc:    All counsel of record (via ECF)

2023 WL 4706741
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

CITY OF FORT LAUDERDALE POLICE AND FIREFIGHTERS' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, Plaintiff,
v.
PEGASYSTEMS INC., Alan Trefler, and Kenneth Stillwell, Defendants.

CIVIL ACTION NO. 22-11220-WGY
|
Signed July 24, 2023

**Attorneys and Law Firms**

Lonnie Anthony Browne, Snehee Khandeshi, Tricia L. McCormick, Danielle S. Myers, Megan Allison Rossi, Christopher D. Stewart, Debra Jean Wyman, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Paul Mark Falabella, Butler Curwood PLLC, Richmons, VA, Theodore M. Hess-Mahan, Hutchings, Barsamian, Mandelcorn, LLP, Wellesley Hills, MA, Christopher Chad Johnson, Robbins Geller Rudman & Dowd LLP, New York, NY, Walter Kelley, Jr., Tara Lynn Renee Zurawski, Hausfeld LLP, Washington, DC, for Plaintiffs.

Catherine Mary Agnes Carroll, Wilmer Cutler Pickering Hale & Dorr, LLP, Washington, DC, Daniel W. Halston, Pro Hac Vice, Erika M. Schutzman, Wilmer Hale LLP, Boston, MA, Robert K. Smith, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, Michael G. Bongiorno, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, for Defendants.

**MEMORANDUM AND ORDER**

YOUNG, UNITED STATES[1] DISTRICT JUDGE

# I. INTRODUCTION

**\*1** The Lead Plaintiff, City of Fort Lauderdale Police and Firefighters' Retirement System ("Fort Lauderdale") brings this securities fraud putative class action against the Defendants Pegasystems Inc. ("Pega"), Alan Trefler ("Trefler"), and Kenneth Stillwell ("Stilwell").[2] This lawsuit comes on the heels of the decision in Appian Corporation v. Pegasystem Inc., et al., Civil Action No. 2020-07216 (Circuit Court of Fairfax County, Virginia) (the "Virginia Action"), which ordered Pega to pay Appian Corporation ("Appian") over $2,000,000,000.00 for willfully and maliciously misappropriating Appian's trade secrets. The core of Fort Lauderdale's case is that the Defendants -- despite knowingly having engaged in the conduct underlying the Virginia Action -- failed to disclose that litigation, falsely reassured investors that Appian's claims were "without merit," and misleadingly promised never to misappropriate trade secrets. Lead Pls.' Consolidated Amended Compl. for Violations of the Federal Securities Laws ("Compl."), ECF No. 61, ¶¶ 1-32.

Pega moves to dismiss for failure to state a claim. Defs.' Mot. to Dismiss the Consolidated Amended Compl. ("Defs.' Mot."),

2023 WL 4706741

ECF No. 64. The grounds alleged are failure to plead facts with particularity establishing (1) that any of the challenged statements are false or misleading, (2) a strong inference of scienter, and (3) loss causation. Defs.' Mot. 1.

After careful evaluation, this Court **DENIED** Pega's motion to dismiss with respect to the allegations concerning defendants Pega and Trefler. Based on the factual allegations in the complaint, the most compelling inference is that Trefler was aware of, participated in, and directed Pega's corporate espionage against Appian. Compl. ¶¶ 33-119, 197-241. In addition, Pega did not discipline the authors of the conspiracy. Id. ¶ 99. Rather, it encouraged and rewarded their actions with cash bonuses. Id. ¶ 104. Therefore, Pega deceived investors when it promised them to "[n]ever use illegal or questionable means to acquire a competitor's trade secrets or other confidential information, such as ... seeking confidential information from a new employee who recently worked for a competitor, or misrepresenting your identity in hopes of obtaining confidential information." Id. ¶ 154. Moreover, Pega and Trefler misled investors when they reassured them, on February 16, 2022, that Appian's claims against Pega were "without merit." Id. ¶ 145. Pega's and Trefler's misstatements are also causally connected to the significant decline in the value of Pega's stock on February 17 and May 10-11, 2022. Id. ¶ 244. Therefore, this action can proceed.

Regarding defendant Stillwell, however, the allegations of scienter are lacking. Accordingly, Pega's motion to dismiss is **GRANTED WITHOUT PREJUDICE** with respect to defendant Stilwell.

## II. PROCEDURAL HISTORY

On May 19, 2022, Fort Lauderdale, individually and on behalf of others similarly situated, filed a class action complaint for violation of the Securities Exchange Act of 1934 against Pega, Trefler, and Stillwell pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3). Complaint ("Orig. Compl."), ECF No. 1. On October 18, 2022, Fort Lauderdale filed a consolidated class action complaint ("complaint"). Compl. The putative class is comprised of investors who purchased or otherwise acquired Pega common stock between June 16, 2020, and May 9, 2022, inclusive (the "Class Period"). Id. ¶ 1. The complaint contains two counts alleging violations of Section 10(b) of the Exchange Act, 15 U.S.C. Section 78j(b) and Rule 10b-5 promulgated thereunder, 17 Code of Federal Regulations Section 240.10b-5 (count 1), and violations of Section 20(A) of the Exchange Act, 15 U.S.C. Section 78t(a) (count 2). Id. ¶¶ 259-278.

**\*2** On December 19, 2022, the Defendants filed a motion to dismiss both counts of the complaint. Defs.' Mot. The parties have fully briefed the issue. Defs.' Mem. in Supp. of Their Mot. to Dismiss the Consolidated Amended Compl. ("Defs.' Mem."), ECF No. 65; Lead Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss the Consolidated Amended Compl. ("Pls.' Opp'n"), ECF No. 71; Defs.' Reply Mem. in Supp. of Their Mot. to Dismiss the Consolidated Amended Compl. ("Defs.' Reply"), ECF No. 72. On May 17, 2023, this Court heard oral arguments and denied Pega's motion to dismiss with respect to defendants Pega and Trefler. This memorandum explains that ruling. Regarding the defendant Stillwell, Pega's motion was taken under advisement. Electronic Clerk's Notes, ECF No. 76.

This Court has jurisdiction over the action. Subject matter jurisdiction is proper pursuant to 28 U.S.C. Section 1331 and Section 27 of the Exchange Act, 15 U.S.C. Section 78a and 28 U.S.C. Section 1331. The defendants have not challenged this Court's personal jurisdiction over them. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. Section 78aa and 28 U.S.C. Section 1931(b).

## III. FACTS ALLEGED

Pega develops "low code" software solutions that allow customers to build applications for their specific business needs. Compl. ¶ 2. Appian provides a similar product and is one of Pega's primary competitors. Id.

Since 2012, Pega's senior executives and employees participated in a conspiracy to misappropriate Appian trade secrets. Id. ¶ 3. The conspiracy took place in two distinct phases: "Project Crush" spanning 2012 to 2014, and "Teardown" taking place

2023 WL 4706741

between 2019 and 2022. Id. ¶ 5, 9, 95. Pega utilized the misappropriated information to enhance its products and win business over Appian. Id. ¶ 7.

### A. "Project Crush"

Under the internal codename "Project Crush," Pega hired Youyong Zou ("Zou") to spy on Appian. Id. ¶ 4. Zou was an employee of a U.S. government contractor with open access to Appian's software and documentation. Id. Over the course of more than two years, Zou attended numerous meetings with Pega's management -- including a meeting on January 29, 2013, at Pega's headquarters attended by Trefler and other executives. Id. ¶¶ 44, 56. During these meetings, Zou showed Pega how to use Appian's platform and answered Pega's "detailed technical questions" about Appian's software. Id. ¶¶ 43-44, 62-64. In addition, Zou recorded several hours of video content of his use of Appian's platform and downloaded large volumes of Appian's documentation for Pega. Id. ¶¶ 6, 43, 46, 63-64. The misappropriated information widely circulated across Pega, including to over 200 executives and employees. Id. ¶ 45.

Pega was aware of the illicit nature of its activities and attempted to conceal them. For instance, Pega used a middleman, KForce, to retain and pay Zou. Id. ¶ 41. Pega told KForce it needed "an Appian Developer" with "several years of experience working specifically with Appian," and that "[a]ccess to the Appian BPM tool is a must." Id. Pega stressed to KForce that the developer could not be "loyal" to Appian because Pega did not want its scheme "getting back to Appian." Id. Moreover, Pega altered internal documents to "remove Youyong's name," requiring its employees to refer to Zou using the pseudonym "Matt": "[W]e're going to call him Matt (so that he isn't 'outed' as our spy);" "[m]y lips are sealed ... [Zou] will now forever be known as Matt." Id. ¶ 54. Also, Pega asked its employees not to divulge its use of Appian's trade secrets. For example, Ben Baril sent an email to various Pega employees that "included links to some videos" providing "insight into some of the woes of creating applications in Appian," cautioning: the "videos are STRICTLY INTERNAL." Id. ¶ 101 (emphasis in original).

**\*3** Project Crush involved Pega's CEO, Alan Trefler; Pega's Chief Product Officer ("CPO"), Kerim Akgonul ("Akgonul"); Chief Technology Officer ("CTO"), Don Schuerman ("Schuerman"); Chief of Clients and Markets ("CMM"), Leon Trefler (defendant Trefler's brother); Director of Product Marketing, John Petronio ("Petronio"); Director of the office of the CTO Ben Baril ("Baril"); Head of Product Marketing, Douglas Kim ("Kim"); and Vice President of Product Management, Steve Bixby ("Bixby"). Id. ¶¶ 8, 53-66.

### B. Appian's "Teardown"

When Zou lost access to Appian's software by "switch[ing] to another project" with his employer, Pega concocted a second "teardown" of Appian. Id. ¶ 43. Teardown was supposed to be an operation even "broader [in] scope" than "Project Crush." Id. ¶¶ 67-8. Initially, Pega again considered using an outsider similar to Project Crush for this new espionage campaign. Id. ¶ 68. Trefler, Schuerman, Leon Trefler, Akgonul, Bixby, and other executives discussed a "consulting engagement to deep dive Appian's product, training, methodology (all aspects of the client journey)." Id. Despite its efforts, however, Pega could not find a contractor willing to accommodate its needs. Id.

Accordingly, Pega -- under Trefler's direction -- decided to spy on Appian itself. To do so, Pega's employees would use front or fake companies to pose as Appian customers to infiltrate Appian's platform. Id. ¶¶ 81-99. For example, Baril recruited Le (a Solutions Consulting Manager at Pega), to use a business space rental company Le co-owned with his wife to gain access to Appian. Pega then proceeded to use Le's company's login credentials to "shoo[t] a ton of footage" of Appian's software "to steal 4 deals from Appian in Q4 and Q1 2020." Id. ¶¶ 84-6. This strategy was replicated with several other Pega employees, including Michael Fine ("Fine"), a Solutions Consulting Manager at Pega; Peter Bessman ("Bessman"), a Pega Solutions Engineer; Vijay Krishna Potluri ("Potluri"), a Director of Case Management at Pega in India and member of Pega's Product Management group); Arun Kumar Sarada ("Sarada", a Product Manager; Keith Fairbrother ("Fairbrother"), a member of Pega's "go-to-market strategy group"; Vijay Vaddem ("Vaddem"), a Senior Product Manager at Pega; Eric Davis

("Davis"), a Solutions Consultant at Pega; and Baril himself. Id. ¶¶ 82-96.

Pega was aware of the illicit nature of its activities. In his correspondence with Schuerman and others, Baril often referred to the employees referred above as "spies." Id. ¶¶ 73-4 (e.g., Baril boasted to Schuerman and Gill: "My spies have managed to get me another 15 day instance"). Baril himself doubted the legality of his conduct. On October 17, 2019, he asked Schuerman "[w]ho can I ping about legality of using [Appian's] system?" Id. ¶ 79. Instead of directing Baril to seek "guidance as to the propriety of [Pega's] actions" -- as Pega's Code of Conduct required -- Schuerman disregarded Baril's concerns and responded: "[H]ow much more do you need to do/capture?" Id. ¶ 80.

Moreover, the participants to the conspiracy did not receive "any formal disciplinary consequences." Id. ¶ 99. Rather, Pega rewarded their actions with cash bonuses. Id. ¶ 104. Specifically, Pega awarded extra compensation to employees for completing management-based objectives ("MBO"), which included presenting information regarding competing platforms. Id. For example, Bessman internally circulated a presentation on Appian as "homework or proof to receive his MBO credit." Id. Fine and Le both received cash bonuses for their assistance in spying on Appian. Id.

### C. The Virginia Action

**\*4** In early 2020, two former Pega employees, Petronio and Bearden disclosed evidence of Pega's scheme to Appian. Shortly thereafter, on May 29, 2020, Appian filed the Virginia Action against Pega. Id. ¶¶ 11-13, 113. The lawsuit alleged that:

> Pegasystems has engaged in an unlawful campaign of corporate espionage against Appian ... [i]nvolving personnel at Pegasystems up to and including Pegasystems' CEO and Founder, Alan Trefler, and other high-ranking Pegasystems executives, and assisted at least by Zou, Pegasystems' unlawful schemes have involved stealing Appian's trade secrets and confidential information and then using them to damage Appian's business and reputation, and to steal Appian's customers and potential customers.

Declaration Of Daniel W. Halston, ECF No. 66, Exhibit 14, 1. Appian initially sought damages in the amount of $90,000,000.00, punitive damages, treble damages, and injunctive relief. Compl. ¶ 175.

Between May 29, 2020, and February 16, 2022, Pega filed several 10-Q and 10-K forms with the Securities and Exchange Commission ("S.E.C.") which made no express mention of the Virginia Action. Id. ¶¶ 45-8. Pega, however, reported that "[w]e have received, and may in the future receive, notices that claim we have misappropriated, misused, or infringed other parties' intellectual property rights." Id. ¶ 136.

On February 11, 2022, Appian amended its complaint in the Virginia Action, increasing its damages claim to approximately $3,000,000,000.00. Id. ¶ 145. A few days later, on February 16, 2022, Pega filed its Report on Form 10-K for fiscal year 2021, which made express and detailed mention of the Virginia Action. Id. On the same occasion, Pega stated that Appian's claims "are without merit," Pega has "strong defenses to these claims," and that "any alleged damages claimed by Appian are not supported by the necessary legal standard." Id. The following day, on February 17, 2022, Pega's stock dropped approximately 15.62%. Id. ¶ 243.

After a seven-week trial, on Monday, May 9, 2022, the jury returned a unanimous verdict in favor of Appian. Id. ¶¶ 116-117. The jury concluded Pega and Zou had willfully and maliciously misappropriated Appian's trade secrets in violation of the Virginia Uniform Trade Secrets Act ("VUTSA") and Virginia Computer Crimes Act ("VCCA"). The verdict awarded compensatory damages of $2,036,860,045 as against Pega and $5,000 as against Zou. Id. ¶¶ 22, 117, 222. In the following two days, Pega's share price dropped approximately 28%. Id. ¶ 244.

Pega moved to set aside the verdict. That motion, however, was denied, and the court entered judgment in favor of Appian

for the full amount. Id. ¶ 119. The court also awarded nearly $24,000,000 in attorney's fees and costs, and post-judgment interest of approximately $122,000,000 per year. Id.

## IV. ANALYSIS

Pega moves to dismiss for failure to state a claim alleging that Fort Lauderdale has not pled facts with particularity establishing (1) that any of the challenged statements are false or misleading, (2) a strong inference of scienter, and (3) loss causation. Defs.' Mot. 1.

As to defendants Pega and Trefler, Pega's arguments miss the mark. The facts alleged in the complaint raise a strong inference that Trefler was aware of, involved in, and directed Pega's corporate espionage against Appian. Moreover, Trefler knew or was reckless in not knowing that Pega's promise not to misappropriate trade secrets and his assurance that Appian's claims were "without merit" posed a substantial danger to mislead investors. Both assurances were also false and misleading according to the standard set forth in the Private Securities Litigation Reform Act ("PSLRA"), as well as causally connected to the drop in value of Pega stock in February and May 2022. Therefore, Pega's motion to dismiss is denied as to Pega and Trefler and the core of Fort Lauderdale's case is allowed to proceed.

**\*5** As to defendant Stillwell, Pega is correct. The absence of sufficient factual allegations as to Stillwell's knowledge of or involvement in the conspiracy prevents a finding of scienter. As a result, Pega's motion with respect to defendant Stillwell is granted without prejudice.

### A. Pleading Standard

To withstand a motion to dismiss, a complaint must "state a claim upon which relief can be granted ...." Fed. R. Civ. P. 12(b)(6). The complaint must include sufficient factual allegations that, accepted as true, "state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Courts "draw every reasonable inference" in favor of the plaintiff, Berezin v. Regency Sav. Bank, 234 F.3d 68, 70 (1st Cir. 2000), but they disregard statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action," Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (brackets, ellipsis, and quotations omitted).

For a viable cause of action under Section 10(b) of the Securities Exchange Act of 1934, Plaintiffs must plead factual allegations that plausibly could give rise to the following two elements: (1) false or misleading statements; (2) a strong inference of scienter (there are also three other required elements which the Defendants do not challenge in their motion to dismiss).

### B. Scienter

To be actionable under the PSLRA, a statement must have been made with the requisite scienter. See ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46 (1st Cir. 2008). Congress has a heightened pleading standard for scienter allegations in private enforcement actions. Securities & Exch. Comm'n v. Sharp, 626 F.Supp.3d 345 (D. Mass. 2022) (citing Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 81, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006)). The reasons underlying this important legislative intervention have been aptly described by my colleague Judge Lindsay:

In particular, Congress sought to reform private securities litigation to discourage unmeritorious class actions, including actions brought because of a decline in stock prices. The aims of the PSLRA are three-fold: '(1) to encourage the voluntary

**City of Fort Lauderdale Police and Firefighters' Retirement...,** --- F.Supp.3d ---- (2023)

2023 WL 4706741

disclosure of information by corporate issuers; (2) to empower investors so that they -- not their lawyers -- exercise primary control over private securities litigation; and (3) to encourage plaintiffs' lawyers to pursue valid claims and Defendants to fight abusive claims.' The PSLRA seeks to curtail the filing of abusive lawsuits at the pleading stage of litigation by establishing uniform and stringent pleading requirements.

In re Galileo Corp. S'holders Litig., 127 F. Supp. 2d 251, 260 (D. Mass. 2001) (Lindsay, J.) (quoting S. Rep No. 104-98 at 4, 15).

Specifically, the pleaded facts must give rise to a "strong inference" of scienter. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). This means that the complaint must "with respect to each act or omission ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); see also In re Bos. Sci. Corp. Sec. Litig., 686 F.3d 21, 30 (1st Cir. 2012). "It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind." Tellabs, 551 U.S. at 314, 127 S.Ct. 2499. Instead, the inference of scienter must be "cogent and at least as compelling as any other opposing inference of nonfraudulent intent." Id.

### A. The Facts Alleged Establish That Pega and Trefler Acted with Scienter

**\*6** A crucial question in this case is whether defendant Trefler, Pega's CEO, was aware of Pega's conspiracy to misappropriate Appian's trade secrets -- a fact that Pega vehemently rejects. Defs.' Mem. 21-26; Defs.' Reply 15-17. Despite Pega's protestations, the facts alleged suffice to support a strong inference that Trefler was aware of, involved in, and directed Pega's corporate espionage against Appian.

Trefler was personally involved in Project Crush. For example, Trefler personally met with Zou at Pega's headquarters on January 29, 2013, where Zou accessed Appian's platform and provided a demonstration. Compl. ¶ 56. As Petronio testified, "Alan Trefler [was] at the meeting with ... Zou" and others on January 29, 2013, during which "Alan was sitting at the head of the table, facing a screen" while Zou was "projecting, showing how to build an application in Appian." Id. Contemporaneous evidence corroborates Petronio's testimony. The day after the meeting with Zou, on January 30, 2013, Petronio emailed Trefler to "[t]hank [him] for [his] time yesterday," and to advise Trefler that Pega was "updating the competitive brief, attack plan, and Appian scalability whitepaper." Id.

Pega attempts to rebut the relevance of this episode to no avail. For Pega, the January 29 meeting falls short of establishing scienter because Fort Lauderdale "allege[s] no facts indicating that Mr. Trefler understood that the presentation contained misappropriated trade secrets." Defs.' Reply 16. This is not the case. According to the complaint, "it was a known thing that Appian ... was very black box about giving out trials ... [i]t was common [knowledge] that it's impossible to get an Appian trial." Compl. ¶ 39. Trefler himself was cautioned of this. In an internal email,[3] Baril explained to Trefler that "Appian is very tightly controlled about who has access to their trial environments." Id. ¶ 75. In fact, Appian's "Terms and Conditions" prohibited the "use" of Appian's service by "competitor[s]," as well as users "provid[ing] information about the [Appian] Cloud Offering to a competitor of Appian." Id. ¶ 39. Trefler also admitted that Pega's hiring of Zou was "[n]ot appropriate." Id. ¶ 217. ("Q. And was it appropriate? A. I don't think it was appropriate for him to hire Zou.").[4] The most compelling inference is that Trefler was aware and involved in Pega's "inappropriate" scheme to misappropriate Appian's trade secrets through Zou -- i.e., Project Crush.

**\*7** Trefler also personally directed Teardown. In an internal email dated September 21, 2019, Trefler told Baril -- the principal executor of Teardown -- that he was "thrilled to have you in this role," and reminded him that he wanted a "write up [o]n everything we think is an ap[p]ian weakness," and wanted "to spend an hour on a[n Appian] demo." Id. ¶ 71. Pega attempts to downplay the significance of this email pointing to Trefler's testimony that his request could have been satisfied by reviewing publicly available information. Defs.' Mem. 24. The context surrounding the aftermath of that email, however, suggests otherwise.

First, Baril did not understand Trefler's request as something that could be fulfilled without accessing restricted information -- such as an Appian trial. Nor did the other executors of Teardown. Shortly after Trefler's September 21, 2019, email, Baril

wrote to Schuerman and Gil: "FYI - Alan [Trefler] asked for an hour long demo of Appian. This is currently impossible. My trial ended and the other system I was using is no longer accessible. I'll work on finding another one of [sic] getting another trial (involves registering a domain, email etc.)" Compl. ¶ 72. A few days later, on September 27, 2019, Baril boasted to Schuerman and Gill: "My spies have managed to get me another 15 day instance" of Appian's platform. Id. ¶ 73. Schuerman was pleased to hear that and answered: "Awesome. So we have some stuff we can show Alan ...." Id.

Baril's and Schuerman's understanding of what Trefler's request entailed was conveyed to Trefler. On October 1, 2019, Baril cautioned defendant Trefler that "Appian is very tightly controlled about who has access to their trial environments," assuring him that he was "working to get a new instance so that I can record some videos of their environment for you." Id. ¶ 75 (emphasis added). Trefler, however, is not alleged to have ever sought to clarify Baril's "misunderstanding" as to the scope of his assignment, for example, by asking Baril not to access restricted Appian trials.

Even after having gained access to restricted information, Trefler's appetite for Appian's trade secrets was not yet satisfied. Thus, in the following months, Trefler personally met with Baril to provide "direction and feedback" and express his "desire for [Pega] to have more technical - sort of deeper dive technical details." Id. ¶¶ 70, 78. Access to a restricted Appian trial was not yet enough to satiate Trefler's thirst for "technical details" about Appian's platform. If so, it is difficult to conceive how publicly available information would have been enough -- as Pega unpersuasively argues. The allegations in the complaint suffice at this stage to raise a compelling inference that Trefler was aware, involved, and directed Pega's corporate espionage into Appian.

Moreover, Trefler knew or was reckless in not knowing that his and Pega's statements posed a substantial danger to mislead investors. One court has found that mere awareness of the illegalities underlying a lawsuit against a corporation is not enough to support scienter. City of Phila. v. Fleming Cos., 264 F.3d 1245, 1264 (10th Cir. 2001) ("[E]ven if we were to accept as true Plaintiffs' unsupported statements that ... Defendants ... 'must have known' both about the [lawsuit] and about the 'fraudulent' business practices forming the basis of that lawsuit, the important issue in this case is not whether Defendants knew the underlying facts, but whether Defendants knew that [the alleged misstatements or omissions] posed substantial likelihood of misleading a reasonable investor."). The securities defendants must have also been aware that their statements posed a "substantial likelihood of misleading a reasonable investor." Id.

**\*8** Here, however, there is little doubt that Trefler knew or was reckless in not knowing that falsely reassuring investors that Appian's $3,000,000,000.00 claim against Pega had no merit -- despite his knowledge to the contrary -- posed a "substantial likelihood of misleading a reasonable investor." As Trefler knew, the relief sought in the Virginia Action amounted to almost four times Pega's current assets and roughly three times Pega's revenue in 2021. Compl. ¶ 174; Q4 2021 Pegasystems Inc. Earnings Call, Exhibit 7, ECF No. 66, 3-4. A false denial of Appian claims' merit posed an obvious danger to mislead investors as to the substantial financial risks Pega was facing in connection with the Virginia Action. The same can be said of Pega's promise not to engage in the very conduct underlying the Virginia Action, which caused the emergence of that financial risk. Therefore, scienter is established as to defendant Trefler. The same is true for Pega -- to which Trefler's scienter is imputed. In re Boston Sci. Corp. Sec. Litig., No. CV 20-12225-DPW, 2022 WL 17823837, at *2 (D. Mass. Dec. 20, 2022) (Woodlock, J.) (Automatically imputing scienter from the defendant corporation's CEO to the defendant corporation).

### B. The Facts Alleged Are Insufficient to Establish that Stillwell Acted with Scienter

Conversely, with respect to defendant Stillwell, the allegations in the complaint are insufficient to establish scienter. According to Fort Lauderdale, Stillwell must have known of Pega's corporate espionage given his position as Pega's CFO and corresponding obligation to conduct a reasonable investigation into financial disclosures. Pls.' Opp'n 23-4. "Stillwell either performed the investigation properly, and discovered Appian's allegations had merit, or did not complete the investigation and recklessly misapplied GAAP, and then misled the market about Pega's business successes," Fort Lauderdale argues. Id. 24. This, however, is mere speculation. In fact, Fort Lauderdale's argument is a mere extension of the "scienter by status" theory, which has been uniformly rejected. Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 283 (D. Mass. 1998) (inferences that defendants by virtue of their position within company "must have known" about problems are "inadequate"). Lacking scienter, Pega's motion to dismiss with respect to defendant Stillwell is **GRANTED.** The statements

2023 WL 4706741

attributed solely to Stillwell, are therefore, not actionable.[5]

### C. False and Misleading Statements

To survive a motion to dismiss, a securities complaint must show that "defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading." Ganem v. InVivo Therapeutics Holdings Corp., 845 F.3d 447, 454 (1st Cir. 2017) (quoting Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001)). The allegations in the complaint must meet the standard under Federal Rule of Civil Procedure 9(b) and the "heightened pleading requirements" imposed on private securities litigation. Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 85 (1st Cir. 2008).

To plead falsity under the PSLRA, a plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." Hill v. Gozani, 638 F.3d 40, 55 (1st Cir. 2011) (alteration in original) (quoting 15 U.S.C. § 78u-4(b)(1)). Information is material if a "reasonable investor would have viewed it as having significantly altered the total mix of information made available." Mississippi Pub. Employees', 523 F.3d at 85 (internal quotation marks and citation omitted). "[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor." Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 186, 135 S.Ct. 1318, 191 L.Ed.2d 253 (2015).

An omission can be misleading under Rule 10b-5 only where there is an affirmative duty to disclose. See Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). Plaintiffs carry the burden of showing "that defendants ... omitted to state a material fact necessary to make a statement not misleading." Ganem, 845 F.3d at 454 (quoting Geffon, 249 F.3d at 34). "[T]he mere possession of material, nonpublic information does not create a duty to disclose it." Hill, 638 F.3d at 57 (quoting Cooperman v. Individual, Inc., 171 F.3d 43, 49 (1st Cir. 1999)) (cleaned up). Thus, "in order to get past 'go' on a motion to dismiss, a plaintiff must first identify a statement made by defendants, show how the omission rendered that statement misleading, and finally establish that there was a duty to disclose the omitted information." Ponsa-Rabell v. Santander Sec. LLC, 35 F.4th 26, 34 (1st Cir. 2022).

### A. Pega Falsely Promised Investors Not to Misappropriate Trade Secrets

**\*9** One of the statements contained in Pega's Code of Conduct ("Code") is actionable. Compl. ¶¶ 151-7. Particularly, Pega assured investors[6] in its Code of Conduct that it would:

> Never use illegal or questionable means to acquire a competitor's trade secrets or other confidential information, such as ... seeking confidential information from a new employee who recently worked for a competitor, or misrepresenting your identity in hopes of obtaining confidential information.

Id. ¶ 154 (the "Code of Conduct Statement"). As seen in the scienter section, this is exactly what is properly alleged to have happened here.[7] Thus, the Code of Conduct Statement is objectively false. Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co., 845 F.3d 1268, 1277 (9th Cir. 2017) (falsity may be shown where statements "could [be] understood as at least promising specifically not to do what had been done."); Construction Laborers Pension Tr. For S. Cal. v. CBS Corp., 433 F. Supp. 3d 515, 532 (S.D.N.Y. 2020) (statements may be actionable when they are "so anathema to the alleged internal wrongdoing that, even if general or aspirational, they [are] materially false.").

Pega insists that the Code of Conduct Statement is not actionable because it is "aspirational" and, in any event, only a "handful" of Pega employees participated in the conspiracy. Defs.' Reply 19. Neither argument is persuasive.

First, the Code of Conduct Statement is not "aspirational." Instead, it describes with specificity a course of conduct that Pega promised to abjure. Courts have found similarly specific statements to be actionable. See Nykredit Portefolje Admin. A/S v. ProPetro Holding Corp., 2021 WL 9037758, at *17 (W.D. Tex. Sept. 13, 2021) ("Because ProPetro's Code of Ethics specifies practices the company purports to adopt ... these statements are actionable."); In re Tenaris S.A. Sec. Litig., 493 F. Supp. 3d 143, 159 (E.D.N.Y. 2020) (Finding the code of conduct statement: "[the company] will not condone, under any circumstances, the offering or receiving of bribes or any other form of improper payments" to be actionable).

Second, far from involving just "a few bad apples," Pega's espionage campaign was organized and directed by the very "nerve center" of the organization.[8] Among the architects of the conspiracy were not only Pega's CTO (Don Schuerman), CMM (Leon Trefler), and CPO (Kerim Akgonul), but also Trefler, Pega's Chairman, founder, CEO, and moral compass. Compl. ¶ 155 (Pega's Code assured investors that "[i]f any of [Pega's employees] are asked to depart from this Code, whether by our supervisor, another employee or anyone else, we agree to seek clarification and/or guidance as to the propriety of the actions in question from our Chief Executive Officer."). In addition, Pega did not discipline the participants of the conspiracy. Compl. ¶ 99; See CBS, 433 F. Supp. 3d at 535 (allegations the defendant corporation "took no action at all in the face of blatant and pervasive violations of its [Code of Conduct]" may suffice); Cheng v. Activision Blizzard, Inc., 2022 WL 2101919, at *9 (C.D. Cal. Apr. 18, 2022) (same). Rather, it encouraged and rewarded their malfeasance through cash bonuses. Compl. ¶ 104. In short, Pega's most senior executives orchestrated and directed the conspiracy while fostering a corporate culture that promoted and harbored precisely the kind of behavior that Pega promised investors it would prohibit. In re Signet Jewelers Ltd. Sec. Litig., 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018) (Statements in code of conduct are actionable where evidence submitted in another litigation demonstrated "pervasive" culture of harassment involving "senior executives" and "directly at odds" with code of conduct.). Therefore, Pega's Code of Conduct Statement is actionable.

### B. Trefler and Pega Misleadingly Reassured Investors that Appian's Claims Were "Without Merit"

**\*10** When Pega first specifically disclosed the Virginia Action, Trefler reassured investors that he believed Appian's claims were "without merit." Compl. ¶ 145. This is an actionable opinion statement. Omnicare, 575 U.S. 175, 189, 135 S.Ct. 1318. (liability is established if a statement "omits material facts about the issuer's ... knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself."). A reasonable investor "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." Omnicare, 575 U.S. 175, 189, 135 S.Ct. 1318. Trefler's statement that Appian's claims were "without merit" did not "fairly align" with his awareness of, involvement in, and direction of Pega's espionage campaign against Appian. Moreover, Trefler was not only aware of "some fact[s] cutting the other way" -- such as a "single junior attorney express[ing] doubts about a practice's legality, when six of his more senior colleagues gave a stamp of approval." Id. ¶¶ 18 9-90. Rather, his involvement and direction of the conspiracy "call[s] into question [Trefler]'s basis for offering the opinion" that Appian's claims were "without merit." Id. ¶ 191.

Trefler's decision to single out his denial of Appian's claims from his belief that Pega possessed "strong defenses" against those claims further reinforces this conclusion. Omnicare, 575 U.S. 175, 190, 135 S.Ct. 1318 ("[W]hether an omission makes an expression of opinion misleading always depends on context."). The full statement signed by Trefler was that Appian's claims "are without merit," Pega has "strong defenses to these claims," and that "any alleged damages claimed by Appian are not supported by the necessary legal standard." Compl. ¶ 145. Given the way that statement was couched and the identity of the speaker, a reasonable investor could justifiably have understood Trefler's message that Appian's claims were "without merit" as a denial of the facts underlying Appian's claims -- as opposed to a mere statement that Pega had legal defenses against those claims.

This does not mean that Pega was under the obligation to "confess to the wrongdoing" when it disclosed the Virginia Litigation.[9] Pls.' Opp'n 8. An issuer may legitimately oppose a claim against it, even when it possesses subjective knowledge that the facts underlying the claims against it are true. When it decides to do so, however, it must do so with exceptional care, so as not to mislead investors. For example, an issuer may validly assert its intention to oppose the lawsuit. See In re SeaChange Int'l, Inc., 2004 WL 240317, at *7-9 (D. Mass. Feb. 6, 2004) (Woodlock, J.) (ruling the "general descriptive" statement "[w]e cannot be certain of the outcome of the foregoing litigation, but do plan to oppose the allegations against us

and assert our claims against the other parties vigorously" inactionable, even "assuming knowledge" of the conduct underlying the litigation). It may also state that it has "substantial defenses" against it, if it reasonably believes that to be true. See Hall v. Johnson & Johnson, 2019 WL 7207491, at *19 (D.N.J. Dec. 27, 2019) (statements about "substantial defenses" to asbestos litigation inactionable because "even assuming as true that there was asbestos in [the products], the Company may very well have [had] defenses to the lawsuits premised on other bases such as lack of causation, or procedural issues occurring at trial."). An issuer may not, however, "ma[ke] [(misleading)] substantive declarations regarding its beliefs about the merits of the ... litigation." Rosenbaum Cap. LLC v. Bos. Commc'ns Grp., Inc., 445 F. Supp. 2d 170, 175 (D. Mass. 2006) (emphasis added); see also, a contrario, Hall v. Johnson & Johnson, No. CV 18-1833 (FLW), 2019 WL 7207491, at *19 (D.N.J. Dec. 27, 2019) (Dismissing the complaint because "Plaintiff has not identified any specific facts indicating that any of the Defendants possessed information regarding the viability of the lawsuits against the Company."). Here, Trefler and Pega categorically denied that Appian's claims had any merit -- despite possessing substantial information about the viability of those claims. Trefler's and Pega's opinion statement that Appian's claims were "without merit" was, therefore, misleading.[10]

### D. Fort Lauderdale Adequately Alleged Loss Causation

**\*11** Fort Lauderdale adequately alleged loss causation -- i.e., "a causal connection between the material misrepresentation and the loss." Massachusetts Ret. Sys. v. CVS Caremark Corp., 716 F.3d 229, 237 (1st Cir. 2013). Pega concealed from the market its corporate espionage against Appian, while falsely reassuring investors that it would never misappropriate trade secrets. Compl. ¶ 154. After Appian sued and the existence of the Virginia Action was disclosed, Pega continued misleading investors stating that the claims against were "without merit." Id. ¶ 145. As the truth finally emerged carrying with it a multi-billion-dollar judgment, Pega's stock fell dramatically. Id. ¶ 244. Unsurprisingly, market analysts tied that drop in stock to the verdict and Pega's misappropriation of trade secrets. Id. ¶ 245. In fact, it is apparent that Pega's disclosure of the verdict "relate[s] to the same subject matter as the alleged misrepresentation[s]." Massachusetts Ret. Sys., 716 F.3d at 240. Accordingly, Fort Lauderdale has sufficiently alleged loss causation at this stage.

Pega's arguments to the contrary are unavailing. According to Pega, the investors were sufficiently made aware of the risks connected with the Virginia Action through its S.E.C. disclosures in February 2022. Defs.' Reply. 20. This was not the case. Pega's February 2022 "disclosure" cannot shield Pega from liability because it misleadingly represented to investors that Appian's claims were "without merit." Moreover, Pega's argument that the public information present in the market about the Virginia Action was sufficient per se to make investors aware of the risks connected with purchasing Pega stocks amounts to a "truth-on-the-market" defense -- which is not appropriate at this stage. In re Credit Suisse v. AOL Sec. Litig., 465 F. Supp. 2d 34, 51 (D. Mass. 2006) (Gertner, J.) (" '[t]he truth on the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint' "). Therefore, Pega's loss causation argument fails.

### V. CONCLUSION

For the foregoing reasons, this Court on May 17, 2023 **DENIED** Pega's motion to dismiss (ECF No. 64) with respect Defendants Pega and Trefler. Regarding Defendant Stillwell, Pega's motion (ECF No. 64) is today **GRANTED WITHOUT PREJUDICE.**

**SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2023 WL 4706741

**Footnotes**

1    This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 45 years.

2    Pega, Trefler, and Stillwell are collectively referred to as the "Defendants."

3    The email was dated October 1, 2019 -- well before any alleged misstatement.

4    Pega attempts to discount the evidentiary value of this admission by arguing that "[i]n the portion of the deposition transcript excluded by Plaintiffs, Mr. Trefler explains that working with Mr. Zou was "inappropriate" only because Mr. Petronio, and by implication Kforce, failed to properly vet Mr. Zou for the assignment." Defs.' Mem. 25 citing Declaration of Daniel W. Halston ("Trefler's Depo."), ECF 66, Exhibit 20, 282:21-283:4 ("Q. And what do you think was inappropriate about [hiring Mr. Zou]? A. Well, [Mr. Petronio] didn't check that Zou was fully cleared to do the work. Q. Was he fully cleared? A. Well, from what I've seen, there's a contention about what he's allowed to do, and neither he nor Kforce had brought that to light at the time."). The portion of the transcripts Pega offers in support of its contention, however, does not so clearly support Pega's argument as to fully discount the evidentiary value of Trefler's admission. Trefler's Depo. 285:3-13 ("Q. But you also do concede, don't you, that Pegasystems should not have hired Mr. Zou to do this work in the way that it did? A. I think that the hiring and the progression should have been different. Q. It shouldn't have happened, correct? MR. FRANK: Objection. That's not what he said. THE WITNESS: No, it shouldn't have been different. I'm not sure what it was that shouldn't have happened."). What was the "progression" Trefler was referring to if not Zou's assistance to Pega in spying on Appian? Given the uncertainty about the exact scope of Trefler's testimony, this Court adopts, as it must at this stage, the interpretation most favorable to the plaintiff.

5    See Compl. ¶¶ 121, 122, 124, 125, 127, 132.

6    Pega's Code of Conduct was specifically directed to investors. In its 2020 and 2021 10-Ks, Pega assured investors that it had "adopted a written code of conduct that applies to our Board of Directors and employees, including our principal executive officer, principal financial officer, principal accounting officer, and persons performing similar functions." Compl. ¶ 149. It also stated that "[a] copy of our code of conduct can be found on our website, www.pega.com," and that "[o]ur Code of Conduct is available on our website in the 'Governance' section." Compl. ¶ 148. Pega's Code was publicly available on Pega's website during the Class Period. Id. ¶ 149.

7    While Zou was not a new employee who recently worked for Appian but an employee of a third-party contractor with open access to Appian's platform, this Court rules this difference immaterial.

8    According to the complaint, Pega's espionage campaign against Appian involved: Pega's CEO (Alan Trefler), CTO (Don Schuerman), CMM (Leon Trefler), CPO (Kerim Akgonul), Director of Product Marketing (John Petronio), Director of the office of the CTO (Ben Baril), Head of Product Marketing (Douglas Kim), Vice President of Product

2023 WL 4706741

Management (Steve Bixby), a Solutions Consulting Manager (Michael Fine), a Solutions Engineer (Peter Bessman), a Director of Case Management (Vijay Krishna Potluri), a Product Manager (Arun Kumar Sarada), a member of Pega's go-to-market strategy group (Keith Fairbrother), a Senior Product Manager (Vijay Vaddem), and a Solutions Consultant (Eric Davis). Compl. ¶¶ 8, 53-56, 82-96.

9       In this respect, this Court is not persuaded by the holding in Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc., 496 F. Supp. 3d 952, 963 (E.D. Va. 2020) cited by Fort Lauderdale ("[Defendant] protests that it need not 'confess to the wrongdoing alleged in [another case] while that litigation was ongoing.' But Singer [v. Reali, 883 F.3d 425 (4th Cir. 2018)] requires just that.").

10      The parties also devoted a considerable portion of their pleadings to arguing whether Pega's failure to expressly mention the Virginia Action in its S.E.C. filings before February 16, 2022, violated GAAP Rule ASC 450 and S.E.C. Regulation S-K, Item 103. Having found that Pega and Trefler knowingly made false and misleading statements and given the fact-intensive nature of that question, this Court prefers not to express a definitive view on the issue at this stage. See, e.g., In re Ambac Fin. Grp., Inc. Sec. Litig., 693 F. Supp. 2d 241, 273 (S.D.N.Y. 2010) ("The parties' disagreements over GAAP compliance also raise issues of fact that cannot be resolved on a motion to dismiss."). This Court adopts the same approach with respect to Trefler's statements concerning Pega's competitiveness and credibility. Compl. ¶¶ 123, 129, 130.

---

**End of Document**                                            © 2023 Thomson Reuters. No claim to original U.S. Government Works.